IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-CV-1324KAJ |
| v. | ) ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

## EAMES PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO COMPEL DOCUMENTS RESPONSIVE TO THEIR INITIAL DOCUMENT REQUESTS, AND FOR SANCTIONS

MURPHY SPADARO & LANDON
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

Attorneys for plaintiffs Thomas A. Eames,
Roberta L. Eames and Tammy Eames (on behalf of
themselves and all others similarly situated)

October 26, 2005

125275

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

   A. Nature of the Case..........................................................................................................2

   B. Nationwide's Theory of the Case ..................................................................................3

   C. The Initial Document Requests .....................................................................................4

   D. The Eames Plaintiffs' Initial Attempt to Confer ...........................................................5

   E. The E-Discovery Default Standard ...............................................................................6

   F. The August 5 Teleconference........................................................................................6

   G. The Next Round of "Negotiations" ...............................................................................8

   H. The September 13 Teleconference..............................................................................10

   I. The October 3 Meeting and its Aftermath....................................................................11

ARGUMENT .......................................................................................................................12

I. NATIONWIDE'S BAD FAITH IS OBVIOUS................................................................12

II. NATIONWIDE'S SEARCH IS CALCULATED TO FAIL...........................................14

CONCLUSION ....................................................................................................................15

## INTRODUCTION

Plaintiffs Thomas A. Eames, Roberta L. Eames and Tammy Eames (the "Eames plaintiffs") respectfully move, pursuant to Federal Rules of Civil Procedure 34 and 37(a), to compel Nationwide to a) immediately produce documents responsive to the Eames plaintiffs' initial document requests, and b) pay meaningful sanctions for its abuse of the discovery process.

The record on this dispute is detailed and lengthy -- made lengthier, in fact, by the duration of Nationwide's misconduct. But if the Special Discovery Master steels himself to the task of reviewing this record, he will see a dysfunctional process born of Nationwide's bad faith:

- In over six months since the Eames plaintiffs served Nationwide with their document requests, Nationwide has produced nothing -- not a single document -- other than an incomplete copy of the Eames's policy (which Nationwide had already produced as its initial disclosure).

- Nationwide has refused to pursue the most basic and obvious avenues for identifying responsive documents, including the Eames plaintiffs' repeated request that it make a good-faith effort to identify the persons most knowledgeable of the disputed practice's genesis.

- Nationwide has attempted to avoid discovery through the parsing of words and the willful misreading of discovery requests. Months after its "legal characterization" objection was rejected by the Court, it continues to raise that objection as a bar to discovery.

- Nationwide has increased the Eames plaintiffs' costs dramatically, forcing them to chase Nationwide repeatedly simply to elicit its participation in the meet-and-confer process.

- Nationwide deliberately violated the Court's instructions regarding the conduct of the parties' October 3, 2005 meeting on discovery issues. It did so because compliance would have reduced delay and increased the prospect of a productive meeting.

125275                                                                                      1

• Nationwide has raised objections before the Court that were never communicated to the Eames plaintiffs, placing both the Court and the plaintiffs in an unfair position.

Half measures are nothing in the face of such conduct. On this motion, for example, Nationwide may argue that its current search efforts -- slow and deliberate, and carefully designed to avoid the identification of responsive documents -- should be permitted to wind their way to some fruitless conclusion six months down the road. We propose a different result:

1. Nationwide should be ordered to produce immediately all documents in its possession, custody or control that refer or relate to the disputed practice: the use by Nationwide (through its insurance agents) of the modifier "full" in characterizing PIP (or any aspect of PIP) within "rate quotes," memoranda of insurance or other policy-related documents. This would include, without limitation, documents relating to the practice's genesis and documents addressing the merits of the practice or criticisms of the practice.

2. Nationwide should provide the SDM with a detailed and certified narrative report on its search for responsive documents. The report should confirm that as part of the search, Nationwide canvassed upper management and persons with knowledge of the practice's genesis.

3. Nationwide should pay the sum of $25,000 as discovery sanctions.

4. Nationwide should bear all costs of the SDM's labors through the date of his decision.

This is the Eames plaintiffs' opening brief in support of their motion to compel.

