# EXHIBIT L

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -

    THOMAS A. EAMES, on behalf of
 4  themselves and all others        :    CIVIL ACTION
    similarly situated; ROBERTA L.   :
 5  EAMES, on behalf of themselves   :
    and all others similarly         :
 6  situated; TAMMY EAMES, on behalf :
    of themselves and all others     :
 7  similarly situated;              :
                                     :
 8            Plaintiffs,            :
                                     :
 9        v                          :
                                     :
10  NATIONWIDE MUTUAL INSURANCE      :
    COMPANY,                         :
11                                   :
              Defendant.             :    NO. 04-1324 (KAJ)
12                           - - -

13                    Wilmington, Delaware
               Friday, August 5, 2005 at 10:00 a.m.
14                    TELEPHONE CONFERENCE

15                           - - -

16  BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

17                           - - -

    APPEARANCES:
18

19            MURPHY, SPADARO & LANDON
              BY:  JOHN S. SPADARO, ESQ.
20
                   Counsel for Plaintiffs
21

22            SWARTZ CAMPBELL, LLC
              BY:  NICHOLAS E. SKILES, ESQ.
23
                   and
24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

1    APPEARANCES: (Continued)

2

3                SWARTZ CAMPBELL, LLC
             BY:   CURTIS P. CHEYNEY, ESQ.
4                   (Philadelphia, Pennsylvania)

5

6                        Counsel for Defendant

7

8                        - oOo -

9                    P R O C E E D I N G S

10               (REPORTER'S NOTE:  The following telephone

11   conference was held in chambers, beginning at 3:30 p.m.)

12   10:00 a.m.)

13               THE COURT:  Hi, this is Judge Jordan.  Who do I

14   have on the line?

15               MR. SPADARO:  Your Honor, good morning.  It's

16   John Spadaro with my associate Philip Edwards from Murphy

17   Spadaro & Landon for the Eames plaintiffs.

18               MR. CHEYNEY:  Good morning, Your Honor.  Curt

19   Cheyney in Philadelphia and Nick Skiles is in Dover on a

20   cell phone for Nationwide.

21               THE COURT:  All right.  We're on this call

22   to deal with discovery disputes.  In the first instance,

23   Mr. Skiles, in case there is confusion, let me clear it up.

24   The way the discovery dispute process is to work is if a

25   discovery date is set for my handling of a discovery

1    dispute, I expect the papers to come in sufficiently in

2    advance in accordance with the procedure that is set out in

3    the order so that I can take a look at them without having

4    to make a reminder call to counsel, which is what happened

5    in your case yesterday.  And the letters are to be three

6    pages in length.  Yours is a five-page single spaced letter.

7    So are we on the same page now?

8            MR. SKILES:  Absolutely, Your Honor.  I

9    apologize.

10           THE COURT:  All right.  Let's play this square

11   all the way around.  It makes things easier.  Then I won't

12   have to worry about getting letters like the one I got from

13   Mr. Spadaro saying strike their response because it's two

14   pages too long.

15           MR. SKILES:  Certainly, Your Honor.  Thank you.

16           THE COURT:  Okay.  Mr. Spadaro, I have read your

17   letter.  Do you want to take me to what you think is the

18   most significant or salient parts of that, please?

19           MR. SPADARO:  Yes, Your Honor.  Thank you.  Your

20   Honor, the dispute involves two document requests from our

21   April 7th initial document requests.  It also involved

22   Nationwide's refusal to comply with the Court's default

23   standards for electronic discovery which were incorporated

24   by reference as part of the March 28, 2005 scheduling order

25   at paragraph one.  Your Honor, an overarching issue that I

1    think will emerge as we discuss these issues is Nationwide's

2    refusal to work cooperatively with us, refusal to

3    communicate with us and to answer direct questions regarding

4    discovery matters that are aimed at negotiating, either

5    resolving or narrowing disputes.

6              THE COURT:  Okay.  I absolutely want to give you

7    your chance to get into that.  Before you do, though, I want

8    to hit one question up front which I think is significant.

9    The discovery that you have asked for, well, under the

10   current scheduling order, discovery as to issues other than

11   class certification is stayed, of course.  I want you to

12   explain to me how the things that you are specifically

13   asking for here pertain to class certification, if you

14   would, please.

15             MR. SPADARO:  Well, Your Honor, class

16   certification has its elements under Rule 23.

17             THE COURT:  Right.

18             MR. SPADARO:  One of them is numerosity.

19             THE COURT:  Right.

20             MR. SPADARO:  One thing these document requests

21   were calculated to address was how widespread the practice

22   is.  That's not a chief purpose of them because I think

23   we've addressed that, and I hope our certification brief

24   shows we've addressed that more than adequately through our

25   third-party discovery in the case of the insurance agents,

1    but issues like the commonality of the questions of fact

2    and law when you've got, there is a lot of case law out

3    there on Rule 23 about a widespread scheme to deceive in

4    the marketplace that says discovery is required in a class

5    certification case.  We can't know if they have documents,

6    a document, what kind of documents.  We'd love to see that

7    it's internal memos, it's minutes from a board meeting that

8    says, you know:  We don't want to sell PIP.  Healthcare

9    costs being what they are, we don't want to sell the product

10   but we are mandated to.  We have a lousy loss ratio on those

11   products but the way to address that is to depress sales of

12   PIP limits.  And the way to depress sales is to have people

13   believe either that they can't buy any more or that the

14   $15,000 that they bought is the most they can buy.

15              Our complaint alleges directly that that is the

16   consequence in the marketplace of telling people that they

17   have full PIP limits when in fact you treat the transaction

18   as a $15,000 limit.  So these are documents that, if they

19   exist, can only be gotten at through this kind of discovery.

