# EXHIBIT N

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -
     THOMAS A. EAMES, on behalf of
 4   themselves and all others      :    CIVIL ACTION
     similarly situated; ROBERTA L. :
 5   EAMES, on behalf of themselves  :
     and all others similarly        :
 6   situated; TAMMY EAMES, on behalf:
     of themselves and all others    :
 7   similarly situated;             :
                                     :
 8              Plaintiffs,          :
                                     :
 9        v                          :
                                     :
10   NATIONWIDE MUTUAL INSURANCE     :
     COMPANY,                        :
11                                   :
                Defendant.           :    NO. 04-1324 (KAJ)
12                          - - -

13                  Wilmington, Delaware
             Tuesday, September 13, 2005 at 9:30 a.m.
14                  TELEPHONE CONFERENCE

15                          - - -

16   BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

17                          - - -
     APPEARANCES:
18

19           MURPHY, SPADARO & LANDON
             BY:  JOHN S. SPADARO, ESQ.
20
                     Counsel for Plaintiffs
21

22           SWARTZ CAMPBELL, LLC
             BY:  NICHOLAS E. SKILES, ESQ.
23
                 and
24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

```
 1   APPEARANCES: (Continued)

 2                 SWARTZ CAMPBELL, LLC
                   BY:  CURTIS P. CHEYNEY, ESQ.
 3                      (Philadelphia, Pennsylvania)

 4                 Counsel for Defendant

 5

 6

 7                      - oOo -

 8              P R O C E E D I N G S

 9           (REPORTER'S NOTE:  The following telephone

10   conference was held in chambers, beginning at 9:30 a.m.)

11           THE COURT:  This is Judge Jordan.  Who do I have

12   on the line?

13           MR. SPADARO:  Your Honor, it's John Spadaro for

14   the Eames plaintiffs.  Good morning.

15           MR. CHEYNEY:  Curt Cheyney for Nationwide.  With

16   me is Pete Oesterling, the liaison for Nationwide.

17           MR. SKILES:  Also Nick Skiles on behalf of

18   Nationwide.

19           THE COURT:  Mr. Oesterling, why we don't we

20   start having you tell me a little bit about yourself, if you

21   would, please.

22           MR. OESTERLING:  I'm an attorney in the Office

23   of General Counsel.  I've been working for Nationwide for a

24   little over 21 years.  I currently head up the discovery

25   unit for the corporation.  I have two lawyers and three
```

1  paralegals that work for me full-time and a host of

2  temporary lawyers and paralegals that we employ on an as

3  needed basis.

4       THE COURT:  Tell me about your experience with

5  and knowledge of the computer systems at Nationwide since

6  the purpose of having an e-discovery liaison person is -- no

7  offense that you got a law degree, because that is great if

8  you also have the technical expertise -- but it's to have

9  somebody that knows the system.  Tell me what you know about

10  the system.

11       MR. OESTERLING:  I know enough about the systems

12  to I think serve as a qualified e-discovery liaison with

13  regards to the two systems that are in question here.  I

14  have what I would call an e-discovery team for technical

15  questions that I can't answer with regards to the detail

16  associated with, you know, the technical aspects.

17       THE COURT:  Are these people readily accessible

18  and answerable to you?  In other words, we wouldn't be

19  hearing, oh, I'll have to get back to you in a week kind of

20  stuff?

21       MR. OESTERLING:  No, no.  No, Your Honor.

22  They're very responsive since we've been engaged in numerous

23  electronic discovery requests and have gotten our system and

24  process down pretty well given the challenges associated

25  with some of the volume that we are involved with.

1          THE COURT:  You said you had numerous

2    experiences with this.  Have you served in this liaison role

3    previously?

4          MR. OESTERLING:  No, Your Honor.  This is the

5    first opportunity that I've had to serve as an e-liaison

6    under the default standard in Delaware.

7          THE COURT:  Well, I appreciate your viewing it

8    as an opportunity.

