## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

THOMAS A. EAMES, ROBERTA L. EAMES ）
and TAMMY EAMES, on behalf of ）
themselves and all others ）
similarly situated, ）
）
             Plaintiffs, ）    C.A. No. 04-CV-1324KAJ
）
v. ）
）
NATIONWIDE MUTUAL INSURANCE ）
COMPANY, ）
）
             Defendant. ）

## EAMES PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
## MOTION TO COMPEL DOCUMENTS RESPONSIVE TO
## THEIR INITIAL DOCUMENT REQUESTS, AND FOR SANCTIONS

MURPHY SPADARO & LANDON
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

Attorneys for plaintiffs Thomas A. Eames,
Roberta L. Eames and Tammy Eames (on behalf of
themselves and all others similarly situated)

November 9, 2005

125732

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................4

I. NATIONWIDE TURNS DISCOVERY ON ITS HEAD.............................................4

II. NATIONWIDE PROVES OUR POINT...................................................................7

IV. NATIONWIDE'S RECENT RESPONSES ARE BESIDE THE POINT ................9

CONCLUSION......................................................................................................................10

## TABLE OF AUTHORITIES

<u>**Case**</u>                                                                                                 <u>**Page**</u>

Duplan Corp. v. Deering Millikan, Inc., 397 F. Supp. 1146 (D.S.C. 1975) .................................... 5

International Paper Co. v. Fibreboard Corp., 63 F.R.D. 88 (D. Del. 1974) .................................... 5

Unisys Corp. v. Royal Indem. Co., C.A. No. 99C-08-055JOH (Del. Super. Ct. Jan. 9, 2001),
aff'd, C.A. No. 99C-08-055JOH, 2001 WL 845666 (Del. Super. Ct. May 25, 2001) .................... 5

## **INTRODUCTION**

In the Eames plaintiffs' opening brief we presented an overwhelming record of Nationwide's discovery abuses -- a disgraceful chronicle of stonewalling, sandbagging and violation of Court orders. In response, Nationwide indicts opposing counsel for the (apparently) unforgivable sin of "letter writing." In Nationwide's view, it is perfectly acceptable to ignore a Court order on electronic discovery standards; to exclude from a discovery-related meeting persons whose attendance was specifically required by the Court; to raise objections at oral argument that it never asserted in its written responses; and to respond to the Court's admonitions by dashing off facetious e-mails. But write someone a letter and you have gone too far.

Nationwide's reply is cynical, misleading and outrageous. It actually compounds some of Nationwide's worst misconduct. Take for example our charge that Nationwide avoids discovery through the parsing of words, and by ignoring Court orders. A perfect example can be found at page 14 of Nationwide's brief, where Nationwide asserts that "[t]here has been no previous motion to compel in this case," and that "[n]o orders compelling discovery have been entered."

But in fact the March 28, 2005 Scheduling Order requires that discovery disputes be joined by *letter application* as opposed to formal motion. Ex. A, Para. 3(f). As Nationwide well knows, the Eames plaintiffs filed such an application (regarding the very same discovery at issue here) on May 31, 2005. This letter led to the parties' August 5 teleconference with the Court, at which the Court overruled Nationwide's "legal characterization" objection, rejected its assertion that no electronic discovery was in play, and ordered compliance with the Default Standard.

Nationwide apparently justifies its first assertion (that no prior discovery motion has ever been filed) by virtue of the spurious distinction between a discovery *letter* and a discovery *motion*. This is precisely the sort of puerile gamesmanship that brought us to this point.

1

Nationwide's assertion that no discovery orders have ever been entered, on the other hand, is simply appalling. It is an open admission that Nationwide simply does not recognize the Court's authority. But Judge Jordan's orders were just that; and they relate directly to this dispute. It must now be clearer than ever that nothing short of sanctions will suffice.

Or consider a second example. During the parties' September 13 teleconference with the Court, the Eames plaintiffs argued that Nationwide was wrong to limit its e-mail search to "people who are connected to Delaware":

> [Y]es, I know that they're going to search e-mails from last week and they're going to limit it to people who are connected to Delaware. That search is calculated to fail. It has almost no chance of discovering the documents that we're looking for.

The Court immediately asked Nationwide's counsel whether Nationwide was in fact limiting its e-mail search to Delaware:

> THE COURT: Now, stop. I read that in your letter. Then I read their response which said we're not limiting this geographically. You said they're limiting to people in Delaware. They said expressly we're not doing that. Where is the disconnect? *** Mr. Cheyney, are you limiting this?
>
> MR. CHEYNEY: No, Your Honor.[1]

In its brief here, however, Nationwide offers an extended defense of its "Delaware only" e-mail search. That defense begins with the acknowledgement that Nationwide "has identified more than 75 employees and independent agents whose e-mails have been searched." Ans. Bf. at 7. At the parties' October 3 discovery meeting, Nationwide's counsel admitted that these "independent agents" are all *Delaware* agents; and that the employees come from what

---

[1] This exchange appears at page 10 of the September 13, 2005 hearing transcript. It is reproduced at Exhibit N to our opening brief.

