# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

THOMAS A. EAMES, ROBERTA L. EAMES )
and TAMMY EAMES, on behalf of          )
themselves and all others              )
similary situated,                     )
                                       )
          Plaintiffs,                  )
                                       ) Civil Action
v.                                     ) No. 04-CV-1324KAJ
                                       )
NATIONWIDE MUTUAL INSURANCE            )
COMPANY,                               )
                                       )
          Defendant.                   )


          Deposition of Glenn Deaton Agency, Inc.
taken pursuant to Federal Rule of Civil Procedure
30(b)(6) through its designee GLENN W. DEATON at the
law offices of Murphy, Spadaro & Landon, 1011 Centre
Road, Suite 210, Wilmington, Delaware, beginning at
10:40 a.m., on Tuesday, August 9, 2005, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:

        JOHN S. SPADARO, ESQ.
        MURPHY SPADARO & LANDON
          1011 Centre Road - Suite 210
          Wilmington, Delaware  19805
          For the Plaintiffs

        CURTIS P. CHEYNEY, III, ESQ.
        SWARTZ CAMPBELL & DETWEILER
          1601 Market Street - 34th Floor
          Philadelphia, Pennsylvania  19103-2316
          For the Defendant

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477





WILCOX & FETZER LTD.
Registered Professional Reporters

```
 1    APPEARANCES:   (Cont'd)

 2         ROBERT J. LEONI, ESQ.
           MORGAN SHELSBY & LEONI
 3           131 Continental Drive - Suite 206
             Newark, Delaware  19713
 4           For the Witness

 5                  -  -  -  -  -

 6                   GLENN W. DEATON,

 7         the deponent herein, having first been

 8         duly sworn on oath, was examined and

 9         testified as follows:

10                   EXAMINATION

11    BY MR. SPADARO:

12       Q.   Sir, would you state your name for the record,

13    please?

14       A.   Glenn W. Deaton.

15       Q.   Can you tell me your home address, please?

16       A.   128 Sweet Gum Drive, Dover, Delaware, 19904.

17       Q.   Have you given sworn testimony under oath at a

18    deposition proceeding before?

19       A.   Yes.

20       Q.   And you understand that I will be asking you

21    questions at the deposition and that you will be

22    expected to answer them completely and truthfully

23    under oath?

24       A.   Yes, I do.
```



1      Q.    And will you agree that if any question I ask
2    is unclear to you or if you feel that it needs
3    rephrasing or repetition, you will ask me to clarify
4    or repeat the question?
5      A.    Yes, I will.
6      Q.    And if you need to take a break, let me know
7    that.  I'm going to try to move quickly enough so that
8    we don't need any breaks during your testimony, but
9    that doesn't mean you're not entitled to take one if
10   you want to.  Okay?
11     A.    Okay.
12     Q.    Are you represented by any attorney at this
13   deposition?
14     A.    I am.
15     Q.    Is Mr. Leoni representing you today?
16     A.    Yes, he is.
17     Q.    And are you a representative of the Glenn
18   Deaton Agency Incorporated?
19     A.    I am.
20     Q.    What is the Glenn Deaton Agency Incorporated?
21     A.    I'm an independent contractor, agent, principal
22   for Nationwide Insurance Company.
23            MR. SPADARO:  Could you read that back,
24   Kurt?



WILCOX & FETZER LTD.
Registered Professional Reporters

1              (The reporter read back the last answer.)

2       BY MR. SPADARO:

3         Q.    Do I understand from your answer that you're

4       indicating that in the business in which you operate

5       Nationwide acts as a principal and you act as

6       Nationwide's agent?

7         A.    The term principal I use to describe myself as

8       an agency, I'm the agency principal.

9         Q.    The principal of the business?

10        A.    Correct.

11        Q.    Maybe I should ask.  What is your relationship

12      to the Glenn Deaton Agency Incorporated?

13        A.    I'm the president of the corporation and the

14      primary agent-producer.

15        Q.    And what do you mean by "agent-producer"?

16        A.    I am responsible for the sale of the products

17      in the office and also have other licensed staff, but

18      I am the primary producer of sales, salesperson, if

19      you will.

20        Q.    What does -- if I refer to the Glenn Deaton

21      Agency Incorporated as Deaton or the Deaton Agency,

22      will you know what I mean?

23        A.    Yes.

24        Q.    What, if anything, does the Deaton Agency sell?



1    A.    We sell a variety of property, casualty and

2    life and health, financial service products, including

3    automobile, homeowner, commercial property liability,

4    worker's compensation, life insurance and some mutual

5    funds and variable products as well.

6    Q.    The products that you listed are all insurance

7    products, are they not?

8    A.    Correct.

9    Q.    And does the Deaton Agency sell Nationwide

10   Insurance products to consumers?

11   A.    Yes.

12   Q.    And ask the Deaton Agency sell exclusively

13   Nationwide Insurance products to Delaware consumers?

14   A.    I am a captive, exclusive agent of Nationwide.

15   I do have opportunities to sell products outside of

16   that arrangement, but primarily Nationwide products.

17   Q.    Are you able to estimate roughly the percentage

18   of Nationwide Insurance products that you sell

19   compared to the insurance products of other insurance

20   companies?

21   A.    Nationwide sales represents I would say 90 to

22   95 percent of our overall sales.

23   Q.    What do you mean when you are referring to the

24   Deaton Agency as captive?

1    A.    I have a contract to sell Nationwide's products

2    exclusively.  I'm required to sell Nationwide's

3    products.  I'm not allowed to broker or go outside of

4    that agreement for market.  In other words, if

5    Nationwide offers that product for sale, I'm going to

6    sell their product.

7              If I have occasion to sell a product that

8    Nationwide is not interested in that market, I'm

9    allowed to place that through another carrier.

10   Q.    So you're allowed to sell other insurance

11   companies' products so long as they don't compete in

12   this market with products that Nationwide is selling?

13   A.    Correct.

14   Q.    I hope you understand what I meant.  When I

15   said, "this market," I meant Delaware.  And I think

16   you understood my question that way?

17   A.    Correct.  That's the only state that I am

18   licensed to transact.

19   Q.    And you do hold a professional license?

20   A.    Yes, I do.

21   Q.    Could you identify it for me?

22   A.    I have a license through the Delaware Insurance

23   Commissioner's office, an agency's license to sell all

24   of the products that I mentioned, property, casualty,



1    life, health, bonding and variable annuities as well.

2      Q.   You understand, do you not, that you've been

3    designated by the Deaton Agency to testify on its

4    behalf at this deposition?

5      A.   Yes.

6      Q.   Do you freely accept that designation?

7      A.   Yes, I do.

8            MR. SPADARO:   Let me ask the court

9    reporter to mark as Exhibit 1 to your deposition a set

10   of documents that purports to be a copy of a letter

11   signed on my behalf by another attorney in my firm,

12   Mr. Brockstedt, dated March 24, 2005 and addressed for

13   hand delivery to the Glenn Deaton Agency Incorporated,

14   attached to which is a copy of the subpoena that we

15   served on the Glenn Deaton Agency in this case.

