IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 04-CV-1324KAJ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### EAMES PLAINTIFFS' RESPONSE TO NATIONWIDE'S OBJECTIONS TO THE SDM'S JANUARY 4, 2006 <u>REPORT AND RECOMMENDATIONS</u>

In their recent motion for the adoption and supplementation of the SDM's January 4, 2006 Report and Recommendation, the Eames plaintiffs offered chapter and verse on Nationwide's prolonged abuse of the discovery process -- what the SDM referred to as Nationwide's "delayed, incomplete, and evasive responses to Plaintiffs' requests." Ex. A at 8. <u>And see generally</u> Ex. B (Eames plaintiffs' January 24, 2006 motion). In the pages that follow, we address Nationwide's defense of its conduct as set forth in its objections to the SDM's report. Though it is a conclusory defense -- unsupported by even a single documentary exhibit, despite the nearly year-long history of dispute -- it brings into focus the purported rationale for Nationwide's conduct: its blind insistence that it can properly avoid discovery so long as it disagrees with the plaintiffs' case on the merits.

That rationale fails on several levels. It was rejected under the law of the case over six months ago. If adopted, it would constitute a license to avoid discovery whenever a defendant contests liability. And it is false as a matter of fact.

128316

Nine months of gamesmanship should finally be enough. The SDM's recommendations should be adopted, and the Eames plaintiffs' separate motion (seeking the imposition of meaningful sanctions) should be granted.

### I. NATIONWIDE'S POSITION ON THE MERITS IS (STILL) NOT AN EXEMPTION FROM DISCOVERY

Nationwide's objections make its essential position clear: *We don't agree that we're doing anything wrong,* says Nationwide, *so we don't owe the plaintiffs any discovery.* For example, Nationwide says at page 3 of its objections that "it is Nationwide's position, and will always be Nationwide's position and proper defense that, *inter alia,* any use, casual or otherwise, of the word 'full' within a document that also references PIP does not 'characterize' or refer to a higher limit amount of PIP coverage than was sold . . . ." Elsewhere in the objections Nationwide repeats this refrain:

> Any claim of delay is also unfounded because it is Nationwide's position and defense that it did not (and does not) engage in the "offending practice" conduct about which plaintiffs complain.
>
> ***
>
> However, class certification is limited to the definition proposed in the Complaint, and which directs the inquiry to PIP limits, and not to a description of coverage generally. The Discovery Master, however, bases his findings on the supposed class-related discovery, on an inquiry into PIP coverage (rather than PIP limits).

D.I. 143 at 11, 15. Nationwide thus says that the discovery targets its characterization of PIP limits as "full"; and since Nationwide does no such thing, there can be no responsive documents.

Nationwide's position is not merely wrong, but sanctionable. Here is why:

## A. The Judicial Admissions

Nationwide's claim that it does not characterize PIP limits as "full" is objectively, demonstrably false. In fact, Nationwide has actually admitted that it engages in the offending practice in this and other litigation.

At the November 8, 2005 oral argument on Nationwide's motion to dismiss, the Court asked Nationwide's counsel a simple question: whether there was any legal theory under which the Eames plaintiffs could prevail. Nationwide's response is dispositive not just of this seemingly endless discovery dispute, but of the merits as well:

> THE COURT: *** Is there . . . a theory on which they could prevail?
>
> MR. CHEYNEY: No, because it is not ambiguous. You have to first find the contract has an ambiguity. Even with the word "full," give it to them. It's full $15,000. Its not fuller than $15,000. Its not the fullest available. It's just full.

Ex. C at 46.

In other words, Nationwide asserted at oral argument that the meaning of the challenged usage is "full $15,000" -- a meaning that (remarkably) Nationwide characterizes as unambiguous. But the meaning of "full" is *maximum*:

> **full** 1.: containing as much or as many as is possible or normal . . .
> 2 **a**: complete esp. in detail, number, or duration . . . 3 **a**: being at the highest or greatest degree: MAXIMUM . . .

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 471 (10th ed. 1993). The $15,000 limit, by contrast, is the statutory minimum under 21 Del. C. §2118(a). Since "full" means *maximum* and the $15,000 limit is the *minimum,* Nationwide's interpretation of the challenged usage translates to "*maximum minimum*." This is the formulation that Nationwide says is unambiguous.

