# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

THOMAS A. EAMES, ROBERTA L. EAMES )
and TAMMY EAMES, on behalf of )
themselves and all others )
similarly situated, )
)
      Plaintiffs, )  C.A. No. 04-CV-1324KAJ
)
v. )
)
NATIONWIDE MUTUAL INSURANCE )
COMPANY, )
)
      Defendant. )

## EAMES PLAINTIFFS' MOTION FOR ADOPTION AND SUPPLEMENTATION
## OF THE SDM'S JANUARY 4, 2006 REPORT AND RECOMMENDATION

Plaintiffs Thomas A. Eames, Roberta L. Eames and Tammy Eames (the "Eames

plaintiffs") respectfully move for the adoption and supplementation of the Special Discovery

Master's January 4, 2006 Report and Recommendation. Specifically, the Eames plaintiffs

request that 1) the SDM be upheld in his recommendation that the Eames plaintiffs' October 26,

2005 motion to compel be granted; 2) the SDM be upheld in his award of $8,775 in expenses to

the Eames plaintiffs; 3) the Eames plaintiffs be awarded sanctions in the amount of $25,000; and

4) the SDM's Report be modified and supplemented to provide that all costs of the SDM's

services be borne by Nationwide.

### I. THE RECORD SUPPORTS FAR MORE
### RELIEF THAN THE SDM RECOMMENDED

The record presented to the SDM (and outlined below, under argument heading II)

confirms that through a prolonged pattern of evasion, noncooperation and violation of Court

orders, Nationwide derailed the discovery process for nearly a year. On this basis, the SDM

making it more productive. But the Court expressly prohibited Nationwide from employing its standard "we'll get back to you" approach; rather, Nationwide was to bring to the meeting any and all personnel needed to address the Eames plaintiffs' questions:

> THE COURT: *** Have the technical people in the room, if you have to, Mr. Oesterling. Don't have a meeting where he's got questions without having the people there who can answer him.

Id. at 21-22.

On September 16, 2005, we provided Nationwide with specific written questions as directed by the Court. Ex. C. Each of the questions was focused on the existence and location of documents that might be responsive to the Eames plaintiffs' discovery. Questions 6 through 8 are illustrative:

> 6. Are there occasions when Nationwide's management issues instructions, guidance or suggestions to its insurance agents regarding the content or form of documents to be used in the sale of auto insurance products? If so, from whom do those instructions, etc. typically come? In cases where the instructions, etc. are in writing, how and where are they stored?
>
> 7. Are there occasions when Nationwide's management issues instructions, etc. to its underwriting staff regarding the form or content of documents to be used in the sale of auto insurance products? What persons would typically be involved in such an exchange? How and where would records of such an exchange be found?
>
> 8. How are form underwriting documents for auto products developed? Who at Nationwide would be a likely custodian for such documents? How and where would records of such activity be found?

Id. Nationwide never objected to any of these questions at any time prior to the in-person meeting; and it has never raised any objection to the questions since.

In advance of the meeting, the Eames plaintiffs asked Nationwide to identify the attendees who would appear for Nationwide. Id. Nationwide responded by identifying three

lawyers: Mr. Cheyney and Mr. Marino (who are counsel of record here), and Nationwide's in-house counsel, Mr. Oesterling. The Eames plaintiffs immediately advised Nationwide that "Judge Jordan's instructions at the September 13 teleconference require wider participation by Nationwide than you suggest." Ex. D.

The in-person meeting took place on October 3, 2005. The documents set forth as Exhibit E reflect the parties' competing memorializations of that meeting. Both sides agree, however, that Nationwide failed to address several of the Eames plaintiffs' questions at the meeting; and that in fact, Nationwide's in-house counsel stated that he would need to contact underwriting staff and "products compliance" personnel to secure answers. Ex. E. There can thus be no dispute that the Court's September 13 instruction to Nationwide (*Don't have a meeting where he's got questions without having the people there who can answer him*) was violated. Nor can there be any doubt that Nationwide deliberately chose to violate that instruction: it knew the questions, and was warned by the Eames plaintiffs that its proposed list of attendees was insufficient, all in advance of the meeting.

