IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-CV-1324KAJ |
| v. | ) ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

**EAMES PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
FOR ADOPTION AND SUPPLEMENTATION OF THE SDM'S
JANUARY 4, 2006 REPORT AND RECOMMENDATION**

Plaintiffs Thomas A. Eames, Roberta L. Eames and Tammy Eames ("the Eames plaintiffs") have moved for the adoption and supplementation of the Special Discovery Master's January 4, 2006 Report and Recommendation. Specifically, the Eames plaintiffs have requested that 1) the SDM be upheld in his recommendation that the Eames plaintiffs' October 26, 2005 motion to compel be granted; 2) the SDM be upheld in his award of $8,775 in expenses to the Eames plaintiffs; 3) the Eames plaintiffs be awarded sanctions in the amount of $25,000; and 4) the SDM's Report be modified and supplemented to provide that all costs of the SDM's services be borne by Nationwide. This is the Eames plaintiffs' reply on that motion.

**I. THE SDM'S RECOMMENDATIONS FIND
ABUNDANT SUPPORT IN THE RECORD**

In their opening memorandum the Eames plaintiffs offered a detailed documentary history with twenty-two exhibits. That detailed record reveals how (in the SDM's words), "Nationwide, a sophisticated company with an expert legal team, spent months providing

128520

incomplete or evasive responses until Your Honor instructed Nationwide to make a meaningful response." Ex. A at 8. It reveals, too, how "Nationwide employed hyper technical interpretations of plaintiffs' requests and even refused to acknowledge that there was electronic discovery." Id. It confirms that "[i]t was not until the teleconference with Your Honor on August 5, 2005, that Nationwide acknowledged that there was electronic discovery and began taking steps to search for such documents [,]" and that "it still took until oral argument on December 14, 2005, for Nationwide to even identify how many potentially responsive documents were to be reviewed and when they might be produced." Id. The Eames plaintiffs have thus documented Nationwide's ten-month campaign of delay and evasion in detail -- just as they did before the SDM.

How does Nationwide respond? Its principal response, to which it repeatedly returns, goes like this:

> Nationwide objects . . . because the Letter Report and the Recommendations . . . compel the production of documents sought by Plaintiffs by way of varying informal emails (regarding which no Court order exists) . . . .

\*\*\*

> Nationwide preformed its searches in the face of ever-changing and expanding informal discovery demands and requests by Plaintiffs.

\*\*\*

> Plaintiffs fail to point out is (sic) that through their counsel's compulsive use of numerous informal emails the Plaintiffs' discovery demands have progressively changed from the demands outlined in their initial Requests.

\*\*\*

> Plaintiffs should not be heard to complain about discovery when they continuously and orally (sic) attempt to expand their requests . . . .

2

D.I. 148 at 2, 3, 4, 6. In other words, Nationwide says that when the Eames plaintiffs came before the SDM, they moved to compel not on their original document requests but some other, expanded requests that grew out of their attorney's compulsive drafting of e-mails; and that this tactic actually succeeded in fooling the SDM, who (though he had the original requests before him) recommended an award of expenses for Nationwide's failure to respond to discovery that never even existed.

In support of this strange tale of phantom discovery and perverted justice, Nationwide cites . . . well, nothing. Not a single one of the "ever-changing" and "expanding" informal discovery demands are cited in or attached to Nationwide's answering brief. Despite the plaintiffs' "compulsive use of numerous informal emails," not a single passage from any e-mail is identified by Nationwide. Though we are told that the plaintiffs "continuously . . . attempt to expand their requests," not a single such attempt found its way into Nationwide's papers.

To call this argument nonsense is to elevate it. Nationwide identifies no "new and expanding" requests because no such requests exist. In fact, the Eames plaintiffs' efforts at negotiation served to *narrow* the requests by agreeing early on that Nationwide could limit its production to generic (or non-policyholder-specific) documents:

> Could we set aside for the moment the existence of responsive
> documents from among policyholder-specific materials (like claim
> files) and focus on generic materials, like internal memoranda,
> guidelines and manuals, and board meeting minutes?

Ex. B (May 16, 2005 e-mail from J. Spadaro to C. Cheyney). But all these generic items fall squarely within the original requests -- as do the document categories identified by the SDM.

This last point is dispositive of the "phantom discovery" argument: if the documents recommended by the SDM for production fall within the categories targeted by our documents

3

requests, then the SDM could not possibly have ordered any phantom discovery. And this is clearly the case. Again, the April 2005 document requests sought production of documents that refer to or characterize PIP limits as "full", and documents that refer or relate to that characterization. Ex. C (Request Nos. 1 and 2). The SDM recommended that Nationwide produce:

> (a) all generic documents . . . that refer to or characterize PIP as full; (b) all documents that relate to the genesis of the practice of characterizing PIP as full . . . ; and (c) all documents evidencing complaints or negative comments about the practice of characterizing PIP as full . . . .

