## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, | ) ) ) ) | **PUBLIC VERSION** |
| | ) | |
| Plaintiffs, | ) | C.A. No. 04-CV-1324KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

## EAMES PLAINTIFFS' OPENING BRIEF IN SUPPORT
## OF THEIR MOTION FOR CLASS CERTIFICATION

MURPHY SPADARO & LANDON
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

Attorneys for plaintiffs Thomas A. Eames,
Roberta L. Eames and Tammy Eames (on behalf of
themselves and all others similarly situated)

May 15, 2006

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ........................................................................1

SUMMARY OF ARGUMENT........................................................................................................4

STATEMENT OF FACTS ..............................................................................................................6

A. The Amended Complaint's Allegations ....................................................................................6

B. Nationwide's "Captive" and "Exclusive" Insurance Agents.....................................................8

C. How Nationwide Does It ..........................................................................................................13

1. The Rate Quotes, Rate Quote Letters, Binders, Etc.................................................................13

2. The Practice's Uniformity and Scope.......................................................................................18

3. The Agency Office Automation System...................................................................................20

4. The Mechanics of Deception ...................................................................................................22

5. Nationwide's Departure From the First Convention ................................................................25

6. Nationwide's Departure From the Second Convention............................................................25

7. Nationwide's Motive ...............................................................................................................26

D. The Eames Plaintiffs' Experiences.........................................................................................28

ARGUMENT .................................................................................................................................31

I. THE LEGAL FRAMEWORK ...................................................................................................31

II. ALL WHO SUFFERED THE SAME INJURY ARE INCLUDED IN THE CLASS ............32

III. THE NUMEROSITY STANDARD IS MET..........................................................................33

IV. THE COMMONALITY STANDARD IS MET ......................................................................34

V. THE TYPICALITY STANDARD IS MET..............................................................................35

VI. THE ADEQUACY STANDARD IS MET ..............................................................................36

VII. THE PREDOMINANCE STANDARD IS MET....................................................................37

VIII. THE SUPERIORITY STANDARD IS MET .................................................................................38

CONCLUSION ...............................................................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) ................................................31, 37, 38

Arenson v. Whitehall Convalescent & Nursing Home, 164 F.R.D. 659 (N.D. Ill. 1996) ...............7

Baby Neal v. Casey, 43 F.3d 48 (3d Cir. 1994)....................................................................34, 35

Bank v. Elec. Payment Serv., Inc., C.A. No. 95-614SLR, 1997 WL 811552
(D. Del. Dec. 30, 1997)........................................................................................................... 38

Barnes v. Am. Tobacco Co., 161 F.3d 127 (3d Cir. 1998),
cert. denied, 526 U.S. 1114 (1999) ..................................................................................7, 32, 35

Chiang v. Veneman, 385 F.3d 256 (3d Cir. 2004)...............................................................32, 38

Coleman v. Cannon Oil Co., 141 F.R.D. 516 (M.D. Ala. 1992) .............................................31, 39

Crowhorn v. Nationwide Mut. Ins. Co., 836 A.2d 558 (Del. Super. Ct. 2003) .............................36

In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291 (D. Del. 2003)...................... 33, 34, 35, 37

Deutschman v. Beneficial Corp., 132 F.R.D. 359 (D. Del. 1990) .................................................34

Eisen v. Carlisle & Jacqueline, 417 U.S. 156 (1974) ............................................................... 7, 32

Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985), cert. denied sub. nom, Weinstein v.
Eisenberg, 474 U.S. 946 (1985)......................................................................................................31

Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178 (3d Cir. 2001) .................................................34

Lewis v. Curtis, 671 F.2d 779 (3d Cir. 1982)...............................................................................37

Malloy v. Eichler, 628 F. Supp. 582, 590 (D. Del. 1986), aff'd, 860 F.2d 1179 (3d Cir. 1988) ...33

In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527 (D. Del. 1994).............................34, 37

Montalvo v. Tower Life Building, 426 F.2d 1135 (5th Cir. 1970)..................................................30

Mulligan v. Choice Mtge. Corp., USA, No. 96-596-B, 1998 WL 544431
(D.N.H. Aug. 11, 1998) ...................................................................................................................33

In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493 (S.D.N.Y. 1996) ...............31, 39

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154 (3d Cir. 2001) ..........35, 37

Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452 (E.D. Pa. 1968) ...................33

Stephenson v. Capano Development, Inc., 462 A.2d 1069 (Del. 1983) .......................................32

In re The Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283 (3d Cir. 1998),
cert. denied, 525 U.S. 1114 (1999) ................................................................................32, 35, 38

Trotter v. Perdue Farms, Inc., C.A. No. 99-893RRM, 2001 WL 1002448
(D. Del. Aug. 16, 2001) .............................................................................................................31

In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231 (D. Del. 2002), aff'd,
391 F.3d 516 (3d Cir. 2004)........................................................................................................ 33

In re Warfarin Sodium Antitrust Litig., 391 F.3d 516 (3d Cir. 2004) ...................................36, 37

Wilmington Firefighters Local 1590 v. City of Wilmington, 109 F.R.D. 89 (D. Del. 1985)....... 35

**Other Authorities**

6 Del. C. §2513 ..........................................................................................................................32

21 Del. C. §2118 ..........................................................................................................................1

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) .......................................22

4 Herbert B. Newberg and Alba Conte,
NEWBERG ON CLASS ACTIONS (3d ed. 1982)..........................................................................31

## NATURE AND STAGE OF THE PROCEEDING

This proposed class action was commenced in the Superior Court of the State of Delaware in and for Sussex County on August 20, 2004. On October 1, 2004, Nationwide removed the case from Superior Court to this Court.

In their Amended Complaint plaintiffs Thomas A. Eames, Roberta L. Eames and Tammy Eames (the "Eames plaintiffs") seek certification of a proposed class and subclass with respect to the defendant Nationwide's misrepresentation of policy limits for Personal Injury Protection (or "PIP") coverage under 21 Del. C. §2118. They contend that Nationwide has represented to thousands of Delaware insureds that they enjoy "full" PIP (or "full coverage" for PIP), when in fact Nationwide contends or will contend that they are entitled to just the minimum PIP limits required by statute. They further contend that:

1. The challenged practice is deceptive. It tends to suggest to ordinary consumers either that they have purchased PIP limits higher than the statutory minimum (of $15,000 per person and $30,000 per accident), or that those limits are the highest available for purchase.

2. The challenged practice is uniform and widespread. It is carried out through the use of Nationwide's Agency Office Automation software, which (according to Nationwide's 30(b)(6) designee) is provided by the company to its insurance agents as a template for the creation of policy-related documents.

3. Nationwide's Agency Office Automation software requires that when the agent indicates the chosen deductible (or "deductible option") for PIP, he record that choice through one of several standardized menu options. If the deductible is $250, the Agency Office Automation system offers the corresponding menu option "$250." If the deductible is $500, that dollar amount can likewise be selected from the menu options offered. But if the deductible is

zero -- as is overwhelmingly the case when minimum limits are sold -- the Agency Office Automation system offers no numerical menu option at all, but only the word "full." This ensures that in the vast majority of instances when Nationwide purports to sell minimum limits, the purchaser will be confronted with any number of policy-related documents (including rate quotes, rate quote letters, binders, memoranda of insurance and other documents) that display the adjective "full" in the line entry for PIP. In the case of rate quote letters -- which Nationwide concedes are shared with consumers on its behalf, and in connection with the policy's sale -- the standard menu option actually reads "Full Coverage."