## STATEMENT OF FACTS

### A. Nature of the Case

This proposed class action was commenced in August 2004. It seeks certification of a proposed class and subclass with respect to Nationwide's misrepresentations of policy limits for Personal Injury Protection (or "PIP") coverage under 21 Del. C. §2118. Specifically, the

125275                                      2

proposed class representatives contend that Nationwide has represented to thousands of Delaware insureds that they enjoy "full" limits of liability for PIP coverage, when in fact Nationwide contends that they are entitled to just the minimum PIP limits required by statute.

There can be no doubt that this practice (characterizing PIP limits as "full") is widespread. In the early course of discovery, one Nationwide insurance agent testified that his agency routinely engages in the practice:

> Q: Is it fair to say that the characterization of PIP as full in documents like the auto rate quote shown on the last page of Deaton 2 is a routine one in your business?
>
> A: Yes.
>
> Q: What I could do is show you some additional examples of that characterization as it appears in other sets of documents that Deaton produced simply so you could confirm that full is in there. We can go through that exercise. I'm happy to do that. Or you could simply tell me that you expect to find it in all of them, if that's the case.
>
> A: Yes. I would expect to see that usage of the word "full" in the various documents that you have obtained.
>
> Q: And you would expect to see it in connection with PIP?
>
> A: Correct.

Ex. A at 41-42. Moreover, the parties recently stipulated that among documents produced by three other Nationwide agents in response to the Eames plaintiffs' subpoenas, the "vast majority" set forth the characterization of PIP limits as "full." Id. at 55-56.

### B. Nationwide's Theory of the Case

Nationwide claims that its subjective intent in characterizing PIP as "full" is not to characterize the limits of liability, but to signal the absence of a deductible. Thus, in the reply brief on its motion to dismiss, Nationwide argued that these characterizations "reflect that the

125275                                    3

Eames (sic) had elected PIP coverage with no deductible." D.I. 95 at 6. Nationwide also insists that the policy-related documents in which the offending characterizations typically appear are not part of the policy itself.

The Eames plaintiffs will overcome these contentions at the appropriate time. They are important here only because they help explain Nationwide's conduct in avoiding discovery.

### C. The Initial Document Requests

On April 7, 2005, the Eames plaintiffs served Nationwide with their initial document requests, seeking production of documents related to the disputed practice. That discovery consisted of just three requests, two of which are at issue here:

> 1. All documents that refer to or characterize limits of liability for PIP coverage as "full."
>
> 2. All documents that refer or relate to the characterization of limits of liability for PIP coverage as "full."

Ex. B. In response, Nationwide produced just a single document: a copy of portions of the Eames's auto policy. But since Nationwide had already produced that document as the sum total of its initial disclosures, Nationwide's production essentially amounted to nothing.

Nationwide justified its refusal to produce documents on the basis of its general objection. Specifically, Nationwide objected that:

> [t]he only legal and enforceable interpretation of these terms, pursuant to Nationwide's coverage obligations upon which Plaintiffs asserts (sic) a breach of contract, are those characterizations and references set forth in the insurance policy and Declarations page which form part of the policy. No other reference or characterization is relevant to this action.

Ex. C. Nationwide thus argued that the characterization of PIP as "full" could have legal significance only if it appeared in the contract; and since Nationwide had produced an (incomplete) copy of the Eames's policy, it need produce nothing else. Significantly,

125275                                    4

Nationwide's responses stated no objection whatever on grounds of undue burden or prematurity.

### D. The Eames Plaintiffs' Initial Attempt to Confer

On May 11, 2005 the Eames plaintiffs wrote to Nationwide seeking to clarify its response. Was Nationwide contending that no responsive documents existed? Or was it shielding documents behind its "legal characterization" objection? Thus, the Eames plaintiffs posed these simple questions:

> 1. In responding to our document requests, has Nationwide searched all documents in its possession, custody or control that might reasonably be expected to contain characterizations of PIP limits as "full", including internal memoranda, guidelines and manuals, and minutes of board meetings?
>
> 2. Conversely, has Nationwide limited its search to insurance policies?
>
> 3. Is Nationwide aware of any documents in its possession, custody or control that do not consist of insurance policies or parts of insurance policies, but do characterize PIP limits as "full"?

Ex. D. Nationwide responded the next day, but offered no answer to these questions. Ex. E.