20              This is not at all related to class

21   certification discovery, but to answer the question

22   indirectly, I would also point out if the objections were

23   available, and that would be the objections you would want

24   relief with, that would be the first time.  It does not

25   appear in their written responses.  It was never raised by

1   Nationwide at any point in my communication with them

2   trying to resolve the disputes. And it doesn't appear in

3   Mr. Skiles' five-page letter either. So I think maybe the

4   best indicator that we haven't run afoul of the stay of

5   merits discovery is they haven't even raised that point.

6           THE COURT: All right. Now, you had other

7   issues that you wanted to raise with me?

8           MR. SPADARO: Yes, Your Honor. Thank you.

9   Your Honor, I know the nature of the case is known to the

10  Court but, briefly, we're targeting Nationwide's practice

11  of certain personal injury protection or PIP coverage to

12  Delaware consumers and telling them in writing that the

13  transaction is a sale of full PIP limits, in those words,

14  when Nationwide is, as I said, treating the transaction of

15  the sale of the minimum limits of $15,000 per person and

16  $30,000 per accident. We contend that the practice is

17  deceptive. And that it leads consumers to believe, as I

18  have indicated, either that they purchased all they can

19  purchase, either that they have more than statutory minimum

20  or they have as much as you can get, although the statutory

21  minimum is as much as you can get.

22          Nationwide repeatedly characterizes both in the

23  context of this dispute where they're fond of saying this

24  is a breach of contract case. And we have pled breach of

25  contract but we also plead a violation of the Delaware

1    Consumer Fraud Act.  The elements of that statutory fraud

2    are important to the discovery dispute I think, Your Honor.

3    And they're very brief.  Any misrepresentation or omission

4    in the sale and insurance product is actionable under the

5    statute.  You don't have to show scienter, for example.  You

6    don't have to show justifiable reliance.  Any deceit, even

7    if it's unknowing, any misrepresentation or omission in the

8    sale to the consumer of the insurance product is actionable

9    if it results in damage.

10           Why did Nationwide have the breach of contract

11   count and why they did they not acknowledge there is a count

12   under fraud?  It's because they expected the parol evidence

13   to work for them and against us, and specifically on this

14   discovery.

15           They don't call it the parol evidence rule but

16   they're essentially relying on the parol evidence rule in

17   saying that we only get a copy of the contract because of

18   references to PIP limits, not in what they say the contract

19   is.  And there is a dispute about that, too.  But those

20   references would be inadmissible at trial so they're

21   invoking the parol evidence rule.

22           But the parol evidence rule actually works in

23   our favor in this case because we will prove to the jury

24   that Nationwide's use of this modifier "full" for PIP

25   limits is made not only in documents outside the four

1    corners but is actually made in documents that are part of

2    the contract, documents that qualify as part of the contract

3    under principles of contract law and even under Nationwide's

4    own guidelines for determining what is in and out of the

5    contract. And we're going to prove all this at trial to the

6    jury's satisfaction, if we're given a chance.

7            And if we're correct, Your Honor, that these

8    representations are being made within the contract itself,

9    then they are not parol statements at all. But if they were

10   parol statements, and I think this is important, parol

11   evidence does not bar proof of prior or contemporaneous

12   statements in cases alleging misrepresentation or fraud.

13   And we cite the Hynansky papers in our case, and Hynansky is

14   a recent Chancery Court decision that collects other cases

15   for this principle. It's a well established principle under

16   Delaware law. So if consumers had been told by Nationwide

17   they're purchasing full PIP limits, those representations

18   are actionable whether they're in or out of the contract

19   so long as they are misrepresentations because, Your Honor,

20   Delaware law doesn't allow an auto insurer to trick

21   consumers whether it's in the contract or outside the

22   contract.

23           So on April 7th, we served Nationwide with three

24   document requests, and two are disputed. Request number one

25   asks for all documents.

1          THE COURT:  You don't have to repeat this.  I

2   read your papers.

3          MR. SPADARO:  I guess in summary, the first

4   request asks for the documents that establish the practice

5   is taking place.  And the second request asks for documents

6   that might discuss the practice like the hypothetical memo I

7   spoke about before.  And those are the types of documents we

8   want in discovery.

9          Nationwide responded with its general objection.

10  Now, the general objection is far more limited than what we

11  see in Mr. Skiles' letter of yesterday.  For example, the

12  general objection -- and I'm being too narrow.  Objections

13  both specific and general that are stated in Nationwide's

14  responses to the document requests do not include any

15  reference to the requests being not limited in time, for

16  example.  That  is something that has never been raised, was

17  not raised in their written response to the requests and has

18  never been raised in any communication from Nationwide to me

19  in the negotiation process, such as it was.

20         THE COURT:  Okay.

21         MR. SPADARO:  It's an objection that was raised

22  yesterday for the first time.

23         THE COURT:  Mr. Spadaro, I really don't want to

24  you repeat what is in your letter.  You can state, however,

25  things you want to highlight or emphasize with respect to

1  generally how the meet and confer --

2          MR. SPADARO:  I'll try to do that.  I wasn't in

3  a position.  When I wrote the letter, I didn't know they

4  would raise new objections the day before the hearing so I

5  did want to make the point.

6          The burden objection is another one.  There is

7  no burden objection in the responses.  There is no burden

8  objection communicated to me when they wrote to the Court.

9          But the general objection is this parol evidence

10  objection, where they say the only legal characterization is

11  what you see in the contract so all you get is the contract.

12  And their position is that the only document we get in class

13  certification discovery is what we regard as an incomplete

14  copy of the policy.  So why are they wrong about that, Your

15  Honor?

16          THE COURT:  You've got to stop and let me finish

17  what I wanted to say to you; okay?

18          MR. SPADARO:  Sure.

19          THE COURT:  I've read your letter.  I'm going to

20  give them a chance to speak for themselves and I'll give you

21  another chance to respond.  But at the beginning of this --

22          MR. SPADARO:  I'm sorry, Your Honor.

23          THE COURT:  At the beginning of this, you said

24  you wanted to point out to me how the meet and confers have

25  generally worked or failed to work.  That is what I am

1  interested in hearing from you now because I will be asking

2  them about what their position is and I'll give you a chance

3  to respond to it.