9          All right.  Thank you, Mr. Oesterling.

10          Now, Mr. Spadaro, Mr. Cheyney, let's turn to you

11    folks.  I got some questions for you and we're going to be

12    quick here because I have other people to help out with

13    problems they've got.  So I can't spare another hour of

14    the kind of junk we went through.  And I use that term

15    advisedly, I don't use it lightly or flippantly.  It was the

16    sort of lack of cooperation which charitably can be called

17    "junk" that lead us to a long conversation on August 5th.

18          And, Mr. Spadaro, your letters have got some

19    heated rhetoric.  I want you to answer me some specific

20    questions.  First, you assert that you still know nothing

21    about how the Nationwide system works.  I've read the

22    letter that was attached to Mr. Cheyney's responsive

23    correspondence, a letter from him to you dated August 22nd

24    which appears to discuss Nationwide's system and the

25    approach that they're intending to take.  It's a three

1    and-a-half page single spaced document. Having read that

2    document, which I assume you did, how can you assert to me

3    you know nothing of their system and how it works?

4            MR. SPADARO: Well, Your Honor, I know what they

5    say they're going to do. I don't know how their systems

6    work. Your Honor, for example, I presented them in May

7    with search terms. An example of how my system works, my

8    little six lawyer firm system works, if you want to find a

9    description of PIP as "full," you can type in PIP within 10

10   characters of the word "full," just to take an example. Do

11   I know whether they can do that? Or what, I guess more to

12   the point, what they would be doing it on? I don't know.

13           Now, the Third Circuit in the Frazer (phonetic)

14   case. And Your Honor may have seen reference to that in the

15   papers.

16           THE COURT: I did.

17           MR. SPADARO: In the Frazer case, the Third

18   Circuit said; and not my words, the Third Circuit words;

19   that Nationwide searched it's main frame server. I asked

20   them to do that here. They told me we don't have a main

21   file server. That was their response. They didn't tell me.

22   You know, obviously there is something behind that. There

23   is maybe some qualifier to "main." I'm not that computer

24   literate. Maybe they have a network of file servers. Does

25   Your Honor know that from what we read? Do we know that

1    from what we read?

2           THE COURT:  No, I know this from what you read.

3    That you are guilty of hyperbole in your expressions to the

4    Court and it's not helpful.  It's an example where you folks

5    obviously can't get along because instead of saying there is

6    additional technical information that I would like to have

7    that I have asked for specifically that they decline to

8    give, and which I asked the Court to instruct them to give,

9    instead of me say "I know nothing about their system,"

10   which is flat not true because unless you don't understand

11   English, having read this letter, you understand and know

12   something about the system.  It may not be everything you

13   want to know about their system.

14          What I'm telling, Mr. Spadaro, you make the

15   process more difficult, not less difficult when you write

16   letters to the Court that say "sanction them, I still know

17   nothing" and then I dig through the correspondence and the

18   attachments and I see a four-page single spaced letter, a

19   lot of which is not relevant to what you were trying to get

20   at, I grant that, but some of which is specific to "this is

21   what we think we can do and how we intend to approach a

22   search."

23          So, no, I'm not -- see, this is what is

24   important.  I'm not here to engage in a discussion where you

25   justify yourself because I just don't have time for that.

1    What I have tried to express to you people is I have

2    hundreds of cases.  So if the next step has to be that I

3    appoint a Special Discovery Master and it comes out of both

4    your hides, we'll do it.  We'll do that.

5              MR. SPADARO:  Your Honor --

6              THE COURT:  Stop.

7              MR. SPADARO:  Well --

8              THE COURT:  Stop.

9              MR. SPADARO:  I'll stop.

10             THE COURT:  Thank you.

11             MR. SPADARO:  I can't make a record if I stop.

12             THE COURT:  I'll give you a couple minutes to

13   make your record.  But if you think you are going to get an

14   abuse of discretion ruling out of the Third Circuit because

15   I'm not letting you keep burning time on this, you're

16   welcome to try.  You're welcome to try.  But I just don't

17   have time to give you an hour today for you to make another

18   record.