Nationwide calls its "Delaware leadership team." <u>See</u> Opening Bf., Ex. Q. Nationwide justifies these limitations thus:

> This case involves an insurance policy . . . issued in Delaware to Delaware residents. The disputed PIP coverage benefits . . . was [sic] paid in Delaware for a Delaware accident. The PIP coverage issues are governed by Delaware law . . . .
>
> ***
>
> The proper focus of discovery is obviously Delaware.
>
> ***
>
> ***The searches in this case have obviously been properly focused on Delaware.***

Ans. Bf. at 12-13 (emphasis added).

Nationwide thus presumes to lecture us on candor to the Court; but when asked directly whether it was limiting its e-mail search to Delaware, Nationwide answered with knowing falsity. It is not guilty of hyperbole, but outright dishonesty.

Yet the third example may be worst of all. As we showed in our opening brief, the Court ordered the parties to hold their October 3 meeting, and at ***Nationwide's*** instance required the Eames plaintiffs to develop a detailed set of written questions. <u>See</u> Opening Bf., Ex. N at 21-22, 26. The Court instructed Nationwide to "[h]ave the technical people in the room, if you have to," in order that our questions might finally be answered. <u>Id</u>. at 21. The Court then added this final (and very clear) instruction: "Don't have a meeting where he's got questions without having the people there who can answer them." <u>Id</u>. at 21-22. But Nationwide made sure that the parties had just such a meeting. As Nationwide concedes at page 12 of its brief (referencing the "questions that Mr. Oesterling agreed to follow up on"), Nationwide brushed off several of the Eames plaintiffs' questions with its classic "we'll get back to you" response. Nationwide did this despite

having been supplied with those questions a full seventeen days prior to the meeting. The meeting itself took place thirty-seven days ago; and since Nationwide has still yet to answer any of the questions it dodged on October 3, it has now had a full fifty-seven days to "follow up."

But according to Nationwide, all this is just fine. And why? Because, says Nationwide, "The questions that Mr. Oesterling agreed to follow up on were not technical questions." Ans. Bf. at 12. In other words, Nationwide is playing its game of "gotcha" not just with us, but with Judge Jordan himself. Through a parsing of words so perverse as to be childish (not childlike, with its connotations of innocence), Nationwide claims to have trumped the trial judge.

In the end, the exchange is a simple one. The Court says, *Don't have a meeting where he's got questions without having the people there who can answer him.* Nationwide replies, *We'll do as we please, and the Court and the plaintiff will like it.* The sanctions we have requested are, if anything, too small.

## ARGUMENT

### I. NATIONWIDE TURNS DISCOVERY ON ITS HEAD

The discovery process is not complicated. Under Rule 34, the propounding party requests the production of documents. The responding party may object to requests that seek irrelevant, confidential or privileged documents. The responding party can also object if full compliance would impose an undue burden. Certain objections, like privilege and burden objections, require the objecting party to come forward with supporting facts; and this allows the propounding party (and ultimately the Court) to test the objections' integrity.

Nationwide did not object to the initial document requests on grounds of burden or privilege, so those objections have been waived. Nationwide has never supplied the Court with any burden affidavit or privilege log, making it even clearer that those objections cannot apply.

See Unisys Corp. v. Royal Indem. Co., C.A. No. 99C-08-055JOH, slip. op. at 8 (Del. Super. Ct.

Jan. 9, 2001), aff'd, C.A. No. 99C-08-055JOH, 2001 WL 845666 (Del. Super. Ct. May 25, 2001)

("The party asserting that discovery is 'unduly burdensome or expensive' must establish undue

burden and expense in specific detail . . .") (Ex. B). See also Duplan Corp. v. Deering Millikan,

Inc., 397 F. Supp. 1146, 1160 (D.S.C. 1975) (failure to claim privilege at the time production is

requested results in waiver); International Paper Co. v. Fibreboard Corp., 63 F.R.D. 88, 94 (D.

Del. 1974) ("An improperly asserted claim of privilege is no claim of privilege at all").

During the parties' August 5 teleconference with the Court, meanwhile, the Court rejected

Nationwide's assertion that the discovery should be stayed pending a decision on its motion to

dismiss; and rejected as well Nationwide's relevance (or "legal characterization") objection.