16            (Deaton Deposition Exhibit No. 1 was

17   marked for identification.)

18   BY MR. SPADARO:

19     Q.   Have you had an opportunity to examine the

20   document that's been marked as Deaton Exhibit 1?

21     A.   Yes, I have.

22     Q.   Have you seen this document before, Mr. Deaton?

23     A.   Yes.

24     Q.   Does it appear to be what I have described?



Glenn W. Deaton                        8

1      A.    Yes, it does.

2      Q.    If you turn to the fourth page of the document,

3   do you see there an appendix that purports to set

4   forth a description of the documents being subpoenaed

5   and the topics for your testimony today?

6      A.    Yes.

7      Q.    And on the next page do you see the heading

8   Matters for Examination?

9      A.    Yes.

10     Q.    And you understand that under that heading is

11  set forth the three subject areas which I'll be asking

12  questions about today?

13     A.    Yes.

14     Q.    And have you had a chance to review those

15  subject areas before today's deposition?

16     A.    I have.

17     Q.    Are you prepared to answer questions relating

18  to those three subject areas?

19     A.    I am.

20     Q.    Thank you.

21            How many employees does the Deaton Agency

22  have, sir?

23     A.    Including myself, five.

24     Q.    Let me ask you a little bit more about your



Glenn W. Deaton                        9

1    relationship, the agency's relationship with

2    Nationwide, if I could.  Okay?

3              Does the Deaton Agency lease equipment

4    from Nationwide?

5    A.    Could you be more specific about equipment?

6    Q.    Well, is there office equipment that you use in

7    your business operations like computers, telephones

8    and that sort of thing?

9    A.    All of the office equipment belongs to my

10   business.  It's not property of Nationwide Insurance,

11   desks, chairs, filing cabinets.

12             Computer equipment specifically for many

13   years was the property of Nationwide Insurance and we

14   were required by contract to lease their hardware and

15   use their software.  A few years ago they decided to

16   get out of the hardware business.  And basically the

17   agents now own the hardware, but we are under contract

18   to use their software and their pipeline, if you will,

19   the company intranet and the software and all the

20   products of running the software and the computer is

21   provided by Nationwide, but the computer is owned by

22   the agency.

23   Q.    When you say that the software is owned by

24   Nationwide, does that include what might be called



1    document management software?

2      A.    Yes.

3      Q.    Do you send and receive e-mails at the Deaton

4    Agency?

5      A.    Yes, we do.

6      Q.    If I understand correctly, is it correct to say

7    that your e-mails are sent and received on

8    Nationwide's file server?

9      A.    That's correct.

10     Q.    How is the Deaton Agency compensated for its

11   role in selling Nationwide Insurance products in

12   Delaware?

13     A.    We're compensated strictly through commissions

14   on products that we sell.  We have no other source of

15   income other than commission based on the sales.

16     Q.    When a premium is obtained from a consumer in

17   connection with the sale of a Nationwide Insurance

18   product through the Deaton Agency, do you begin by

19   transferring the premium to Nationwide?

20     A.    Yes.  Any premium received by our office is in

21   a fiduciary capacity, is placed in a fiduciary

22   account, a premium-bearing account only and is

23   remitted to Nationwide.  And I receive my commission

24   after they have processed their transactions on a

1    biweekly basis.

2       Q.    So Nationwide collects premiums and then pays

3    to you commissions based on how much premium was

4    collected?

5       A.    Right.

6       Q.    How are employees' salaries paid?  Are they

7    paid directly by the Deaton Agency?

8       A.    Yes.  The employees are employees of myself and

9    are paid directly by me.

10      Q.    How long have you been the president of the

11   Deaton Agency?

12      A.    I started with Nationwide in the fall of 1989.

13   Fifteen, sixteen years.

14      Q.    Now, Mr. Deaton, we're going to be referring to

15   a particular type of coverage within the automobile

16   insurance product known as personal injury protection.

17            Are you familiar with that term?

18      A.    I am.

19      Q.    And if I call it personal injury protection,

20   you'll know what I mean?

21      A.    Yes.

22      Q.    If I call it PIP, you will know what I mean?

23      A.    Yes.

24      Q.    I may make reference to limits of liability for



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    PIP coverage.  If I do that, will you know what I

2    mean?

3        A.    Yes.

4        Q.    And --

5              MR. LEONI:  John, I'm just going to ask

6    that you make sure that if he doesn't understand it in

7    the context that you're asking that you explain that

8    because we have to make sure he understands it in the

9    context that you're using it.

10             MR. SPADARO:  Sure.

11   BY MR. SPADARO:

12       Q.    We have agreed if you have any questions about

13   my questions you will ask me, right?

14       A.    Certainly.

15       Q.    I'm not trying to give you an insurance 101

16   quiz.  But just for the record can you give me your

17   understanding of what limits of liability means as an

18   insurance term?

19       A.    Sure.  Limits of liability would be the amount

20   provided by the contract, a maximum amount based on a

21   per person limit or a per occurrence limit, but limit

22   of liability would be the maximum amount payable by

23   the company for a claim, a covered claim.

24       Q.    And that amount is a dollar amount?



Glenn W. Deaton                    13

1    A.    Correct.

2    Q.    So it's expressed in numbers, is expressed in

3    dollars?

4    A.    It's expressed in dollars, yes.

5    Q.    Are you able to give me a step-by-step

6    description -- I could break it down if you want me

7    to, but maybe it's faster not to.  It's your

8    preference.

9          If I ask you to give me a step-by-step

10   description of the process by which an ordinary

11   Delaware consumer in your neighborhood comes in and

12   purchases a Nationwide auto policy, could you do that

13   for me?

14   A.    Yes, I could.

15   Q.    Okay.  Would you, please?

16   A.    Sure.  Once a quote is given -- generally, the

17   process starts by an individual requesting a quote for

18   what the coverage would be.

19          We would --

20   Q.    I'm sorry.  I don't mean to interject.  Along

21   the way I may ask you to clarify a term here or there.

22   A.    Sure.

23   Q.    By "quote" you're referring to the consumers

24   asking how much will it cost me to buy auto insurance?

1    A.    They would like a price quotation for the cost
2    of coverage.
3          We would gather the required information
4    that is needed to prepare a quote, certain personal
5    information about the type of vehicle, driving record,
6    information about the driver and so forth.  Once the
7    quote is prepared and given and accepted, the
8    application process would start where we would
9    basically complete the Nationwide application on the
10   computer, generate an application, going through the
11   various information as needed about drivers and so
12   forth, the vehicle and coverages.
13         At that point we would interview with the
14   client or with the applicant explaining and requesting
15   if they have specific limitations, limits of liability
16   that they would like to compare with, if they have a
17   current contract.  If they do not have current
18   coverage, we would explain to them what's required by
19   law and then show them the option limits that are
20   available.
21         Upon completion of the application it
22   would be printed out and any trailing documents that
23   were required to be signed -- a trailing document
24   would be a document in addition to the application

1    itself.  The form A is considered a trailing document.