Nationwide continues to argue, of course, that the "full" usage is not found within the contract's four corners, and therefore cannot be a basis for recovery. The Eames plaintiffs, for their part, continue to argue that the "full" usage *is* a part of the contract, but is actionable regardless. But there is no question that the usage appears *somewhere* in documents provided by Nationwide's agents to Delaware consumers; and Nationwide has admitted that when it does appear, it means "full $15,000" (or "maximum minimum").

Yet this is not the only case in which Nationwide has admitted to characterizing PIP limits as full. In Hardy v. Nationwide Ins. Co., 356 S.E.2d 38 (Ga. Ct. App. 1987), the Georgia Court of Appeals addressed Nationwide's simultaneous characterization of PIP as both "basic" and "full" -- a different and less problematic practice than the one challenged here, but a similar one nonetheless. Specifically, Hardy was a case in which the PIP claimant signed a Nationwide insurance application in the following format:

> [T]he second page of the application for insurance in this case provided the applicant . . . with a seriatim selection of a number of available coverages, including "BASIC PERS INJURY PROT" and, immediately below, "ADD PERS INJURY PROT". To the right of the basic PIP selection was a box labeled "FULL COVERAGE"; this box was marked with an "X." To the right of the additional (or optional) PIP selection was a series of boxes labeled "$5,000," "$20,000" and "$45,000," respectively; none of these boxes was marked.

Hardy, 356 S.E.2d at 39. Because the form expressly denominated *basic* PIP, the Court of Appeals found that it was not confusing:

> The application here plainly separates the selection of *basic* PIP coverage from the selection of additional PIP coverage. [The Georgia statute] mandates $5,000 minimum PIP coverage on motor vehicles registered in this state. The term "FULL COVERAGE" when used in conjunction with the selection of *basic* PIP coverage on the application obviously means full PIP coverage in the amount of $5,000.

128316

4

Id. (emphasis added).

The features that rescued Nationwide in the Hardy case are absent here. The documents targeted by the Eames plaintiffs -- the rate quotes, memoranda of insurance, etc. -- make no reference to *basic* PIP. Nor do they contrast basic PIP from additional PIP, or offer a menu of specified dollar limits. See Ex. D (setting forth the unadorned characterization of PIP as "full"). The Court should also consider Judge Carley's special concurrence in Hardy. In that special concurrence, Judge Carley criticized Nationwide's use of the "full" modifier as *unbelievably deceptive*:

> I am constrained to concur in the result reached by the majority that the application form complies with the current statutory language . . . .
>
> ***
>
> With that preface, I cannot help but opine that this form, while admittedly barely complying with the new statute, is *unbelievably deceptive* in that the block wherein one may indicate his selection of only basic personal injury protection is captioned by the words: "FULL COVERAGE." Especially is this a less than adequate description in view of the fact that there is absolutely no coverage which may be purchased that is *less* than that which is designated as "FULL COVERAGE."

Hardy, 356 S.E.2d at 40 (emphasis added in part).

Hardy is thus dispositive on the ambiguity issue: if a reasonable reader (like Judge Carley) found "unbelievable deception" in Nationwide's characterization of "basic" PIP as full, how much more deceptive does the usage become when the "basic" modifier is removed? Yet the more immediate points are 1) in Hardy, Nationwide was finally adjudicated to have characterized PIP limits as full, and 2) the Georgia appellate court's decision appears to reflect an affirmative argument by Nationwide that the "full" usage referred to the minimum $5,000 limit under the Georgia PIP statute. Hardy, 356 S.E.2d at 39.

128316                                              5

The Hardy case, alone or in combination with Nationwide's admissions at oral argument, makes several points clear. First, Nationwide does characterize PIP *limits* (not other aspects of PIP) as "full." It has been doing so for years, and not just in Delaware. Second, there must logically be some documentary record of the genesis and history of this practice: when and why Nationwide decided to employ the "full" usage, how and when it directed its insurance agents to do so, etc. It simply cannot be a coincidence that the usage shows up in different places and times, or that it is a routine usage in Delaware. See Ex. E at 41 (Nationwide's Delaware insurance agent agrees that "the characterization of PIP as full" in auto rate quotes is "a routine one" in Delaware). Third, there must logically be some documentary record of questions, concerns or complaints surrounding the "full" usage, since we know that Nationwide has been sued for employing that usage at least once (in Hardy).[1]

Far from affording Nationwide an exemption from discovery, Nationwide's so-called "proper defense" is a sham.