In its briefing before the SDM, Nationwide conceded that in the course of the October 3 meeting, it "agreed to follow up on" certain of the subject questions. D.I. 120 at 12. Yet Nationwide insisted that it had done nothing wrong. And why? Because, said Nationwide, "The questions that Mr. Oesterling agreed to follow up on were not technical questions." Id. Thus has Nationwide played its game of "gotcha" not just with us, but with the trial judge himself.

Of course, the Court did not remotely limit its instruction (that the parties *not* have a meeting at which the plaintiffs' questions would go unanswered) to so-called "technical" questions. The obvious purpose of ordering the Eames plaintiffs to prepare their questions in advance was to place Nationwide in a position to finally answer them. And if that required the

presence at the meeting of additional company personnel (other than lawyers), Nationwide was

to make that happen, too. The Court's reference to bringing "technical people" was not a

loophole, but a safeguard against evasion and delay.

The questions Nationwide failed to address at the October 3 meeting, meanwhile, are the

same ones set forth above -- numbers 6 through 8 in the Eames plaintiffs' September 16, 2005 e-

mail. But not only did Nationwide fail to address them at the October 3 meeting, it continued to

ignore them throughout the entire months of October, November and December 2005. It did

this, not only in the face of the Court's order to the contrary, but also in violation of its own

promise to follow up. Yet none of those questions required much of Nationwide, which must

have known all along the identities of those who typically instruct insurance agents on the use of

form underwriting documents (to take one example).

In the end, the exchange is a simple one. The Court says, *Don't have a meeting where*

*he's got questions without having the people there who can answer him.* Nationwide replies,

*We'll do as we please, and the Court and the plaintiffs will like it.* All things considered, the

SDM dealt with Nationwide too gently.

### B. **The Default Standard**

The SDM found that Nationwide "repeatedly refused to follow the Court's Default

Standard for Electronic Discovery, which was incorporated by reference in the Court's March 28,

2005 Scheduling Order." Ex. A at 7. The accuracy of this finding is confirmed by the

chronology set forth below. It amounts, quite simply, to a *repeated* refusal to comply with this

Court's order.

Though the SDM recommended an award of expenses, no sanctions were imposed for

Nationwide's prolonged and willful noncompliance with the Default Standard. The SDM's

rationale for staying his hand on the sanctions issue is troubling, at least in the context here: the SDM believed he could not recommend sanctions (as opposed to a mere award of expenses) because "there has got to first be an order of the Court, which has been disregarded." Ex. F at 87. And see id. at 86-89. These excerpts from the hearing before the SDM suggest that the SDM does not believe that a violation of a bench ruling can support a sanctions award. See id. at 87-88 (SDM challenges the notion of a sanctions award by asking, "Did Judge Jordan enter and order in the record or in the docket as opposed to saying something in the transcript?") Since the Court reinforced the necessity of compliance with the Default Standard during a teleconference (and not in any written order), the SDM apparently felt without authority to award sanctions: "[M]y understanding of the law is I don't have authority to order sanctions." Id. at 86. But all the Court's orders are orders, whether written or oral. Indeed, most of this Court's discovery-related business is now conducted by letter applications followed by telephonic hearings; so that the SDM's view, if adopted, might constitute a license to violate bench rulings with impunity. Moreover, the SDM overlooked the fact that the Default Standard itself is a written document, *incorporated within* a written order.

In short, Nationwide repeatedly ignored the Court's Scheduling Order and its incorporation of the Default Standard. Its violation of the Court's instructions regarding the parties' October 3 meeting was a continuing violation, repeated every day for over three months. The SDM could have, and should have, imposed a substantial sanctions award.[1]

---

[1] It comes as no surprise that in a recently concluded PIP-related class action in Delaware's Superior Court, Nationwide was twice sanctioned for discovery abuses. See Exs. G and H.