Ex. A at 10. Each of these categories is thus a sub-category of the original request. That is, each of the SDM's categories *narrows* the original requests, which were broader in scope.

For example, documents in the SDM's first category are those that (by definition) refer to or characterize PIP as "full." This category is virtually identical to our Request No. 1, with the important exception that (unlike the original request) it is limited to generic documents only. The SDM's second category -- generic documents reflecting the disputed practice's genesis -- likewise consists entirely of documents responsive to Request No. 1, because any document that relates to the practice's genesis must logically refer to the practice itself. Documents within the SDM's third category, meanwhile, must logically be responsive to Request No. 1, Request No. 2, or both.

The fact that Nationwide places any faith at all in these outlandish arguments, even *ten months* after the discovery was served, confirms again the need for drastic measures: the SDM chides Nationwide for its hypertechnical reading of discovery requests, and Nationwide promptly shifts gears from the hypertechnical to the absurd. In the face of such willful misconduct, substantial money sanctions are the only tool left to the Court.

4

## II. THE SDM CORRECTLY UNDERSTOOD THAT NATIONWIDE HAD VIOLATED COURT ORDERS

With the benefit of full briefing and lengthy oral argument, the SDM came to the clear understanding that Nationwide had violated multiple Court orders. Nationwide pretends otherwise, but contradicts itself along the way. At page 5 of its answering brief it insists that "the SDM was correct that Nationwide did not violate any specific Order of the Court"; but at page 2 it assails the SDM "because the Letter Report and the Recommendations . . . incorrectly implies (sic) that there are numerous Court Orders flaunted by Nationwide." D.I 148 at 2, 5.

In any event, the SDM's analysis confirms at least two significant instances of Nationwide's noncompliance with Court orders. *First*, the SDM found (and there is no dispute) that "Nationwide repeatedly refused to follow the Court's Default Standard for Electronic Discovery, which was incorporated by reference into the Court's March 28, 2005, Scheduling Order." Ex. A at 7. Here Nationwide's conduct was absolutely willful: the Eames plaintiffs reminded Nationwide of the Default Standard's incorporation within the Scheduling Order, and requested Nationwide's compliance, on March 8, April 6, May 5, May 16 and May 20, 2005 -- all to no avail. See Ex. D (various letters and e-mails). In fact, Nationwide waited almost five months before appointing its liaison.

In its answering brief, Nationwide says only that it "may have been slow in appointing its E-Discovery liaison." D.I.148 at 4. It offers no explanation for the five-month delay. But this cavalier attitude is more outrageous still when we consider that under the Scheduling Order, the dedicated phase for class certification discovery -- a phase that the Court adopted at Nationwide's request -- was to run for just *three months.* D.I. 43 at 2, ¶3(e) (providing for close of class certification discovery on or before June 17, 2005). In other words, it took Nationwide roughly twice as long as the dedicated discovery phase to even *name* its liaison, despite having

affirmatively requested that phasing, and despite repeated reminders from our side that its failure to act was in violation of the Scheduling Order.

***Second***, the SDM correctly found that at the August 5, 2005 telephonic hearing, the Court "rejected Nationwide's arguments and instructed them to provide a response." Ex. A at 3. The SDM further found, however, that Nationwide offered little meaningful information on the search for responsive documents until at least four months later: "However, it was not until oral argument on December 14, 2005, that Nationwide revealed that its searches identified roughly 104,000 documents to be reviewed for responsiveness." Id. at 7.[1] During that interim, of course, Nationwide produced nothing.

Nor do these violations stand alone. In our opening brief, we established that the Court straitly instructed Nationwide regarding the parties' October 3, 2005 meeting: "Don't have a meeting where he's got questions without having the people there who can answer him." Ex. F at 21-22. The questions were presented to Nationwide well in advance of the meeting, and they prompted no objection from Nationwide. As we have also shown, they were important questions regarding the development and implementation of form underwriting documents for auto insurance products. But Nationwide offered no answers to those questions at the October 3 meeting, and now says it was required to provide timely answers only to "technical" questions -- and this because the Court had the foresight to suggest that technical people attend the meeting if necessary.

---

[1] This search was subject to the "Delaware focus" that Nationwide championed before the SDM. As a result, it led to the production of just 344 pages, including the same form insurance application produced seventy-two times. Nationwide admits that none of these 344 pages reflect the genesis of the disputed practice. Ex. E.

Even if Nationwide's cynical, hypertechnical and intellectually dishonest interpretation of the Court's instructions were accepted -- which would be nothing short of travesty -- how does Nationwide explain its failure to address the questions during the entire months of October, November and December 2005? After all, Nationwide does not dispute that the Court ordered the questions to be answered *at some point*; and it concedes (as it must) that it promised a prompt follow-up at the October 3 meeting. See Ex. G (Nationwide confirms that, as of October 2005, "Mr. Oesterling is following up on the additional matters that you requested that he address during the meeting.")