4.  Nationwide's Agency Office Automation system leaves the agent no choice but to a) employ the "full" usage, and b) employ it in a column entry that is otherwise reserved for dollar amounts. Moreover, for every other auto coverage in that column that involves an identifiable limit of liability, the limit of liability is shown (in dollars). Only the PIP entry fails to set forth a dollar amount; only the PIP entry fails (according to Nationwide) to show the limit of liability for a coverage that has one; and only the PIP entry is used by Nationwide to convey a ***non-numeric*** "deductible option." Thus does Nationwide convey the dollar value zero by use of the term "full"; and thus does it lead consumers to think themselves fully (not minimally) covered for PIP.

4.  Nationwide engages in this practice in the hope of avoiding the sale of PIP limits beyond the statutory minimum. It does this because year in and year out, its loss ratio for PIP is

***

The Amended Complaint alleges one count of statutory consumer fraud under 6 Del. C. §2513, and a second count for civil conspiracy. It seeks certification of the following class and subclass:

> A. All of Nationwide's Delaware insureds to whom Nationwide has represented, at any time since August 20, 2001, that they enjoy "full" PIP (or "full coverage" for PIP) under 21 Del. C. §2118, where Nationwide in fact contends or will contend that they are entitled only to the minimum PIP limits required by that statute.
>
> B. All of Nationwide's Delaware insured who are part of the proposed class described above, and who have been advised by Nationwide that (according to Nationwide) their available PIP limits have been exhausted by virtue of Nationwide's payment of the minimum statutory amount.

Amended Compl. ¶14.[1]

The Eames plaintiffs now move for class certification under Federal Rule of Civil Procedure 23. This is their opening brief in support of the motion for class certification.

---

[1] The Amended Complaint specifically excludes from the proposed class those persons who have already secured recovery against Nationwide in connection with the practices complained of here, whether by settlement or judgment; and Nationwide's officers, directors, employees, agents or legal representatives, or the successors or assigns of any of them. Id. ¶15.

## SUMMARY OF ARGUMENT

1. In resolving a motion for class certification, certain fundamental principles should be borne in mind. First, the Third Circuit looks favorably on the class action device; and any doubts regarding the propriety of class certification should be resolved in favor of certifying the class. Second, and consistent with this approach, the standards for class certification are lenient. Third, it has been widely held that claims alleging consumer fraud are uniquely suited to representative treatment under Rule 23. Fourth, it is likewise widely held that claims alleging a common scheme of deceptive practice meet the predominance standard under Rule 23(b)(3). Finally, a motion for class certification is not an inquiry into the merits. To the contrary, the well pled allegations of the class representatives' complaint must be taken as true.

2. Because this is a consumer fraud case, the Court should also be mindful of the important distinctions between statutory consumer fraud and common law fraud. Unlike common law fraud, claims under Delaware's Consumer Fraud Act require no proof of scienter, intent to induce reliance or justifiable reliance. This case thus involves no individualized proofs on the reliance issue. Similarly, the statute imposes no privity requirement. A consumer is thus a class member if he suffers the injury that flows from Nationwide's deception, *regardless* of whether the offending representation was made to him personally (or whether, instead, it was made to a third party who is actually the named insured).

3. The numerosity standard is met. Based on disclosures made by Nationwide just days ago, it appears that the class will number substantially more than 2,000 people. Nonparty discovery of Nationwide's Delaware insurance agents likewise suggests that the numerosity standard is easily met.

4. The commonality standard is met. The Eames plaintiffs not only possess claims in common with the class; their claims are virtually identical to those of the class.

5. The typicality standard is met. The Eames plaintiffs' claims are not merely typical of the class's claims, but virtually identical to them.

6. The adequacy standard is met. The Eames plaintiffs' attorneys have substantial experience in complex coverage litigation, PIP-related litigation, and PIP-related class actions. They have previously served as Class Counsel in a successful (and unprecedented) PIP-related class action against Nationwide; and they are actively prosecuting PIP-related class actions against other major auto insurers. Further, the Eames plaintiffs are subject to no conflict of interest, and hold no interests antagonistic to that of the class.

7. The predominance standard is met. Common issues surrounding Nationwide's deceptive practice lie at the very core of this case; and those issues predominate over any individualized issues (to the extent individualized issues even exist).

8. The superiority standard is met. Resolution of the class's consumer fraud claims in a single class action is manifestly superior to thousands of individual actions. Moreover, such individual actions will never materialize, since it is only through the class action device that class members may learn of the alleged deceptive practices.

## STATEMENT OF FACTS

### A. The Amended Complaint's Allegations

The Amended Complaint alleges that as a matter of general business practice, and acting through its authorized insurance agents, Nationwide routinely represents to consumers that they are purchasing "full" PIP, when in fact Nationwide contends that the thing sold is just *minimum* PIP. Amended Compl. ¶9. The Amended Complaint further alleges that Nationwide routinely makes these representations through "rate quotes" and other policy-related documents. Id. It also alleges that when Nationwide has occasion to pay PIP benefits to the affected claimants, "it treats their PIP limits as exhausted once the minimum statutory amount has been paid." Id.

In addition, the Amended Complaint sets forth several allegations specific to (but not unique to) the Eames plaintiffs. It alleges that they have been subjected by Nationwide to the offending practice. Id. ¶13. It alleges specific oral and written representations made to the Eames plaintiffs by Nationwide (through Nationwide's insurance agent), and promising them "full" PIP. Id. It further alleges that the earliest of these representations (oral and written) were made to the Eames plaintiffs in or about March 1994, when the Nationwide auto policy was first sold to them. Id. It next alleges that, following the Eames plaintiffs' February 7, 2003 collision (in which all three plaintiffs sustained injuries, and thus became PIP claimants) Nationwide made additional written representations characterizing their PIP coverage as "full." Id. Finally, the Amended Complaint alleges that by letter to the Eames's attorney dated June 13, 2003, Nationwide took the position that Mr. Eames's PIP coverage had been exhausted, on an "each person" basis, by virtue of Nationwide's payment of the minimum limit -- meaning that Nationwide contends that PIP limits under the Eames's policy are subject to the statutory minimum of $15,000 per person, $30,000 per accident. Id.

Several observations are thus in order. First, a comparison of the Amended Complaint's class-wide allegations to the allegations specific to the proposed class representatives shows them to be essentially identical. The same practice is complained of as to both the class representatives and the class: the (deceptive) characterization of PIP as "full", where Nationwide contends that the minimum limits apply. The same injury, too, flows from that practice: PIP claimants who should be entitled to full PIP limits are left with just minimum limits.

Second, these allegations must properly be taken as true on this motion. Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 177-78 (1974) ("We find nothing in either the language or history of Rule 23 that gives the Court any authority to conduct a preliminary inquiry into the merits of the suit in order to determine whether it may be maintained as a class action.") Accord, Barnes v. Am. Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998), cert. denied, 526 U.S. 1114 (1999) (citing Eisen for the proposition that "[i]n considering whether certification is proper, we refrain from conducting a preliminary inquiry into the merits"); Arenson v. Whitehall Convalescent & Nursing Home, 164 F.R.D. 659, 661 (N.D. Ill. 1996) ("When evaluating a motion for class certification, the Court accepts the well-pled allegations made in support of certification as true.")

Third, the law of the case has already established that these allegations plead uniform misrepresentations and class-wide injury:

> When read in the light most favorable to Plaintiffs, the Complaint appears to allege false representations by Nationwide that were known to be false and that damaged Plaintiffs *and other class members.* According to the Complaint, Nationwide "falsely described PIP limits as 'full'," and *class members were harmed* either because they believed that they had purchased coverage with limits higher than $15,000/$30,000 or because they believed that those were the highest limits available to purchase.

D.I. 150 at 10 (Court's February 2, 2006 Memorandum Opinion) (emphasis added; citations omitted).