On May 16, 2005, the Eames plaintiffs wrote a second time, asking again that Nationwide address the questions in the May 11 e-mail, and offering to accept a production limited to generic documents (meaning documents not specific to any policyholder). Ex. F. Nationwide again failed to respond, so on May 20 the Eames plaintiffs wrote once more, indicating that though they had been forced to seek relief, they would remain available for further negotiation. Ex. G. Nationwide finally responded on May 23, 2005, but used the opportunity to argue the merits. Nationwide's May 23 letter thus offered no information on its document search, and no hope that it would actually produce anything. Ex. H.

125275                                                5

### E. The E-Discovery Default Standard

The Scheduling Order incorporates by reference the Court's Default Standard for discovery of electronic documents. D.I. 43 ¶1. Nationwide ignored the Default Standard, however; and on March 8, 2005, the Eames plaintiffs wrote to Nationwide to remind them of their obligations in this regard. See letters and e-mails collected at Ex. I.

Roughly one month passed with no response from Nationwide, and no compliance by Nationwide with the Court-ordered Default Standard. Accordingly, on April 6, 2005, the Eames plaintiffs wrote to Nationwide again, providing its counsel with an additional copy of the March 8 letter and again requesting a response. Id. Another month passed with no response from Nationwide, and none of the disclosures required by the Default Standard; and on May 5, 2005, the Eames plaintiffs wrote again, requesting a response to the March 8 letter and the follow-up e-mail of April 6. Id. On May 16 we wrote once more, asking whether Nationwide "[c]ould . . . review and comply with the Default Standards now?" Id. On May 20, the Eames plaintiffs chased Nationwide for a fourth time. Id. Finally, as part of Nationwide's May 23 "drop dead" response, Nationwide responded that "no electronic discovery . . . has been requested . . . ." Id. On this basis, it simply refused to acknowledge the Default Standard's applicability to the case -- despite the Court's express order to the contrary.

Nationwide's position was more remarkable still when we consider that the Eames plaintiff's initial document requests set forth a specific definition of the term "document" to expressly "include (without limitation) documents created or stored by electronic means."

### F. The August 5 Teleconference

In anticipation of the August 5 teleconference with Judge Jordan, and as required by the Scheduling Order, both sides submitted letter briefs to the Court. Exs. J and K. On the literal

125275                                        6

eve of the teleconference, Nationwide's letter raised new objections that appeared nowhere in its discovery responses and were never before communicated to the Eames plaintiffs. Nationwide thus argued that the document requests were "broad" and of "unlimited scope", despite its failure to raise (much less particularize) any burden objection in its original responses. Ex. K at 2. Nationwide also raised (for the first time) a prematurity objection, arguing that the discovery "should be abated until the plaintiff responds to and the Court resolves defendant's Motion to Dismiss . . . ." Id. at 1. Again, no hint of these objections was offered in Nationwide's responses to the Eames plaintiffs' discovery. See generally Ex. C. With respect to the Default Standard, Nationwide continued to insist that it had no application to the dispute because "there is (sic) no electronic discovery responses at issue . . . ." Ex. K at 2.

The Court rejected Nationwide's position emphatically:

> So what I'm telling you is if it comes down to advocacy before me on those discovery dispute, you come up way short, mister -- way, way, way short. The record that looks like has developed here that is presented to me is basically one where you said I'll give you the document. I'll give you the contract. Otherwise, you can drop dead until my 12(b) . . . is decided. That is sort of the gist of the feeling or the communications that seem to be going back and forth. And I'm just trying to disabuse you of this in the most direct, clear, emphatic way I possibly can. I will not tolerate this.

Ex. L at 33. Recognizing that the document requests expressly targeted electronic documents, the Court also criticized Nationwide's failure to comply with the Default Standard:

> So you are not at liberty to say "I don't care how many times they say they think we've got relevant documents in our electronic database, I say there is no electronic discovery." That approach is the level of an almost willful refusal to acknowledge what is on the face of their document.

Id. at 36. See also id. at 35-36 (Court characterizes Nationwide's position as "genuinely remarkable.") Having disposed of Nationwide's objections, the Court ordered the parties to

"make a good faith effort at a meet and confer" on discovery issues. Id. at 35. An additional eighty-two days have passed since that Order -- additional, that is, to the four months that preceded the August 5 teleconference -- but still Nationwide has produced nothing.