4          MR. SPADARO:  Your Honor, I didn't catch

5  everything you said.  I think Your Honor is saying you will

6  let them respond to the substance and then we'll get back to

7  me on the procedural stuff.

8          THE COURT:  No.  If you need to pick the phone

9  up, please pick the phone up.

10          MR. SPADARO:  I will, Your Honor.

11          THE COURT:  All right.  What I said was I am

12  going to give them a chance to characterize their own

13  position before you characterize it for them and I'll give

14  you a chance to respond, but what I'm still giving you the

15  floor for now is at the outset of this discussion, you said

16  "I want to also make the Court aware of how the meet and

17  confers have failed to involve meaningful communication."  I

18  want you to get that on the table, too, because I'm going to

19  ask them to respond to it.

20          MR. SPADARO:  I guess then that Your Honor

21  understands our position on the discoverability generally of

22  these documents.

23          THE COURT:  I think I do.

24          MR. SPADARO:  Let me talk about the meet and

25  confer issue.  Your Honor, Exhibit E to our papers is my

1    May 11th e-mail to Mr. Cheyney.  And in the May 11 e-mail,

2    at this point we served responses, we served the requests.

3    We've gotten the objection back, we've gotten a copy of what

4    they say is the policy, and it's clear they're not going to

5    give us anything more.  So what do we do under Rule 37?  You

6    write and say we take exception and we want to try to work

7    this out.

8            My May 11th e-mail on Exhibit E asks three

9    simple questions:  First question:  Your Honor may have it

10   before you.  Has Nationwide searched all documents in its

11   possession, custody or control that might reasonably be

12   expected to contain characterizations of PIP limits as

13   "full" --

14           THE COURT:  I'm sorry.  I have to interrupt you

15   there, Mr. Spadaro.  The court reporter who is here with me

16   needs to take care an issue with his machine, okay?  So I'll

17   just ask you to hold silent here for a moment while he does

18   that; all right?

19           MR. SPADARO:  Sure.  Thank you.

20           (Pause.)

21           THE COURT:  Okay.  We're back on line.

22           MR. SPADARO:  Thank you, Your Honor.  The three

23   questions on the May 11th e-mail were, to essentially

24   distill them:  What you have searched for?  The second

25   question:  Have you limited your search to insurance

1    policies only?  The third question:  Are you aware of any

2    documents that exist that aren't insurance contracts?

3           So I'm asking them did you look for stuff other

4    than insurance contracts or did you only look or did the

5    lawyers get it, read it and say "you know what?  We don't

6    have to do anything.  We'll give them a copy of the policy."

7    And aside from that, can you tell me, you know, what do you

8    know about the document population that exists?  Is there

9    anything there?

10          These are important questions because they can

11   put me in a position to suggest compromises.  If I know what

12   is there, if I know how they can get at it, there could be

13   follow-up discussions.  Well, now you told me that you do

14   have some minutes of board meetings, or you do have some

15   memoranda or e-mails that might be responsive.  How do you

16   get them?  How much time or money?

17          That leads me to the other reason why it's

18   important to get answers to the questions.  Because you pick

19   up Skiles' letter and you learn for the first time they're

20   arguing burden.  Well, burden, generally burden is something

21   that is required to be made with particularity.  If they

22   haven't even looked, if they don't know what they have, they

23   obviously can't know whether there is a marginal burden or

24   undue burden or something in between.  But my questions were

25   directed more to trying to anticipate what their concerns

1  were and try to narrow it down.

2         The three questions in that e-mail have never

3  been answered.  They never responded to that e-mail.  They

4  never told me "we looked."  Yes, we looked for things other

5  than insurance contracts.  No, we didn't.  Yes, we're

6  aware there are responsive documents but we're actually

7  withholding them.  Obviously, you don't want to file an

8  application targeted at counts that don't exist.  If they

9  don't exist; and that's number three, we don't have anything

10  other than insurance contracts; we would have gone away.

11  But none of those questions were ever answered.

12         So let's see.  On May 16th -- now, this one is a

13  little harder to find, Your Honor.  At Exhibit H is a

14  collection of letters.  The fourth page is my May 16th

15  e-mail and the first thing I asked there is can you respond

16  to the question I asked last time in May 11th message, but I

17  also asked in the May 16th e-mail -- again, it's the fourth

18  page of Exhibit H.

19         THE COURT:  I'm with you.

20         MR. SPADARO:  I also asked:  Would Nationwide be

21  willing to make a production limited to generic documents,

22  that is, not policyholder-specific documents?  You see,

23  we're not asking to produce 25,000 insurance contracts but

24  the generic documents, the things that are not specific to

25  any policyholder.  For example, the types of documents like

1    internal memoranda, a memo to an agent about the practice

2    itself, not specific to a particular policyholder.  That

3    question has never been answered.  I don't whether they have

4    generic documents and I don't know whether they're willing

5    to produce them.  I don't know how many they have.  I don't

6    know how many there are.

7            If you look at the e-mails more thoroughly,

8    these questions about where the documents are, how they

9    might be retrieved is something I raise again and again and

10   I know nothing about.  I know about their document retention

11   practices indirectly through other litigation.  I don't know

12   anything specific to this dispute because none of those

13   questions were answered.

14           THE COURT:  Okay.  I'll give you a minute or so

15   to sum up on this point.

16           MR. SPADARO:  Okay.  Your Honor, I think I used

17   that last minute to talk about the default standards because

18   it's so closely related to what I just raised.  At Exhibit H

19   is the full collection of.

20           I wrote to them on March 8th, asked them to

21   comply with the default standard.  They never answered that

22   letter.

23           A month later, on April 6th, I asked again.

24   They ignored me.

25           A month later, on May 5th, I asked again.  They

1    ignored me.