19             What I'm telling you is having read the

20   correspondence, I understand you are not getting everything

21   you think you want, but you are not helping the process,

22   because you are overstating your case and you are saying

23   things which frankly I think a fair reading will demonstrate

24   are inaccurate.  To say "it's been months, I still know

25   nothing of their system," in light of the letter, is just --

1    maybe we're working around a semantic issue here. When you

2    say "system," you mean "I want the technical specs and they

3    haven't given them." When I read that in the context in

4    which you gave it to me and a demand for sanctions, it was

5    their thumbing -- literally, you said "They're thumbing

6    their nose at the Court. They haven't given a single

7    document. They still won't talk to me about their system."

8    That is not an accurate picture. You guys still aren't

9    getting along well but to say that they haven't done

10    anything is just flat inaccurate.

11           So now, that's my record for you. I expect

12    better out of you, just like I expect better out of the

13    other side. You quoted at length to me the verbal spanking

14    I gave to the other side about being cooperative in

15    discovery. You can consider this your own version of that.

16    I expect no hyperbole and scrupulous accuracy if you want

17    me to step in and help you with issues. Don't overplay your

18    hand; which you did this time, to a very large extent.

19           Now, in the interest of your making a record,

20    here is your couple minutes. Say what you need to say, get

21    it on the record and then we can move on to substance.

22           MR. SPADARO: Well, Your Honor, I'm not sure

23    exactly how to proceed. After the last teleconference,

24    within hours of the teleconference, we could read into the

25    record the message I sent within hours. It is restrained,

1    it is professional.  I extended everything I had done in

2    this case, Your Honor, and the response the same day is "we

3    don't expect we're going to find anything.  We're not going

4    to.  We don't think we have to meet with you.  We don't

5    think our e-discovery liaison has to meet with you."  That

6    is the response of August 5th from Mr. Cheyney and "maybe

7    Mr. Muncie has their documents" and I think everyone on the

8    calls knows what that's means.  "Maybe Mr. Muncie has the

9    documents."

10            THE COURT:  Look --

11            MR. SPADARO:  The Court doesn't want to hear it.

12            THE COURT:  It's in the record.  You said you

13    needed to make a record.  That is in the record.  Your view

14    on it is in the record.

15            MR. SPADARO:  Default standards, Your Honor,

16    have a specific requirement as to what they're supposed to

17    do to educate me.

18            THE COURT:  Right.

19            MR. SPADARO:  It's true I know they have

20    computers.  I don't know what kind of search was done in

21    Frazer.  Gee, we've got a model from another case where they

22    actually did a search of the file server.  They deny they

23    even have the equipment that Frazer says.  I don't know

24    how they're going to dot searches.  I don't know if they

25    can perform Boolean searches.  I don't know where corporate

1   level management documents are stored. I'm not talking

2   about e-mails that have been -- yes, I know that they're

3   going to search e-mails from last week and they're going

4   to limit it to people who are connected to Delaware. That

5   search is calculated to fail. It has almost no chance of

6   discovering the documents that we're looking for.

7           THE COURT: Now, stop. I read that in your

8   letter. Then I read their response which said we're not

9   limiting this geographically. You said they're limiting to

10   people in Delaware. They said expressly we're not doing

11   that. Where is the disconnect? How come you think they're

12   doing it when they said in correspondence back to you on

13   September 8th we're not doing that? And I assume they'll

14   reiterate that on the call. I don't know. Mr. Cheyney, are

15   you limiting this?

16           MR. CHEYNEY: No, Your Honor.

17           THE COURT: Okay. Mr. Spadaro, why do you

18   believe they're doing it when they say they're not going to

19   do it?

20           MR. SPADARO: Well, Your Honor, if you look at

21   the list of custodians they have given us, 90 percent of

22   that list are agents, insurance agents. And I recognize

23   the names: Broadbent, Muncie, Deaton, Truitt. These are

24   insurance agents that we subpoenaed in this case. They're

25   Delaware insurance agents. That's a list. That list

1    consists mostly of Delaware insurance agents.  It's about 70

2    people on that list.

3         THE COURT:  Did you pick the phone up and speak

4    to Mr. Cheyney and say "This is why I'm concerned?  That

5    there's a limitation to Delaware and can you allay my

6    concern?"  Did you have a conversation like that?