There are thus no objections available to Nationwide, and it should be ordered to respond.

Specifically, it should be ordered in the plainest possible terms to produce all documents in its

possession, custody or control that refer or relate to the disputed practice: the use by Nationwide

(through its agents) of the modifier "full" in characterizing any aspect of PIP. And since

Nationwide has had over *seven months* to find these documents, it should produce them now.[2]

This, again, is how discovery works -- unless you are dealing with Nationwide. With

Nationwide, discovery can be avoided regardless of the record. Are relevance, burden and

privilege objections unavailable? No worry; Nationwide will search some small corner of the

company, or a designated "team" of custodians. Are there people within the company who

almost certainly know where the critical documents can be found? Small matter; Nationwide

---

[2] Nationwide takes pains to emphasize that the case was stayed for a time. The SDM should know that the stay lasted all of four weeks. Nationwide thus enjoyed an entire month free of litigation demands, during which time it might have identified and readied for production the documents we seek.

will consult them only if the plaintiff supplies their names in advance -- and since the plaintiff

cannot possibly know this information, Nationwide is safe.

Is this not a fair summary of Nationwide's approach? We have proven by overwhelming

evidence, after all, that Nationwide's agents in Delaware routinely characterize PIP as "full." It is

therefore likely, if not certain, that some management-level decision was made to institute the

practice. The logical course, then, is to identify persons with knowledge of the practice's

inception, and begin the document search there.

Instead, Nationwide searches the e-mail accounts of its Delaware agents from 2002

forward.[3] Nationwide's brief, meanwhile, explains its failure to produce documents and identify

custodians this way:

> *** Nationwide has repeatedly asked Plaintiffs' counsel to provide
> any information they have regarding the actual or possible
> existence of any such claimed to exist (sic) documents. Plaintiffs
> continue to refuse to do so. Nationwide has also repeatedly asked
> the Plaintiffs' counsel to provide any information they have
> regarding the possible custodians of any such documents.
> Plaintiffs similarly continue to refuse to do so . . . .

Ans. Bf. at 5-6 (citation omitted). This is a remarkable take on the discovery process, even for

Nationwide: a plaintiff may discover only those documents it can identify in advance by date,

title, author and location. When responding, the defendant corporation need only consult with

those potential custodians who the plaintiff identifies in advance by name.

Every farce, no matter how entertaining, must have its end. The documents we seek are

critical to this case. They are relevant and discoverable. No objections are available to

Nationwide. Logic dictates that the documents exist, and that they can be found with good-faith

---

[3] Note that at a March 1 case management conference with the Court, Nationwide rejected our
suggestion that its initial disclosures need not include documents in the hands of its insurance
agents, since those documents were (according to Nationwide) outside its possession, custody or
control. Ex. C at 5-6.

efforts. Indeed, *Nationwide has never claimed that the documents do not exist.* The documents should have been produced long ago; and the SDM should order their production now.

## II. NATIONWIDE PROVES OUR POINT

Nationwide's brief confirms our characterization of its conduct as obstructionist and evasive. Several examples have already been noted, including Nationwide's months-long refusal to acknowledge the Court's Order regarding the Default Standards; its violation of the Court's instructions surrounding the October 3 meeting; its willful misleading of the Court on the issue of its "Delaware only" e-mail search; and its apparent refusal to produce any document that the plaintiff does not, through the exercise of sheer clairvoyance, identify specifically in advance.

Predictably, Nationwide's brief offers more examples. Beginning at page 6 Nationwide offers a list of its "significant efforts" to respond. Space does not permit a full critique of that list; but one would expect Nationwide to lead with its best punch. Consider, then, Nationwide's "top three" -- the action items that top Nationwide's list. First, Nationwide tells us that it "made its initial Rule 26 Disclosures." Ans. Bf. at 6. Nationwide neglects to mention that the only document produced with these disclosures was the disputed copy of the Eames's auto policy.

Nationwide next boasts that it has "supplied Plaintiffs with a complete (sic) copy of the governing insurance policy issued to Plaintiffs." Id. In other words, Nationwide's "top two" are in fact a "top one." Nationwide's pitiful initial disclosure -- the sum total of which consists of an incomplete copy of the Eames's policy -- was simply run through the copier a second time.

Next on the list is the appointment of an e-discovery liaison. Of course, Nationwide resisted this appointment for months in the face of a Court Order. Its appointee has held this post for three months now; and during his tenure a grand total of five pages have been produced -- none of them in response to our initial document requests.