2    A vehicle inspection form, if a vehicle may be

3    customized or altered or have existing damage we are

4    required to view the vehicle and potentially have a

5    document, a trailing document as an inspection report.

6    A child's or student's report card that would be in

7    line for a discount, a defensive driving class, any

8    supplemental document that would affect the rate

9    provided or the coverage provided, we would be

10   required to obtain those, signatures on the

11   application and any trailing documents would be

12   obtained.

13            We would review what coverages are elected

14   and rejected by the applicant.

15   Q.    When all of that was completed what would

16   happen?

17   A.    The premium would be collected based on the

18   applicant's choice of pay plan.  There are a variety

19   of different pay plan options available.  We would

20   collect the appropriate premium, provide a receipt.

21   And we would at that point provide a binder or

22   memorandum of insurance, some proof that the

23   application process had been completed.

24            We would provide that to the applicant



1     with a receipt.  The application would be released or

2     sent to Nationwide by the computer.  We would set up a

3     new file retaining the documents in our file.  No

4     paper really transactions go to Nationwide.  It's done

5     electronically and we retain the original application

6     and any trailing documents in our file.  Premiums are

7     collected by our firm, by our agency, are deposited in

8     a local bank, are remitted on Nationwide's remittance

9     program.  And they will then a couple of business days

10    later they will electronically draft those funds from

11    the fiduciary account.

12              At that point the policy is processed and

13    generated directly by Nationwide from their service

14    center and sent out to the insured.

15              We tell every applicant that they will

16    receive their policy package directly from Nationwide

17    with I.D. cards and the policy packet itself; when

18    it's received to please give us a call if they have

19    any questions, to review if there's anything there

20    that they're not sure of.  And we would set up our

21    file from there and that's basically, that's the basic

22    transaction process.

23    Q.    Okay.  Let me ask you about the point at which

24    the premium has been collected and a binder or

1    memorandum of insurance or other proof of insurance

2    has been provided to the consumer.  Okay?

3    A.    (The witness nodded.)

4    Q.    Are you with me?

5    A.    Yes.

6    Q.    Have I so far characterized that part of your

7    testimony correctly?

8    A.    Yes.

9    Q.    At that point is the consumer insured for

10   automobile insurance by Nationwide?

11   A.    Yes.

12   Q.    So it's your understanding at that point an

13   insurance contract exists?

14   A.    Yes.

15   Q.    How long after that point -- well, at that

16   point the consumer presumably goes, leaves your office

17   and goes home carrying the auto memorandum of

18   insurance or binder or other proof of insurance,

19   right?

20   A.    Correct.

21         MR. CHEYNEY:  Objection.

22   Q.    How much time typically passes, if you can tell

23   me, between that event and the consumer's receipt of

24   policy documents generated from Nationwide's service

1    center?

2        A.    Generally, one week, approximately a week's

3    time to process and have that sent out in the mail to

4    them.

5        Q.    Have you known it to take less than a week?

6        A.    Yes.

7        Q.    Have you known it to take more than a week?

8        A.    Yes.

9        Q.    On the far end of the scale, how long does it

10   take when it takes longer than a week?

11       A.    Only an additional day or two, maybe ten days

12   maximum.

13       Q.    And if the insured vehicle is involved in an

14   automobile collision during that one week to ten-day

15   interim, it's your understanding that Nationwide

16   insures that event?

17            MR. CHEYNEY:   Objection.

18       A.    Correct.

19       Q.    Where is the Nationwide service center?  Do you

20   know?

21       A.    It is in Gainesville, Florida for the bulk of

22   the automobile policies that we issue.  They're

23   generated from the Gainesville, Florida service

24   center.



Glenn W. Deaton                              19

1    Q.   Are there other Nationwide service centers that

2    address other regions of the country?

3    A.   Yes.

4    Q.   Thank you.

5              This process you've described very

6    patiently for me, which I appreciate, this step-by-

7    step process by which the consumer purchases the auto

8    insurance from Nationwide, as part of that process are

9    documents shared with the consumer at any stage?

10   A.   Documents, yes.

11   Q.   For example, is the price quote that you

12   started your description with a written price quote?

13   A.   Yes.

14   Q.   And that's a document that's shared with the

15   consumer and he can take home with him?

16   A.   We do have a formal quote letter when someone

17   asks for a quote that we can provide a user friendly

18   quote letter.  Generally, that's not sent out on a

19   telephone quote or if someone comes into the office

20   and I provide the quote on the computer and share with

21   them the information on the monitor and they say yes,

22   I would like to purchase that coverage, generally that

23   quote letter is not printed out.

24             We would go directly into the application



Glenn W. Deaton                          20

1    process.  Many times we would hot print or screen

2    print, if you will, the quote to show them if they

3    brought their policy with them and they would like to

4    compare, we would print off a document like that which

5    would be just a screen print.  But there is a formal

6    quote letter that can be generated if it's requested.

7         Q.    Whether the document is generated hard copy or

8    not, is it often the case that the consumers are

9    allowed to see the quote in writing while they're in

10   your office?

11        A.    Yes.

12        Q.    Are there any other documents that as part of

13   this process the consumers either see visually or are

14   allowed to take with them?

15        A.    Yes.

16        Q.    I think you mentioned the memorandum of

17   insurance or binder or other proof of insurance.

18        A.    Correct.

19        Q.    That's one category of documents that is given

20   to the consumer, right?

21        A.    Correct.  They are offered a copy of the

22   physical application as well and the Delaware Form A

23   Delaware Protection Act document.

24        Q.    I think you referred earlier to options that



1    the consumer has with respect to the limits of

2    liability that they can purchase for different

3    coverages.

4              Do you recall that?

5    A.    Correct.

6    Q.    And I'm going to limit my questions to

7    automobile insurance.  All right?

8    A.    Mm-hmm.

9    Q.    There are --

10             MR. LEONI:  You have to answer actually

11   verbally yes or no.

12             THE WITNESS: Yes.

13             MR. SPADARO:  Thank you, Mr. Leoni.

14   BY MR. SPADARO:

15   Q.    There are different dollar amounts in limits of

16   liability that consumers are able to purchase within

17   different coverages, right?

18   A.    Correct.

19   Q.    It's your understanding that with respect to

20   PIP coverage there's a minimum amount that's mandated

21   by statute.  Is that right?

22   A.    That's right.

23   Q.    And the minimum statutory limits of liability

24   for PIP coverage according to your understanding are

1    $15,000 per person/$30,000 per accident.  Is that

2    right?

3       A.   Correct.

4       Q.   But consumers are able to purchase more than

5    that, aren't they?