## B. The Law of the Case

The discovery at issue was served on Nationwide in early April 2005. In May 2005 Nationwide objected to the discovery, arguing that the modifier "full" can only have legal significance if it appears within the insurance contract. Since Nationwide had already produced its version of the insurance contract, no further discovery of Nationwide could be taken (or so said Nationwide). See Ex. F (Nationwide's responses to the Eames plaintiffs' initial document requests).

On May 31, 2005, after several failed attempts to negotiate with Nationwide, the Eames

---

[1] Despite that fact, Nationwide has made no attempt to retrieve and produce documents relating to the Hardy case.

128316                                6

plaintiffs wrote to the Court seeking to compel the production of further responsive documents. Ex. G. A teleconference was conducted on August 5, 2005, the results of which are summarized neatly by the SDM: "At the teleconference, Your Honor rejected Nationwide's arguments and instructed them to provide a response." Ex. A at 3.

Nationwide thus argued *six months ago* that its position on the merits trumped our discovery. The Court heard that objection and overruled it, *six months ago*. But despite the clarity of that result (the law of the case, no less) Nationwide continues to resist the very same discovery on the very same grounds: it argues throughout its objections that because its use of the "full" modifier does not mean what we say it means, there are no documents to produce. D.I. 143 at 2-3, 11, 15. And the fact that it persists in its already adjudicated, long-since-discredited position six months after the Court ruled (and even after the SDM recommended an award of nearly $9,000 in expenses) confirms the obvious. Nationwide will never take this process seriously until it is forced to pay substantial sanctions.

### C. The Spirit of the Discovery Process

We have shown above that Nationwide's claim of a "merits exemption" from discovery is wrong on the facts and contrary to the law of the case. But if none of this were so -- if Nationwide had a good-faith basis for insisting that it does not characterize PIP limits as full, and if the Court had not already overruled its objections -- how might Nationwide have properly responded? What does the spirit of the rules require?

The answer is simple. Litigants often object to the form of their adversary's document requests, but that is not a basis for withholding discovery. Nationwide could have simply objected on the purported basis that its "full" usage refers not to PIP limits but to the absence of a PIP-related deductible. See D.I. 96 at 6 (Nationwide argues, in support of its motion to dismiss,

that the "full" usage "reflect[s] that the Eames (sic) had elected PIP coverage with no deductible.") Subject to that objection, Nationwide could have then searched for and produced the documentary record of the usage's genesis and history, along with complaint-related documents from the <u>Hardy</u> case and elsewhere. The issue of the usage's meaning could have been left to the merits. That is how a responsible litigant deals with a formal objection.

### D. The Larger Implications

What would it mean for Nationwide to succeed on this motion? The immediate effect would be to forever foreclose any chance of the Eames plaintiffs' discovering how the disputed practice developed, or whether and when it has been subject to challenge (in <u>Hardy</u> and elsewhere). All bad results, to be sure.

But the implications for other cases are even worse. Parties could litigate their discovery objections to conclusion, have their objections overruled, ignore the consequences of the ruling for months, and then litigate the same objections later with success. Parties could avoid all discovery in every case simply by arguing that under their view of the merits, the adversary's discovery requests are irrelevant. Rule 26 would be a dead letter, and complex contract cases would be tried with no more documentary evidence than a copy of the contract itself.

To avoid these results, the SDM's thoughtful decision should be upheld, and Nationwide's conduct repudiated.

### II. THE SDM CORRECTLY REJECTED NATIONWIDE'S MISCELLANEOUS ARGUMENTS

Nationwide's remaining points are a hodgepodge of bad logic and distorted facts. We address the most egregious examples below.

- *"The SDM wrongly presumed the existence of responsive documents."* The SDM recommended that Nationwide be ordered to produce all generic documents that refer to or

128316                                                8

characterize PIP as full; all documents that relate to the practice's genesis; and all documents evidencing concerns or complaints with respect to the practice. Ex. A at 10. Nationwide says that this ruling presumes the existence of responsive documents.

It should first be pointed out that Nationwide is in a position to make this argument only because of its own recalcitrance. That is (and as Nationwide concedes at page 13 of its objections), Nationwide has focused its search on recent e-mails from Delaware insurance agents, along with "the e-mail of state management level employees who report to and receive reports from the Delaware agents . . . ." D.I. 143 at 13.[2] Since we know from Hardy that the offending practice is neither limited to Delaware nor of recent origin, these search parameters were always doomed to failure. And as we have elsewhere shown, Nationwide has consistently refused our request that it begin the search by identifying those persons within the company who have knowledge of the practice's genesis. See Ex. I (evidencing our repeated requests that Nationwide identify persons with knowledge of the practice's genesis).