## C. Nationwide Argued Objections for Months,
### Knowing They Had Already Been Waived

The SDM correctly noted that at the Court's August 5, 2005 teleconference, the Court

"rejected Nationwide's arguments and instructed them to provide a response." Ex. A at 2.

Among the objections overruled during the August 5 teleconference was Nationwide's assertion

that the subject discovery was "broad, vague, [and] unlimited [in] scope . . . ." Ex. I

(Nationwide's pre-teleconference letter to the Court.) But those objections were nowhere stated

in Nationwide's written responses to the discovery; and at oral argument before the SDM,

Nationwide was forced to admit that they had been waived *from the start:*

> SPECIAL MASTER SEMPLE: *** And in addition, you know,
> when Nationwide first filed its responses I did not -- am I not
> correct that Nationwide did not make any objections based on
> vagueness or overbreadth, or burden.
>
> MR. CHEYNEY: No, we didn't at that time.
>
> SPECIAL MASTER SEMPLE: Are they not, under the rules,
> waived?
>
> MR. CHEYNEY: Well, we think our answer is still correct
> regardless of that.
>
> SPECIAL MASTER SEMPLE: But my question is: --
>
> MR. CHEYNEY: Yeah.

Ex. F at 73. And see Ex. A at 5 (SDM confirms that "at oral argument, Nationwide's counsel

conceded that Nationwide did not timely make objections based on vagueness, overbreadth, or

burden and that as a result those objections were waived.")

In other words, Nationwide essentially ambushed the Eames plaintiffs at the August 5,

2005 teleconference by first refusing to negotiate on the discovery, and then arguing objections

to the Court that it knew had already been waived. Virtually the entire eight-month-long dispute

has been an exercise in arguing *waived* objections -- including, most notably, Nationwide's

prolonged attempt to limit the type, date and location of documents to be searched. Here again,

the SDM should have recommended substantial sanctions.

### D. Nationwide Misled Both the Court and SDM

During the parties' September 13, 2005 teleconference with the Court, the Eames

plaintiffs argued that Nationwide was wrong to limit its e-mail search to "people who are

connected to Delaware":

> [Y]es, I know that they're going to search e-mails from last week
> and they're going to limit it to people who are connected to
> Delaware. That search is calculated to fail. It has almost no
> chance of discovering the documents that we're looking for.

Ex. B at 10. The Court immediately asked Nationwide's counsel whether Nationwide was in fact

limiting its e-mail search to Delaware:

> THE COURT: Now, stop. I read that in your letter. Then I read
> their response which said we're not limiting this geographically.
> You said they're limiting to people in Delaware. They said
> expressly we're not doing that. Where is the disconnect? *** Mr.
> Cheyney, are you limiting this?
>
> MR. CHEYNEY: No, Your Honor.

Id. Before the SDM, however, Nationwide offered an extended defense of its "Delaware only"

e-mail search. That defense began with the acknowledgement that Nationwide "has identified

more than 75 employees and independent agents whose e-mails have been searched." D.I. 120 at

7. At the parties' October 3 discovery meeting, Nationwide's counsel admitted that these

"independent agents" are all *Delaware* agents; and that the employees come from what

Nationwide calls its "Delaware leadership team." See Ex. E. Nationwide justified these

limitations thus:

> This case involves an insurance policy . . . issued in Delaware to
> Delaware residents. The disputed PIP coverage benefits . . . was
> [sic] paid in Delaware for a Delaware accident. The PIP coverage
> issues are governed by Delaware law . . . .

***

> The proper focus of discovery is obviously Delaware.

***

> ***The searches in this case have obviously been properly focused
> on Delaware.***

D.I. 120 at 12-13 (emphasis added).

Nationwide's representation to the Court -- that it was not imposing geographic limits on

the search -- was less than candid at best, and deliberately false at worst. But its conduct is more

troubling still in the light of the <u>Hardy</u> case.