Nationwide has simply reserved to itself the right to violate and ignore Court orders on a repeated basis, and for months at a time -- even when the delay runs longer than the dedicated discovery period itself. Whether they be written orders or bench rulings matters not. In the end, what matters is that they apply equally to both sides, the downstate family and the $115 billion corporate giant alike. So that Nationwide may finally come to understand this, we ask for sanctions in the amount $25,000.

### III. **THE SDM PROPERLY FOCUSED ON THE ISSUES BEFORE HIM**

Nationwide says that its prolonged and repeated refusal to comply with the Court-ordered Default Standard, and its equally prolonged failure to answer Court-mandated questions in the negotiation process "were not before the SDM in the Motion to Compel." D.I. 148 at 6. Nationwide knows this is false. The Eames plaintiffs' opening brief before the SDM set forth dedicated headings titled "The E-Discovery Default Standard" and "The October 3 Meeting and its Aftermath." D.I. 116 at 6, 11. Under an argument heading titled "Nationwide's Bad Faith is Obvious," the brief continued:

> Directly instructed to bring to the October 3 meeting all persons necessary to respond to the Eames plaintiffs' specific written

7

> questions, and warned by its adversary that its proposed list of
> attendees would violate that instruction, Nationwide proceeded to
> violate it anyway. As a result, the Eames plaintiffs continue to
> await responses to those written questions more than three weeks
> after the meeting concluded -- and this in the face of the Court's
> directive that Nationwide not "have a meeting where he's got
> questions without having the people there who can answer him."

Id. at 13.[2] Our reply brief on the motion to compel likewise assailed Nationwide's prolonged refusal to honor the Default Standard, and direct violation of the Court's instructions regarding the October 3 meeting. D.I. 123 at 1, 7. The same issues were argued at length at the December 14, 2005 hearing before the SDM. Ex. H at 88-94.

Based on a detailed record -- because unlike Nationwide, the Eames plaintiffs actually attach documentary exhibits to their briefs -- the SDM found that Nationwide "repeatedly refused to follow" the Default Standard, and "spent months providing incomplete or evasive [discovery] responses . . . ." Ex. A at 7-8. These issues were squarely within the Court's referral of the matter to the SDM, and they were briefed and argued to the SDM at length. For Nationwide to say otherwise is highly unfortunate.

## IV. THE SDM PROPERLY REJECTED NATIONWIDE'S HYPERTECHNICAL APPROACH TO DISCOVERY

The transcript of the September 13, 2005 telephonic hearing confirms beyond dispute that in response to direct questioning from the Court, Nationwide flatly denied any Delaware-specific limitation on its e-mail search:

> MR. SPADARO: [Y]es, I know that they're going to search e-
> mails from last week and they're going to limit it to people who are
> connected to Delaware. That search is calculated to fail. It has
> almost no chance of discovering the documents that we're looking
> for.

---

[2] The quoted passage was written in late October 2005. Again, Nationwide would continue to ignore the subject questions (posed in advance of the October 3 meeting) throughout the entire months of October, November and December 2005.

8

> THE COURT: Now, stop. I read that in your letter. Then I read their response which said we're not limiting this geographically. You said they're limiting to people in Delaware. They said expressly we're not doing that. Where is the disconnect? *** Mr. Cheyney, are you limiting this?
>
> MR. CHEYNEY: No, Your Honor.

Ex. F at 10. Before the SDM, however, a different picture of Nationwide's e-mail search emerged:

> SPECIAL MASTER SEMPLE: And can you tell me what -- what have you searched and where have you searched?
>
> MR. CHEYNEY: We have searched all the Delaware agents' Email files. We have searched the Delaware, which includes Delaware, Maryland and all of the management-level people who report to the Delaware agents.
>
> SPECIAL MASTER SEMPLE: Okay. Let me just stop you right there. What does that mean, Delaware Email files?
>
> MR. CHEYNEY: The Emails of every agent who has a lease with us of an Email system. We have in our server the ability to search their Emails for words full, PIP, any relation to that.
>
> We also searched the state management-level employees, which include employees who have management-level responsibility beyond Delaware and are not situated only in Delaware.

Ex. H at 26-27. In other words, the search was entirely Delaware-specific; but some of the "state management-level employees" who supervise operations in Delaware are located *outside* Delaware (in Maryland, for example).

On the strength of this utterly specious distinction, Nationwide felt free to deny before the trial judge the existence of any Delaware-specific limitation whatever -- after which Nationwide affirmatively argued before the SDM that "[t]he searches in this case have obviously been properly focused on Delaware [!]" D.I. 120 at 12-13. The SDM correctly rejected

9

Nationwide's cynical parsing of words. But it should not only be rejected; it should be punished as outright deception.