Fourth, though Nationwide denies the allegations, it concedes that the Eames plaintiffs have pled misrepresentations made *in connection with the sale of* insurance:

> Q: And it's fair to say in describing the lawsuit that according to your understanding the proposed class representatives, Thomas Eames and Roberta Eames and Tammy Eames, are challenging in this lawsuit certain alleged business practices of Nationwide *in connection with the sale of personal injury protection* in the State of Delaware. Is that fair to say?
>
> A: Yes.

Deposition of Nationwide's Rule 30(b)(6) designee, Patricia Szlosek ("Szlosek dep."), at 13 (emphasis added) (A89).[2]

### B. Nationwide's "Captive" and "Exclusive" Insurance Agents

Nationwide frequently claims that its Delaware agents are "independent" agents -- an assertion that, in our view, is neither here nor there if the Eames plaintiffs can prove at trial (as we intend to prove) that the agents make uniform representations on Nationwide's behalf. But discovery to date has uncovered substantial evidence that Nationwide's Delaware insurance agents are Nationwide agents in every meaningful sense, and not independent at all.

On these issues, the Eames plaintiffs have deposed both Nationwide and the Glenn Deaton Agency, a representative Delaware agent, under Rule 30(b)(6). Nationwide testified through its designee, Patricia Szlosek, while the Deaton agency testified through Mr. Deaton himself. Their testimonies can best be described as similar in substance but different in style: what Mr. Deaton concedes freely and even matter-of-factly, Ms. Szlosek admits only grudgingly.

---

[2] References to the alphanumeric sequence beginning with "A__" are to the pages of the accompanying appendix.

and often in argumentative fashion. Yet there is much common ground between the two

testimonies, and much that is important to this motion.

To begin, Mr. Deaton testified that under the standard agency contract with Nationwide,

he is a *captive* and *exclusive* Nationwide insurance agent -- unable to sell any competing

insurance product from any other insurer in Delaware:

> Q:  And does the Deaton Agency sell Nationwide Insurance
> products to consumers?
>
> A:  Yes.
>
> Q:  And [does] the Deaton agency sell exclusively Nationwide
> Insurance products to Delaware consumers?
>
> A:  I am a captive, exclusive agent of Nationwide.  I do have
> opportunities to sell products outside of that arrangement, but
> primarily Nationwide products.
>
> Q:  Are you able to estimate roughly the percentage of Nationwide
> Insurance products that you sell compared to the insurance
> products of other insurance companies?
>
> A:  Nationwide sales represents I would say 90 to 95 percent of our
> overall sales.
>
> Q:  What do you mean when you are referring to the Deaton
> Agency as captive?
>
> A:  I have a contract to sell Nationwide's products exclusively.  I'm
> required to sell Nationwide's products.  I'm not allowed to broker
> or go outside of that agreement for market.  In other words, if
> Nationwide offers that product for sale, I'm going to sell their
> product.
>
> If I have occasion to sell a product that Nationwide is not
> interested in that market, I'm allowed to place that through another
> carrier.
>
> Q:  So you're allowed to sell other insurance companies' products
> so long as they don't compete in this market with products that
> Nationwide is selling?

A: Correct.

Q: I hope you understand what I mean. When I said, "this market," I meant Delaware. And I think you understood my question that way?

A: Correct. That's the only state that I am licensed to transact.

Deposition of Glenn W. Deaton ("Deaton dep."), at 5-6 (A49-50).

In an exercise that was something like pulling teeth, Ms. Szlosek likewise admitted that because the agency contract requires Mr. Deaton to sell Nationwide products exclusively, he may properly be termed a "captive and exclusive" Nationwide agent:

Q: It appears that in the testimony that we have reviewed Mr. Deaton refers to himself as a captive, exclusive agent of Nationwide. Do you see that on page 5 at line 14?

A: Yes.

Q: As you read these words in the context of this testimony that you reviewed, do you have a sense of what is meant by that?

A: Well, Mr. Deaton is an independent agent. He is not an employee of Nationwide. So while *he may be termed exclusive and captive*, he sells products that Nationwide produces.

Q: Have you in your tenure with Nationwide ever heard of its agents referred to as captive?

A: Yes.

***

Q: Well, does Nationwide agree that Mr. Deaton, as he has testified, is a captive, exclusive agent of Nationwide?

A: Nationwide agrees that Mr. Deaton is an independent agent who is not an employee of Nationwide.

Q: At page 6, line 1, part of the excerpt that you reviewed Mr. Deaton testifies to being a party to a contract that requires him to sell Nationwide's products exclusively. Do you see that?

A: Yes.

Q: Can you tell me whether Nationwide regards that as accurate testimony?

A: Well, there again, I understand that they would sell Nationwide's products if there was a product that Nationwide offers and if the party, in fact, eligible to be written with Nationwide. That is my understanding.

Q: Is that an affirmative response to my question?

A: Could you repeat the question?

Q: We see at page 6, line 1 and 2 that Mr. Deaton has testified to being a party to a contract that requires him to sell Nationwide's products exclusively. Is that fair to say?

A: Well --

Q: I mean, is that a fair characterization of what appears on the page is all I'm asking?

A: Correct.

Q: I'm asking whether Nationwide regards that as accurate testimony?

A: To an extent that there is a product to be sold and that their client is eligible.

Q: So that is accurate testimony?

A: That would be my understanding.

Szlosek dep. at 16-21 (emphasis added) (A90-91).

According to Nationwide, then, its Delaware agents are *captive, exclusive, independent* agents -- an oxymoron on the order of *liberated, unfettered hostage*. But there is no real independence in this arrangement. Agents like Mr. Deaton devote substantially all of their business (in Mr. Deaton's case, up to ninety-five percent of the agency business) to the sale of

Nationwide insurance products. Most importantly, they are contractually prohibited from competing with Nationwide on even a single insurance policy.

Other compelling evidence likewise reflects the agent's status as Nationwide's captive. Mr. Deaton testified, for example, that agents are contractually required to use computer software provided by Nationwide; that all the agent's software is Nationwide software; and that the Nationwide software package includes document management software. Deaton dep. at 9-10 (A50-51). In a modern office setting, to control the entirety of a business's software is to control the business itself.

Mr. Deaton further testified that agents are contractually required to participate in the Nationwide "company intranet." Id. at 9 (A50). He confirmed that all Delaware agents' e-mails are sent and received on Nationwide's file server. Id. at 10 (A51). None of this testimony is disputed. See Szlosek dep. at 23-24 (A92).[3]

Ms. Szlosek likewise affirmed Mr. Deaton's testimony that his agency is compensated strictly through commissions on the sale of Nationwide products. Szlosek dep. at 28 (A93). Not surprisingly, she testified that agents like Mr. Deaton display Nationwide's signage to the public:

> Q: If we were to climb in a car and visit Mr. Deaton's office today, would you expect to see signage outside Mr. Deaton's office that displays the Nationwide logo?
>
> A: Yes.

---

[3] Asked about his tenure as president of the Deaton agency, Mr. Deaton answered in terms of his tenure with Nationwide:

> Q: How long have you been the president of the Deaton Agency?
>
> A: I started with Nationwide in the fall of 1989. Fifteen, sixteen years.

Deaton dep. at 11 (A51).

Id. at 31 (A94). Ms. Szlosek also identified several ads in the Wilmington yellow pages that identify Nationwide insurance agents -- every one of which displayed the Nationwide logo and no other. Id. at 34-36 (A95).

Class certification is not an inquiry into the merits, and it is not strictly necessary for the Court to resolve agency issues on this motion. But the Eames plaintiffs have already marshaled enough evidence on that score to establish, as a matter of law, the actual and apparent authority of Nationwide's Delaware insurance agents. Everything those agents do, they do for Nationwide.