### G. The Next Round of "Negotiations"

The next teleconference with the Court would take place on September 13, 2005. In the interim between the two teleconferences, the parties exchanged additional e-mail messages and letters -- though no documents were produced. Those communications are set forth as a single exhibit, and deserve to be read in full. See Ex. M.[1] They are noteworthy for the following:

• The Eames plaintiffs wrote to Nationwide on August 5, just hours after the parties' teleconference with the Court concluded. In that message, we reiterated the questions that Nationwide had previously refused to answer as part of the meet-and-confer process, asking (for example) whether Nationwide would attempt to identify those persons who might be knowledgeable regarding the genesis of the disputed practice. Ex. M at MTC1-2.

Nationwide's response, likewise sent just hours after the Court admonished the parties, is so obviously lacking in any spirit of compromise that it essentially speaks for itself. But we do call the SDM's attention to one particularly troubling passage:

> I do not anticipate discovering any documents you suggest exist.
> Perhaps Mr. Muncie has them.

Id. at MTC3. The reference to "Mr. Muncie" is to the local Delaware insurance agent through which the Eames's auto policy was placed. The suggestion that Nationwide's corporate-level documents on the genesis of the offending practice might be found in the hands of a tiny

---

[1] For ease of identification, the Eames plaintiffs have numbered the documents that comprise Exhibit M with an alphanumeric sequence beginning with "MTC1."

125275                                8

insurance agency from Seaford, Delaware (as opposed to Nationwide itself) was obviously meant to be facetious.

Nationwide's August 5 message also promised a response "on Wed. next when my report returns from vacation." Id. But no response arrived the following Wednesday, and Nationwide later denied having promised any response by that date. Id. at MTC8, MTC9, MTC16. The succeeding weeks brought more of the same, as we were forced to chase Nationwide for return communications on August 11, August 16, August 22 and September 2. Id. at MTC8, MTC9, MTC14, MTC30.

- Eventually Nationwide took steps to create the appearance of cooperation. In its August 22, 2005 letter, Nationwide agreed to search "Delaware state email files" along with the company's board minutes. Ex. M at MTC18. But that approach is designed for failure.

First, the types of documents sought by our discovery -- documents on the genesis of the disputed practice, and any criticisms of the practice that Nationwide either anticipated receiving or actually received -- would likely be found in the hands of upper and mid-level management employees. Those are the employees that implement and advance specific claims-handling practices. Thus, while there is nothing objectionable to searching board minutes, those documents are (at best) a secondary source.

As for e-mails, Nationwide has expressly limited its e-mail search to Delaware insurance agents and persons with Delaware-specific responsibility. In addition, Nationwide refuses to search e-mails prior to 2002 -- despite the fact that the disputed practice was in place long before that date. See Ex. M at MTC36.

Corporate-level documents, of course, could not possibly be identified by a Delaware-only search. Moreover, a Delaware-specific limitation makes sense only if Nationwide has

restricted the disputed practice to the State of Delaware. On reviewing the evidence of the parties' protracted meet-and-confer, the SDM will see that the Eames' plaintiffs have repeatedly asked Nationwide whether the disputed practice is limited to Delaware, or whether (conversely) Nationwide uses the "full" modifier in other states. Nationwide refuses to answer this question.

• In an August 24, 2005 letter, the Eames plaintiffs asked Nationwide to distribute a straightforward "document search" instruction to its Delaware-specific document custodians and those to whom the custodians report. Ex. M at MTC21-22. More than two months have passed, but Nationwide has yet to honor the request.

• We have repeatedly asked Nationwide to simply make a good-faith effort to identify persons with knowledge of the disputed practice's genesis. See, e.g., Ex. M at MTC1, MTC24. Though such an effort makes obvious sense -- assuming one is actually trying to identify responsive documents -- Nationwide refuses to do this.

## H. The September 13 Teleconference

A further teleconference with the Court was held on September 13, 2005. During the call, Judge Jordan stated candidly that he was pressed for time; and he made no secret of his unhappiness in having to encounter the dispute again, saying that "I can't spare another hour of the kind of junk we went through." Ex. N at 4. We must acknowledge, too, that the Court found fault with the Eames plaintiffs for (in Judge Jordan's view) overstating their criticisms of Nationwide's compliance with the Default Standard.