2              I wrote again on May 16th.  Final answer,

3    ignoring us, Mr. Cheyney wrote back and said there is no

4    electronic discovery you requested.  And I pointed out

5    in  my letter, definition number three of our document

6    requests specifically targets documents stored or created

7    electronically.  And I can tell Your Honor, this is

8    Nationwide.  It's a hundred billion dollar insurance

9    company.  Most what they have is on the hard drive.  They

10   can produce it in hard copy.  But in terms of finding it,

11   retrieving it, most of it is on the hard drive.  They did

12   almost all their business on the PC on the claims side.

13              THE COURT:  Okay.  I have your position.

14              MR. SPADARO:  Thank you, Your Honor.

15              THE COURT:  All right.  Mr. Skiles, Mr. Cheyney,

16   who is speaking on behalf of Nationwide?

17              MR. CHEYNEY:  If I may, Your Honor I will.

18              THE COURT:  And you got to identify yourself.

19              MR. CHEYNEY:  I'm sorry.  Curt Cheyney.

20              THE COURT:  All right.  Go ahead.  And I want to

21   you speak in order first to the substance of the discovery

22   dispute.  And you do not need to repeat the substance of

23   Mr. Cheyney's five-page letter but if there is something you

24   wanted to add or highlight or emphasize, that's fine.  And

25   then I want to you speak to the process of discovery, having

1    heard what I just heard about you folks supposedly ignoring

2    efforts at reaching a meaningful meeting of the mind about

3    discovery.  Go ahead.

4                MR. CHEYNEY:  It's my letter, Your Honor, and I

5    apologize for the extent of it.  Nothing needs more to be

6    said about that.  Accept my apologies, please.

7                We don't think there is a discovery dispute.

8    The interrogatories were so broad and general, requests so

9    broad and so general, we answered them and we believe that

10   is our answer and that is our view.  This is not a discovery

11   dispute.  If he wants to ask additional discovery, he

12   wants to take depositions, that's his purpose and that is

13   his design,, but we don't have to have a modification of

14   interrogatories or requests or production of documents for

15   which we don't get a chance to either answer or object to

16   or otherwise raise questions through the normal process.

17   I don't think the discovery dispute conferences are a

18   vehicle for modifying discovery that has already been in

19   and answered.

20               THE COURT:  Well, hold on, Mr. Cheyney.  Let's

21   explore that position.  The assertion is made that you were

22   asked for all documents that refer to or characterize the

23   limits of liability for PIP coverage as "full" and that they

24   got something from you which indicates that they believe

25   can't possibly cover the waterfront.  So they're asking and

1    did ask, "look, tell us, did you confine this search in

2    some way?  Speak to us about what you did so we understand

3    what happened."  That's what your opponent is telling me

4    happened.  Is your only response to that we gave them an

5    answer and we don't ever have to do anything else?

6           MR. CHEYNEY:  No, we gave them a relevant

7    answer because discovery is supposed to be for relevant

8    information.  The relevant test would be in the context

9    of this pre-certification, it's actually still pre- or Rule

10   12(b) motion to dismiss, and our position is that the only

11   relevant document that characterizes the PIP limits is the

12   policy, including the declarations page.  There is no other.

13   In fact --

14          THE COURT:  And what is the basis?  What is the

15   basis of that position, Mr. Cheyney?  Because you don't have

16   the option of playing games with me the way I'm beginning

17   to sense games were being played with the other side.  I

18   want to know -- Stop.  Do not speak over me -- I want to

19   know the answer to the question that was put to you by

20   Mr. Spadaro.  Is this a position, a legal position that

21   we're giving you the contract and nothing else because that

22   is our view of relevance?

23          MR. CHEYNEY:  That is our view of the entire

24   search within the underwriting file.  That is our view of

25   the legal position and relevance of the questions that are

1    presented in the complaint.

2              THE COURT:  All right.  Then I think we'll be

3    able to make pretty short work of that.  Is there anything

4    else with regard to the substance of the discovery dispute

5    that you want to discuss?

6              MR. CHEYNEY:  Yes, we still have objections

7    pending.

8              THE COURT:  Okay.  What are they?

9              MR. CHEYNEY:  The objections go to the

10   overbroadness of the scope of the request.  The objections

11   go to this is discovery before the 12(b)(6) motion is

12   decided or ruled upon or answered and we have provided other

13   answers and documents in our 26(f) disclosure.

14             THE COURT:  All right.  Is there anything else?

15             MR. CHEYNEY:  Your Honor, our objections are as

16   I said they were, and it's burdensome.  Our obligation is to

17   produce relevant documents and we have.

18             THE COURT:  What is the burden?

19             MR. CHEYNEY:  The issue of classification.  I'll

20   stop.  You were talking.

21             THE COURT:  Yes.  What about burden?  The

22   assertion is made you haven't told them anything about the

23   scope of the search that would be required to go beyond this

24   claim file and, therefore, you're not really in a position

25   to say anything about burden or at least you haven't said

1   anything about it.  Is there something more you want to say

2   about it here?

3            MR. CHEYNEY:  These are the documents we saved

4   or recently accessible documents related to the sale of a

5   policy?

6            THE COURT:  This document.

7            MR. CHEYNEY:  All documents, generic documents

8   aren't even referenced in the complaint, aren't attached to

9   the complaint that Mr. Eames even saw or could have been

10  misled on.  Remember, class actions are not for fraud cases.

11  That's the unique part of the misrepresentation, a reliance

12  of specific damage.  That is not a class action case.  This

13  is a policy and the policy is what we have pled as our

14  defense and if the word full is not even in the policy.

15  There are no documents that relate to the policy description

16  of the word "full," period.

17            Looking for generic documents is unreasonable.

18  It's expensive.  It's burdensome.  It's time consuming.

19  It's not even limited in time as to what the scope is.  It's

20  not limited to the State of Delaware.  From the face of the

21  interrogatory request, the Court can see that.