7         MR. SPADARO:  Your Honor, this is why the

8    Exhibit B, as painful as it is, needs to be read from start

9    to finish.  It's in there more than once where you're

10   searching Delaware agents and I expect the other 20 people

11   on that list are probably people with some sort of regional

12   responsibility for Delaware and they never decided that,

13   they never confirmed that.  This is the state of mind

14   ignorance.

15        Your Honor challenged me to say, to prove that

16   the point that they're making is wrong.  I don't know

17   enough.  But I know enough to say that the agents -- and,

18   you know, the duplicity is on two levels here.  Your Honor

19   may or may not recall because so much has transpired that

20   when they made their initial discovery disclosures, I

21   complained that the documents themselves, the documents

22   created and shared with the consumers in Delaware should

23   come not from the agents, that we shouldn't be put to the

24   expense of multiple subpoenas of nonparties because they

25   have possession, custody and control of their agents'

1   documents.

2           Now they're using Delaware agents to limit the

3   search to Delaware, and there is no way we're going to get

4   the documents that way.  And, suddenly, they do have control

5   over the agents' documents.  And not only that, they're

6   presenting the documents as their documents.  That is

7   absolutely sanctionable.  I've been doing it for 20 years

8   and that is sanctionable conduct.  That is completely being

9   obscured I think by the process here.

10          THE COURT:  The process being that you have

11  to do what?  That you have to discuss their issues, the

12  problems you are having with them?

13          MR. SPADARO:  Well, Your Honor, to me, the

14  process is one in which every call is a referendum on me

15  personally.

16          THE COURT:  No.

17          MR. SPADARO:  And, well, that has been my

18  experience, Your Honor.  And if you go back the transcripts

19  of earlier calls, I think I have shown objectively that they

20  were not responding to me.  Mr. Oesterling just said with a

21  straight face these aren't people that say I'll get back to

22  you in a week and yet you see if you read these e-mails, you

23  know Mr. Cheyney says "I'll get back to you next Wednesday."

24  Next Wednesday comes and goes, a week passes.  "You said you

25  were going to get back to me next Wednesday."  "No, I did

1    never said that."  I write to him, you still haven't gotten

2    back to me.  I'm chasing them, chasing them.  It's more of

3    the same.  Now, once I said, "look, I'm going to get the

4    judge on the phone," things began to change somewhat and

5    they began to put a prettier face on things.  And I think

6    the Court -- it sounds me as though the Court has bought

7    into it, and we despair of the process at this point if that

8    is the case because I do not know, I do not know -- I know

9    they're going to go to e-mails for their agents.  Those are

10   not their systems.  I know nothing about their systems.

11           And, Your Honor, Your Honor has told me that

12   that is a misrepresentation.  I don't know what to do.  I

13   haven't been in this situation before where I know what I'm

14   saying is true objectively and I can't persuade the Court of

15   it and.  But I am as ignorant of their systems, their

16   internal systems where the documents are that we want and

17   who might have them as anyone in the parking lot outside my

18   office window right now.

19           THE COURT:  Have you spoken to Mr. Oesterling?

20           MR. SPADARO:  I asked repeatedly to meet with

21   Mr. Oesterling.  If Your Honor read Exhibit B, you will see

22   their first reaction was "You don't get an audience.  Show

23   me," Mr. Cheyney's says on August 5th, within hours of

24   speaking with Your Honor, within hours.

25           THE COURT:  I read it.  I did read it.  I read

1     where he said "I see no requirement for that."  I'm asking

2     you, did you say, "look, I want to speak to the man" and

3     they said "no, you don't get to?"

4           MR. SPADARO:  That was their response.  When I

5     first asked to meet with them later on, I asked for an

6     in-person meeting with this attendance.  Again, I proposed

7     four days.  He said they were unavailable on each four dates

8     on the month of September.  Then I told them "I'm calling

9     the judge.  Are you available on September 13th or 14th?"