Nationwide proves our point in others ways as well:

• Nationwide says that "[d]espite Plaintiffs' efforts to imply otherwise, voluminous documents have been produced to them." Ans. Bf. at 6. But the "voluminous documents" were produced not by Nationwide, but by three tiny Delaware insurance agents pursuant to nonparty subpoenas. Each agency has produced hundreds, if not thousands more documents than has Nationwide (despite Nationwide's status as a party). This is thus a case in which a $1 billion corporate defendant has produced roughly thirty-five pages over the course of eight months, while a tiny handful of mom-and-pop nonparties have produced a hundredfold more.

• We have repeatedly argued that if Nationwide's use of the "full" modifier is not limited to Delaware, its document search should not have a Delaware focus. In our opening brief, we complained that though we have repeatedly asked Nationwide whether the disputed practice is limited to Delaware, Nationwide refuses to answer. Opening Bf. at 10. Nationwide's answering brief provided it with the perfect platform for addressing this question; and if the practice were indeed limited to the geographic bounds of Delaware, one would expect that Nationwide would rush to answer. Yet Nationwide passed on the question again.

• As noted in our opening brief, we asked Nationwide to distribute a straightforward "document search" message to those persons to whom Nationwide's Delaware "leadership team" reports. Nationwide responds that "Plaintiffs' counsel has been informed that Nationwide had already previously sent a search request." Ans. Bf. at 9. But Nationwide has never distributed the specific search message we requested. In addition, Nationwide says that it has now sent "the notice" -- presumably meaning its own notice, the language of which it has never shared -- to the corporate reports. But even that small step was never reported to us; its appearance in the briefs is a revelation.

This, of course, is not the first time Nationwide has supplied discovery-related information to the Court where the same information should have been supplied to us as part of the meet-and-confer process. This episode thus stands as an example of Nationwide's continued parsing of words (on the one hand) and its chronic sandbagging (on the other).

Nationwide has already been threatened with sanctions. That threat does not impress Nationwide. The Eames plaintiffs, on the other hand, have bled time and resources in a futile attempt to persuade Nationwide to conduct and complete a genuine search, and finally produce something. Only meaningful sanctions can set things right.

## IV. NATIONWIDE'S RECENT RESPONSES
## ARE BESIDE THE POINT

Nationwide points to its production of an Insurance Department circular as evidence of its good faith. Nationwide notes that it identified the circular in its recent responses to Mr. Eames's September 16, 2005 interrogatories. But those responses are a further indictment of Nationwide.

By its plain terms, the circular relates to an amended disclosure statement that Delaware auto insurers are required to share with purchasers of insurance. The circular states that the purpose of the amendment "is to incorporate [a] reference to uninsured insurance." In other words, the amendment (and, by extension, the circular) relates to a mandatory disclosure on uninsured motorist coverage. It has nothing to do with PIP, and does not remotely prescribe language (much less PIP-related language) for use in rate quotes, memoranda of insurance or policy declarations.

The interrogatory response on which Nationwide relies is its response to Interrogatory No. 2. Nowhere in that response (from which Nationwide quotes) does it relate this circular to its creation of rate quotes, memoranda of insurance or the like. Of course, if the circular did give

rise to the disputed practice, there would presumably be some written record of that *within* Nationwide. When regulatory requirements change, after all, those changes must be communicated to the ranks; and such things do not happen by telepathy.

The Eames plaintiffs will address the deficiencies in these responses in the separate motion to compel that they will apparently be forced to file. But the SDM should appreciate that Nationwide's interrogatory responses do not rehabilitate its conduct.

## CONCLUSION

For the reasons set forth above and in our opening brief, we respectfully request that the SDM grant the full range of relief sought by this motion.

Respectfully submitted,

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

Attorneys for plaintiffs Thomas A. Eames, Roberta
L. Eames and Tammy Eames (on behalf of
themselves and all others similarly situated)

November 9, 2005

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

THOMAS A. EAMES, ROBERTA L. EAMES )
and TAMMY EAMES, on behalf of )
themselves and all others )
similarly situated, )
         )
                 Plaintiffs, )    C.A. No. 04-CV-1324KAJ
         )
v. )
         )
NATIONWIDE MUTUAL INSURANCE )
COMPANY, )
         )
                 Defendant. )

## NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk

of the Court using CM/ECF which will send notification of such filing(s) to the following:

Nicholas E. Skiles, Esq.
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, DE 19899


                              MURPHY SPADARO & LANDON

                              /s/ John S. Spadaro
                              John S. Spadaro, No. 3155
                              1011 Centre Road, Suite 210
                              Wilmington, DE 19805
                              (302) 472-8100

                              Attorneys for plaintiffs
                              Thomas A. Eames, Roberta L. Eames and
                              Tammy Eames (on behalf of themselves and
November 9, 2005                        all others similarly situated)

125756