6       A.   Yes.

7       Q.   What is the full amount of limits of liability

8    available from Nationwide today for PIP coverage?

9            MR. CHEYNEY:  Objection.

10           MR. LEONI:  Do you know what?  So far we

11   have been talking generically, but actually the notice

12   of deposition refers only to Nationwide Mutual

13   Insurance Company.  So I'm assuming, and maybe

14   wrongfully so, your questions are limited to

15   Nationwide Mutual.

16           MR. SPADARO:  Yes.  All my questions are

17   limited to the defendant in this case, Nationwide

18   Mutual -- let me make sure I get the name right --

19   Nationwide Mutual Insurance Company.

20   BY MR. SPADARO:

21      Q.   Do you understand that, sir?

22      A.   Yes.

23      Q.   Do all of your responses so far relate to

24   Nationwide Mutual Insurance Company?



Glenn W. Deaton                                    23

1     A.    Yes.

2     Q.    So let me ask you again:  Can you tell me the

3    full amount of PIP limits of liability that are

4    available for purchase from Nationwide today in

5    Delaware?

6              MR. CHEYNEY:   Objection.

7     A.    The maximum limits for PIP available is

8    $100,000 per person/$300,000 per accident.

9     Q.    Do you have a sense of in percentage terms of

10    the percentage of auto policies that the Deaton Agency

11    is involved in selling on Nationwide's behalf for

12    which Delaware consumers in a typical year purchase

13    the minimum limits of $15,000 per person/$30,000 per

14    accident?

15              MR. LEONI:  Hold on a second.  Can I hear

16    that back?

17              Could you read it back, Kurt?

18              THE WITNESS:  Because he --

19              MR. LEONI:  Hold on.  He's going to read

20    the question back to make sure we understand it.

21              (The reporter read back the last

22    question.)

23              MR. LEONI:  Again, we're referring only to

24    Nationwide Mutual Insurance Company personal auto



1    policies?

2                    MR. SPADARO:  Yes.

3    BY MR. SPADARO:

4       Q.   I've said that I'm only referring to the

5    defendant Nationwide Mutual Insurance Company and I

6    have clarified all of my questions relate to

7    automobile insurance.  So that's a given with every

8    question I ask unless I specify otherwise.  I'm not

9    going to ask you about products other than auto at

10   this point.

11                   Do you understand my question?

12      A.   I understand your question.  But my response

13   would be particularly regarding Nationwide Mutual, the

14   company one, that Nationwide Mutual -- we're not

15   talking about the non-standard.  We're talking about

16   generally -- all right.

17      Q.   I'm only asking about the defendant in this

18   case, Nationwide Mutual Insurance Company.

19      A.   Yes.  I understand your question.

20                   MR. LEONI:  Just to be clear for the

21   witness because he seems to be having a little

22   trouble --

23                   MR. SPADARO:  If you have an objection to

24   form, we're in the District Court, if you have an

Glenn W. Deaton                              25

1   objection to the form, you can object to form.  I'll

2   clarify.

3   BY MR. SPADARO:

4     Q.    You understand I'm trying to figure out how

5   often people purchase the minimum limits?  Do you

6   understand my question?

7     A.    Yes, I do.

8     Q.    If you can ballpark that for me in percentage

9   terms, that would be helpful.

10    A.    Under Nationwide Mutual Insurance Company

11  policies that we issue I would say only 25 percent or

12  less purchase the minimum PIP coverage.

13    Q.    Okay.  Thank you.  That's very helpful.

14          Now, in response to our subpoena it's your

15  understanding that the Deaton Agency produced certain

16  documents to us?

17    A.    That's correct.

18    Q.    And is it your understanding that we reached a

19  compromise by which the parties agreed that the Deaton

20  Agency would produce policy-related documents for just

21  35 policyholders?

22    A.    Yes.

23    Q.    And just for the record, over the course of the

24  time period embraced by this lawsuit the agency has

1    sold many more than 35 insurance policies, auto

2    insurance policies, that is, on behalf of Nationwide?

3    A.    Yes.

4    Q.    But this was a compromise we reached to reduce

5    the burden and expense of responding to the subpoena.

6    Do you understand that?

7    A.    Yes.

8    Q.    I want to mark as Exhibit 2 to your deposition

9    a set, a single set of these policy-related documents

10   that were produced by the Deaton Agency as part of

11   this compromise.

12           Do you understand what I have represented?

13   A.    Yes.

14   Q.    And it's your understanding, is it not, that

15   the Deaton Agency's attorneys, Mr. Leoni and his

16   office, have blacked out or redacted certain

17   identifying information that might otherwise have

18   identified the policyholders under these policies?

19   A.    Yes.

20   Q.    And it's your understanding that the attorneys

21   for the Deaton Agency have numbered the sets that were

22   produced to us with one- or two-digit numbers?

23   A.    Yes.

24           MR. SPADARO:  Let me start by marking as

Glenn W. Deaton                              27

```
 1    Exhibit 2 to your deposition set number 63 from the
 2    Deaton production.
 3                  (Deaton Deposition Exhibit No. 2 was
 4    marked for identification.)
 5    BY MR. SPADARO:
 6        Q.   Just review that, if you would, to your
 7    satisfaction.  Let me know when you feel comfortable
 8    answering some questions about it.
 9        A.   (Reviewing document)  Okay.
10        Q.   Does this appear to be a copy of the documents
11    from set 63 of the Deaton production?
12        A.   Yes.
13        Q.   I'm going to ask you if you can try to describe
14    the approximately seven pages that are part of Exhibit
15    2 for me in a little more detail.
16        A.   Okay.
17        Q.   Thank you.
18        A.   Page 1 -- the document is a standard automobile
19    insurance application through Nationwide Mutual.  The
20    first page of the document provides basic declaration
21    type information about the name of the insured, date
22    of the application and basic demographic information
23    about the insured, license, date of birth, social,
24    address and so forth.
```

1          Page number 2 begins with detail about the
2     vehicle to be insured itself, including the make,
3     model, year, vehicle identification number and
4     ownership.  The second area of the second page of the
5     document provides the coverage that's been selected.
6     The liability, physical damage, uninsured motorist and
7     PIP coverage are detailed there.  Any discounts are
8     listed there on the bottom of that second page.
9          Page 3 provides ratings variables,
10    including the work or work commute, annual mileage and
11    any surcharges for rate class that might be
12    applicable.
13    Q.    If I could just interject for a moment.  By
14    rating variables are we referring to underwriting
15    factors that might result in a determination of the
16    premium to be charged?
17    A.    Correct.
18    Q.    Thank you.
19    A.    Below that on the third page is some general
20    information specific to the place of the domicile of
21    the applicant, where they live, and payment
22    information is also included on page 3.
23          The fourth page is a closing statement
24    that provides information on how Nationwide will

1    handle the application regarding misrepresentations

2    and acknowledgment of coverage and accepting of the

3    risk.