In other words, Nationwide carefully avoids any meaningful search so it can posit the hypothetical prospect that responsive documents do not exist. But again, there can be no question that responsive documents do exist. In the "complaint" category, for example, the Hardy decision itself is a responsive document.[3]

But Nationwide's argument makes no sense. By recommending that

---

[2] During a September 13, 2005 teleconference with the Court, the Court asked Nationwide whether its e-mail search would be subject to any Delaware-specific limitations. Nationwide responded, "No, Your Honor." Ex. H at 10.

[3] Philip M. Casto, the attorney who represented Nationwide in the Hardy case, apparently maintains an office in Gainesville, Georgia. Has Nationwide contacted Mr. Casto to determine who he reported to within the company regarding the Hardy matter? Has it searched its own files for documents relating to Hardy?

128316                                9

Nationwide be ordered to produce responsive documents, the SDM does not presume the documents' existence. Rather, he places Nationwide under a serious and substantial obligation of good faith to find and produce those documents that do exist.

So long as Nationwide wastes its search efforts on recent-vintage e-mails from Delaware insurance agents, it ensures that the search will fail. That is the very definition of bad faith.

- *"The plaintiffs have yet to prove that responsive documents do exist."* Nationwide says that the Eames plaintiffs are not entitled to discovery because "plaintiffs' counsel has repeatedly confessed that while he hopes such documents exist, he does not have any, and does not know that any such documents exist." D.I. 143 at 4 (emphasis removed). This argument, more than most, reveals the puerile gamesmanship in Nationwide's position: unless the adversary can produce to Nationwide *Nationwide's own documents in advance*, it is entitled to no discovery. All discovery is thus reduced to a shell game. The propounding party is entitled only to those documents it can identify with specificity; and since that knowledge is unique to the responding party, nothing is ever produced. Meanwhile, the responding party disdains all obvious sources of information, searching only where it knows documents are unlikely to be found.

In any event, there is abundant evidence that responsive documents exist. Again, the offending practice is real; it is national in scope; and Nationwide has been at it for roughly twenty years. No such practice can exist in a modern business setting (within a $115 billion corporation) without resulting in a substantial documentary record. Further, Hardy confirms that complaints have been raised in the past.

- *"Nationwide's good faith is reflected by its review of over 100,000 documents."* At oral argument before the SDM (which took place more than eight months after we propounded

128316                                                         10

the discovery), Nationwide boasted that it was in the process of reviewing roughly 104,000 documents for responsiveness. Ex. A at 4. But this review was subject to the Delaware-specific parameters that guaranteed its failure.

The results should not be surprising. After reviewing the 104,000 documents, Nationwide produced a grand total of 344 pages. Seventy-two of those pages consist of the same blank form produced seventy-two times. And in an e-mail exchange between the parties, Nationwide admits that its search of the 104,000 documents "did not locate documents specifically outlining or reflecting a genesis for the [challenged practice]." Ex. J. This is the production for which the Eames plaintiffs were made to wait nine months.

- *"Any delay was a function of the stay."* The Court may recall that this case was stayed for a time while the Third Circuit addressed our application for interlocutory review on jurisdictional issues. Nationwide offers that circumstance to excuse its nine-month-long discovery dance.

The record shows, however, that the stay was entered on June 6, 2005. Ex. K. By its terms, the stay was entered "pending final resolution by the . . . Third Circuit regarding plaintiffs' request for review of this Court's order of April 27, 2005 . . . ." Id. The Third Circuit denied permission to appeal on July 7, 2005, automatically ending the stay. Ex. L. The stay thus lasted a grand total of thirty-one days -- during which time Nationwide might have searched out responsive documents from likely sources, free of other case-related obligations.

The stay is no excuse.

- *"It was not bad faith for Nationwide to seek a stay of all discovery pending a decision on its motion to dismiss."* On August 4, 2005, Nationwide wrote to the Court in anticipation of a telephonic hearing on the same discovery issues that remain with us today. In that letter, and at

128316                                                 11

the hearing itself, Nationwide argued that all discovery should be stayed pending the outcome of its motion to dismiss. The SDM correctly noted that the Court rejected that request. Ex. A at 3.

But nowhere did the SDM remotely suggest that the request itself was bad faith. Rather, the SDM suggested that Nationwide's subsequent campaign of evasion and delay might be viewed as "a calculated effort to stay discovery long enough for the Court to hear its motion to dismiss" notwithstanding the Court's prior ruling. Id. at 8. Nationwide has no answer to the SDM's concerns, and so distorts them.