In <u>Hardy v. Nationwide Ins. Co.</u>, 356 S.E.2d 38 (Ga. Ct. App. 1987), a policyholder

challenged Nationwide's practice in Georgia of characterizing "basic PIP" as "full." Though the

Georgia appellate court found that the modifier "basic" rescued Nationwide's usage under the

applicable Georgia statute, one concurring judge was deeply troubled nonetheless:

> I cannot help but opine that this form, while admittedly barely
> complying with the new statute, is ***unbelievably deceptive*** in that
> the block wherein one may indicate his selection of only basic
> personal injury protection is captioned by the words: "FULL
> COVERAGE." Especially is this a less than adequate description
> in view of the fact that there is absolutely no coverage which may
> be purchased that is ***less*** than that which is designated as "full
> coverage."[2]

<u>Hardy</u>, 356 S.E.2d at 40 (emphasis added in part).

In other words, Nationwide engaged in a closely similar practice in Georgia roughly

---

[2] We note that the forms employed by Nationwide in Delaware do not benefit from the "basic"
modifier seen in <u>Hardy</u>.

twenty years ago. It should be obvious that the practice is national in scope, and by no means tied to Delaware. This did nothing to prevent Nationwide from arguing for a Delaware-specific limitation before the SDM -- *after* denying to the Court that it was even seeking such a limitation.

## II. THE RECORD SUPPORTS THE SDM'S RECOMMENDATIONS

The record on this never-ending discovery dispute is a sorry chronology of evasion, delay and noncooperation. It emphatically supports the SDM's findings and recommendations.

### A. The Initial Document Requests

On April 7, 2005, the Eames plaintiffs served Nationwide with their initial document requests, seeking production of documents related to the disputed practice. That discovery consisted of just three requests, two of which are at issue here:

> 1. All documents that refer to or characterize limits of liability for PIP coverage as "full."
>
> 2. All documents that refer or relate to the characterization of limits of liability for PIP coverage as "full."

Ex. J. In response, Nationwide produced just a single document: a copy of portions of the Eames's auto policy. But since Nationwide had already produced that document as the sum total of its initial disclosures, Nationwide's production essentially amounted to nothing.

Nationwide justified its refusal to produce documents on the basis of its general objection. Specifically, Nationwide objected that:

> [t]he only legal and enforceable interpretation of these terms, pursuant to Nationwide's coverage obligations upon which Plaintiffs asserts (sic) a breach of contract, are those characterizations and references set forth in the insurance policy and Declarations page which form part of the policy. No other reference or characterization is relevant to this action.

Ex. K. Nationwide thus argued that the characterization of PIP as "full" could have legal

significance only if it appeared in the contract; and since Nationwide had produced an

(incomplete) copy of the Eames's policy, it need produce nothing else. Again, Nationwide's

responses stated no objection whatever on grounds of undue burden or prematurity.

### B. The Eames Plaintiffs' Initial Attempt to Confer

On May 11, 2005 the Eames plaintiffs wrote to Nationwide seeking to clarify its

response. Was Nationwide contending that no responsive documents existed? Or was it

shielding documents behind its "legal characterization" objection? Thus, the Eames plaintiffs

posed these simple questions:

> 1. In responding to our document requests, has Nationwide
> searched all documents in its possession, custody or control that
> might reasonably be expected to contain characterizations of PIP
> limits as "full", including internal memoranda, guidelines and
> manuals, and minutes of board meetings?
>
> 2. Conversely, has Nationwide limited its search to insurance
> policies?
>
> 3. Is Nationwide aware of any documents in its possession,
> custody or control that do not consist of insurance policies or parts
> of insurance policies, but do characterize PIP limits as "full"?

Ex. L. Nationwide responded the next day, but offered no answer to these questions. Ex. M.

On May 16, 2005, the Eames plaintiffs wrote a second time, asking again that

Nationwide address the questions in the May 11 e-mail, and offering to accept a production

limited to generic documents (meaning documents not specific to any policyholder). Ex. N.