The final irony is that no e-mail search could ever do justice to our document requests. As the Court is aware, the advent of widespread e-mail usage is fairly recent. But as the decision in <u>Hardy v. Nationwide Ins. Co.</u>, 356 S.E.2d 38 (Ga. Ct. App. 1987) confirms, the disputed practice is both national in scope (hence our rejection of any "Delaware focus" for document searches) and roughly twenty years old. Thus, even today -- even after ten months of briefings, hearings and orders -- Nationwide continues to resist any meaningful search for documents.

## V. THE COURT'S FRAMEWORK FOR COST ALLOCATION SHOULD BE FOLLOWED

At the September 13, 2005 telephonic hearing, the Court stated clearly its intention to impose "the full freight" of the cost of the SDM's labors on whichever party was found by the SDM to be "the bad actor." Ex. F at 25-26. The SDM has now found that Nationwide "provided delayed, incomplete and evasive responses"; that it "spent months providing incomplete or evasive responses"; that it "employed hypertechnical interpretations of discovery"; and that it may even have engaged in "a calculated effort to stay discovery long enough for the Court to hear its motion to dismiss" after the Court expressly rejected such a stay. Ex. A at 8. These finding and observations should be dispositive on the cost allocation issue. Similarly, the cost-allocation standards under Rule 53(h)(3) (which Nationwide fails to address) require that Nationwide, a $115 billion corporation, bear these costs.[3]

Nationwide's response is nothing short of remarkable: that the plaintiffs, not Nationwide, have actually engaged in "abusive discovery tactics" through their "expanded

---

[3] For a discussion of how the standards apply, see our opening brief (D.I. 142) at pages 19-20.

informal requests"; and that the plaintiffs should therefore pay the SDM's costs. Space does not permit a full response to this outrageous suggestion -- belied by every page and line in the record of this never-ending dispute -- but we note the following basic points:

- As noted above, Nationwide neither cites nor quotes even a single communication from the Eames plaintiffs that constitutes any new or expanded discovery request.

- Also as noted above, the relief recommended by the SDM flows directly from the document requests in question.

- The subject discovery was served on Nationwide over ten months ago. At no point has Nationwide ever moved for relief with respect to any allegedly "abusive" tactics.

Ultimately, Nationwide has shown itself incapable of anything like reasonable conduct. Had it devoted just a fraction of the resources it reserves for avoiding discovery to finally *answering* the discovery -- for example, identifying persons with knowledge of the disputed practice's genesis, and searching out responsive documents from there -- the Eames plaintiffs and the Court would have been spared untold hours, costs and frustration. Instead, the case has been thoroughly derailed, with class certification discovery lagging more than eight months behind (and counting).

We respectfully ask the Court to act decisively against Nationwide's misconduct: to leave no doubt in the minds of Nationwide's decision makers that it must honor both the letter and spirit of Court's orders, and produce immediately the document categories identified by the SDM. This can best be accomplished -- can *only* be accomplished, we think -- by 1) adopting the SDM's recommendations in full, including his recommended award of expenses, 2) awarding substantial monetary sanctions to the Eames plaintiffs, and 3) allocating all costs of the SDM's services to Nationwide.

11

## **CONCLUSION**

For the reasons set forth above, and for the reasons advanced by our opening brief, the Eames plaintiffs respectfully request that the SDM's January 4, 2006 Report and Recommendations be adopted and supplemented as outlined above. They likewise request that all costs of the SDM's services to date be allocated to Nationwide; and that Nationwide be ordered to pay sanctions in the amount of $25,000.

                                      Respectfully submitted,

                                      MURPHY SPADARO & LANDON

                                      /s/ John S. Spadaro
                                      John S. Spadaro, No. 3155
                                      1011 Centre Road, Suite 210
                                      Wilmington, DE 19805
                                      (302)472-8100

February 8, 2006                        Attorneys for the Eames plaintiffs

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)　C.A. No. 04-CV-1324KAJ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

Nicholas E. Skiles, Esq.
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, DE 19899

　　　　　　　　　　　　　　　　MURPHY SPADARO & LANDON

　　　　　　　　　　　　　　　　/s/ John S. Spadaro
　　　　　　　　　　　　　　　　John S. Spadaro, No. 3155
　　　　　　　　　　　　　　　　1011 Centre Road, Suite 210
　　　　　　　　　　　　　　　　Wilmington, DE 19805
　　　　　　　　　　　　　　　　(302) 472-8100

　　　　　　　　　　　　　　　　Attorneys for plaintiffs
　　　　　　　　　　　　　　　　Thomas A. Eames, Roberta L. Eames and
February 7, 2006　　　　　　　　Tammy Eames (on behalf of themselves and
　　　　　　　　　　　　　　　　all others similarly situated)

128573