### C. **How Nationwide Does It**

### 1. **The Rate Quotes, Rate Quote Letters, Binders, Etc.**

Mr. Deaton gave detailed testimony regarding the process by which Nationwide agents sell auto insurance in Delaware:

> Q: *** If I ask you to give me a step-by-step description of the process by which an ordinary Delaware consumer in your neighborhood comes in and purchases a Nationwide auto policy, could you do that for me?
>
> A: Yes, I could.
>
> Q: Okay. Would you, please?
>
> A: Sure. Once a quote is given -- generally, the process starts by an individual requesting a quote for what the coverage would be. We would --
>
> Q: I'm sorry. I don't mean to interject. Along the way I may ask you to clarify a term here or there.
>
> A: Sure.
>
> Q: By "quote" your referring to the consumers asking how much will it cost me to buy auto insurance?
>
> A: They would like a price quotation for the cost of coverage. We would gather the required information that is needed to prepare a quote, certain personal information about the type of vehicle,

driving record, information about the driver and so forth. Once the quote is prepared and given and accepted the application process would start where we would basically complete the Nationwide application on the computer, generate an application, going through the various information as needed about drivers and so forth, the vehicle and coverages.

\*\*\*

Q: When all of that was completed what would happen?

A: The premium would be collected based on the applicant's choice of pay plan. There are a variety of different pay plan options available. We would collect the appropriate premium, provide a receipt. And we would at that point provide a binder or memorandum of insurance, some proof that the application process has been completed.

\*\*\*

Q: Okay. Let me ask you about the point at which the premium has been collected and a binder or memorandum of insurance or other proof of insurance has been provided to the consumer. Okay?

A: (The witness nodded.)

Q: Are you with me?

A: Yes.

Q: Have I so far characterized that part of your testimony correctly?

A: Yes.

Q: At that point is the consumer insured for automobile insurance by Nationwide?

A: Yes.

Q: So it's your understanding at that point an insurance contract exists?

A: Yes.

Deaton dep. at 13-17 (A51-52). Mr. Deaton elaborated on the practice of sharing written rate

quotes with consumers, and the methods by which they are shared:

> Q: Thank you. This process you've described very patiently for me, which I appreciate, this step-by-step process by which the consumer purchases the auto insurance from Nationwide, as part of that process are documents shared with the consumer at any stage?
>
> A: Documents, yes.
>
> Q: For example, is the price quote that you started your description with a written price quote?
>
> A: Yes.
>
> Q: And that's a document that's shared with the consumer and he can take home with him?
>
> A: We do have a formal quote letter when someone asks for a quote that we can provide[,] a user friendly quote letter. Generally, that's not sent out on a telephone quote or if someone comes into the office and I provide the quote on the computer and share with them the information on the monitor and they say yes, I would like to purchase that coverage, generally that quote letter is not printed out. We would go directly into the application process. Many times we would hot print or screen print, if you will, the quote to show them if they brought their policy with them and they would like to compare, we would print off a document like that. Which would be just a screen print. But there is a formal quote letter that can be generated if it's requested.
>
> Q: Whether the document is generated hard copy or not, is it often the case that the consumers are allowed to see the quote in writing while they're in your office?
>
> A: Yes.

Id. at 19-20 (A53).

Rate quotes are thus shared with consumers as a regular part of the insurance agent's

business -- and small wonder, since it is generally difficult to sell a product without telling the

purchaser its price. As Mr. Deaton testified, these rate quotes are communicated to consumers in

any of four ways: by "formal" rate quote letter; by telephone; by displaying the quote on a computer screen in the consumer's presence; and by a "hot print" or "screen print" of the screen in hard copy. But however the quote is communicated, there can be no question that it is communicated in connection with the policy's sale -- which is why Mr. Deaton included the quote process as part of his step-by-step description of the sale of insurance.

These fundamental truths were echoed in Nationwide's own testimony. Importantly, that testimony confirms that 1) the rate quote letters are shared with consumers; 2) they are shared with consumers in connection with the sale of auto policies; and 3) they are shared with consumers by the agents *on Nationwide's behalf*:

> Q: And it's contemplated that rate quote letters will actually be given to consumers to quote coverages, premiums, deductibles and limits of liability for coverage being offered to consumers, right?
>
> MR. MARINO: Objection to form.
>
> A: Correct.
>
> Q: And it's contemplated by Nationwide that those quotes will be made on behalf of Nationwide to the consumers as part of the sale of insurance to them, right?
>
> MR. MARINO: Objection to form.
>
> A: Well, the agents are making the product that is a Nationwide product, they're quoting the product, the Nationwide product, yes.
>
> ***
> Q: The rate quote letter quotes rates for the purchase of a Nationwide automobile insurance product, doesn't it?
>
> A: Yes.
>
> Q: It quotes the rates on whose behalf?
>
> MR. MARINO: Objection to form.
>
> A: The product is the Nationwide product.

Q: So it quotes the rates on behalf of Nationwide, correct?

A: Right.

Q: So when the agent prepares the rate quote letter and gives it to the consumer, he's acting on Nationwide's behalf, isn't he?

MR. MARINO: Objection to form.

A: He's representing the product of Nationwide, yes.

Szlosek dep. at 116, 121-22 (A115-17).

Mr. Deaton's description of the sale process also refers to "a binder or memorandum of insurance." These documents, he explained, are created at the precise point at which the premium is collected, as a receipt for the premium. Deaton dep. at 15 (A52). This testimony makes clear that these documents, too, are created in connection with the policy's sale.

Representative samples of all these document types (and other, similar policy-related documents) were obtained by the Eames plaintiffs through nonparty subpoenas of four prolific Nationwide agents in Delaware. The document reproduced at page A33 of the accompanying appendix is an auto rate quote (titled, appropriately enough, "Auto Rate Quote #1"). In the line entry for PIP -- within the same column that shows limits of liability or deductibles (as the case may be) in dollars for all coverages other than PIP -- the unadorned modifier "FULL" appears. A33.[4]

The document reproduced at page A34-35 of the appendix is a rate quote letter, formatted in a manner closely similar to the rate quote shown at page A33. In a column otherwise reserved for dollar amounts -- one that reads, for example, "100/300 Per Person/Occurrence" for third-party bodily injury coverage -- PIP is described only by the words "Full Coverage."

---

[4] Redactions within the documents produced by the nonparty insurance agents were made by the agents' attorney, ostensibly to protect the privacy of the insureds.

Reproduced at page A36 is a binder receipt of the type Mr. Deaton described. At page A37 is a memorandum of insurance. Both documents employ the same uniform format, under which the PIP entry for the "dollar amount" column -- the column that shows limits of liability (in dollars) for third-party bodily injury coverage, third-party property damage coverage. etc. -- reads "FULL."

Other policy-related documents likewise reflect this uniform practice. The document reproduced at page A38 of the appendix is titled "Violations, Accident History . . . Vehicle and Coverage Information." Based on Mr. Deaton's description of the information collected as part of the application process. it is clear that this document is part of that process (and thus closely connected to the policy's sale). Deaton dep. at 14 (confirming that "information about the type of vehicle, driving record, information about the driver and so forth" are collected in the application process) (A52). As with all the document types, this document characterizes PIP as "FULL." The same is true of the additional document types at pages A39, A40 and A41.

### 2. The Practice's Uniformity and Scope

So uniform is the offending practice that at the Deaton deposition, and as a means of avoiding the necessity of wading through stacks of representative documents, Nationwide, the agents and the Eames plaintiffs stipulated as follows:

> MR. SPADARO: The parties have stipulated that in the vast majority of documents produced by the insurance agents pursuant to the Eames plaintiffs' subpoenas the word "full" appears next to the term "PIP."
>
> MR. LEONI: So stipulated.
>
> MR. CHEYNEY: It's agreed.