But the September 13 teleconference is important for other reasons. First, the Court ordered an in-person meeting, which the parties ultimately held on October 3, 2005. Ex. N at 21. Second, *at Nationwide's request*, the Court ordered the Eames plaintiffs to present Nationwide with specific written questions prior to the meeting, ostensibly as a means of making it more

productive. Id. at 26. Third, the Court expressly prohibited Nationwide from employing a "we'll get back to you" approach; rather, Nationwide was to bring to the meeting any and all personnel needed to address the Eames plaintiffs' questions:

> THE COURT: *** Have the technical people in the room, if you have to, Mr. Oesterling. Don't have a meeting where he's got questions without having the people there who can answer him.

Id. at 21-22. Fourth, the Court stated its intention to appoint an SDM. And finally, the Court directed that if a party was found by the SDM to be the "bad actor here," the costs associated with the SDM's services would be borne by that party. Id. at 25-26.

### I. The October 3 Meeting and its Aftermath

The parties' in-person meeting took place on October 3, 2005. It was attended, on Nationwide's side, by its litigation counsel and one in-house lawyer. None of the "technical people" required by the Court's September 13 instructions attended the meeting.

In advance of the meeting, Nationwide advised the Eames plaintiffs that it would limit its attendees to the three lawyers mentioned above. The Eames plaintiffs responded that "Judge Jordan's instructions at the September 13 teleconference require wider participation by Nationwide than you suggest." Ex. O. On September 16 (and consistent with the Court's September 13 instructions), the Eames plaintiffs provided Nationwide with a list of nine written questions to be addressed at the October 3 meeting. Ex. P.

The documents set forth as Exhibit Q reflect the parties' competing memorializations of the October 3 meeting. Both sides agree, however, that Nationwide failed to address several of the Eames plaintiffs' questions during that meeting; and that in fact, Nationwide's in-counsel stated that he would need to contact underwriting staff and "products compliance" personnel to secure answers. Ex. Q. There can thus be no dispute that the Court's September 13 instruction to

125275                                           11

Nationwide ("*Don't have a meeting where he's got questions without having the people there who can answer him*") was violated. Nor can there be any doubt that Nationwide deliberately chose to violate that instruction: it knew the questions, and was warned by the Eames plaintiffs that its proposed list of attendees was insufficient, all in advance of the meeting.

The October 3 meeting has not led to the production of even a single document.

## ARGUMENT

### I. NATIONWIDE'S BAD FAITH IS OBVIOUS

The surest sign of Nationwide's bad faith is the very fact that, as we approach the *seventh* month since the document requests were propounded, Nationwide has still produced nothing. But other signs abound.

As noted above, the Eames plaintiffs earlier subpoenaed certain of Nationwide's Delaware insurance agents. Following negotiations with the agents' counsel, the Eames plaintiffs agreed to accept a random production of thirty-five auto insurance files from each of four insurance agents. Affidavit of Heather R. Jones ¶3 (Ex. R). Of the 140 files produced by the agents, forty-eight appear to involve the sale or purported sale by Nationwide of the statutory minimum PIP limits. Id. ¶4. In every instance but one, the agents characterized PIP as "full." Id. These documents, and the testimony of Nationwide's own Delaware agent (confirming that Nationwide's characterization of PIP as "full" is a commonplace) confirm that the disputed practice is routine, widespread and deliberate. Can it be, then, that no documents exist regarding its genesis or history? That the uniform characterization of PIP as "full" by scores of insurance agents throughout Delaware is merely a coincidence?

Of course not. Uniform practices like this are the product of planning; they require written instructions, and they result in an identifiable (and therefore discoverable) record. It is

thus inconceivable that Nationwide does not possess a written record of the practice's genesis. Obviously, then, the persons who could best identify that record are those with knowledge of the practice's history. Nationwide's persistent refusal to identify and consult those persons is additional evidence of bad faith.