22            THE COURT:  All right.  Talk to me about the

23  process of discovery then.  The assertion is made that these

24  are all things that you could have said to them that would

25  have led to some negotiation perhaps about, okay, if it

1    doesn't say Delaware on the face of the interrogatory, just

2    give me Delaware, or if you think this time period is too

3    broad, unbroaden it, then let's talk about a reasonable time

4    period.  But that discussion never occurred because you

5    wouldn't respond to their e-mails or letters.  Do you have a

6    response you want to give me now not to what they asked but

7    to what they say you failed to do?

8              MR. CHEYNEY:  Well, I will say that on a

9    personal level, and I will speak specifically then, it is

10   hard to speak to Mr. Spadaro.  It invites a letter back.

11   For instance, I did write and ask for what would be a

12   protocol for a word search?  And he said we can't do it.  In

13   fact, in his letter he said we can't do it.  I want to know

14   everything you have and I am looking for generic documents

15   that probably aren't relevant and could be relevant.

16             Searching board minutes for a document that

17   has the words "full" and "PIP" in it somewhere involves

18   confidential information, it involves claims files,

19   attorney-client privilege.  I can't agree with him on

20   everything and still protect my client's interest.  And just

21   yesterday, I tried to work with him and I got a letter

22   accusing me of extortion.  I can't be responding back and

23   forth and getting letters that go nowhere.  In fact, one of

24   the early letters from this point he said we are so far

25   apart it's amazing.

1            THE COURT:  Well, I've got to --

2            MR. CHEYNEY:  Our differences are profound.

3            THE COURT:  Well you know what?  I've got to

4  agree, you guys are so far apart.  I excuse not for a moment

5  anything Mr. Spadaro might have said in the way of heated

6  rhetoric accusing people of extortion; which, of course,

7  Mr. Spadaro, you will have a chance to answer for in a

8  moment; but that doesn't excuse an unwillingness to at least

9  discuss or offer some kind of a meaningful chance to meet

10  and confer about what is going on in respect to a discovery

11  request that has come to you.

12            So I'm pretty sure I understand what is going on

13  here, which is I've got lawyers that can't get along.  I've

14  got lawyers that find each other's personal styles off

15  putting and difficult to address and deal with.  And I

16  intend for us to move past that.

17            So Mr. Spadaro, do you want to respond to the

18  assertion.

19            MR. CHEYNEY:  Might I finish with one point?

20            THE COURT:  Sure.  Absolutely.

21            MR. CHEYNEY:  On May 12th, I wrote to

22  Mr. Spadaro:  "John, I have forwarded your request to

23  Nationwide's counsel and suggested a substantive response.

24  If possible and feasible, can you suggest a protocol for a

25  document sweep?  What word order or phrase might you

1    suggest.  I don't want to go through every PIP,  MedPay,

2    BUIM and feret out any offhand comment by an adjuster that

3    might use "full" referring to the available PIP limit stated

4    in the policy while considering a claim and making a claim

5    log entry; after all, no claim adjuster's comment has

6    relevance to the insured's state of mind when purchasing the

7    policy."

8            The response is we want to know everything.

9    That I can't give you that search parameter.  Tell me

10   generically what might be in your Board of Director minutes.

11   I can't believe the court would want me to search Board of

12   Directors meetings that have no relevance to Mr. Eames and

13   before we even decide a Rule 12(b)(6), but that is up to the

14   Court to go that way.  I just had a 12(b)(6) motion that

15   has been outstanding for nine months not even answered and

16   I don't even know what if the word "full" has any relevance

17   to this case at all, let alone do a sweep of e-mail, claim

18   files, rate files, everything.  I just think that that is

19   beyond reason, Your Honor, and it's certainly not a search

20   for relevant information.

21           THE COURT:  All right.  Mr. Spadaro.

22           MR. SPADARO:  Your Honor, I guess there are four

23   or five points, if I may be permitted.  I'll try to do it as

24   quickly as possible.

25           THE COURT:  Yes.  And I want you to start, I'm

```
 1    telling you to start with the assertion that it's hard to

 2    talk to you because you make it difficult because of the

 3    language you use in response.

 4                 MR. SPADARO:  I would like to start with that.

 5    And I think, Your Honor, if Your Honor can remember back to

 6    our prior appearances --

 7                 THE COURT:  Boy, do I.

 8                 MR. SPADARO:  -- this always happens.  That if

 9    we're alleging some legal issue, their response is John

10    Spadaro is a bad guy.  Invariably, that is their response.

11    All I can say, Your Honor -- I'll say two things.  First

12    of all, what happened this week was appalling.  It was

13    appalling and it was completely outside the norms of

14    Delaware practice.  And I was not going to raise it with the

15    Court but now I'm be attacked personally once again.

16                 Now, Your Honor knows the case has been stayed.

17    We filed the motion.  We do everything by the book.  We

18    filed the motion.  We didn't just ignore their motion to

19    dismiss, we actually filed an affirmative motion that is

20    on the docket asking that it be deferred until the juris-

21    dictional issues were sorted out.  And I think everyone on

22    the call understands the logic of that, especially since

23    Nationwide asked us to stay the case and move to stay the

24    case, the entire case, including their motion to dismiss

25    while those issues were sorted out.  But we -- I'm not sure
```

1   what that beeping is.  I'm not sure if the Court hears it.

2   We heard the motion to defer their notion pending outcome

3   on the jurisdictional issues.  They never responded.  That

4   motion was unopposed.  So that was the state of play.  That

5   was the state of play until the stay was entered.  There was

6   never a procedural obligation for you to respond to their

7   motion and they actually proposed the stay and asked the

8   Court to stay the case.

9        The stay has recently been lifted.  Within a

10  few days of the stay being lifted, I wrote to Mr. Cheyney

11  and proposed a briefing schedule for his motion to

12  dismiss.  I proposed that we answer on August 22nd and

13  that they respond, I think the date was September 12th

14  or September 14th.  Mr. Cheyney wrote back and said, well,

15  that gives you an extension and we're not giving you an

16  extension.