10    Then, and only then, they came back and said "Guess what?

11    Mr. Oesterling is going to meet with you."  And now we have

12    a meeting scheduled for the end of September, almost 60 days

13    out from the August 5th teleconference.  But I don't want to

14    continue with process.  I want to get the documents.  But

15    this is not -- we are not moving to a place where I get the

16    documents.  And that is not fair.  Because discovery is,

17    Your Honor knows the purpose of civil discovery.  That's

18    where we're moving.  We're moving to a place where they come

19    back and said "We did our search.  We didn't find anything"

20    because they're going to ask.

21          THE COURT:  Now, see, stop.  You say that is

22    where we're moving.  That is the problem with what is

23    happening in this case.  You're so convinced that they're

24    bad actors, your experience either in the course of this

25    case or previous case was Mr. Cheyney or both has persuaded

1   you that -- and I'll use your own words.  You've accused

2   them of duplicity, which is a fancy way of saying they're

3   liars.  "Judge, these people are liars."  So, stop.  So

4   that's where your mind is at.  And you know what?  At the

5   end of it, it may turn out that you're right.  That's an

6   explosive charge but it's not one that you can expect the

7   Court to buy into.

8           So when you say objectively "I don't know what

9   to do, I can't persuade the Court, you've bought into it,"

10  I'm reading a record here.  I'm reading a record where you

11  demand things and they write back to you and say "we're not

12  giving you this.  What do you think about that?"  And you

13  write back and say "I already told you about that and this

14  the other thing I want."

15          It's true this isn't working smoothly.  Heck,

16  it's so far from being what it ought to be that it really is

17  virtually totally a breakdown, which is why I said I'm

18  inclined to, for no other reason than I can't spend all my

19  time with sorting out stuff for you people, to get a Special

20  Discovery Master in who has technical expertise.  You will

21  both pay for it, at least in the first instance.  I'll ask

22  that person if they can find any reason for me to believe

23  one side or the other is more at fault.  And if I think

24  there is, I'll make adjustments to it.

25          But you want me to go immediately to sanctions.

 1    And what I'm having a problem with, and I'm going to have to

 2    give Mr. Cheyney an opportunity to speak here for a couple

 3    minutes, is you've taken the step of saying "I know where

 4    this is going.  I know where it's headed."  And I can't take

 5    that approach.  I'm a judge, Mr. Spadaro.  I have to wait

 6    until things actually play out and I can see how people

 7    behave.  I'm not allowed to be Karnac, put the discovery

 8    letters to my forehead and say what the answer is before I

 9    look at them or see what is the appropriate response, i.e.,

10    sanctions or not, until people have a chance to perform.  In

11    your view, they've had their chances, they've burned their

12    bridges, et cetera.  I look at this record, and that's not

13    true.  After August 5th, did things move as they should

14    have?  No.  Was there movement?  Yes.

15              All right.

16              MR. SPADARO:  Your Honor, can I just make two

17    quick points.

18              THE COURT:  Yes.

19              MR. SPADARO:  Because I did use the word

20    duplicity.

21              THE COURT:  You used the word duplicity.

22              MR. SPADARO:  I did, and this is why.  You just

23    asked Mr. Cheyney point blank, "are you limiting anything to

24    Delaware?"  He said "no."  If you look at the August 22nd

25    letter.  I know it's a collection and argument date.

1    August 22, 2005 letter from Mr. Cheyney.  I'll check to see

2    if it's an exhibit.  Yes, it's Exhibit C to their papers so

3    maybe it's easier to find it that way.  If you turn to page

4    2, and if you look at the first full paragraph, there in the

5    middle of the page, they tell us, item number 3 in that

6    paragraph, "Nationwide will first search Delaware state

7    e-mail files and Nationwide Mutual Insurance Company board

8    minutes."

9             Now, the board minutes search is helpful and

10   it's generic.  It's not Delaware specific.  All right.  But

11   the board minute search you're talking about, Your Honor

12   know how boards work.  Boards do not get into minutia,

13   generally.  Boards go on the periphery issues from issue to

14   issue.  When you want, you're in litigation and you want

15   the minutia, you have to go to the management and middle

16   management and sometimes beneath that.  So I wanted a search

17   of board minutes because it might be there but board minutes

18   are not really the heart of our search attempts.  From our

19   perspective, they've never been.