4              The fifth page includes statements that

5    are asked to be initialed in total by the insured

6    regarding their use and ownership and declaration of

7    any drivers in the household or have regular use of

8    that vehicle and any forbidden uses of the vehicle

9    under the personal auto policy, including delivery of

10   pizza and you will see there in the one bullet the

11   newspapers or taxicab-type things are prohibited.  We

12   ask that they acknowledge that there.

13             And the final part on page 5 is the

14   signature place where the applicant and the producing

15   agent would sign and date and time the application.

16   Q.   So those first five pages are -- bear with me

17   for a second.

18             Those first five pages are the application

19   themselves?

20   A.   Those pages are the application, yes.

21   Q.   And the remaining two pages of Deaton Exhibit 2

22   are not what you would describe as part of the

23   application?

24   A.   Correct.



Glenn W. Deaton                           30

1      Q.    But they are part of the larger process of

2   placing insurance?

3      A.    Correct.

4      Q.    I'm sorry I interrupted you.  Thank you.

5      A.    The sixth page is the Delaware Motorists'

6   Protection Act, a form that's used to acknowledge and

7   where the applicant would select and verify or reject

8   any coverage options that they would like.  The

9   minimum limits are displayed on this form that are

10  required by Delaware law, along with other optional

11  coverages for physical damage, including

12  comprehensive, collision, uninsured motorist, loss of

13  use.  This is the form that we have the insured sign

14  that spells out the requirements and also the options

15  that are provided under the Delaware policies.

16          The final page is a copy of the screen

17  print that I mentioned.  This would be a document that

18  I would share with an insured that would come in the

19  office if we were comparing different quotes.  This is

20  simply a screen print of our quote process off the

21  computer.

22     Q.    That final page that you've indicated is shared

23  with the consumer is titled Auto Rate Quote Number 1?

24     A.    Correct.

1    Q.    Let me ask you to turn, if you would, to the

2    second page of Deaton Exhibit 2, please.

3              I'm going to direct your attention to the

4    entries in the middle of the page under the Heading

5    Vehicle Level Coverages.

6              Do you see that?

7    A.    Yes.

8    Q.    Now, there appear to be under that heading

9    three columns setting forth information.  Is that fair

10   to say?

11   A.    Yes.

12   Q.    In the left-hand column we see the first entry

13   reads Comprehensive and underneath that Collision and

14   then underneath that Property Damage and so forth.

15   That left-hand column identifies different types of

16   insurance coverage within the automobile insurance

17   product?

18   A.    Correct.

19   Q.    Is that fair to say?

20   A.    Yes.

21   Q.    And the middle column begins with the number

22   250.  Do you see that?

23   A.    Yes.

24   Q.    And that corresponds to the entry in the

1    left-hand column that says Comprehensive, right?

2        A.    Correct.

3        Q.    And what does that information up to that point

4    indicate?

5        A.    That entry relates to the deductible that would

6    be applied to that line of coverage.   $250 would be

7    the deductible applicable to the comprehensive line of

8    coverage.

9        Q.    Very briefly, what does comprehensive coverage

10   entail in an auto insurance policy?

11       A.    Comprehensive coverage provides coverage for

12   damage to the insured vehicle that is not collision

13   related and would include glass breakage, vandalism,

14   theft, fire, flood.   Collision with an animal would be

15   one comprehensive coverage where a collision would

16   take place with an animal, but it's damage to the

17   vehicle that's generally not collision related.

18       Q.    So it appears that it's contemplated for this

19   particular insurance contract that there will be a

20   deductible for comprehensive coverage of $250, right?

21       A.    Correct.

22       Q.    And that deductible is expressed in a dollar

23   amount?

24       A.    Yes.



Glenn W. Deaton                    33

1    Q.    In the right-hand column there appear to be
2    dollar amounts set forth for each of the types of
3    coverage.
4              Do you see that?
5    A.    Yes.
6    Q.    The first being $23.20 corresponding to the
7    comprehensive coverage entry, right?
8    A.    Correct.
9    Q.    Am I correct that sets forth the premium amount
10   to be collected with respect to each coverage within
11   the automobile insurance contract?
12   A.    Yes.
13   Q.    Now let me ask you to turn, if you could, to
14   the last page of Deaton Exhibit 2 entitled Auto Rate
15   Quote Number 1 and let me know when you have that
16   before you, please.
17   A.    I do.
18   Q.    This document has a similar format, doesn't it?
19   A.    Yes.
20   Q.    Because we see abbreviated names for the
21   different types of coverage beginning with COMP for
22   comprehensive and then COLL for collision, then PD for
23   property damage and so forth, right?
24   A.    Correct.



1      Q.    And then in the middle column we see the dollar

2      amount for comprehensive that indicates 250,

3      signifying the $250 deductible to be charged for that

4      coverage, right?

5      A.    Correct.

6      Q.    In the right-hand column we see that 23.20

7      indicating the $23.20 premium to be collected for the

8      comprehensive coverage, correct?

9      A.    Correct.

10     Q.    Now, there is information redacted on this

11     page.  So let me ask you as it appears in unredacted

12     form, does the name of the insured appear on this

13     page?

14     A.    Yes.

15     Q.    And would the page in unredacted form indicate

16     anywhere the vehicle to be insured?

17     A.    Yes.

18     Q.    How would it identify that vehicle?

19     A.    By the year, make and model would generally

20     appear in the heading above the $250 deductible where

21     it's been redacted.  The vehicle year and type would

22     appear there.

23     Q.    And we know that the types of coverages are

24     described in the document, right?



1    A.    Correct.

2    Q.    And the limits of liability for the coverages

3    are set forth, are they not?

4    A.    Yes.

5    Q.    And the premium amount to be charged for each

6    is set forth, right?

7    A.    Yes.

8    Q.    Turning to that middle column that begins with

9    the number 250 for the deductible for comprehensive

10   coverage, that is not a dollar amount that indicates

11   the limit of liability for comprehensive coverage, is

12   it?

13   A.    No.

14   Q.    It indicates rather the dollar amount of the

15   deductible for that coverage, right?

16   A.    Correct.

17   Q.    Why does it indicate a dollar amount for the

18   deductible rather than for the limit of liability?

19   A.    The deductible is a common factor that would be

20   charged against a claim regardless of -- the value of

21   the vehicle is a variable that cannot really be

22   contemplated at the time of application.  The value or

23   limit of that coverage would be contemplated at the

24   time of the claim, meaning someone may have purchased

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    a brand-new vehicle on this day valued at $20,000.

2    Well, when the claim time comes a week, a month, a

3    year later, the value of that vehicle would be

4    determined at that time based on the actual cash value

5    of the vehicle at the time.

6            So that deductible is assessed as a common

7    factor against the amount of the claim because the

8    limit of liability would be relatively unknown based

9    on the actual cash value of the vehicle.