Not incidentally, we note that Nationwide's August 2005 request for a stay of all discovery was pure ambush. Though the Eames plaintiffs had been in frequent contact with Nationwide beginning in May 2005, Nationwide never told us it would seek such a stay at any time prior to its August 4 letter to the Court. It then incorporated within that letter -- which masqueraded as a response to our motion to compel -- a written application for a stay. The Eames plaintiffs' only opportunity to respond to the "stay" application came the next morning, on the telephone with the trial judge; no written response was possible owing to Nationwide's gaming of the process.

The point, of course, is that Nationwide was guilty of bad faith on multiple levels. For while it is surely bad faith to impose a *de facto* stay through one's own misconduct (and after the Court has rejected a stay application), it is also bad faith to ambush your adversaries, and manipulate the process to deprive them of the right to be fully heard.

- ***The "full" usage is not found in any document related to the plaintiffs' purchase experience."*** This is simply false. As Nationwide is aware, the Eames plaintiffs served the Muncie Agency (which handled the Eames's account) with a nonparty document subpoena. The document attached as Exhibit M was produced by the agency in response to that subpoena. It

128316                                12

clearly describes "PERSONAL INJURY PROTECTION" as "FULL", with the latter term appearing in the place reserved (as to other coverages) for dollar amounts. Further, the complaint (which frames the scope of discovery) directly alleges that the Eames plaintiffs were subjected to the offending practice in the sale of their auto insurance. Compl. ¶¶9-10, 13.

- ***"The plaintiffs were never given any generic documents, so generic documents can't be relevant to class certification issues."*** Six months after its objections were overruled by the Court, Nationwide argues that we are essentially entitled to no discovery unless the documents to be discovered were shown to the Eames plaintiffs prior to the lawsuit. By this logic, if Nationwide's CEO authored a memo titled *How to Cheat Auto Insureds by Characterizing PIP as Full*, that document would not be discoverable. Similarly, in securities class actions, only the prospectus could ever be discovered.

Nationwide's argument might fairly have been characterized as weak six months ago. For Nationwide to be raising it now is outrageous: its objections to the discovery were heard and overruled in August 2005.[4] Here again the case cries out for sanctions.

- ***"Discovery responses are not incomplete merely because the search is incomplete."*** Nationwide's concluding argument is that "no Federal Rule on discovery presumes a discovery response under Rule 34 is incomplete merely because the search is incomplete or unfinished." D.I. 143 at 16. This of course contradicts Nationwide's suggestion (elsewhere in the same brief) that responsive documents do not exist; for if their non-existence had been confirmed, the search would indeed be over.

---

[4] As the SDM noted, Nationwide asserted no vagueness, burden or overbreadth objections in its written responses. At oral argument before the SDM, Nationwide conceded that those objections were waived. Ex. A at 5.

That aside, it is true enough that a search is not necessarily a bad-faith search by virtue of being incomplete. But with the passage of time, the ordinary presumption that a party is acting in good faith begins to wear thin. When that party has failed to complete its search for a full month, or two, or three, reasonable minds can be forgiven their suspicions. When the same party is a sophisticated, wealthy corporate giant, with sufficient resources to expedite any document search, the suspicions grow darker. And when that party claims that the search remains "unfinished" in *month nine*, the question is not whether to impose sanctions but rather, how much to impose.

## CONCLUSION

For the reasons set forth above, Nationwide's objections to the Special Discovery Master's January 4, 2006 Report and Recommendation should be overruled.

                                       Respectfully submitted,

                                       MURPHY SPADARO & LANDON

                                       /s/ John S. Spadaro
                                       John S. Spadaro, No. 3155
                                       1011 Centre Road, Suite 210
                                       Wilmington, DE 19805
                                       (302)472-8100

February 1, 2006                      Attorneys for the Eames plaintiffs

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 04-CV-1324KAJ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

Nicholas E. Skiles, Esq.
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, DE 19899

                                            MURPHY SPADARO & LANDON

                                            /s/ John S. Spadaro
                                            John S. Spadaro, No. 3155
                                            1011 Centre Road, Suite 210
                                            Wilmington, DE 19805
                                            (302) 472-8100

                                            Attorneys for plaintiffs
February 1, 2006                         Thomas A. Eames, Roberta L. Eames and
                                            Tammy Eames (on behalf of themselves and
                                            all others similarly situated)

128337