Nationwide again failed to respond, so on May 20 the Eames plaintiffs wrote once more,

indicating that though they had been forced to seek relief, they would remain available for

further negotiation. Ex. O. Nationwide finally responded on May 23, 2005, but used the

opportunity to argue the merits. Nationwide's May 23 letter thus offered no information on its document search, and no hope that it would actually produce anything. Ex. P.

### C. The E-Discovery Default Standard

The Scheduling Order incorporates by reference the Court's Default Standard for discovery of electronic documents. D.I. 43 ¶1. Nationwide ignored the Default Standard, however; and on March 8, 2005, the Eames plaintiffs wrote to Nationwide to remind them of their obligations in this regard. See letters and e-mails collected at Ex. Q.

Roughly one month passed with no response from Nationwide, and no compliance by Nationwide with the Court-ordered Default Standard. Accordingly, on April 6, 2005, the Eames plaintiffs wrote to Nationwide again, providing its counsel with an additional copy of the March 8 letter and again requesting a response. Id. Another month passed with no response from Nationwide, and none of the disclosures required by the Default Standard; and on May 5, 2005, the Eames plaintiffs wrote again, requesting a response to the March 8 letter and the follow-up e-mail of April 6. Id. On May 16 we wrote once more, asking whether Nationwide "[c]ould . . . review and comply with the Default Standards now?" Id. On May 20, the Eames plaintiffs chased Nationwide for a fourth time. Id. Finally, as part of Nationwide's May 23 "drop dead" response, Nationwide responded that "no electronic discovery . . . has been requested . . . ." Id. On this basis, it simply refused to acknowledge the Default Standard's applicability to the case -- despite the Court's express order to the contrary.

Nationwide's position was more remarkable still when we consider that the Eames plaintiff's initial document requests set forth a specific definition of the term "document" to expressly "include (without limitation) documents created or stored by electronic means."

### D. **The August 5 Teleconference**

In anticipation of the August 5 teleconference with Judge Jordan, and as required by the

Scheduling Order, both sides submitted letter briefs to the Court. On the literal eve of the

teleconference, Nationwide's letter raised new objections that appeared nowhere in its discovery

responses and were never before communicated to the Eames plaintiffs. Nationwide thus argued

that the document requests were "broad" and of "unlimited scope", despite its failure to raise

(much less particularize) any burden objection in its original responses. Ex. I at 2. Nationwide

also raised (for the first time) a prematurity objection, arguing that the discovery "should be

abated until the plaintiff responds to and the Court resolves defendant's Motion to Dismiss . . . ."

Id. at 1. Again, no hint of these objections was offered in Nationwide's responses to the Eames

plaintiffs' discovery. See generally Ex. K. With respect to the Default Standard, Nationwide

continued to insist that it had no application to the dispute because "there is (sic) no electronic

discovery responses at issue . . . ." Ex. I at 2.

The Court rejected Nationwide's position emphatically:

> So what I'm telling you is if it comes down to advocacy before me
> on those discovery dispute, you come up way short, mister -- way,
> way, way short. The record that looks like has developed here that
> is presented to me is basically one where you said I'll give you the
> document. I'll give you the contract. Otherwise, you can drop
> dead until my 12(b) . . . is decided. That is sort of the gist of the
> feeling or the communications that seem to be going back and
> forth. And I'm just trying to disabuse you of this in the most
> direct, clear, emphatic way I possibly can. I will not tolerate this.

Ex. R at 33. Recognizing that the document requests expressly targeted electronic documents,

the Court also criticized Nationwide's failure to comply with the Default Standard:

> So you are not at liberty to say "I don't care how many times they
> say they think we've got relevant documents in our electronic
> database, I say there is no electronic discovery." That approach is

the level of an almost willful refusal to acknowledge what is on the
face of their document.