Deaton dep. at 55-56 (A62).

Or consider the file-by-file review that underlay this stipulation. As shown by the affidavit of Heather R. Jones (prepared earlier in the case in connection with briefing before the Special Discovery Master), the Eames plaintiffs agreed to accept from the four agents a random sampling of thirty-five files each, for a total of 140 files. A72 ¶3. A review of those 140 files identified forty-eight consumer accounts involving the sale or purported sale of the statutory minimum PIP limits. Id. ¶4. In forty-seven of the forty-eight files, the Nationwide agent characterized PIP as "full." Id.[5]

Nationwide will say that although the modifier "full" routinely appears on the PIP line entry -- an entry otherwise reserved for limits of liability, expressed in dollars -- it cannot reasonably be viewed as describing or characterizing the PIP coverage. Mr. Deaton disagreed:

> Q: *** Let me take you to the entry for PIP in the left-hand column. Do you see that?
>
> A: Yes.
>
> Q: And in the middle column it says full. Do you see that?
>
> A: Yes.
>
> Q: And that's a characterization that we see in -- I'll represent to you that that characterization of PIP as full is one that can be found in every set of documents that the Deaton Agency produced. Do you understand what I am representing to you?
>
> A: Yes.
>
> Q: Does that surprise you?
>
> A: No.

---

[5] As explained below, this means that of forty-eight insureds that purportedly purchased minimum limits, forty-seven were assigned no PIP deductible. This statistic shows how frequently the purported sale of minimum PIP limits goes hand-in-hand with the absence of a PIP deductible.

Q:  Is it fair to say that the characterization of PIP as full in
documents like the auto rate quote shown on the last page of
Deaton 2 is a routine one in your business?

A:  Yes.

Q:  What I could do is show you some additional examples of that
characterization as it appears in other sets of documents that
Deaton produced simply so you could confirm that full is in there.
We can go through that exercise. I'm happy to do that. Or you
could simply tell me that you expect to find it in all of them, if
that's the case.

A:  Yes. I would expect to see that usage of the word "full" in the
various documents that you have obtained.

Q:  And you would expect to see it in connection with PIP?

A:  Correct.

Deaton dep. at 40-42 (A58-59).

### 3.  The Agency Office Automation System

It is no accident that Nationwide agents throughout Delaware all characterize PIP as

"full" in such a broad variety of policy-related documents. The practice is a routine one (as Mr.

Deaton confirmed) because Nationwide's software imposes it on the agent. This software --

essentially the holy grail of the disputed practice, and the thing Nationwide kept hidden from

discovery for over a year -- is the Agency Office Automation ("AOA") system.

Ironically, The Eames plaintiffs stumbled upon this information less than one month ago,

while questioning Nationwide's designee on the application process generally (as opposed to the

"full" usage specifically):

Q:  Is an application process a requirement of Nationwide?

A:  The application process, I mean it's the only way to actually
process whereby the agent is inputting the information into his it's
called AOA. It's an agency office automation system where he's
inputting this information. That process -- you would have no

> other way of submitting a piece of business that were to be sold to actually Nationwide for that without having to go through that application process. So it's not that Nationwide requires something like that. It's just the way, the process of placing the business into Nationwide's portfolio.

Szlosek dep. at 43 (A 97). Asked to elaborate on the nature of the AOA system, Ms. Szlosek

described a "front-end input system that the agencies use to enter new clients' information

*relative to the sale of insurance*." Id. (emphasis added). She later reiterated that the AOA

system creates documents at the point of sale:

> Q: What does your use of the phrase "front-end application" mean?
>
> A: My meaning behind that is the interaction that occurs at the point of sale between the customer and the agencies, it is occurring with these agencies and their technology to be able to enter data on an applicant that will then be transmitted to Nationwide, which is in my mind the back-end system, if that helps any.

Id. at 87 (A108).

Ms. Szlosek explained that the AOA system provides the framework for the entire auto

insurance transaction. It displays all the relevant data fields, and requires the agent to tab from

field to field as he enters or selects appropriate information -- for example, the insured's name

and address, the make and model of the vehicle to be insured, the types of coverages to be

placed, and the limits of liability for each. Id. at 44 (A97). She further explained that the AOA

system "doesn't skip anything," requiring the agent to hit the tab key as he proceeds from one

data field to the next. Id. at 94-95 (A110).

In other words, Nationwide's Delaware agents do not spend their work days typing in the

word "full" on the PIP line entry. If the assigned deductible is zero (as is overwhelmingly the

case where Nationwide purports to sell the minimum PIP limits), the AOA system generates the

"full" usage automatically:

Q: The word full appears in the next column, does it not?

A: Yes.

***

Q: Mechanically how does that word appear on the document of this type? Do you know?

A: Yes, I do know. This is one of the deductible selections that *the agent has to enter* with respect to the coverage personal injury protection.

Id. at 96 (emphasis added) (A110). See also id. at 98-99 (confirming that the AOA system affirmatively requires the agent to convey the deductible value zero with the word "full") (A111).

The document reproduced at pages A191 of the accompanying appendix was produced by Nationwide just three business days before the filing of this opening brief. It shows graphically the "drop-down menu" that confronts the agent, requiring him to characterize PIP as full for each of the policy-related document types that are the subject of this lawsuit. Ms. Szlosek thus confirmed that Nationwide's Delaware rate quotes are created through the AOA system, and that their "full PIP" usage is likewise an AOA product. Id. at 105-07, 111 (A112-14). She confirmed that Nationwide's rate quote letters, with their reference to "Full Coverage" for PIP, are created on the AOA system. Id. at 112-16, 119-20 (A114-16). She gave the same testimony as to "vehicle screens" and memoranda of insurance. Id. at 127-34 (A118-20).

### 4. The Mechanics of Deception

Nationwide's deceptive practice works by exploiting expectations. It takes a word of ordinary usage ("full") and plain meaning ("maximum").[6] It places that word where, by convention, it would naturally describe the amount or extent of insurance provided. It then interprets the word to mean essentially the opposite -- not maximum, but minimum.

_____

[6] See MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 471 (10th ed. 1993).

We turn, then, to the conventions that feed the natural impression that the modifier "full", placed within the "limits" column, suggests full limits. They were explained in detail by Mr. Deaton, beginning with comprehensive coverage.

Mr. Deaton confirmed that the dollar amount shown in the "limits/deductibles" column for comprehensive coverage is a deductible (in the example used at Mr. Deaton's deposition, $250) and not a limit of liability. Deaton dep. at 35 (A57). The reason, he explained, is that no readily identifiable limit of liability exists for such coverage: the loss's value will depend on the ever-depreciating value of the car, and the extent of the damage -- factors that either change over time or simply cannot be predicted. Id. at 35-36 (A57). The first and most important convention, then, is that where definite limits of liability are identifiable, they are set forth as a dollar amount in the appropriate column; and where they are not, a deductible appears in that space:

> Q: So the limit of liability is not expressed in that column for
> comprehensive coverage because it's not a readily identifiable
> number at the time the policy is purchased?
>
> A: Correct.
>
> Q: Rather, it's a number to be determined later based on the
> depreciating value of the property?
>
> A: And the amount of damages incurred, correct.
>
> ***
> Q: And the reason that entry [for collision coverage] is expressed
> as a deductible rather than showing the limit of liability for
> collision damage is the same reason you explained with respect to
> comprehensive coverage, right?
>
> A: Yes.
>
> Q: It is an unknowable factor at the time the policy is purchased?
>
> A: Correct.

***

Q:  And the 10,000 indicates, the 10,000 figure in that middle column of the last page of Deaton Exhibit 2 for [third-party] property damage indicates the dollar amount of the limit of liability for property damage coverage?