Further evidence lay in Nationwide's resurrection of its "legal characterization" objection. That is, Nationwide originally argued that the only legally significant characterization of PIP is the one found in the insurance contract; and since Nationwide denies that the offending characterizations are part of the contract (though we say they are), it refused to respond. The Court emphatically rejected that argument at the August 5 teleconference; yet Nationwide raised it again in its August 22 letter, claiming an inability to identify persons with knowledge of the practice's history "[s]ince the company does not characterize 'PIP' coverage in any policy as 'full' . . . ." Ex. M at MTC19. This is sheer willfulness: a deliberate reassertion of objections that have already been overruled under the law of the case. Indeed, it is no less willful than Nationwide's insistence that the document requests' express *targeting* of electronic documents did not call for the *production* of electronic documents.

Still more evidence abounds. Directly instructed to bring to the October 3 meeting all persons necessary to respond to the Eames plaintiffs' specific written questions, and warned by its adversary that its proposed list of attendees would violate that instruction, Nationwide proceeded to violate it anyway. As a result, the Eames plaintiffs continue to await responses to those written questions more than three weeks after the meeting concluded -- and this in the face of the Court's directive that Nationwide not "have a meeting where he's got questions without having the people there who can answer him." Ex. N at 21-22.

Nationwide's strategy must finally be clear. It never had any intention of responding to discovery, placing all its hope in its pending motion to dismiss (which we believe will fail). It sought to persuade the Court to stay discovery pending a decision on that motion; and when that approach failed, it set out to delay the process long enough so that it could avoid producing anything until after the motion was decided. Considering that oral argument on the motion to dismiss is scheduled for early November, it appears that Nationwide's strategy may yet succeed.

But there remains one chance it will not succeed. If the SDM orders the relief we seek, including meaningful sanctions, Nationwide's gaming of the process will have backfired.

## II. NATIONWIDE'S SEARCH IS CALCULATED TO FAIL

In its August 22 letter, Nationwide stated its intention to search "Delaware state email files" from September 2002 to the date of the Eames plaintiffs' complaint. Ex. M at MTC18. At the October 3 meeting, Nationwide confirmed that this search would include only e-mails of those on its list of Delaware "custodians" -- a list consisting of Delaware insurance agents and what Nationwide calls its Delaware "leadership team." Ex. Q. Nationwide admits that in its supposed effort to identify responsive documents, it has interviewed just a single person from outside this Delaware-only list. Id.

These search parameters -- limited to Delaware-specific sources and the two-year period immediately preceding our complaint -- are calculated to fail. If, as we suspect, the disputed practice was developed under the supervision of upper or mid-level management, and particularly if the practice has been employed outside Delaware, responsive documents are bound to exist outside the Delaware-only parameters. Further, the practice's longevity suggests that the documents we seek antedate 2002 by many years.

125275                                14

If the goal is to finally identify the documentary record of the practice's genesis, there is simply no reason to avoid our approach: identifying persons with knowledge of that history, and focusing the document search there. Nationwide's refusal to do this is unreasonable; and its imposition of arbitrary geographical and temporal limits, with no connection to the disputed practice itself, is a roadmap to nowhere.

## CONCLUSION

In over six months since the Eames plaintiffs' initial document requests were served, Nationwide has produced nothing. Instead, it has ignored all attempts at reasonable compromise; sandbagged us at hearings; violated Court orders; and thoroughly derailed the litigation schedule. Now the SDM has an opportunity to set things right. If that opportunity is lost -- if the SDM does not act decisively -- Nationwide will feel vindicated in its conduct, and the plaintiffs will secure no document discovery on the very business practice that their complaint purports to challenge. We respectfully urge the SDM to avoid that result.

Respectfully submitted,

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

Attorneys for plaintiffs
Thomas A. Eames, Roberta L. Eames and Tammy Eames (on behalf of themselves and all others similarly situated)

October 26, 2005

125275                                     15

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, ) ) ) ) ) | |
| Plaintiffs, ) ) | C.A. No. 04-CV-1324KAJ |
| v. ) ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, ) ) ) ) | |
| Defendant. ) | |

### NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

Nicholas E. Skiles, Esq.
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, DE 19899

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

Attorneys for plaintiffs
Thomas A. Eames, Roberta L. Eames and
Tammy Eames (on behalf of themselves and
all others similarly situated)

October 26, 2005

125318