17       Now, I know we're not in state court.  The

18  Supreme Court Rules incorporate the Delaware principles of

19  lawyer conduct which say it's uncivil and unprofessional

20  to deny a party a reasonable extension.  In other words,

21  Mr. Cheyney's position was under the local rules I had two

22  weeks from the lifting of the stay and that's it -- two

23  weeks during summer months when I had family vacations, I

24  had other obligations and I proposed to counsel what is an

25  eminently reasonable stay date and I'm telling him I'm going

1    to answer your motion, your case dispositive motion in a

2    couple weeks in the month of August.  He did not come back

3    and say here are alternative dates.  He just wrote back and

4    said, what he said to me was this:  You drop your discovery

5    demands and cancel this call and withdraw your document

6    requests or we won't give you an extension.  And I told him

7    I was not going to allow the class discovery to be extorted

8    from them over an extension of the briefing schedule.  And I

9    told them that was, I told them that that was outside the

10   bounds of normal practice among Delaware lawyers.

11          And I realize Mr. Cheyney is not a Delaware

12   lawyer.  But that is what happened earlier this week, and I

13   do not apologize for my reaction to.  I've rarely had

14   lawyers in a complex case or even in smaller cases refuse to

15   extend a modest extension to a briefing schedule on a motion

16   that they stayed for several months.

17          THE COURT:  All right.  Move to your next point.

18          MR. SPADARO:  All right.  Now, let's get more

19   specific.  Exhibit E has my questions.  Did you search for

20   just insurance contracts or have you searched for other

21   documents?  Where are the documents?  What is the nature of

22   the search you have done?

23          Their position is that I am such an evil person

24   that that question can't be answered.  And I think that you

25   know that is about as lacking in merit as anything I have

1    heard in court.  Whether they like me or not, when I ask

2    have you restricted your search to insurance contracts or

3    have you done a broader search, would you be willing to

4    consider a production of generic documents, those questions

5    are capable of being answered.  If the answer is no, lawyers

6    disagree.  That is what the litigation process is for.

7            THE COURT:  Okay.  Then respond to the

8    assertion they make that Mr. Cheyney says I reached out to

9    Mr. Spadaro.  I said to him, hey, do you have any ideas

10   about a word sweep?  What is your reaction that your

11   response was no, our response is we want everything, period.

12           MR. SPADARO:  No, that was not my response, Your

13   Honor.  And this is empirical.  We don't feel it's

14   objective.  It's Exhibit H, the fourth page in my May 16th

15   response.  And here is my response to the suggestion of a

16   document sweep.  And I think I also addressed this in my

17   letter.  But I say in the second paragraph, in my May 16th

18   e-mail:  "But that aside -- and that that is our idealogical

19   disagreements -- it's difficult to frame the search terms

20   when I don't know what your search capabilities are."  This

21   is why I need them, to anoint the discovery liaison and who

22   can tell me what kind of hardware and software.  You know,

23   they can bring tools to this that I can't even imagine.

24           I continued.  "My law firm's document management

25   software could search 'PIP' within 10 words of 'full,'

1    'protection' within 10 words of 'full,' et cetera, and this

2    capability could make for a very manageable search.

3    Nationwide is obviously more high-tech than my six-lawyer

4    firm, and may have search capabilities far beyond those that

5    I might propose.

6           "On a related point, I have written to you

7    repeatedly Nationwide's failure to comply with the Court's

8    Default Standard for Discovery of Electronic Documents, as

9    required under Section 1 of the Scheduling Order."

10          THE COURT:  All right.

11          MR. SPADARO:  If Nationwide would simply comply

12   with the standard, you might be better able to work through

13   document-search issues."

14          Now, that is a drop dead response.  That is

15   saying well, look, here in my firm response.

16          THE COURT:  Okay.  I got you, Mr. Spadaro.

17          Mr. Cheyney, I want you to -- now, you see,

18   because you folks apparently are incapable of speaking

19   civilly to each other, I'm asking you now to respond to what

20   Mr. Spadaro says he said to you, which was not "no, forget

21   it, I want everything," it was an invitation for you folks

22   to speak in more detail about search capabilities, which you

23   evidently did not respond to.  So what is your answer to

24   that?  What did you say in response?

25          MR. CHEYNEY:  I didn't respond.  I said in my

1    Answers to Interrogatories. If I could, please, Your Honor,

2    go back to what the dialogue was in response to the quest-

3    ions about my abuse of privilege or my abuse of courtesy?

4              THE COURT:  Sure.

5              MR. CHEYNEY:  We gave him every courtesy from

6    the beginning. We didn't require an answer to our motion.

7    We agreed to a stay. We agreed to everything. And when the

8    Court remanded the matter, I wrote to him and said now let's

9    focus on the motion to dismiss. He then wrote, suggested

10   a scheduling of August 22nd, September 12th. I didn't say

11   no. Then he introduces the discovery dispute. And this is

12   what I said. And it's only one paragraph, five sentences.

13             "In light of your discovery dispute, Nationwide

14   is not willing to extend your response time for our motion

15   to dismiss. This motion to dismiss was filed timely, has

16   been outstanding for many months during which you had more

17   than ample time to formulate a response. Accordingly, we

18   will ask the judge to require the plaintiff to file their

19   response to the pending dispositive motion and abate all

20   discovery against Nationwide (including the informal Motion

21   to Compel More Specific Responses to Interrogatories and

22   Requests For Production of Documents) until the Motion to

23   Dismiss is decided by the Court. Of course, we hoped you

24   might agree to this; but should you agree, then we can ex-

25   tend the time for filing the Answer to the Motion to

1    Dismiss."

2              I never said drop, abandon, forget your dis-

3    covery dispute.  I just said August 22nd is fine.  I never

4    said he could have the extensions, I never said he couldn't

5    have an extension.  All I said is before we know what the

6    word "full and the relevance of the word "full" is, our

7    motion to dismiss should be heard because that will deter-

8    mine whether "full" has any relevance and I'm only obligated

9    to review and view discovery requests in the context of

10   relevance and answer what is relevant information.