20            It says right here they're going to search

21   Delaware state e-mail files.  That is what I know about

22   their system.  I have e-mail files and, of course, I knew

23   they had e-mail files because that's a modern corporation.

24   They're a $115 billion corporation operating in the 21st

25   Century.  So it's incorrect to say I know nothing about

 1    their systems in that sense. I know they had e-mails before
 2    I sued them, Your Honor. But they're limiting to Delaware,
 3    and the list, the list of people they give me as custodians
 4    is made up almost entirely of Delaware insurance agents who,
 5    according to them, are not even Nationwide. And, you know,
 6    we go back and forth.
 7            You talk about duplicity. I can prove, if I get
 8    the transcript, that earlier they said "We don't have
 9    possession, custody and control of the Delaware agents
10    documents."
11            THE COURT: Okay.
12            MR. SPADARO: Now they're their own custodians.
13            THE COURT: All right. Mr. Cheyney, you've got
14    a few minutes if there is anything you think you need to put
15    on the record on this call, and then I have --
16            MR. CHEYNEY: I understand, Your Honor. I want
17    to really yield to Mr. Oesterling because we've done a great
18    deal. First, to say we took your admonitions seriously.
19    We have been working steadily. We have not been trying to
20    obscure or do anything. The issue of Frazer is a non
21    sequitur. That was a main server for the AOL system, agents
22    only, not for the company. And we were looking for a
23    specific document that we, new by header, date, author,
24    title, title header and what it was about. That is not
25    what we have here. There is no main server that covers the

1    company at all.  Different parameters, different search

2    operations.  We have no way of looking for a day, a time, a

3    title.  There is no genesis document.  There is no generic

4    document by subject or description.

5         We are searching Delaware first.  And we did not

6    say our agents, capital A, "Agents" are our employees and

7    their documents are their documents.  They're independent

8    contractors.  This is a three court case.  The United States

9    says they're independent contractors.  Yes, we have access

10   to their electronic system when they're on us and lease

11   their system from us but we're not just limiting our search

12   to Delaware.  We don't intend to limit our search for

13   Delaware but to start at Delaware first.

14        Now, can I please ask Mr. Oesterling to tell us

15   what we have done to show you what we have done to try to

16   deal with your admonitions and to cooperate as best we can?

17             THE COURT:  Yes.

18             MR. CHEYNEY:  Can he give a couple minutes?

19             THE COURT:  Yes, over a couple minutes.  Yes.

20             MR. OESTERLING:  Yes, Your Honor.  We were

21   requested to search 148 mail files.  Of those 148, we've

22   completed 116.  Out of those 116, we've collected in excess

23   of 80,000 potentially responsive e-mails.  Now, this would

24   be e-mails that contained the search words that were agreed

25   upon by the parties.

1              THE COURT:  Let me ask you, Mr. Oesterling, have

2    you met with Mr. Spadaro or had any conversation with him?

3    Has he heard your voice before today?

4              MR. OESTERLING:  No, he hasn't, Your Honor.

5              THE COURT:  Okay.

6              MR. CHEYNEY:  If I could interrupt, Pete.

7              We do have an agreement to meet on the 20th,

8    whatever day it was.  And the date I agreed was the date I

9    said Pete would come back from vacation.  That is why we

10   called and got a date, not because I was afraid of this

11   conference.  And my earlier letter says when he returns on

12   the first of this week, we will give you some dates.  And we

13   did, not in fear but in cooperation.

14             Please go on, Pete.

15             THE COURT:  Well, I'm taking it as a given you

16   are doing things.  I can see it from the correspondence.

17             MR. CHEYNEY:  We completely searched the board

18   minutes, and the last thing we found it even mentioned PIP

19   was a Texas PIP in 1993.  It has nothing to do with these

20   issues nothing to do with it whatsoever.  We have searched

21   over the board minutes of the corporation, the state level

22   minutes which were where there is officers of the

23   corporation that relate with the agents and we started the

24   agent search.  We've done a great deal.