10   Q.   So the limit of liability is not expressed in

11   that column for comprehensive coverage because it's

12   not a readily identifiable number at the time the

13   policy is purchased?

14   A.   Correct.

15   Q.   Rather, it's a number to be determined later

16   based on the depreciating value of the property?

17   A.   And the amount of damage incurred, correct.

18   Q.   And the amount of damage incurred.  Thank you.

19           The number 500 appears in the middle

20   column for the entry for collision damage.  Do you see

21   that?

22   A.   Yes.

23   Q.   And what does that number express?

24   A.   In similar fashion, it is a deductible that



1    would be charged against the claim to the insured for

2    a collision claim.

3       Q.   And that's expressed as a dollar amount?

4       A.   Correct.

5       Q.   And the reason that entry is expressed as a

6    deductible rather than showing the limit of liability

7    for collision damage is the same reason you explained

8    with respect to comprehensive coverage, right?

9       A.   Yes.

10      Q.   It is an unknowable factor at the time the

11   policy is purchased?

12      A.   Correct.

13      Q.   The number 10,000 appears in that middle column

14   entry on this last page of Deaton Exhibit 2 for

15   property damage coverage.

16           Do you see that?

17      A.   Yes.

18      Q.   And is that insurance coverage that insures

19   against property damage claims brought by other

20   drivers for damage done to their property?

21      A.   Correct.

22      Q.   And the 10,000 indicates, the 10,000 figure in

23   that middle column of the last page of Deaton Exhibit

24   2 for property damage indicates the dollar amount of



Glenn W. Deaton                    38

1    the limit of liability for property damage coverage?

2    A.    That's correct.

3    Q.    And that's expressed as a dollar amount because

4    it is a dollar amount known at the time the policy is

5    purchased?

6    A.    That's correct.

7    Q.    When the policy is purchased it's readily

8    ascertainable what the limit of liability is for

9    property damage coverage or bodily injury coverage,

10   right?

11   A.    Correct.

12   Q.    And for the bodily injury entry we see 15/30 in

13   the middle column.

14         Do you see that?

15   A.    Yes.

16   Q.    What does that mean?

17   A.    That signifies $15,000 per person and a $30,000

18   per accident limitation.

19   Q.    So that's the limit of liability for bodily

20   injury coverage?

21   A.    Correct.

22   Q.    And that's the insurance made available for

23   claims by other persons than the insured against the

24   insured for bodily injury suffered in a covered event?



```
 1      A.    Correct.

 2      Q.    The next entry on the left reads UMBI.   Do you

 3   see that?

 4      A.    Yes, I do.

 5      Q.    What does that stand for?

 6      A.    It stands for uninsured motorist bodily injury

 7   coverage.

 8      Q.    I'm sorry.  I skipped.  There's an entry above

 9   that column that says DB.

10              Do you see that?

11      A.    Yes.

12      Q.    What does that stand for?

13      A.    That stands for death benefit.

14      Q.    What is the death benefit coverage?  Could you

15   explain that quickly?

16      A.    Nationwide's product provides a death benefit

17   to the named insured, the driver and passengers if

18   they are killed in a covered accident if they are

19   wearing their seat belt.  There is a small death

20   benefit payable.

21      Q.    Then in the middle entry where otherwise

22   there're expressed limits of liability or deductibles

23   you see the entry in letters CNW.

24              Do you see that?
```

1      A.    Correct.

2      Q.    I have no idea what that means and I guess that

3    means coverage not wanted, but maybe you could tell

4    me.

5      A.    That's exactly correct.

6      Q.    Is it the case that wherever I see CNW in the

7    documents that Deaton produced it means coverage not

8    wanted?

9      A.    Yes.

10     Q.    And I'll represent to you that I have seen that

11   entry in documents produced by other insurance agents

12   that have been subpoenaed in the case.

13           Do you understand what I have told you?

14     A.    Sure.  Yes.

15     Q.    Do you understand that to be a standard

16   abbreviation used in documents of this type --

17     A.    Yes.

18     Q.    -- by insurance agents?

19     A.    Yes.         .

20     Q.    I'm sorry.  Your answer is?

21     A.    Yes.

22     Q.    Thank you.

23           Let me take you to the entry for PIP in

24   the left-hand column.  Do you see that?



Glenn W. Deaton                    41

1       A.    Yes.

2       Q.    And in the middle column it says full.

3             Do you see that?

4       A.    Yes.

5       Q.    And that's a characterization that we see in --

6    I'll represent to you that that characterization of

7    PIP as full is one that can be found in every set of

8    documents that the Deaton Agency produced.

9             Do you understand what I am representing

10   to you?

11      A.    Yes.

12      Q.    Does that surprise you?

13      A.    No.

14      Q.    Is it fair to say that the characterization of

15   PIP as full in documents like the auto rate quote

16   shown on the last page of Deaton 2 is a routine one in

17   your business?

18      A.    Yes.

19      Q.    What I could do is show you some additional

20   examples of that characterization as it appears in

21   other sets of documents that Deaton produced simply so

22   you could confirm that full is in there.  We can go

23   through that exercise.  I'm happy to do that.  Or you

24   could simply tell me that you expect to find it in all

1    of them, if that's the case.

2       A.    Yes.   I would expect to see that usage of the

3    word "full" in the various documents that you have

4    obtained.

5       Q.    And you would expect to see it in connection

6    with PIP?

7       A.    Correct.

8             MR. SPADARO:   Just give me a couple of

9    minutes to think if I have anything else and I may

10   have nothing else.

11            MR. LEONI:   While we're on break, you're

12   not allowed to talk to me, him, anybody else about

13   your testimony, what questions you were asked, what

14   questions you may be asked.   You can talk to him about

15   anything else, hunting or whatever.

16             Do you understand that?

17             THE WITNESS:   Yes.

18             MR. LEONI:   Okay.

19             (A brief recess was taken.)

20             MR. SPADARO:   Mr. Deaton, let me show you

21   what I am going to ask the court reporter to mark as

22   Exhibit 3 to your deposition.

23             (Deaton Deposition Exhibit No. 3 was

24   marked for identification.)



1    BY MR. SPADARO:

2       Q.    Mr. Deaton, take your time reviewing that

3    document, but I don't think I have too much to ask you

4    about it.  I will represent to you that the document

5    marked as D-3 entitled Auto Memorandum Of Insurance is

6    just that, an auto memorandum of insurance that was

7    shared with us by the plaintiffs in this case, Mr. and

8    Mrs. Eames.

9             Do you understand what I have represented?

10      A.    Yes.

11      Q.    You can I think readily determine that this is

12   not a document related to an auto policy that was sold

13   through your office.

14      A.    Correct.

15      Q.    But instead it appears to relate to a policy

16   sold through another Delaware insurance agent?

17      A.    Correct.

18      Q.    I simply want to ask you whether -- let me go

19   back.

20            You referred during your helpful

21   description of the step-by-step process by which the

22   auto policy is sold to a document type called the auto

23   memorandum of insurance.