Id. at 36. See also id. at 35-36 (Court characterizes Nationwide's position as "genuinely

remarkable.")  Having disposed of Nationwide's objections, the Court ordered the parties to

"make a good faith effort at a meet and confer" on discovery issues. Id. at 35.

### E.  The Next Round of "Negotiations"

The next teleconference with the Court would take place on September 13, 2005.  In the

interim between the two teleconferences, the parties exchanged additional e-mail messages and

letters -- though no documents were produced.  Those communications are set forth as a single

exhibit, and deserve to be read in full.  See Ex. S.[3]  They are noteworthy for the following:

•  The Eames plaintiffs wrote to Nationwide on August 5, just hours after the parties'

teleconference with the Court concluded.  In that message, we reiterated the questions that

Nationwide had previously refused to answer as part of the meet-and-confer process, asking (for

example) whether Nationwide would attempt to identify those persons who might be

knowledgeable regarding the genesis of the disputed practice. Ex. S at MTC1-2.

Nationwide's response, likewise sent just hours after the Court admonished the parties, is

so obviously lacking in any spirit of compromise that it essentially speaks for itself.  But we do

call the SDM's attention to one particularly troubling passage:

I do not anticipate discovering any documents you suggest exist.
Perhaps Mr. Muncie has them.

Id. at MTC3.  The reference to "Mr. Muncie" is to the local Delaware insurance agent through

which the Eames's auto policy was placed.  The suggestion that Nationwide's corporate-level

documents on the genesis of the offending practice might be found in the hands of a tiny

---

[3] For ease of identification, the Eames plaintiffs have numbered the documents that comprise
Exhibit S with an alphanumeric sequence beginning with "MTC1."

insurance agency from Seaford, Delaware (as opposed to Nationwide itself) was obviously meant to be facetious.

Nationwide's August 5 message also promised a response "on Wed. next when my report returns from vacation." Id. But no response arrived the following Wednesday, and Nationwide later denied having promised any response by that date. Id. at MTC8, MTC9, MTC16. The succeeding weeks brought more of the same, as we were forced to chase Nationwide for return communications on August 11, August 16, August 22 and September 2. Id. at MTC8, MTC9, MTC14, MTC30.

• Eventually Nationwide took steps to create the appearance of cooperation. In its August 22, 2005 letter, Nationwide agreed to search "Delaware state email files" along with the company's board minutes. Ex. S at MTC18. But that approach was designed for failure.

First, the types of documents sought by our discovery -- documents on the genesis of the disputed practice, and any criticisms of the practice that Nationwide either anticipated receiving or actually received -- would likely be found in the hands of upper and mid-level management employees. Those are the employees that implement and advance specific claims-handling practices. Thus, while there is nothing objectionable to searching board minutes, those documents are (at best) a secondary source.

As for e-mails, Nationwide expressly limited its e-mail search to Delaware insurance agents and persons with Delaware-specific responsibility. In addition, Nationwide refused to search e-mails prior to 2002 -- despite the fact that the disputed practice was in place long before that date. See Ex. S at MTC36.

Corporate-level documents, of course, could not possibly be identified by a Delaware-only search. Moreover, a Delaware-specific limitation makes sense only if Nationwide has restricted the disputed practice to the State of Delaware. Hardy proves that it has not.

• We repeatedly asked Nationwide to simply make a good-faith effort to identify persons with knowledge of the disputed practice's genesis. See, e.g., Ex. S at MTC1, MTC24. Though such an effort makes obvious sense -- assuming one is actually trying to identify responsive documents -- Nationwide refused to do this.

## F. The September 13 Teleconference and its Aftermath

As shown above, the Court's instructions during the parties' September 13, 2005 teleconference were specific and emphatic: the Eames plaintiffs were to propound specific written questions in advance of an in-person meeting, and Nationwide was to provide definitive answers at the meeting. Further, Nationwide was to bring to the meeting the persons necessary to answer the plaintiffs' questions; there was to be no deferring or ducking of the questions, by order of the Court.