A:  That's correct.

Q:  And that's expressed as a dollar amount because it is a dollar amount known at the time the policy is purchased?

A:  That's correct.

Q:  When the policy is purchased it's readily ascertainable what the limit of liability is for property damage coverage or bodily injury coverage, right?

A:  Correct.

Q:  And for the bodily injury entry we see 15/30 in the middle column.  Do you see that?

A:  Yes.

***

Q:  So that's the limit of liability for bodily injury coverage?

A:  Correct.

Id. at 36-38 (A57-58).  The first convention may thus be expressed as *For that which has an identifiable limit of liability, the limit if liability is shown.*

The second convention -- which can be readily confirmed by reference to any of the sample documents found at pages A33 through A41 of the accompanying appendix -- may be expressed as *That which is measured in dollars is expressed in dollars.*  For comprehensive and collision coverage (where deductibles apply), the deductibles are always shown as a numerical dollar amount.  For third-party bodily injury, third-party property damage and uninsured motorist coverage (where identifiable limits are known), the limits are likewise shown as dollar amounts.

With a single exception, these two conventions are uniformly employed; and the Court will find them at work in the columnar coverage descriptions of Nationwide's rate quotes, rate quote letters, binders, memoranda of insurance, vehicle screens and other document types. See A33-41 (representative samples). As the reader will have guessed, the exception is PIP.

### 5. Nationwide's Departure From the First Convention

PIP has, of course, a readily identifiable limit if liability. The minimum PIP limit is prescribed by statute; and absent some deception, PIP limits (whether minimum, maximum or in between) are readily ascertainable from the moment an auto policy is formed until the day it expires. Yet according to Nationwide, the documents that set forth limits for all other "limits-based" coverages make no reference to PIP limits. Instead, says Nationwide, that entry is reserved for the insured's "deductible option" -- indicating whether a deductible was chosen and, if so, in what amount. D.I. 95 at 6 (Nationwide argues that "full PIP" entries "reflect that the Eames (sic) had elected PIP coverage with no deductible.") Thus, among the "limits-based" coverages, only the PIP entry fails to inform the consumer of the applicable limits.

### 6. Nationwide's Departure From the Second Convention

Since PIP is a coverage that can have both a limit of liability and a deductible, one might ask whether Nationwide's decision to express one but not the other is so terribly deceptive after all. But Nationwide's failure to show the PIP limit is only half the deception.

For the other auto coverages that are sometimes subject to deductibles, Nationwide always expresses the deductible in dollars -- $100, $250 and so forth. A33-41. Where the coverage is eligible for a deductible but no deductible is assigned, Nationwide simply leaves the applicable entry blank. A42-46. But here again, the only exception is PIP. For PIP the range of possible deductibles starts at zero, then increases to $250, $500 and so forth. All those values are

expressed numerically (in dollars) but the first: if the PIP deductible is zero, Nationwide conveys that information with the single word "Full."

***

Nationwide thus says that when the limits/deductibles column reads $10,000 in the property damage entry, consumers should conclude that they have $10,000 in property damage coverage; but when the same column reads "full" in the PIP entry, they should ***not*** conclude that they have full PIP. Instead, they should understand, with no risk of confusion, that the word "full" conveys the numerical value "zero":

> Q: Going from lowest [deductible] to highest, it would be full, then $100, then $250 and then $500, right?
>
> A: Mm-hmm.
>
> Q: You have to answer yes or no.
>
> A: Yes.
>
> Q: So in that progression full has a dollar value of zero, right?
>
> A: Correct.
>
> Q: The other values are expressed in dollar values within the agency office automation system, right?
>
> A: Correct.

Szlosek dep. at 99 (A111).

### 7. Nationwide's Motive

Sellers of goods and services usually seek to sell ***more*** goods and services, not less. So why would Nationwide use deception to discourage the sale of more PIP? Why would it promote a consumer's mistaken belief that he had purchased more than the minimum limits? Or that the minimum limits were all he could possibly purchase?

The Amended Complaint answers this directly: "Nationwide pursues this [deception] because its loss ratio on PIP claims has historically been unfavorable." Amended Compl. ¶10. Though Nationwide will deny this allegation, there is substantial evidence to support it.

The SDM overruled Nationwide's objections to the Eames plaintiffs' 30(b)(6) notice on February 28, 2006, and the deposition went forward on April 11. See D.I. 169 (SDM's decision). Less than twenty-four hours before the deposition commenced, Nationwide's counsel produced a letter disclosure on certain topics targeted by the notice. A81-84. Included in these disclosures

[7]

---

[7] "Loss ratio" is, in simplest terms, the ratio of money going out to money coming in -- that is, the ratio of net sums spent on claims handling and claims payment to net earned premium. A more formal definition was set forth in the 30(b)(6) notice; and we note that Nationwide never objected to that definition. A74-79.

Ms. Szlosek explained that so long as the loss ratio is less than 100, the coverage

remains profitable. Szlosek dep. at 141 ("Well, it might help to point out that anything

under 100 percent you're still earning money . . . .") (A121).

### D. The Eames Plaintiffs' Experiences

Discovery confirms that Mr. and Mrs. Eames, the named insureds under the policy at

issue, were subjected to the same uniform representation that gives rise to every class member's

claim.[8]

There is no dispute that Mr. and Mrs. Eames purchased their policy from Culver

Insurance Agency of Seaford, Delaware, a Nationwide agent, in or about March 1994. Mr.

Eames testified that he met with Linda Sanders and Keith Culver, both Culver employees, at the

---

[8] Under Nationwide's standard auto policy, a person is an insured for purposes of PIP by virtue
of suffering injury in a covered collision, and regardless of whether or not he is a named insured.
A16. Mr. and Mrs. Eames's daughter, Tammy, was injured in the February 2003 collision, is
thus an insured for PIP purposes. Though she was not on the receiving end of the offending
representations, she suffers the same injury all class members share: Nationwide contends that
her PIP coverage is minimal when it should really be full.

time the policy was purchased. Deposition of Thomas A. Eames ("Thomas Eames dep.") at 18-19 (A145). He dealt with Ms. Sanders regarding the purchase of auto insurance for the family truck. Id. at 21 (A146). Though Nationwide's examiner labored mightily to wear Mr. Eames down, he ultimately testified *fourteen times* that Ms. Sanders told him orally that the policy would include full PIP coverage. Id. at 23-25, 29-30, 32 (A146-48). Mr. Eames also testified that various paperwork he received from the Culver agency characterized PIP as full. Id. at 25 (A147).

Mr. Eames further testified that in connection with his purchase of the policy, he was shown or received the rate quote reproduced at page A1 of the appendix. Id. at 35-36, 40 (A149-50). As with all documents created by the AOA system, this rate quote characterized PIP as full. A1. In characterizing PIP as full, this document was like "[e]very one [Mr. Eames] received" in connection with the policy's purchase. Id. at 37 (A150).

Mrs. Eames testified that she and her husband received the document shown at page A1 of the appendix (with its characterization of PIP as "full") in the mail, simultaneously with the policy itself. Deposition of Roberta L. Eames ("Roberta Eames dep.") at 36-37 (A166-67). She testified that during telephone communications with Culver employees, the agents also told her orally that the policy would include full PIP coverage. Id. at 38, 44-47 (A167-69). This representation was made to Mrs. Eames prior to (and in connection with) the policy's purchase. Id. at 38, 47 (A167, A169).

Moreover, there is no dispute that on February 8, 2003 the Culver agency provided the Eameses with a printout of the "vehicle screen" shown at page A31 of the appendix. Because this document is a creature of the AOA system, it likewise characterizes PIP as "full." A31. Nor is there any dispute that on June 17, 2003, the Culver agency provided the Eameses with the

memorandum of insurance shown at page A32 of the appendix. Like all other AOA documents, it too sets forth the offending representation. A32.