11             One other point.  If there is information that

12   he learns about, nongeneric, relevant information that deals

13   with Mr. Eames' complaint, if there is information that is

14   relevant that I didn't answer, then he has sanctions, but

15   this is a search for a hypothetical nonexisting potential

16   search for a negative which I think is unnecessary but I

17   never extended.

18             THE COURT:  Stop, Mr. Cheyney.  Answer me this.

19   When you say it's not relevant, it's proving a negative, if

20   the question to you is -- and I put this in the context of

21   class certification discovery.  If the question to you is,

22   look, I want to know what sort of discussions or internal

23   memoranda or other information there is that would shed

24   light on how Nationwide, itself used these terms and under-

25   stood them, your position is that it just isn't relevant to

1  this case; is that it?

2          MR. CHEYNEY:  Correct.  Communicated to the

3  plaintiff.  The plaintiff has to have a misrepresentation

4  made to him that he relies upon to his detriment.  It has

5  nothing to do with what I said to myself walking down the

6  hall in the office or at a board meeting.

7          THE COURT:  All right.  Good enough.  I got your

8  positions.  Now I have some rulings for you and I hope you

9  all are listening very carefully.

10         First, we'll deal with the briefing.  You've

11  given them the extension they want.  It isn't unreasonable.

12  And despite what you are telling me, Mr. Cheyney, this was

13  I think a pretty solid example of you saying, no, we're not

14  going to answer, unless you withdraw your discovery, we're

15  not giving you an extension.  It was a poor trade to offer.

16  But in any event, you're out of luck on that.  They've got

17  their extension.

18         On briefing, you guys come to a reasonable

19  agreement on that schedule.  And if you can't agree with it,

20  I'll just make it easy.

21         MR. CHEYNEY:  I agree.

22         THE COURT:  The proposal that was made is

23  sensible.  That's the briefing schedule.  Get it done.

24         Second, you may think you can't believe that I

25  would have you respond to discovery until your motion is

1    decided but you would be mistaken, Mr. Cheyney, because this

2    court does not operate on the principle that the filing of a

3    motion to dismiss stops discovery in a case.  If that were

4    the principle upon which we operated, cases would grind to a

5    halt across the board because everybody thinks that their

6    case is one that is so important it ought to have the

7    dispositive motion decided right up front.

8           It's a little bit of an exaggeration, not

9    everyone but a very, very large percentage including people

10   just like you who think you know what?  My case ought to be

11   heard on the merits of the pleadings right now because if

12   only you, judge, were in tune enough to see our point of

13   view, we wouldn't have the expense of discovery.  It would

14   definitely be a better world if the press of work in the

15   courts across the country were such that every person who

16   wanted their issue heard first could have it heard first.

17          But that isn't the way it works.  The way it

18   works is you file your motions if you think you have

19   something.  If there is an extraordinary case where you

20   think it is so important that no other discovery can happen

21   while this is going on, then we take a look at that.

22          And in fact, in this case, merits discovery was

23   stayed and class certification discovery was allowed.  And

24   the other side has made what I think is not an unreasonable

25   request for information associated with the claims in their

1   complaint.  You may not like it but that doesn't make it

2   "irrelevant."  It also doesn't make it outside the bounds of

3   proper discovery.

4           So what I'm telling you is if it comes down to

5   advocacy before me on those discovery dispute, you come up

6   way short, mister -- way, way, way short.  The record that

7   looks like has developed here that is presented to me is

8   basically one where you said I'll give you the document.

9   I'll give you the contract.  Otherwise, you can drop dead

10  until my 12(b) of is decided.  That is sort of the gist of

11  the feeling or the communications that seem to be going back

12  and forth.  And I'm just trying to disabuse you of this in

13  the most direct, clear, emphatic way I possibly can.  I will

14  not tolerate that.

15          If you've got an issue with discovery, your

16  obligation is to sit down and discuss it with the other

17  side.  And if Mr. Spadaro is off-putting, he is off-putting,

18  but get past it.  And if you need to collect a batch of

19  letters and a history of anecdotes about how Mr. Spadaro is

20  over the top so he can come to me and say he is abusing the

21  process, do it and I'll hear you.  But I can tell you now,

22  both sides, if I have to spend an hour with you sorting out

23  who is more obnoxious which is what at least half this call

24  was about:  "He is bad, he is mean, he is nasty, he hit

25  first," I'm going to end up leveling sanctions at you

1     because that is not what the litigation process is about and

2     I won't let you make it about that.  You have real clients

3     with real money at stake, real interests on the line and

4     they don't care about whether you guys like each other, and

5     I don't care whether you guys like each other.

6            So get over yourselves and get past the emotion

7     here, please.  You should be sitting down.  If one side says

8     you have a meaningful dispute about what bounds of relevance

9     are, the way to do it is to say "we just don't think that is

10    relevant until our 12(b)(6) motion is decided.  Let's take

11    it to the judge."  You bring it to me.  Then I would say to

12    you, "well, I disagree."  You know, if this tends to go to

13    the certification issues, there is a reasonable likelihood

14    that it would lead to admissible evidence or it goes to

15    that issue in another way, that, under the broad rules of

16    discovery, it's not inappropriate for them to have that

17    information, I'll tell you I disagree with you.  But what I

18    will not have is "I won't talk" or "I won't respond" or you

19    know, or "I didn't want to write letters because every time

20    I responded to him, I get back a letter I don't like."

21    You've just got to get over that.

22           And, Mr. Spadaro, I hope you get over what

23    apparently your opponents say is a knee-jerk reaction to

24    every response they give you to being some accusatory letter

25    back.  And don't say I don't do that because I'm not hearing

1    you having to defend yourself.  I'm just telling you I'm

2    sure, I'm positive, given the level of rancor apparent from

3    you folks and has been from the start of this case, that

4    there is blame to go around.