25             THE COURT:  All right.  Well, certainly

1  Mr. Spadaro, who could speak for himself if we had time but

2  we don't, would say that is because you are looking in the

3  wrong place.

4       So here is what is going to happen.  You guys

5  are going to have this meeting.  And, of course, I hope it's

6  not too much to expect that it will be thoroughly

7  professional, that everybody will be under control, that

8  there won't be any table pounding or finger pointing or

9  sarcasm or anything else and that there will be an open

10  discussion of the Nationwide computer system.  If it needs

11  to be done under a protective order, we've got one, I think.

12       MR. CHEYNEY:  We submitted one back to him that

13  said it was acceptable to us.  He then said he had some

14  issues with our reply.

15       MR. OESTERLING:  Well, and if I could interject?

16  The Nationwide system, we're talking hundreds of databases.

17  Now, what we're trying to zero in on is what system or

18  systems could potentially have relevant evidence.

19       THE COURT:  What I'm telling you folks on the

20  Nationwide side is it's not good enough for you to say to

21  me this is what we've done.  The way to cut this issue off,

22  which I am insisting you do, is to explain to Mr. Spadaro

23  what the Nationwide system is like.  Have the technical

24  people in the room, if you have to, Mr. Oesterling.  Don't

25  have a meeting where he's got questions without having the

1    people there who can answer him.  Have a discussion about

2    the system.  All right?  Because I don't want to keep

3    talking  to you guys about "they're setting it up to fail,

4    this that and the other.  If you only listen to me, you will

5    see that they're lying sacks."  And I don't want to hear

6    from you "that's not true, that's not true."  What I want

7    is for him to be able to say "I found out this and that

8    and the other thing about this system and we came to some

9    resolution" or I want you to be able to say, "judge, we

10   gave -- we had an X-hour conversation in which we laid out

11   the entirety of our documents storage and retrieval system

12   and asked him and made proposals about how to go forward,

13   and he made counterproposals and this is why it was

14   reasonable or wasn't reasonable" because then I'm in a

15   position to say "is cost shifting appropriate?"

16           Right now, I can't do that because while I

17   disagree flatly, as I've said in this call, with the

18   hyperbole of Mr. Spadaro's letter that nothing has happened

19   or he knows nothing, I agree with him that we're a month

20   plus after the last call and still there is an inadequate

21   degree of cooperation and conversation so that we can get

22   past the issue of e-discovery into the discovery process

23   itself in a way that includes the plaintiff meaningfully.

24           So you guys have your meeting as described, but

25   do you understand both sides what I'm telling you to do?

1    Mr. Spadaro, do you understand?

2                MR. SPADARO:  I do, Your Honor.  I do have one

3    very brief application I'd like to make, if the Court will

4    permit it.  I think it will help.

5                THE COURT:  Go ahead.

6                MR. SPADARO:  Well, Your Honor, my application

7    is that the Court order them now to make a good faith effort

8    to identify persons with knowledge of the practice and its

9    genesis.  And by the practice, I'm not going to use loaded

10   word they're not going to agree with.  We all agree and we

11   stipulated at the deposition of the agents so that we could

12   avoid deposing the next three agents.  That the vast

13   majority of documents that the agents produced characterize

14   PIP as full.  They say "the characterization is innocent,

15   it's this."  I say "it's not innocent, it means that."

16                But when you look at three documents, the

17   characterization and in the memorandum of insurance, and the

18   rate quote documents, these columnar documents that list the

19   type of coverage, the amount of coverage and often list a

20   premium amount for each, we say they're declarations pages,

21   they say they're not and so forth, but there is no question

22   whenever they purport to sell the minimum limit that in

23   those type of documents, PIP is characterized as "full,"

24   and all the agents are doing it and they're not doing it by

25   accident and they've been doing it for years.  Somebody told

 1   them to do it so I'd like a good faith effort to identify

 2   people of the knowledge of the genesis of that practice.  If

 3   we find those people, we'll find the documents.