24            Do you remember that?



1      A.    Yes.

2      Q.    Is this that type of document that you

3   described in that explanation?

4      A.    Yes.

5            MR. SPADARO:  That's all I have,

6   Mr. Deaton.  I appreciate your patience and coming up

7   here today.

8            MR. CHEYNEY:  I have some questions.

9            MR. LEONI:  Mr. Cheney is going to ask you

10  some questions.

11  BY MR. CHEYNEY:

12     Q.    Mr. Deaton, the packet 63 that was shown to

13  you, there is no binder attached, is there?

14     A.    There is not.

15     Q.    Do you keep a copy of the binder?

16     A.    As a rule, generally no.

17     Q.    Do you give a binder copy to the policyholder

18  or the new policyholder?

19     A.    Yes.

20     Q.    What does the binder indicate?  Do you have a

21  copy of that that you could make available?

22     A.    I could make it available.  It is very similar

23  in its format and content to the memorandum of

24  insurance.



1              I could elaborate briefly that the auto

2    memorandum of insurance is generally once the policy

3    is issued by the company and physically processed, the

4    auto memorandum would be issued because it has a

5    policy number on it.

6              The binder contains pretty much the same

7    information with a caveat that says this is a binder

8    subject to the issuance of the policy.  It gives a 30-

9    day time limit.

10   Q.    That's exactly my question.  The binder is not

11   the policy?

12   A.    Correct.

13   Q.    Now, the automobile insurance application that

14   you have as Exhibit 63, this is signed by the

15   applicant.  Is that correct?

16   A.    Correct.

17   Q.    Is the information on it signed by the

18   applicant when they sign it?

19   A.    Yes.

20   Q.    Do you explain to the applicant what the PIP,

21   personal injury protection, full and $71.90 means?

22   A.    Yes.

23   Q.    And what does full mean when it appears there

24   that's explained to the applicant?

Glenn W. Deaton                                        46

1    A.    It means that that coverage is without a

2    deductible meeting the statutory requirement, the full

3    limit of the statute, which is 15/30.

4    Q.    Now, does that 71.90 that appears in that

5    column adjacent to full, to the right of full reflect

6    that premium for that policy coverage?

7    A.    Yes.

8    Q.    And if it were anything greater like the

9    additional policy coverage you spoke of, the APIP or

10   the 100/300,000, would that be a different premium?

11   A.    Yes, it would.

12   Q.    And that appears in the additional personal

13   injury protection, coverage not wanted?

14   A.    Correct.

15   Q.    Is there a discussion between you or your

16   agency and the insured as to the options of the APIP,

17   additional personal injury protection, or the minimum

18   policy limits?

19   A.    Yes.

20   Q.    Is this application always given, always given,

21   routinely given to the insured at the time they come

22   in?

23            MR. SPADARO:  Objection to the form.

24            You can answer.

1              MR. CHEYNEY:  I think those words were

2    your words, "routine" and "common."  I'm just trying

3    to get back to what your question was and repeat those

4    words.

5              So let me do it again.

6    BY MR. CHEYNEY:

7      Q.    Is this application routinely and commonly

8    given to the insured at the time he signs the

9    application?

10     A.    It is offered consistently to the insured if

11   they would like to have a copy of it.

12     Q.    How often in your experience during the course

13   of the year, an average year do they take it or don't

14   take it?

15     A.    It's taken rarely by -- in my experience, the

16   physical application is rarely taken by the applicant.

17   Their concern is the proof of coverage that they would

18   need for the purchase of their vehicle or their motor

19   vehicle or to go to Motor Vehicle for registration

20   processes, purposes.

21              A small percentage generally request the

22   hard copy application.

23     Q.    Now, going to page 3 of the application, the

24   very last line under Notice, it says, and I quote the

Glenn W. Deaton                                   48

1    first three words, "Read your policy."

2              Do you see that?

3    A.    Yes.

4    Q.    Is that something that's always told to an

5    applicant, when the policy comes to read the policy

6    and if there's any questions to call you?

7    A.    Yes.

8    Q.    The application is not the policy, is it?

9    A.    Correct.

10   Q.    In the closing statement on page 4 there's a

11   paragraph four from the bottom.  That first sentence

12   of that paragraph, could you read that?

13   A.    Beginning with "I hereby"?

14   Q.    Yes.

15   A.    "I hereby acknowledge that all coverages,

16   required and optional, available to me have been fully

17   explained."

18   Q.    In connection with that statement is it fair to

19   say from your agency and your personal viewpoint that

20   you explain to the insured at the time of the

21   application what the limits are that they are

22   purchasing, what the deductibles available are and

23   what the available additional APIP coverage for PIP

24   might be?



1    A.    Yes.

2    Q.    Now, it also says in the very last paragraph --

3    could you read that sentence fully, please?

4    A.    "I have read and signed the Delaware Motorist

5    Protection Act form, required by Delaware statute and

6    have selected the coverage and limits requested

7    hereon."

8    Q.    Now, is that form what page 6 would be?

9    A.    Yes.

10    Q.    And do you and your agency go over this form

11    and what is checked on the form?

12    A.    Yes.

13    Q.    Is frequently or infrequently the checking the

14    result of actual conduct of the applicant or by your

15    agency?

16    A.    Do you refer to the physical marking of the

17    box?

18    Q.    Yes.

19    A.    Generally by the agent or agency employee, not

20    the applicant.

21    Q.    Is it always done as a result of a conversation

22    and specific question?

23    A.    Yes.

24    Q.    Do you see anywhere on this policy the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Glenn W. Deaton                    50

1    word "full" unmodified by any other word when it comes

2    to the no-fault coverage package number 3?

3              MR. SPADARO:  Objection.

4              MR. LEONI:  Objection.  Because I don't

5    understand.  You said, "Do you see anywhere on this

6    policy."  What policy?

7              MR. CHEYNEY:  I beg your pardon.  The

8    Delaware Motorists' Protection Act form.  We're on

9    page 6.

10             MR. LEONI:  Of exhibit Deaton Exhibit 2.

11             MR. CHEYNEY:  Withdraw the question.

12   BY MR. CHEYNEY:

13     Q.    Looking at this form where it says the

14   coverages under A, paragraph 3, do you see that?

15     A.    Yes.

16     Q.    And do you see under B, "Options.  You must

17   select limits and coverage desired"?  Do you see that

18   paragraph?

19     A.    Yes.

20     Q.    Do you see paragraph or subparagraph 3 in that

21   column?

22     A.    Yes.

23     Q.    What does that say?

24     A.    "Full Coverage with no Deductible."



Glenn W. Deaton

51

1      Q.    Is it from that choice where the selection is

2    made in column C that information is put into the

3    computer as to what the PIP coverage is for the 15/30?

4      A.    Yes.

5      Q.    At the bottom of that page 6 can you read that

6    information that's contained in the box?