But Nationwide concedes that input from underwriting staff and "products compliance" personnel was needed to answer the questions; and there is no dispute that the October 3 meeting went forward without those people in the room. Several of the Eames plaintiffs' most important questions thus went unanswered, in direct violation of the Court's order. Nor did Nationwide provide answers during the entire months of October, November and December 2005.

Finally, on January 12, 2006, Nationwide wrote to the Eames plaintiffs purporting to answer the subject questions. Ex. T. A review of this two-page letter -- roughly half of which simply restates the Eames plaintiffs' questions verbatim, as with an interrogatory response -- makes it difficult to see why Nationwide could not have simply supplied answers at the October

3 meeting as ordered. More than this, the quality and quantity of information provided by Nationwide's January 12 letter makes it impossible to conceive that it needed over *three months* to respond.

Thus goes the seemingly endless saga of Nationwide's obstruction and delay. Can nothing be done at last?

### G. The Bottom Line

This is a case about a specific disputed practice: Nationwide's routine representation, made to thousands of Delaware consumers in the course of selling auto insurance, that their PIP is "full." Documents produced by four Nationwide insurance agents confirm that this practice is employed uniformly by Nationwide whenever it purports to sell the minimum statutory PIP limits. See Affidavit of Heather R. Jones ¶4 (confirming that out of forty-eight policyholder accounts reflecting the purported sale of minimum limits, forty-seven characterized PIP as "full") (Ex. U). One local Delaware insurance agent confirmed that Nationwide routinely characterizes PIP as "full" in its Delaware rate quotes.

> Q: Is it fair to say that the characterization of PIP as full in documents like the auto rate quote shown on the last page of Deaton 2 is a routine one in your business?
>
> A: Yes.
>
> Q: What I could do is show you some additional examples of that characterization as it appears in other sets of documents that Deaton produced simply so you could confirm that full is in there. We can go through that exercise. I'm happy to do that. Or you could simply tell me that you expect to find it in all of them, if that's the case.
>
> A: Yes. I would expect to see that usage of the word "full" in the various documents that you have obtained.
>
> Q: And you would expect to see it in connection with PIP?

A:  Correct.

Ex. V at 41-42.

There can thus be no question that the practice exists.  Nor can there be serious doubt that it is a longstanding practice of national scope -- since the <u>Hardy</u> case (in which Nationwide characterized "basic" PIP as "full") was decided in Georgia nearly twenty years ago.  Such a widespread corporate practice *must* have an identifiable genesis.

That is why, nearly ten months ago, we served Nationwide with document requests designed chiefly to secure 1) documents reflecting the practice's historical genesis, and 2) documents reflecting any questions, concerns or complaints that have arisen with respect to the practice.  Again, "genesis" documents *must* exist.  And at no point in this lengthy process has Nationwide ever claimed that they *do not* exist.  Instead, Nationwide has refused to identify persons involved in developing the practice; and it has failed to produce even a single "genesis" document.[4]  Nor has Nationwide produced any evidence of questions, concerns or complaints directed to the practice -- even though we know that Nationwide was actually *sued* for its "full" usage in the <u>Hardy</u> case.

By the time the instant briefing concludes, the Eames plaintiffs will have filed two letter applications and six briefs, participated in two telephonic hearings and a third hearing before the SDM, attended one Court-ordered (though largely pointless) in-person meeting, and exchanged countless letters, e-mails and phone calls -- all directed to securing documents that almost certainly exist (and whose existence has never been denied by Nationwide), but which

---

[4]  At oral argument, Nationwide disclosed for the first time that it was in the process of reviewing 104,000 pages for responsiveness to the subject document requests.  Ex. A at 4.  Nationwide has now produced these documents: they total just 344 pages, seventy-two pages of which consist of the same blank form copied seventy-two times.  None of the 344 pages appears reflects the genesis of the disputed practice.

Nationwide simply refuses to produce. That is why the SDM's granting of the motion to compel and awarding of expenses should be adopted.