Nationwide will say that these post-accident representations cannot form the basis of a consumer fraud claim because they are remote in time from the policy's issuance in 1994 (and thus cannot qualify as representations made in connection with the policy's sale). During the merits phase, we will demonstrate that these 2003 representations are so fundamental -- defining as they do the very thing sold -- that they must properly be viewed as connected to the sale itself. See Montalvo v. Tower Life Building, 426 F.2d 1135, 1141-42 (5th Cir. 1970) (rejecting insurer's "'one-shot' view of the 'sale' of insurance protection").

## ARGUMENT

## I.  THE LEGAL FRAMEWORK FAVORS CERTIFICATION

The Third Circuit has indicated that class actions should be looked upon favorably.

Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985), cert. denied sub. nom., Weinstein v.

Eisenberg, 474 U.S. 946 (1985). For this reason, "the standard for determining the class action

prerequisites are met is rather lenient." Trotter v. Perdue Farms, Inc., C.A. No. 99-893RRM,

2001 WL 1002448, slip op. at *2 (D. Del. Aug. 16, 2001) (Ex. A).  Courts thus hold that any

doubts on the issue must be resolved in favor of certification.  Eisenberg, 766 F.2d at 785 (if

error is to be committed, it should be committed in favor of certification); Trotter, slip op. at *2

(citing Eisenberg).

This case is a consumer class action.  Courts and commentators agree that the class

action device exists (in large part) for the express purpose of accommodating such claims:

> It is by now a truism that the class-action lawsuit has become a
> vehicle of citizenship and consumer control over the vagaries of
> political or market forces. * * * Sometimes a class-action lawsuit
> is the only way in which consumers would know of their rights at
> all, let alone have a forum for their vindication.

4 Herbert B. Newberg and Alba Conte, NEWBERG ON CLASS ACTIONS §18.01 (3d ed. 1982)

(quoting Coleman v. Cannon Oil Company, 141 F.R.D. 516, 520 (M.D. Ala. 1992)).  Because

such claims present the classic case for certification, the United Stated Supreme Court has

observed that "[p]redominance is a test readily met in certain cases alleging consumer or

securities fraud . . . ." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997).  The

predominance test is met, too, in cases alleging fraud by conspiracy.  In re NASDAQ Market-

Makers Antitrust Litig., 169 F.R.D. 493, 518 (S.D.N.Y. 1996) (conspiracy claims warrant

certification under Rule 23(b)(3)).  Cases involving a common scheme of deceptive practice are

likewise held to meet the predominance standard.  See In re The Prudential Ins. Co. of America Sales Practices Litig., 148 F.3d 283, 314-15 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999) (allegations of common scheme to defraud policyholders met predominance test).

A motion for class certification is not an inquiry into the merits.  Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 177-78 (1974) ("We find nothing in either the language or history of Rule 23 that gives the Court any authority to conduct a preliminary inquiry into the merits of the suit in order to determine whether it may be maintained as a class action.")  Accord, Barnes v. Am. Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998), cert. denied, 526 U.S. 1114 (1999) (citing Eisen); Trotter, slip op. at *2 (same) (Ex. A).  For purposes of class certification, then, "the substantive allegations of the complaint must be taken as true."  Chiang v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004).

The applicable legal framework thus makes an overwhelming case for class certification.  The Amended Complaint alleges a common deceptive practice consisting of uniform representations to ordinary consumers.  Such allegations present the classic case for certification, particularly under the lenient standards embraced by this Court .

## II. ALL WHO SUFFERED THE SAME INJURY ARE INCLUDED IN THE CLASS

Despite its name, the Delaware Consumer Fraud Act does not mirror the elements of common law fraud.  No proof of scienter, intent to induce reliance or justifiable reliance is required.  Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1074 (Del. 1983).  Rather, the Act creates a private right of action for "any deception, fraud, false pretense, false promise, misrepresentation . . . or omission of any material fact with intent that others rely upon such [misrepresentation] or omission . . . ."  6 Del. C. §2513(a).

Because the Eames plaintiffs' claim requires no proof of reliance, the class may properly include all affected PIP claimants -- whether or not they themselves are named insureds under the policy that owes them PIP coverage, and whether or not the offending representation was made to them personally. Instead, any person claiming PIP coverage under a policy whose named insureds were targets of the "full" usage is a member of the class, so long as Nationwide continues to insist on minimum limits for that person's claim:

> Where state consumer fraud statutes do not require proof of reliance, as is the case here, plaintiff "need only establish a causal link between the [deceptive] conduct at issue and his or her injury," . . . .

In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 249 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004) ("Warfarin I") (quoting Mulligan v. Choice Mtge. Corp., USA, No. 96-596-B, 1998 WL 544431, slip op. at *11-12 (D.N.H. Aug. 11, 1998)).

Given the universality of the offending practice the class will consist of virtually every named insured under any Delaware auto policy issued by Nationwide since August 20, 2001, *plus* all PIP claimants seeking benefits under those policies. No individualized proof of reliance can properly be required as to any class member.

### III. THE NUMEROSITY STANDARD IS MET

Rule 23's first requirement is numerosity. But the rule does not impose any "rigid minimum number of class members necessary to warrant certification; rather, joinder of all members need only be impractical, not impossible." In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 295 (D. Del. 2003). Courts in this Circuit have thus certified classes of just twenty-five to thirty persons. Malloy v. Eichler, 628 F. Supp. 582, 590 (D. Del. 1986), aff'd, 860 F.2d 1179 (3d Cir. 1988) (at least thirty persons); Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, 463 (E.D. Pa. 1968) (twenty-five persons). Further, a plaintiff's reasonable

estimate of the class's size will suffice.  In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp.
527, 558 (D. Del. 1994).

The numerosity standard is easily met here.  Nationwide's letter disclosure shows that in
2001, it issued 468 new Delaware auto policies purporting to offer just minimum PIP limits.[9]  In
2002 through 2005, that category totaled 279, 276, 543 and 876 new policies.  A82.  For the
years impacted by this case, then, Nationwide issued 2,442 new policies offering minimum PIP
limits.  These are not the only sales implicated by the case, since the "full PIP" usage would have
been employed in connection with both new and existing policies.  Further, additional class
members would be found among persons who are not named insureds but are nonetheless PIP
claimants (by virtue of their having been injured in the named insured's collision, etc.).  It is thus
clear that the class will easily exceed 3,000 persons.

## IV.  **THE COMMONALITY STANDARD IS MET**

Rule 23's commonality requirement is satisfied by a showing that "the questions of law or
fact linking the class members are substantially related to the resolution of the litigation, even
though the individuals are not identically situated."  DaimlerChrysler, 216 F.R.D. at 295-96
(quoting Deutschman v. Beneficial Corp., 132 F.R.D. 359, 372 (D. Del. 1990)).  Because
commonality is present on a finding of just one common issue, this standard is easily met.  Baby
Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).

Cases involving uniform misrepresentations are viewed as the paradigm of commonality.
DaimlerChrysler, 216 F.R.D. at 296 (citing Deutschman).  See also Johnston v. HBO Film
Mgmt., Inc., 265 F.3d 178, 184 (3d Cir. 2001) (uniform misrepresentation forming the basis of

---

[9] As Nationwide's counsel recently explained to us, this number is calculated by subtracting the
number of new policies that provide what Nationwide calls "additional" PIP from the total
number of new policies.

securities fraud claim stated common issue).  The Third Circuit thus found common issues where an insurer's agents allegedly engaged in uniform oral misrepresentations.  In re The Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 309-10 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999).