5         So go look at yourselves in the mirror, stop

6    trying to figure out how to best the other side, adjust your

7    professional demeanor and start acting in the way with

8    people who are officers of the court.

9         Now, here is the short of it.  The briefing

10   schedule, it's as Mr. Spadaro suggested.  The discovery,

11   you are to make a good faith effort at a meet and confer

12   and your positions to date have been inadequate and

13   inappropriate.  And this is not going to wait until the

14   12(b)(6) is decided, Mr. Cheyney.  You give a substantive

15   response.

16        As to discovery on the electronic default

17   standard, if you guys can't come to an agreement, default

18   standard means just exactly that.  And saying, well, there

19   is no discovery that is electronic here is just flat

20   inaccurate.

21        You make a statement in your letter which in

22   find to be genuinely remarkable:

23        "Generally speaking, the 'federal courts' use

24   the expression 'electronic discovery' to refer to the method

25   of production of discovery, not necessarily to the form the

1    documents are created or stored."

2          Well, you know, I think you are just wrong on

3    that and I think if you read the default standard, you'd

4    understand we're not talking about the method of delivery,

5    we're talking about searching electronic databases for

6    relevant information.  So it's a default standard because if

7    you folks can't talk to each other, it's what kicks in.

8          So you are not at liberty to say "I don't care

9    how many times they say they think we've got relevant

10   documents in our electronic database, I say there is no

11   electronic discovery."  That approaches the level of an

12   almost willful refusal to acknowledge what is on the face of

13   their document.  I repeat, you may not like what they ask

14   for, you may feel like you have an opportunity or obligation

15   to come to me and said, "judge, it's overly broad, it's

16   burdensome.  Let me tell you about the kind of electronic

17   discovery we're talking about doing here and the money it

18   would cost."  I'm not telling you that you are cut off from

19   any of that.

20         Cost shifting associated with it in an

21   appropriate case, I'll look at any of the Subelocki

22   (phonetic) factors that are well known now in the practicing

23   bar.  This is not a new subject area so please don't try to

24   tell me that electronic discovery just means do I give it to

25   you in a disk or hard copy.  In 2005, that is definitely not

1    what it means.

2            Okay.  Now, I've been on a soliloquy for awhile

3    but does everybody understand what I ruled?

4            MR. SPADARO:  Your Honor, John Spadaro again.  I

5    you have ordered us to meet and confer now.  I understand

6    that.  I don't want to try to rewrite the transcript but I

7    understand that to mean that you feel that in broad strokes,

8    discovery we're seeking should be had, although we may need

9    to narrow it in a reasonable way through negotiations.  And

10   if that is what the Court instructs, we're going to do what

11   the Court tells us to do.

12           Is that a fair summary of where we are in terms

13   of where we are?  Because obviously we're meeting and

14   conferring for a reason.  I don't want to run up against

15   counsel saying -- I'm not saying they would take those

16   position but I have to anticipate what might be.  They would

17   say, well, the Court never blessed your discovery at all.

18   Go ahead.

19           THE COURT:  Hold on, Mr. Spadaro.  Mr. Cheyney,

20   do you understand what I asked you to do, sir?

21           MR. CHEYNEY:  Yes, sir.

22           THE COURT:  Okay.  Mr. Skiles, are you there?

23           MR. SKILES:  Yes, Your Honor.  I am.

24           THE COURT:  Do you understand as well?

25           MR. SKILES:  Yes, Your Honor.  I do.

1          THE COURT: All right. You know what?

2     Mr. Spadaro, these are smart men on the other side. And I

3     think I have been more explicit and more direct and emphatic

4     than I've had to be in a long time with counsel in any case

5     so I trust that you and they will take the import of my

6     words and manage your discovery appropriately. Go back and

7     look at the transcript  and figure it out. And if you guys

8     can't figure it out, at that point I think we'll be stepping

9     it up into the realm of sanctions because I am not going to

10    spend another call like this. And I am confident that based

11    on what I have already said, people can understand and move

12    forward.

13          Now, let me hasten to add I'm not saying there

14    is going to be some automatic sanction flying around if

15    there is another call. If there is a genuine good faith

16    dispute you can't get past because I have given you

17    statements that are more general than are needed for you to

18    really wrestle with a fine point, I'm happy to help you.

19    What I'm not happy to do is to deal with generalized stuff

20    about, no, I think that nothing should happen until my

21    dispositive motion is decided. What I'm telling you is that

22    does not fly. That the notion of get us the documents to

23    deal with the issues that deal with whether they think that

24    is going to be in or out of the case, at this point it's in

25    the case based upon the allegations and I'm saying come to

1   some sensible way to address that.  So I think actually I've

2   said enough.

3              MR. SPADARO:  That was helpful, Your Honor.

4   Thank you.

5              THE COURT:  I trust you folks will get this

6   worked out.  And I'm hopeful the next time I'm dealing with

7   you folks, it will be either in court at oral argument or at

8   a trial, if it gets that far, or to sign whatever settlement

9   agreement you get to, if miraculously people work it out.

10  But what I hope not to have to do is to have another

11  conversation with you folks that is on a personal level.

12  That ought not happen again.

13             All right.  Let's go to work and get going on

14  the merits, folks.

15             MR. SPADARO:  Thank you very much, Your Honor.

16             MR. CHEYNEY:  Thank you, Your Honor.

17             MR. SKILES:  Thank you, Your Honor.

18             (Telephone conference ends at 10:50 a.m.)

19

20

21

22

23

24

25