 4           THE COURT:  Mr. Spadaro.

 5           MR. SPADARO:  Sure.

 6           THE COURT:  I saw that in your correspondence.

 7   I know that is something you would like.  And you know what?

 8   That might be a perfectly reasonable request.  If you

 9   haven't propounded it formally, you should propound it

10   formally.  But I don't have time to address it today, not

11   even to get a response.  I have another group of lawyers who

12   have another discovery dispute and I have to turn to them.

13           Here is the last thing I'm telling you to do.  I

14   want both sides to identify to me and report back to me on a

15   knowledgeable party who I can turn to as a technical expert

16   perhaps in e-discovery to help me sort out your issues if

17   you keep having problems and who could be a Special

18   Discovery Master if I had to pull somebody in here.  You

19   both --

20           MR. SPADARO:  You mean two people or single?

21           THE COURT:  I'm talking about if it can be one

22   person, that's the best, but I'm talking about you folks

23   identifying somebody because --

24           MR. SPADARO:  I understand.

25           THE COURT:  -- this is not productive.  It's not

1  helpful.  You've guys have spent I don't know how much time

2  and money writing me letters, saying how unreasonable the

3  other side is.  I mean I'm not unsympathetic to you,

4  Mr. Spadaro.  You say "it turns into a referendum on me."

5  That's now how you view this but I have to say candidly on

6  this record you are so wrapped up in the emotion of this

7  case, it's just screaming at me over the phone.  The heat

8  waves are coming off the receiver at this end.  Both sides.

9  The sarcasm is evident in spots in the correspondence from

10  the other side.  Your intensity is evident.

11      You folks have got to get your emotions under

12  control.  And I can't be the one who is holding your hand

13  through this.  I have got too many other people with

14  legitimate complaints and disputes that I can't have your

15  issues swamp me on a monthly basis for time to read your

16  letters, digest your problem, which I do, and then get on

17  the phone with you and try to sort it out.

18      So both sides, I want a discussion from you

19  about who would be a good neutral if this happens again,

20  because if it happens, this is the last free bite.  Next

21  time, we're going and I'm bringing somebody into the mix.

22  And in the first instance, we'll be splitting it 50/50 but

23  I'm going to be asking that person "who is a bad actor

24  here?"  And if they say "you know what?  I think Nationwide

25  really is jerking them around," you are going to pay the

1  full freight; not 75 percent, the whole wad.

2          Does everybody understand what I'm trying to get

3  across to you?  Mr. Cheyney?

4          MR. CHEYNEY:  Yes, Your Honor.

5          THE COURT:  Okay.  Mr. Oesterling, I'm glad to

6  have you in the mix.  I know you are in-house with

7  Nationwide but I'm hoping against hope that you will be a

8  force for reason in the course of these discussions.

9          MR. OESTERLING:  Your Honor, if I could make a

10  suggestion to make our meeting more productive?  If there

11  are specific questions, technical questions that I might

12  not be able to answer in a face-to-face, I could do some

13  research prior to our meeting to make sure that it is

14  productive.

15          THE COURT:  Okay.  Well, that's a great idea.

16  And, Mr. Spadaro, you let them him know that.

17          And here is my last piece of advice for you

18  before I hang up because I've got people on hold.  I expect

19  there to be more phone calls; more phone calls and fewer

20  e-mails.  Pick the phone up and speak to each other.  If you

21  need to make a record in e-mail afterwards that you feel

22  they're so completely absent any trust, then you write your

23  confirming e-mail, but pick the phone up and speak to each

24  other, okay?  I think at least 75 percent of your problem is

25  you are so busy each side making a record that you are not

1    even trying to communicate.  You're only trying to build a

2    record to come to me and that is not helpful.

3          All right.  That's it for this call.  I'll look

4    to see from you folks within two weeks your suggestion after

5    good faith discussions on this about who a fair neutral

6    would be with the expertise to help us sort this out if you

7    folks can't give your act together.

8          (The attorneys respond, "Thank you, Your

9    Honor.")

10         THE COURT:  Good-bye.

11         (Telephone conference ends at 10:07 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25