7      A.    "It is not the intent of this statement to

8    limit or discourage the purchase of increased limits

9    of liability and personal injury protection coverages,

10   or other additional coverages which may be available

11   from the company."

12     Q.    Is it your custom and routine and practice in

13   your agency to always offer the APIP coverage?

14     A.    Yes.

15     Q.    The screen saver, page 7 of this of Exhibit 63,

16   is this something that is routinely and commonly given

17   to the insured or is this a screen saver that you use

18   for making a rate quote?

19            MR. SPADARO:    Objection to the form.

20     Q.    It's okay.

21     A.    This is a document that is generally used for

22   explanation and comparison of options, but it is

23   generally not given to the applicant unless requested.

24   It's more of a worksheet, if you will.

1      Q.    It's a rate quote sheet, correct?

2      A.    Correct.

3      Q.    It is not the policy, is it?

4      A.    No.

5            MR. LEONI:  Let me just make sure the

6    record is clear that this is Deaton Exhibit 2 we're

7    talking about which has on the first page a marking

8    number 63.

9            MR. CHEYNEY:  Correct.  It's the last page

10   of that.

11   BY MR. CHEYNEY:

12     Q.    In connection with dealing with applicants for

13   insurance, is there a script given to you by

14   Nationwide as to what to say when talking about PIP

15   protection?

16     A.    No.

17     Q.    Is it fair to say that when dealing with

18   applicants everyone is different and unique?

19     A.    Yes.

20     Q.    Although the areas are covered, there's no

21   script or set formula of language used?

22     A.    That's correct.

23            MR. CHEYNEY:  That's all I have.  Thank

24   you.

1    BY MR. SPADARO:

2       Q.    I just have a couple of follow-up questions,

3    Mr. Deaton, not much.

4              If you would, keep before you Deaton

5    Exhibit 2.  If you would turn to the page that bears

6    the heading Closing Statement, if you could find that.

7       A.    Okay.

8       Q.    If you would direct your attention to the

9    paragraph that begins a little bit, begins about the

10   middle of the page and begins with the words "I hereby

11   acknowledge that all coverages."

12             Do you see that?

13      A.    Yes.

14      Q.    That sentence says, "I hereby acknowledge that

15   all coverages, required and optional, available to me

16   have been fully explained."

17             Do you see that?

18      A.    Yes.

19      Q.    And Mr. Cheney asked you about that sentence.

20   Do you recall that?

21      A.    Yes.

22      Q.    Does the reference to coverages being fully

23   explained have meaning to you?

24      A.    Yes.



Glenn W. Deaton                                54

1    Q.    And what does it mean for coverages to be fully

2    explained?

3    A.    To make sure that the applicant understands

4    what coverages are available to them and what limits

5    of coverages that they are purchasing, what optional

6    limits might be available to them, and coverages not

7    just relating to the PIP, as we mentioned, but

8    additional coverages in terms of rental car, towing

9    and labor, other accessory coverages that may be

10   available that they may not have thought about or

11   contemplated.

12   Q.    The reference in that sentence to coverages

13   being fully explained does not imply a minimal

14   explanation, does it?

15   A.    No.

16   Q.    The last sentence on that page that bears the

17   heading Closing Statement and is part of Deaton

18   Exhibit 2 was a sentence that Mr. Cheyney asked you to

19   read fully.

20         Do you recall that?

21   A.    Yes.

22   Q.    And in response to his request, you read the

23   entire sentence, didn't you?

24   A.    Yes.



1    Q.    You didn't read part of it, right?

2    A.    Correct.

3              MR. SPADARO:  That's all I have.  Thank

4    you.

5              MR. LEONI:  Any other questions?

6              MR. CHEYNEY:  No.

7              MR. LEONI:  All right.

8              (Discussion off the record.)

9              MR. SPADARO:  The parties, being the Eames

10   plaintiffs, the defendant Nationwide and the remaining

11   insurance agents to be deposed today pursuant to the

12   Eames plaintiffs' subpoena, which includes the

13   Broadbent Agency, the Truitt Agency and the Hoban

14   Agency, have agreed to a stipulation in lieu of

15   continuing with those depositions so that based on

16   this stipulation the depositions of the Broadbent,

17   Truitt and Hoban designees pursuant to the plaintiffs'

18   subpoenas will no longer be necessary and have been

19   canceled.

20              And the terms of the stipulation are as

21   follows, and I invite counsel, please, to indicate

22   their assent or disagreement with the way that I

23   characterize it.  The parties have stipulated that in

24   the vast majority of documents produced by the

1    insurance agents pursuant to the Eames plaintiffs'

2    subpoenas the word "full" appears next to the term

3    "PIP."

4              MR. LEONI:  So stipulated.

5              MR. CHEYNEY:  It's agreed.

6              MR. SPADARO:  I have nothing further.

7    Thank you very much.

8              (Proceedings concluded at 12:10 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Glenn W. Deaton                                    57

1                          I N D E X

2    DEPONENT:   GLENN W. DEATON                    PAGE

3        Examination by Mr. Spadaro                   2
         Examination by Mr. Cheyney                  44
4        Examination by Mr. Spadaro                  53

5                        E X H I B I T S

6    DEATON DEPOSITION EXHIBITS                     MARKED

7    1 Letter to Glenn Deaton Agency, Inc. from
       John S. Spadaro dated March 24, 2005
8      with subpoena attached                          7

9    2 Multipage document captioned "Automobile
       Insurance Application Nationwide Mutual
10     Insurance Company"                              27

11   3 Document captioned "Auto Memorandum Of
       Insurance"                                      42
12
     ERRATA SHEET/DEPONENT'S SIGNATURE         PAGE 58
13
     CERTIFICATE OF REPORTER                   PAGE 59
14

15

16

17

18                           .

19

20

21

22

23

24

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1

2

3                    REPLACE THIS PAGE

4                    WITH THE ERRATA SHEET

5                    AFTER IT HAS BEEN

6                    COMPLETED AND SIGNED

7                    BY THE DEPONENT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Glenn W. Deaton                    59

1   State of Delaware    )
                         )
2   New Castle County    )

3

4                  CERTIFICATE OF REPORTER

5

6           I, Kurt A. Fetzer, Registered Diplomate
    Reporter and Notary Public, do hereby certify that
7   there came before me on Tuesday, August 9, 2005, the
    deponent herein, GLENN W. DEATON, who was duly sworn
8   by me and thereafter examined by counsel for the
    respective parties; that the questions asked of said
9   deponent and the answers given were taken down by me
    in Stenotype notes and thereafter transcribed by use
10  of computer-aided transcription and computer printer
    under my direction.

11          I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.

13          I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.

15

16

17              _____
                Kurt A. Fetzer, RDR, CRR
                Certification No. 100-RPR
18              (Expires January 31, 2008)

19

    DATED:      _____
20

21

22

23

24

                        W&F

                WILCOX & FETZER LTD.
               Registered Professional Reporters