But those steps alone will not change Nationwide's course. As a $115 billion corporation, Nationwide can probably afford to pay $8,775 in expenses. Since we know that it regularly ignores this Court's orders, there is no particular reason to expect it to honor the granting of the motion to compel. The only answer lies in formidable monetary sanctions -- sanctions that the SDM apparently felt he was without authority to impose, since (according to the SDM's analysis) the only orders violated were bench rulings.

We implore the Court once more to act decisively to regulate Nationwide's conduct, and restore procedural fairness to this case. We therefore renew our request, made before the SDM, for the imposition of $25,000 in sanctions.

### III. NATIONWIDE SHOULD BEAR THE COST OF THE SDM'S LABORS

At the September 13, 2005 teleconference, the Court made clear its intention to allocate SDM-related costs based on fault:

> So both sides, I want a discussion from you about who will be a
> good neutral . . . .  *** And in the first instance, we'll be splitting
> it 50/50 but I'm going to be asking that person "who is a bad actor
> here?" And if they say "you know what? I think Nationwide
> really is jerking them around," you are going to pay the full freight;
> not 75 percent, the whole wad.

Ex. B at 25-26. This is consistent with Rule 53, which requires the Court to allocate payment of a Master's compensation among the parties "after considering the nature and amount of the controversy, the means of the parties, and the extent to which any party is more responsible than other parties for the reference to a master." Fed. R. Civ. P. 53(h)(3).

As noted above, the SDM found that Nationwide "provided delayed, incomplete and evasive responses"; that it "spent months providing incomplete or evasive responses"; that it

employed hypertechnical interpretations of discovery; and that it may even have engaged in "a calculated effort to stay discovery long enough for the Court to hear its motion to dismiss" after the Court expressly rejected such a stay. These findings answer decisively the question on which cost allocation turns: Nationwide is the bad actor in spades.

All other Rule 53 factors likewise support an allocation of SDM-related costs to Nationwide. Nationwide is a multibillion-dollar entity with vast sophistication in discovery matters. The Eames plaintiffs are a local Delaware family. Allocating the SDM's bill will have no impact whatever on Nationwide's bottom line; but even a fraction of that amount will put a noticeable dent in the Eames's family budget. And the entire exercise could have been avoided if Nationwide had simply set out months ago (as it should have) to identify and produce the documents that explain how the disputed practice came to be -- an obligation it still resists, even in the wake of the SDM's findings.

### CONCLUSION

For the reasons set forth above, the Eames plaintiffs respectfully request that the SDM's January 4, 2006 Report and Recommendations be adopted and supplemented as outlined above. They likewise request that all costs of the SDM's services to date be allocated to Nationwide; and that Nationwide be ordered to pay sanctions in the amount of $25,000.

Respectfully submitted,

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

January 24, 2006                    Attorneys for the Eames plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

THOMAS A. EAMES, ROBERTA L. EAMES )
and TAMMY EAMES, on behalf of )
themselves and all others )
similarly situated, )
)
                Plaintiffs, )     C.A. No. 04-CV-1324KAJ
)
v. )
)
NATIONWIDE MUTUAL INSURANCE )
COMPANY, )
)
                Defendant. )

### NOTICE OF SERVICE

      I hereby certify that on this date, I electronically filed the foregoing document with the Clerk

of the Court using CM/ECF which will send notification of such filing(s) to the following:

      Nicholas E. Skiles, Esq.
      Swartz Campbell LLC
      300 Delaware Avenue, Suite 1130
      P.O. Box 330
      Wilmington, DE 19899

                    MURPHY SPADARO & LANDON

                    /s/ John S. Spadaro
                    John S. Spadaro, No. 3155
                    1011 Centre Road, Suite 210
                    Wilmington, DE 19805
                    (302) 472-8100

                    Attorneys for plaintiffs
                    Thomas A. Eames, Roberta L. Eames and
                    Tammy Eames (on behalf of themselves and
January 24, 2006                all others similarly situated)

127957