Because the Eames plaintiffs allege that they were subjected to uniform misrepresentations, they naturally share several common issues with the class.  Did Nationwide represent that PIP was "full" in connection with the sale of its insurance?  Does it contend that the affected insureds are nonetheless entitled to just the minimum statutory limits?  Is this practice deceptive?  Is it a regular business practice?  Is it worthy of punitive damages?  Is it part of a civil conspiracy, engaged in by Nationwide with its Delaware agents?  All of these questions are common to the Eames plaintiffs and the class alike.

## V.  **THE TYPICALITY STANDARD IS MET**

Under Rule 23, a class representative's claim is typical of the class's claims if it arises from the same conduct or practice and is based on the same legal theory.  Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998), cert. denied, 526 U.S. 1114 (1999) (citations omitted); DaimlerChrysler, 216 F.R.D. at 298 (quoting Wilmington Firefighters Local 1590 v. City of Wilmington, 109 F.R.D. 89, 93 (D. Del. 1985)).  The Third Circuit has held that "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."  Baby Neal, 43 F.3d at 58.

The typicality standard tends to merge with the commonality standard, Barnes, 161 F.3d at 141 (citing Baby Neal); and like the commonality test, typicality is a low threshold.  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001) (citations omitted).

The Eames plaintiffs' claims are not merely typical of those of the class, but virtually identical to them. They arise from the same uniform representations, and proceed under the same legal theories as are available to other class members. Moreover, the Eames plaintiffs themselves include both named insureds (Mr. and Mrs. Eames) and persons insured by virtue of their status as PIP claimants (Mr. Eames, Mrs. Eames and Tammy Eames). They are ideal class representatives who easily meet the low threshold of typicality.

## VI. THE ADEQUACY STANDARD IS MET

Rule 23's adequacy standard has two components. First, it tests whether the proposed Class Counsel is qualified to represent the class. Second, it examines any conflicts of interest between the class representatives and the class they seek to represent. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004) ("Warfarin II") (citations omitted).

In another recent PIP-related class action, the Eames plaintiffs' counsel, Murphy Spadaro & Landon, secured a $5 million settlement for a class of 28,000 PIP claimants. Crowhorn v. Nationwide Mut. Ins. Co., 836 A.2d 558 (Del. Super. Ct. 2003). In Crowhorn, the Superior Court found that attorney John Spadaro "had experience litigating similarly complex cases," and "was sufficiently qualified and experienced to manage the proposed Settlement Class." Id. at 565. In fact, the Superior Court credited Mr. Spadaro with "much success" in his role as Class Counsel. Id.

Mr. Spadaro's professional biography includes extensive experience in complex insurance coverage litigation. In *Unisys v. Royal*, he played a leading role in securing the dismissal of the target defendant in a $35 million Y2K coverage dispute. In *Hoechst v. National Union*, he served as the Court-appointed Defense Coordinator in an $800 million coverage case. In *North American Philips v. Aetna*, he served as one of four lead trial counsel in the four-month

jury trial of a $600 million coverage dispute. See msllaw.com. He is presently pursuing PIP-related class actions against Nationwide, State Farm, Liberty Mutual and USAA.

In assessing the adequacy of the class representatives, the Third Circuit holds plaintiffs to a "'very minimal requirement of knowledge about the litigation and the facts upon which it is based.'" DaimlerChrysler, 216 F.R.D. at 300 (quoting In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527, 559-60 (D. Del. 1994)). And see Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir. 1982) (class representative adequate despite "a complete ignorance" of the case). But in fact, all three class representatives show a clear understanding of class actions generally and this case in particular. See Thomas Eames dep. at 15, 22, 25, 28 (A144, A146-47); Roberta Eames dep. at 18-19, 33, 39 (A162, A166-67); deposition of Tammy Eames at 18-19, 29-30 (A181, A184). Further, the class representatives have proven their mettle by prosecuting this hotly contested case for nearly two full years.

## VII.  THE PREDOMINANCE STANDARD IS MET

The predominance test under Rule 23(b)(3) "measures whether the class is sufficiently cohesive to warrant certification." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 187 (3d Cir. 2001) (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997)). Where proof of liability is focused on a defendant's allegedly deceptive conduct (as opposed to the conduct of individual class members), the predominance test is met. Warfarin II, 391 F.3d at 528. In Warfarin II, the Third Circuit thus found that allegations of a defendant's "broad-based campaign" to deceive consumers "in violation of federal and state consumer fraud and antitrust laws" met the predominance standard. Id. Such allegations "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members . . . ." Id. See also Amchem Products, 521 U.S. at 625

("Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . .")
Accord, Chiang v. Veneman, 385 F.3d 256, 265-73 (3d Cir. 2004) (claims alleging uniform
conduct support finding of predominance, even where individual issues exist).

The Eames plaintiff's claims are consumer fraud claims. They allege a coordinated,
uniform practice (executed through the AOA system) whereby written and oral representations,
shared with consumers, characterized PIP as full. These allegations are the core of the dispute,
and will prove the overwhelming (if not exclusive) focus of the plaintiffs' case in chief. Indeed,
it is impossible to imagine a trial in this case that is not utterly dominated by these issues.

Nationwide will cast the predominance standard as some distant and unattainable object.
But again, this is a consumer fraud case alleging a uniform deceptive practice. As the Supreme
Court has held in Amchem Products, the predominance test is easily met in such cases. Because
it is easily met here, the Court should find predominance under subdivision (b)(3).

### VIII. THE SUPERIORITY STANDARD IS MET

The superiority requirement seeks to balance the fairness and efficiency of a class action
against alternative methods of adjudication. In re The Prudential Ins. Co. of Am. Sales Practices
Litig., 148 F.3d 283, 316 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999) (citations omitted).
Where predominance is found, courts conclude that the class action device serves judicial
economy by avoiding multiple suits. Bank v. Elec. Payment Serv., Inc., C.A. No. 95-614SLR,
1997 WL 811552, slip op. at *22 (D. Del. Dec. 30, 1997) (citations omitted) (Ex. B).

Trial courts enjoy a broad range of tools for the management and supervision of class
actions. These include the use of specialized case management devices, subclasses, and other
tools. For this reason, "[c]ourts are generally loath to deny class certification based on

speculative problems with case management . . . ." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 529 (S.D.N.Y. 1996) (citations omitted).

All factors point to the superiority of a class action here. We suspect that not even Nationwide will contend that the prospect of thousands of individual lawsuits -- with all the attendant cost, expenditure of judicial resources, and risk of inconsistent results -- is preferable to a single class action. Further, the nature of the alleged conduct is such that few (if any) class members will even know of the alleged deception -- much less seek to remedy it -- without certification. See Coleman v. Cannon Oil Co., 141 F.R.D. 516, 520 (M.D. Ala. 1992) (class treatment is often "the only way in which consumers would know of their rights at all, let alone have a forum for their vindication.") For all these reasons, class treatment is manifestly superior to individual actions.

## CONCLUSION

For the reasons set forth above, the Eames plaintiffs respectfully request that 1) the class be certified under Federal Rule of Civil Procedure 23; 2) the named plaintiffs be appointed as representatives of that class; and 3) Murphy Spadaro & Landon be appointed as Class Counsel.

Respectfully submitted,

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

May 15, 2006                    Attorneys for the Eames plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-CV-1324KAJ |
| v. | ) ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

### NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk

of the Court using CM/ECF which will send notification of such filing(s) to the following:

Nicholas E. Skiles, Esq.
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, DE 19899

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

Attorneys for plaintiffs
Thomas A. Eames, Roberta L. Eames and
Tammy Eames (on behalf of themselves and
all others similarly situated)

May 15, 2006

131731