# EXHIBIT B

00071306.DOC

1997 WL 811552  
1998-1 Trade Cases P 72,131  
(Cite as: 1997 WL 811552 (D.Del.))

Page 4

United States District Court, D. Delaware.

Marian BANK, Plaintiff,  
v.  
ELECTRONIC PAYMENT SERVICES, INC.;  
Corestates Financial Corp.; PNC Bank  
Corp.; Banc One Corp., Defendants.

No. Civ.A. 95-614-SLR.

Dec. 30, 1997.

Joseph A. Rosenthal, Kevin Gross, Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware, for plaintiff, of counsel.

Merrill G. Davidoff, Martin I. Twersky, Nina H. Amster, Berger & Montague, Philadelphia, Pennsylvania, Paul R. Rosen, Jeffrey M. Goldstein, Spector, Gadon & Rosen, Philadelphia, Pennsylvania, of counsel.

Donald E. Reid, Morris, Nichols, Arsht & Tunnel, Wilmington, Delaware, for defendants, of counsel.

Peter Buscemi, Stephen P. Mahinka, and Brad Fagg, of Morgan, Lewis & Bockius LLP, Washington, D.C., of counsel.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 On October 13, 1995, plaintiff Marian Bank filed a five count complaint against defendants Electronic Payment Services ("EPS"), CoreStates Financial Corp. ("CoreStates"), PNC Bank Corp. ("PNC"), and Banc One Corp. ("Banc One") alleging antitrust violations under the Sherman Antitrust Act ("Sherman Act"). 15 U.S.C. §§ 1 and 2. Counts I, II, and IV of the complaint allege conspiracies in violation of § 1 of the Sherman Act. Count III alleges unlawful monopolization and attempted monopolization in violation of § 2 of the Sherman Act. Count V alleges violations of the anti-tying provision of the Bank Holding Company Act. 12 U.S.C. § 1972.

On July 15, 1996, plaintiff filed a motion for class certification. (D.I.45) Defendants opposed the class certification motion (D.I.54) and filed a motion to dismiss. (D.I.49) In a memorandum opinion and order dated February 5, 1997, this court granted in part and denied in part defendants' motion to dismiss. (D.I. 71, 72) In particular, the court dismissed defendant EPS from the case entirely and dismissed counts III and V (the non-conspiracy claims) as to defendants Banc One and PNC. The court also denied plaintiff's motion for class certification, but granted it leave to file an amended motion consistent with the memorandum opinion. (D.I.72)

On February 25, 1997 plaintiff filed a motion to amend the complaint. (D.I.77) Defendants responded to plaintiff's motion, but did not specifically oppose the filing of an amended complaint. (D.I. 81 at 4) On July 25, 1997, plaintiff filed its amended complaint. (D.I.110)

Presently before the court are defendants' motion for partial summary judgment and plaintiff's renewed motion for class certification. (D.I.97, 79) Both motions have been fully briefed and oral argument held. (D.I.112) For the following reasons the court shall grant defendants' motion and deny plaintiff's motion.

II. BACKGROUND

Plaintiff's amended complaint does not substantially change the antitrust allegations set forth in its original complaint. Plaintiff's antitrust allegations closely follow the allegations set forth in a complaint and Competitive Impact Statement filed by the United States against EPS. See 59 F.R. 24711 (May 12, 1994), 1994 WL 178790. The gravamen of plaintiff's complaint concerns the business practices of the regional ATM (automated teller machine) network currently owned and operated by EPS: the MAC ATM network. EPS was formed in December 1992 by four bank holding companies: (1) CoreStates; (2) PNC; (3) Banc One; and (4) Key Corp. In forming EPS, the bank holding companies merged their separately owned and operated ATM networks into one ATM network under the MAC brand and logo. Prior to the formation of EPS, CoreStates owned and operated its ATM network using the MAC brand and logo.

As explained in more detail below, plaintiff alleges that the defendants engaged in a course of conduct to substantially reduce competition in the markets for regional "ATM network access" and "ATM processing." (D.I. 110 at 9-13) According to

1997 WL 811552  
(Cite as: 1997 WL 811552, *1 (D.Del.))

Page 5

plaintiff, defendants' conduct reduced competition in five relevant geographic markets: Delaware, Pennsylvania, West Virginia, New Jersey, and Ohio. (D.I. 110 at 5) Plaintiff seeks to represent a class "of all depository institutions in the affected states that participated in the ATM Network and utilized defendants' ATM processing services (excluding defendants and their respective parents, subsidiaries and affiliates) during the four year period preceding April 21, 1994." (D.I. 110 at 20) In the alternative, plaintiff seeks to represent the proposed class for the "period April 21, 1990 through and including December 3, 1992 ..." (D.I. 80 at 5-6)

*2 Defendants oppose class certification and have also challenged Marian Bank's authority to assert claims for damages that occurred after April 17, 1992. On that date, Marian Bank was placed into receivership. On April 20, 1992 a state-owned bank, The Marian State Bank, was created to replace Marian Bank. According to the amended complaint, the Asset Management Committee of Marian Bank ("the Committee") "has the legal authority and power to maintain this action on behalf of Marian Bank and, as a result of an assignment, also owns and asserts claims of [The] Marian State Bank relating to this lawsuit." [FN1] (D.I. 110 at 2) The facts relating to the seizure of Marian Bank and the subsequent creation of the Asset Management Committee are relevant to both defendants' motion for partial summary judgment and Marian Bank's motion for class certification.

> FN1. For the purposes of this opinion, Marian Bank and the Committee will be used interchangeably.

A. Seizure of Marian Bank

On Friday, April 17, 1992, the Secretary of Banking of the Commonwealth of Pennsylvania ("Secretary") placed Marian Bank into receivership pursuant to § 504 of the Department of Banking Code, 71 P.S. § 733-504 (amended 1993). (D.I.51, Ex. 1) The Secretary, having determined that Marian Bank was insolvent and that immediate action was necessary, filed a certificate of possession and a petition for confirmation as receiver of Marian Bank in the Court of Common Pleas of Philadelphia County. (D.I.51, Exs.1, 2) The court confirmed the Secretary as the Receiver [FN2] and authorized the Secretary to "sell and transfer to The Marian State Bank the assets and liabilities set forth in and pursuant to the terms of the Purchase and Assumption Agreement entered into between the [Secretary] and The Marian State Bank...." (D.I.51, Ex. 3)

> FN2. For the purposes of this opinion, the terms "Secretary" and "Receiver" shall be used interchangeably.

The Purchase and Assumption Agreement ("P & A Agreement"), executed on April 19, 1992, provided for the transfer, sale and/or assumption of certain assets, deposits, and other liabilities of Marian Bank to The Marian State Bank, a new state-owned bank. (D.I.114, Ex. 2) In particular, the P & A Agreement provided that several contracts for the provision of services to Marian Bank be transferred and assumed by The Marian State Bank:

> With respect to those contracts listed on the Schedule of Contracts (Schedule D) attached hereto and made part hereof (the "Contracts"), providing for the rendering of services by or to [Marian Bank], existing as of [the close of business on April 17, 1992], [The Marian] State Bank agrees to give the Receiver, within thirty (30) days of [April 17, 1992], written notice specifying whether it elects to assume the Contracts.... [The Marian] State Bank shall be deemed to have assumed every Contract for which no such notification is timely made. The Receiver agrees to assign, transfer, convey and deliver to [The Marian] State Bank all rights, title and interest of the Receiver, if any, in and to any Contracts [The Marian] State Bank elects to assume hereunder.

*3 (D.I. 114, Ex. 2 at 6) Marian Bank's agreement relating to its participation in the MAC ATM network is not identified in "Schedule D". (D.I. 51, Ex. 4 at 14-17) On Monday, April 20, 1992, The Marian State Bank opened for business at the location previously used by Marian Bank.

On May 19, 1992, The Marian State Bank sent a letter to the Secretary stating:

> [P]lease be advised that The Marian State Bank does not elect to assume and hereby disaffirms the following contracts:
> ....
> ATM--MAC Agreement expires November 1992....

(D.I.114, Ex. 3) The letter also provided:

> As of this date, The Marian State Bank has not received a full copy of the Purchase and Assumption Agreement to include all applicable schedules. Very little of the above contract information was received from the FDIC on April 23, 1992. If the schedule from the Receiver

1997 WL 811552                                                                                              Page 6
(Cite as: 1997 WL 811552, *3 (D.Del.))

includes contracts not on the list received at closing, or if any more additional leases and contracts are discovered, the bank reserves the right to disaffirm any contract it deems to be burdensome within 30 days from receipt of information.

(D.I.114, Ex. 3)

In transferring deposits from Marian Bank to The Marian State Bank, the Secretary sought FDIC (Federal Deposit Insurance Corporation) insurance for the new state-owned bank. Accordingly, "the P & A [A]greement provided that [The Marian] State Bank assume the first $100,000 of each depositor's deposits in Marian Bank." *See Hargrove v. Ehigner,* 161 Pa.Cmwlth. 306, 638 A.2d 282, 283 (Pa.Commw.Ct.1994). "Deposits over $100,000 [ ] remain[ed] in Marian Bank." *Id.* On April 20, 1992, The Marian State Bank entered into an agreement with the FDIC for the insurance and, as stated above, opened for business. *Id.*

**B. Litigation Relating to The Receivership Action**

In response to the Secretary's actions, a number of excess depositors (i.e., depositors with accounts that exceeded $100,000) and creditors filed two class action lawsuits relating to the deposits over $100,000 that remained in Marian Bank. *See Hargrove,* 161 Pa.Cmwlth. 306, 638 A.2d 282. The two lawsuits were consolidated with the receivership action in the Common Pleas Court of Philadelphia County. The court certified a class of (1) all depositors with deposits in excess of $100,000 in Marian Bank as of April 17, 1992, and (2) all creditors, other than depositors, of Marian Bank as of April 17, 1992, who filed proof of their claims with the Secretary. *Id.* at 310. The Secretary appealed the trial court's decision, arguing that certification of the class deviates from the procedure set forth in the Pennsylvania banking statutes. *Id.* at 311. An intermediate appellate court agreed with the Secretary and reversed the trial court's decision. While the class action plaintiffs sought leave to appeal this decision, the parties entered into settlement negotiations.

**C. Final Account and Settlement Agreement**

The settlement negotiations resulted in the parties entering into a Final Account and Settlement Agreement ("F & S Agreement"). (D.I.99, Ex. 2) Under the terms of the F & S Agreement, an "Asset Management Committee" (the "Committee") was created "for the purpose of supervising further collection and liquidation of Assets." (D.I. 99, Ex. 2 at 17) The Committee consists of three individuals: (1) one excess depositor recommended by counsel for the class; (2) a person recommended by the Secretary; and (3) one class member selected by the court. (D.I. 99, Ex. 2 at 34) The Committee members selected by class counsel and the Secretary must have the approval of the court. (D.I. 99, Ex. 2 at 34) If a Committee member resigns, a replacement will be selected by the remaining committee members and must also be approved by the court. (D.I. 99, Ex. 2 at 34) The F & S Agreement provides that the Committee's actions "with respect to [the] collection of assets and [the] compromise of claims shall be determined by majority vote of the Committee." (D.I. 99, Ex. 2 at 35)

*4 The F & S Agreement defines the "class" of settling plaintiffs as "all Excess Depositors and other creditors, including trade creditors, of [ ] Marian Bank as of April 17, 1992 [ ] who have timely filed proofs of their claims with the Secretary...." [FN3] (D.I.99, Ex. 2) Counsel for the class is defined as "the law firms of Spector, Gadon & Rosen and Berger & Montague." (D.I.99, Ex. 2) The term "Assets" is defined by the F & S Agreement as including "all claims and causes of action owned by the Secretary as Receiver except those listed on Exhibit E ('the Claims')." [FN4] (D.I. 99, Ex. 2 at 16) (emphasis added).

> FN3. The F & S Agreement excluded from the class individuals who had been partners of Marian Bank, as well as their relatives and related individuals or entities. (D.I. 99, Ex. 2 at 17)

> FN4. Although Exhibit E was not included in the record, all parties have asserted that the excluded claims and causes of action are irrelevant to the issues in the present motions. (D.I. 106 at 11; D.I. 98 at 8)

The F & S Agreement provided that, as soon as practicable, the Committee was to "employ an asset management and collection firm ('Asset Manager') for the purposes of continuing to collect and liquidate the Assets and to submit to the Asset Manager for collection ... for the benefit of the Class." (D.I. 99, Ex. 2 at 26) The selection of the Asset Manager was left to the court after consultation with the Secretary and class counsel. (D.I. 99, Ex. 2 at 26) The F & S Agreement stated that "[t]he assets to be collected by the Asset Manager shall only be the Assets, as defined herein, excluding cash and cash equivalents."

1997 WL 811552                                                                 Page 7
(Cite as: 1997 WL 811552, *4 (D.Del.))

(D.I. 99, Ex. 2 at 26) The Asset Manager is also directed to report regularly "and be subject to the direction of [] the Asset Management Committee." (D.I. 99, Ex. 2 at 27)

After hearings and notice to all interested parties, the court approved the F & S Agreement on December 15, 1994. The court did not modify the terms of the agreement except for some provisions relating to the payment of attorney fees to the two law firms identified as class counsel. (D.I.99, Ex. 3) In the order approving the F & S Agreement, the court certified a class "for settlement purposes only." (D.I. 99, Ex. 3 at 2) The court's order also appointed and identified three individuals as the Committee "for the purposes of collecting the balance of Assets of the Marian Bank for the benefit of the Class, to the extent" specified in the F & S Agreement. (D.I. 99, Ex. 3 at 5)

D. Asset Management Committee Agreement

The Committee is governed by the Asset Management Committee Agreement ("AMC Agreement"), which was entered into by the three Committee members. (D.I.99, Ex. 4) The AMC Agreement incorporated the definition of the term "Assets" as it is defined in the F & S Agreement. (D.I. 99, Ex. 4 at 2) The AMC Agreement provides that all actions by the Committee requires two affirmative votes of the three Committee members. Section 2.1 of the AMC Agreement places certain limitations on the Committee:

> The Committee shall take no action pursuant to this Agreement unless and until this Agreement is approved by the Court. The Committee shall carry out the purposes of the [F & S Agreement] and the directions contained herein, and shall not at any time, enter into or engage in any business, and no part of the Assets or proceeds, revenue or income therefrom shall be used or disposed of by the Committee in furtherance of any business. This limitation shall apply irrespective of whether the conduct of any such business is deemed by the Committee to be necessary or proper for the conservation and protection of the Assets.

*5 (D.I. 99, Ex. 4 at 2-3) Subject to the above limitations, the AMC Agreement enumerated specific powers and responsibilities of the Committee, including the following:

> (e) To do and perform any acts or things necessary or appropriate for the collection and maximizing the present value of and conservation and protection of the Assets, including acts or things necessary or appropriate to maintain Assets held by the Committee pending sale or other disposition thereof or distribution thereof to the Class, and in connection therewith to employ such agents, including counsel, accountants, experts, advisors, or other persons, and to confer upon them such authority as the Committee in their discretion may deem expedient, and to pay reasonable compensation thereof;
> ....
> (g) To institute, join, or defend actions or declaratory judgments or other actions and to take such other action, including settlement of any such action on any terms deemed reasonable by the Committee in their discretion, in the name of the Committee, the Committee in their discretion may deem necessary or desirable to enforce any instruments, contracts, agreements, or causes of action relating to or forming a part of the Assets;
> (h) To cancel, terminate, or amend any instruments, contracts, or agreements relating to or forming a part of the Assets, and to execute new instruments, contracts, or agreements, notwithstanding that the terms of this Agreement, provided that no such new instrument, contract, or agreement shall permit the Committee to engage in any activity prohibited by Section 2.1 of this Agreement;
> ....
> (m) To perform any act authorized, permitted, or required under any instrument, contract, agreement, or cause of action relating to or forming a part of the Assets, whether in the nature of an approval, consent, demand, or notice thereunder or otherwise, unless such act would require the consent of the Class or the approval of the Court in accordance with the express provisions of this Agreement;
> ....

(D.I. 99, Ex. 4 at 4-6) The court approved the AMC Agreement on February 17, 1995, stating that the agreement is binding on all members of the class. (D.I.99, Ex. 5)

E. Asset Management Agreement

The relationship between the Committee and the Asset Manager is governed by the Asset Management Agreement ("AM Agreement"). (D.I.99, Ex. 6) The AM Agreement contains a section entitled "Assets Subject to Agreement" that defined the "initial pool of assets," "additional assets," and "excluded assets." (D.I. 99, Ex. 6 at 3) The initial pool of assets consisted of loans, collateral and proceeds securing

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1997 WL 811552  
(Cite as: 1997 WL 811552, *5 (D.Del.))

Page 8

the loans, and real estate. (D.I. 99, Ex. 6 at 3) The loans and real estate are specifically identified in schedules attached to the AM Agreement. Additional assets consist of assets added by the Committee with the written consent of the Asset Manager. All additional assets must be specifically dated and identified in schedules which list the initial pool of assets. (D.I. 99, Ex. 6 at 3) Excluded assets are defined as any asset that the Asset Manager designates as excluded from the pool of initial assets. (D.I. 99, Ex. 6 at 3) The Asset Manager must designate whether an asset is excluded within sixty days from the date the AM Agreement becomes effective. (D.I. 99, Ex. 6 at 3)

*6 The duties and responsibilities of Asset Manager are also provided for in the AM Agreement. (D.I. 99, Ex. 6 at 4) The Asset Manager's duties are specified in the AM Agreement as follows:

> Asset Manager's duties under this Agreement generally are to provide customary asset management, asset recovery and loan servicing services for the Assets, to prepare Asset Management and Disposition Plans ("AMDPs") for such Assets, and to manage, dispose, collect, and/or resolve such Assets in accordance with the AMPDs and the provisions of this Agreement.

(D.I. 99, Ex. 6 at 4) The Asset Manager's fiduciary duty is specified as follows:

> Asset Manager shall at all times act in good faith and in the best interest of the Class with respect to the Assets. Asset Manger shall carry out its obligations hereunder in accordance with normal standards and practices of the real estate asset management, asset recovery and commercial loan servicing industries, as may be applicable in the circumstances. Asset Manager shall conduct itself as a fiduciary of the Committee and the Class with respect to this Agreement and the Assets, subject to the direction of the Committee, the terms and conditions of this Agreement, and the terms and conditions of the Settlement Agreement. As such, Asset Manger shall conduct itself in a prudent manner and shall act consistent with the best interests of the Class and the Committee with respect to the liquidation and collection of the Assets....

(D.I. 99, Ex. 6 at 4) On August 31, 1995, the court approved the AM Agreement and designated WEARCO, Inc. as the Asset Manager. (D.I.99, Ex. 6) The court stated that WEARCO is to "administer, collect and liquidate the Impounded Assets, for the benefit of the Class of Excess Depositors, pursuant to the terms and conditions of the Asset Management Agreement." (D.I.99, Ex. 6)

F. Marian Bank's Claims

On March 31, 1995, the Court of Common Pleas issued an order granting the Committee leave to file suit on behalf of Marian Bank. The court's order stated:

> [T]he Asset Management Committee is granted leave to designate counsel to institute such suits and/or to pursue and settle such claims in the name of Marian Bank as it deems necessary and appropriate to generate funds or value from any assets, loans, contracts, rights, claims and any and all other types and forms of causes of action of whatever nature, which were transferred to the Asset Management Committee for the benefit of the Class from the Receiver of Marian Bank under the Court ordered and approved Settlement Agreement.

(D.I.99, Ex. 5) In accordance with this order, the Committee filed a complaint against the defendants alleging antitrust violations relating to the MAC ATM network. (D.I.1, 110)

The complaint defines two separate markets: (1) an ATM Network Processing market, and (2) an ATM Network Access market. (D.I. 110 at 7) ATM Network Processing (also called ATM driving) is defined in the complaint as follows:

*7 [P]roviding the data processing services and telecommunications facilities and services used:
1. to operate, monitor, and support the operation of ATMs deployed by a depository institution;
2. to connect the ATMs deployed by a depository institution to that institution's deposit authorization records, for authorization and confirmation of "on-us transactions," and the record-keeping and other functions related to such transactions; and
3. to connect the ATMs deployed by a depository institution to one or more branded ATM networks for authorization and confirmation of "on-others transactions," and the record-keeping and other functions related to such transactions.

(D.I. 110 at 6) The complaint also explains that ATM network processing "can be performed in the facilities of the ATM switch, a depository institution's own facilities, or in the facilities of a data processing service organization." [FN5] (D.I. 110 at 6-7) Although "ATM network access" is not specifically defined in the complaint, the term

1997 WL 811552                                                                                                         Page 9
(Cite as: 1997 WL 811552, *7 (D.Del.))

"Regional ATM network access" is defined as "access to the ATM network as previously defined, and constitutes one of the relevant product/service markets herein." [FN6] (D.I. 110 at 6)

> FN5. An "ATM switch" is defined in the complaint as "a telecommunications and data processing facility used to receive and route transactions from ATMs or ATM processors to data processing facilities used by depository institutions to authorize ATM transaction requests." (D.I. 110 at 5) A "MAC switch" is defined as "an ATM switch operated by or on behalf of, or providing such functionality for branded ATM network access to, MAC or any successor branded ATM network controlled by defendants." (D.I. 110 at 5)

> FN6. "ATM network" is defined in the complaint as "an arrangement whereby more than one ATM and more than one depository institution (or the deposit records of such depository institutions) are interconnected by electronic or telecommunications means, to one or more computers, processors or switches for the purpose of providing ATM services to the depositors and credit card customers of the member depository institutions." (D.I. 110 at 6) "MAC" is defined as "the branded ATM network owned, controlled and operated by EPS since December 1992 and previously owned and operated by CoreStates." (D.I. 110 at 6)

As noted above, plaintiff's complaint sets forth five separate counts. Count I, asserted against defendants CoreStates, PNC, and Banc One, alleges a conspiracy to restrain trade in violation of § 1 of the Sherman Act. Count II, asserted against all named defendants, alleges a conspiracy to impose an illegal tying arrangement to tie ATM network access to ATM network processing in violation of § 1 of the Sherman Act. Count III, asserted against all named defendants, alleges monopolization and attempted monopolization in the markets for ATM network access and ATM network processing in violation of § 2 of the Sherman Act. Count IV, asserted against all defendants, alleges a conspiracy to monopolize the market for ATM network access. Finally, count V alleges that all defendants violated the Bank Holding Act, 12 U.S.C. § 1971 *et seq.*, by tying ATM network access to ATM network processing. As noted above, the court's earlier memorandum opinion and order dismissed the complaint against EPS entirely and dismissed counts III and IV (the non-conspiracy counts) against defendants PNC and Banc One. (D.I.71, 72)

The five counts in plaintiff's complaint all relate to the MAC practice of conditioning the purchase of ATM processing with the purchase of ATM network access (i.e., "no-third party processing" rule). [FN7] (D.I. 110 at 12) As a general matter, there is no dispute that until October 1994, EPS (and previously CoreStates) had implemented a "no-third party processing" rule in operating the MAC ATM network. (D.I. 47, Ex. 11 at 7,8) The "no-third party processing" rule required MAC members to either perform their own ATM processing or obtain it through MAC as part of a single ATM network product. Plaintiff alleges that this practice reduced competition in the markets for ATM network access and ATM network processing, which allowed defendants to overcharge MAC member institutions.

> FN7. In October 1994, the United States and EPS entered into a Consent Decree and Final Judgment in which EPS agreed, *inter alia*, to stop using the "no-third party processing" rule as a business practice. *United States v. Electronic Payment Services, Inc.*, Civ. No. 94-208, 1994 WL 730003 (D.Del. Oct.14, 1994).

*8 From 1986 until April 17, 1992, Marian Bank was a full service member of the MAC ATM network. (D.I. 106 at 16) As a member of the MAC ATM network, Marian Bank paid fees pursuant to a 1989 MAC participation agreement ("Marian Bank Participation Agreement"). (D.I. 51, Ex. 1 at 2) These fees were identified in the invoices as different "components" and charged monthly. The larger fee components included a minimum fee of $600.00 for "processor fees for card management services" and a minimum fee of $1000.00 for "transaction fees." (D.I. 51, Ex. 1 at 3) Marian Bank also paid $175.00 for "ATM operation fees" since it owned and operated one ATM. (D.I. 51, Ex. 1 at 3) The "Marian Bank" antitrust claims are based on the overcharging of MAC fees for the period from April 21, 1990 to April 17, 1992. (D.I. 110 at 8; D.I. 98 at 13; D.I. 99, Ex. 7 at 28-30)

G. The Marian State Bank's Claims

According to the Committee, "The Marian State Bank" antitrust claims are based on the same overcharging of MAC fees during the period from April 20, 1992 to April 17, 1994. (D.I. 106 at 2) On April 20, 1992, the first day it opened for business, The Marian State Bank started its participation in the MAC ATM network on essentially the same terms as the former Marian Bank. The Marian State Bank also

1997 WL 811552                                                                                                    Page 10
(Cite as: 1997 WL 811552, *8 (D.Del.))

continued to operate the former Marian Bank's ATM. Accordingly, The Marian State Bank paid essentially the same monthly fees that the former Marian Bank paid for its participation in the MAC ATM network. Indeed, the MAC invoices after August 1992 are addressed to the former Marian Bank. (D.I.99, Exs.8-10)

As noted above, The Marian State Bank specifically disaffirmed Marian Bank's MAC-ATM Agreement in a letter sent to the Secretary on May 19, 1992. (D.I.114, Ex. 3) On September 22, 1992, The Marian State Bank sent an application to the Pennsylvania Department of Banking regarding its desire to abandon the only ATM it was operating. (D.I.113) The Marian State Bank explained that abandonment of the ATM would result in significant savings. (D.I.113) The Marian State Bank also stated that it would continue to issue ATM cards so that its customers could use other ATMs in the MAC network. (D.I.113) The Department of Banking authorized The Marian State Bank to abandon its ATM on December 21, 1992. (D.I.113)

On December 24, 1992, The Marian State Bank informed the lessor of the ATM space, the armored car service, a protection and monitoring service, and MAC about its decision to abandon its operation of the ATM. (D.I.113) The Marian State Bank stated that it planned to cease operating the ATM effective January 29, 1993. (D.I. 106, Ex. F; D.I. 113). In its letter to MAC, The Marian State Bank expressed its desire to continue as a MAC member and an insurer of MAC ATM cards. (D.I.106, Ex. F)

On January 29, 1993, The Marian State Bank informed the Secretary that it had satisfied all applicable requirements in connection with its abandonment of the ATM. (D.I.113) MAC invoices after January 1993 do not contain the monthly $175.00 "terminal operation fee." (D.I.99, Ex. 9) In April 1993, The Marian State Bank settled its account with the leasing company that owned the ATM and the ATM's related equipment. (D.I.113)

*9 On February 12, 1993, MAC sent a letter addressed to the former Marian Bank regarding a new MAC agreement. (D.I.106, Ex. G) The Marian State Bank responded to this letter on February 18, 1993, stating that it had "numerous questions concerning the new MAC agreement sent to The Marian State Bank." (D.I.106, Ex. F) In April 1993, The Marian State Bank apparently executed a MAC Agreement. [FN8] (D.I. 106, Ex. G; 62 at C012)

According to plaintiff, although The Marian State Bank ceased operating its ATM in January 1993, MAC continued to charge it a $1600.00 minimum fee throughout the period from April 1992 to April 1994. (D.I. 106 at 19)

> FN8. The Committee points to a MAC document which appears to indicate that a MAC contract in the name of "Marian Bank" was issued on February 12, 1993 and became effective on April 15, 1993. (D.I. 62 at C012)

H. Assignment Between Marian Bank and Royal Bank

On September 26, 1994, The Marian State Bank was acquired by Knoblauch State Bank. (D.I.99, Ex. 12) In a letter to the Committee's attorneys, dated May 12, 1995, Knoblauch State Bank asserted that claims relating to "time periods subsequent to April 17, 1992 [were] [ ] [The] Marian State Bank's (now Knoblauch State Bank) assets." (D.I.99, Ex. 11) Knoblauch explained that it believed that The Marian State Bank owned the lease on the ATM since The Marian State Bank had (1) continued to use the ATM, (2) paid the rental fees for the ATM; and (3) filed an application to close the ATM. (D.I.99, Ex. 11)

On July 24, 1995, the Royal Bank of Pennsylvania ("Royal Bank") then acquired all the outstanding shares of Knoblauch State Bank. *See Knoll v. Butler*, 675 A.2d 1308 (Pa.Commw.Ct.1996). [FN9] (D.I.99, Ex. 12) Royal Bank also asserted that it had an interest in the post-April 17, 1992 claims relating to The Marian State Bank. The Committee's attorneys entered into negotiations with Royal Bank to resolve this dispute and the alleged deficiencies raised by defendants. The negotiations resulted in an "Assignment of Claims, Rights [[,] Interests and Causes of Action" ("Assignment") dated November 7, 1996. (D.I.99, Ex. 12) The Assignment was entered into by the Committee (on behalf of Marian Bank) and Royal Bank of Pennsylvania. (D.I.99, Ex. 12) The Assignment provides for the following:

> FN9. The escrow arrangement in which Royal acquired Knoblauch State Bank was unsuccessfully challenged by the Treasurer of the Commonwealth of Pennsylvania. *See Knoll*, 675 A.2d 1309.

1. In consideration for One Dollar ($1.00) and other good and valuable consideration, including but not limited to, the consideration set forth in paragraph 2 below, the receipt and sufficiency of which is

1997 WL 811552
(Cite as: 1997 WL 811552, *9 (D.Del.))

Page 11

hereby acknowledged, Royal hereby conveys, sells, assigns and transfers to the Marian Committee all rights, claims, interests and causes of action of Marian Bank arising out of or in any way related to the Marian MAC Contracts or the Marian ATM which may have been transferred to [The] Marian State Bank, if any, and all rights, claims, interests and causes of action of [The] Marian State Bank arising out of or in any way related to the Marian MAC Contracts or the Marian ATM, which it may now have or have had under the antitrust laws of the United States of America against any of the defendants named in *Marian Bank v. EPS*, C.A. No. 95-614 (hereinafter the "Litigation") with full right to maintain an action thereon to settle, compromise or reassign such cause of action, if any, and give a release of such claims in the name of Royal, [The] Marian State Bank, Marian Asset Management Committee, or Marian Bank, in full discharge of the liability thereunder.

*10 2. In consideration for the assignment set forth in paragraph 1 above, the Marian Committee and Marian Bank hereby agrees to pay to Royal fifty percent (50%) of any recovery by the Marian Committee and/or Marian Bank arising from the Litigation, the Marian MAC Contracts or the Marian ATM, whether that recovery is received by the Marian Committee or Marian Bank through verdict or settlement.

(D.I. 99, Ex. 12 at 2-3)

According to plaintiff, the Assignment "was effectuated to maximize and protect the 'assets' of Marian Bank so that a class action could be pursued for the entire class period, and recovery had." (D.I. 106 at 21) Wendell C. Ehinger, the president of WEARCO, Inc. (the Asset Manager) testified that he was present when the Committee met to discuss the Assignment. (D.I. 99, Ex. 7 at 22) Mr. Ehinger stated that the Assignment was "ultimately started by counsel." (D.I. 99, Ex. 7 at 22) According to Mr. Ehinger, counsel for the Committee asked the members to sign the Assignment. (D.I. 99, Ex. 7 at 24) Mr. Ehinger explained that he and the Committee members discussed the business reasons for signing the Assignment:
Q. Did you say anything about the assignment at the meeting?
A. Yeah. We discussed it and, you know, the reasons for it, and you know, basic business decision....
A. .... we looked at the pros and cons of, you know, why should we do it.

(D.I. 99, Ex. 7 at 23-24) After learning about Royal's assertion that it had an interest in the post-April 17, 1992 claims, the Committee members and Mr. Ehinger considered pursuing the lesser period of time. Mr. Ehinger, however, explained the business reasons for signing the Assignment:
A. ... It's a two-step process. They [Royal] had rights--they gave us all the rights and then we agreed to give them 50 percent of whatever the total we got, whether it was from our claim or their claim. They merged at that point.
Q. And I think you indicated you were--we talked about the pros and cons, you were taking a shot that the addition of that would outweigh the 50 percent that you were giving out. Correct?
A. We really didn't know and probably don't know and won't know until the case is decided how that sorts out. But from a business point of view, it seemed like a not unreasonable approach to take.
Q. If [ ] [The] Marian State Bank portion of the recovery is less than the 50 percent of the Marian Bank portion of recovery that you're giving away or providing in consideration for [The] Marian State Bank claim, the excess depositors and trade creditors of [the] former Marian Bank will have not benefited from this assignment. Correct?....
A. From a purely economic point of view, they would achieve less than they would have if it was the other way around. But by the same token, if it enables us to collect on the suit because it solved the problem, the other problem, then it would clearly-- even getting less would be better than getting you know, a lot less. And again, that's something we made a business decision that's worth whatever chance that may be.

*11 (D.I. 99, Ex. 7 at 56-58) In deciding to sign the Assignment, the Committee members relied upon counsel's advice. (D.I. 99, Ex. 7 at 60) Mr. Ehinger also stated that he considered this decision "more of a legal decision than a business decision." (D.I. 99, Ex. 7 at 60) Mr. Ehinger testified that he did not have any discussions with trade creditors or excess depositors of Marian Bank (except for the three Committee members who are excess depositors) regarding the Assignment. (D.I. 99, Ex. 7 at 35)

Thomas J. Baker, a member of the Committee also explained the business reasons for entering into the Assignment:
13. In the collection or liquidation of any portfolio of assets, causes of action and contract rights, you must be flexible. There is give and take in

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

connection with maximizing the value. In this matter, a reasonable and valid decision was made to trade 50% of our potential claim to get 50! of the total of two claims, and at the same time remove a dispute to our post April 17, 1992 assets which was being asserted by [The] Marian State Bank. This was not only sound logic, but permitted under all our agreements and court orders and was clearly in the best interests of both the depositors and creditors of the former Marian Bank, as well as the potential Class and the victims of Defendant's wrongdoing.

14. This decision was made to overcome a challenge by the Defendants to try to prevent the pursuit of this litigation when it was obvious that, unless this Plaintiff was permitted to proceed on its post April 17, 1992 claims, CoreStates, PNC, Banc One and EPS could be in a position to get away with not answering in damages (and thereby actually profiting for the unlawful conduct....

(D.I. 106, Ex. B at 7-8) Based on the terms of the Assignment, the Committee argues that it has obtained antitrust claims for the entire statutory period. According to plaintiff, by obtaining the claims for the entire statutory period, the Committee acted "to protect and maximize its ability to recover in this lawsuit" and that its action did not breach any fiduciary duty to the settlement class of excess depositors and trade creditors. (D.I. 106 at 26)

## III. DISCUSSION

As noted above, two motions are presently before the court: (1) defendants' motion for partial summary judgment on the asserted post-April 17, 1992 claims and (2) plaintiff's renewed motion for class certification. The court shall address defendants' motion first.

### A. Defendants' Motion for Summary Judgment

#### 1. Summary judgment standard

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ .P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 587. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Assn. v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995) (citation omitted).

*12 Defendants argue that summary judgment for the post-April 17, 1992 claims is warranted because the Committee lacks standing to assert a third party's claims through the assignment of the post-April 17, 1992 claims. [FN10]

> FN10. There is apparently no dispute that the assignment of antitrust claims complies with the Third Circuit's opinion in *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir.1994) (holding that, under controlling federal law, antitrust claims are assignable if they are specifically identified in the assignment of such claims).

#### 2. Analysis

This court determined previously that plaintiff did not have standing to pursue post-April 17, 1992 claims. [FN11] Plaintiff has amended its complaint in an attempt to overcome the court's objection and bridge the gap between its demise and the termination of the allegedly wrongful conduct. Plaintiff relies on the Assignment as the means to accomplish this goal. Defendants argue that the Assignment is invalid and unenforceable and, therefore, the Committee still lacks authority to pursue any post-April 17, 1992

1997 WL 811552                                                                                    Page 13
(Cite as: 1997 WL 811552, *12 (D.Del.))

claims. As support for their position, defendants cite to the general proposition that a party is not permitted to take an action for which it has no authority. [FN12]

> FN11. Plaintiff argues to the contrary, based on the May 19, 1992 letter from The Marian State Bank disaffirming the MAC-ATM contract. Given the continued use by and payment of such services by The Marian State Bank, the assertion of post-April 17, 1992 claims by both Knoblauch State and Royal Banks, and the absence of any evidence of record that the Receiver was ever held liable for any post-April 17, 1992 obligations, the court is not inclined to change its previous ruling.

> FN12. As examples of this general proposition, defendants cite cases involving trustees, special masters, contracts, and corporations. *See e.g., Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (holding that chapter 10 trustee did not have standing to assert, on behalf of holders of debentures issued by debtor, claims against indenture trustee); *Williams v. California First Bank*, 859 F.2d 664 (9th Cir.1988) (holding that a trustee of an estate lacked standing to bring suit against bank on behalf of debtor's creditors, even though creditors assigned to trustee their claims); *Equal Employment Opportunity Comm'n v. Local 638*, 81 F.3d 1162 (1st Cir.1996) (holding that a special master appointed by a magistrate does not have any more authority than that which Congress granted to magistrates); *Orange v. District of Columbia*, 59 F.3d 1267 (D.C.Cir.1995) (holding that contracts executed in excess of what was authorized are void and unenforceable); *Ministar Acquiring Corp. v. AMF, Inc.*, 621 F.Supp. 1252 (S.D.N.Y.1985) (holding that target corporation's defensive acts were illegal or ultra vires).

With respect to this case, the Committee's powers are governed by court-approved documents, the interpretation of which must be consistent as to each other within the context of the circumstances which required court intervention in the first instance. *See generally Anderson v. Stephens*, 875 F.2d 76, 79 (4th Cir.1989). The Committee was given the specific authority to institute lawsuits in the name of Marian Bank by the March 31, 1995 State court order. The order describes the Committee's authority in terms of generating funds from any claims and causes of action "which were transferred to the Asset Management Committee for the benefit of the Class from the Receiver of Marian Bank...." This is not broad language. The Committee was not given a free hand to pursue third party claims and causes of action in order to generate funds for the benefit of the class. The Committee certainly was not given specific authority to institute a lawsuit whereby counsel for Marian Bank would also be representing hundreds of unrelated, diverse financial institutions. In sum, the Committee was confined by the language of the court order to the context of the receivership proceeding.

Plaintiff points to § 2.2(g) of the AMC Agreement which empowers the Committee "to institute, join or defend actions ... and to take such other action ... deemed reasonable by the Committee .... in the name of the Committee ... to enforce any instruments, contracts, agreements, or causes of action relating to or forming a part of the Assets...." (D.I. 106 at 28; 99, Ex. 4 at 5) Section 2.2(g), however, specifically refers to actions taken in the name of the Committee and does not refer to actions taken in the name of Marian Bank. Moreover, the word "Assets" is a defined term in the F & S Agreement and again limits the Committee's activities to pursuing those "claims and causes of action owned by the Secretary as Receiver...." (D.I. 99, Ex. 2 at 16) Finally, § 2.2(m) of the AMC Agreement empowers the Committee to perform "any act authorized, permitted, or required under any cause of action relating to or forming part of the Assets ... unless such act would require the consent of the Class or the approval of the Court...." (D.I. 99, Ex. 4 at 6) The only court approval obtained is that described in the March 31, 1995 order, which limits the Committee's powers as described above. There simply is nothing in the record to indicate that such sweeping authority as plaintiff claims was ever given or even contemplated on behalf of the class of excess depositors and creditors by the State court or the Receiver. Because the court has not been persuaded that plaintiff has the authority to represent third-party claims and causes of action in a class action lawsuit as contemplated by plaintiff, [FN13] the court finds the Assignment unenforceable.

> FN13. In the years since this litigation was filed, the Committee apparently has not attempted to clarify its authority to pursue its contemplated role as class representative with either the class it presently represents or the State court. Neither has Royal Bank (or any other financial institution) applied for leave to intervene as a class representative.

B. Plaintiff's Motion for Class Certification

*13 Since the court has found the Assignment

1997 WL 811552                                                                                                          Page 14
(Cite as: 1997 WL 811552, *13 (D.Del.))

invalid, plaintiff seeks certification of a class of all depository institutions in Delaware, Pennsylvania, New Jersey, West Virginia, and Ohio that participated in the MAC ATM network and utilized defendants' ATM processing services, excluding defendants and their respective parents, subsidiaries and affiliates for the period April 17, 1990 through December 3, 1992. [FN14] (D.I. 110 at 20; 80 at 5-6) Plaintiff seeks to represent this proposed class in asserting antitrust claims relating to defendants' conduct in the markets for ATM network processing and ATM network access. (D.I. 80 at 5)

> FN14. As Marian Bank has noted, a plaintiff may represent a class of purchasers which purchased both before and after the plaintiff as long as the plaintiff has standing against the proposed defendant. (D.I. 80 at 6 n. 5) *See e.g., Gentry v. C & D Oil,* 102 F.R.D. 990, 495 (W.D.Ark.1984) (holding that plaintiff's claims do not have to extend throughout the class period). There is no evidence of record indicating, however, that plaintiff has standing to assert claims past its demise on April 17, 1992 and, therefore, its proposed date of December 3, 1992 is rejected.

The Third Circuit, in *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation* ("GM Trucks"), identified the basic purposes served by class actions in our legal system:

> One of the paramount values in this system is efficiency. Class certification enables courts to treat common claims together, obviating the need for repeated adjudications of the same issues. [ ]
> ....
> Class actions achieve "the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims." [ ]

55 F.3d 768, 783-784 (3d Cir.1995) (citations omitted). The use of class actions to spread litigation costs among numerous litigants with similar claims has been justified because, *inter alia,* "aggrieved persons may be without any effective redress unless they may employ the class-action device." *Id.* at 784 (quoting *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)). In noting these benefits of class actions in *GM Trucks,* the Third Circuit also identified concerns and problems related to class actions:

> [In a class action, the] absentees' interests are being resolved and quite possibly bound by the operation of res judicata even though most of the plaintiffs are not the real parties to the suit. The protection of the absentees' due process rights depends in part on the extent the named plaintiffs are adequately interested to monitor the attorneys (who are, of course, presumed motivated to achieve maximum results by the prospect of substantial fees), and also on the extent that the class representatives have interests that are sufficiently aligned with the absentees to assure that the monitoring serves the interest of the class as a whole....
> Another problem is that class actions create the opportunity for a kind of legalized blackmail: a greedy and unscrupulous plaintiff might use the threat of a large class action, which can be costly to the defendant, to extract a settlement far in excess of the individual claims' actual worth. Because absentees are not parties to the action in any real sense, and probably would not have brought their claims individually, [ ] attorneys or plaintiffs can abuse the suit nominally brought in the absentees' names....

*14 *Id.* at 784-785 (citations omitted and emphasis in original). Given these concerns and problems, the court has the obligation to act as the "protector of the absentees' interests, in a sort of fiduciary capacity, by approving appropriate representative plaintiffs and class counsel." *Id.* at 784. The concerns were specifically considered in designing the procedural requirements for class certification contained in Federal Rule of Civil Procedure 23. *Id.* at 785. Based on the record, the court must make findings pursuant to the requirements set forth in Rule 23(a) and (b). *Id.* at 778; *see also Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 625 (3d Cir.1996).

Subsection (a) provides that class certification is appropriate only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). With respect to the requirements under Rule 23(b), plaintiff seeks class certification under subsection (3). Under subsection (3), class certification is appropriate only if:

> the court finds that the questions of law or fact

1997 WL 811552                                                              Page 15
(Cite as: 1997 WL 811552, *14 (D.Del.))

common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). To obtain certification, plaintiff must establish that all four prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) are met. *Neal v. Casey*, 43 F.3d 48, 55 (3d Cir.1994); Fed.R.Civ.P. 23(a) and (b). The court shall address these prerequisites and requirements *in seriatim*.

**1. Numerosity**

Plaintiff asserts that several hundred depository institutions can be identified as part of the class. (D.I. 46 at 18; 47, Ex. 16; 80 at 12) The court notes that, in their answering brief to plaintiff's renewed class certification motion (D.I.100), defendants do not contest the numerosity prerequisite. To the extent that defendants argue that joinder is not impracticable, [FN15] the court still finds in favor of plaintiff.

> FN15. In their first brief opposing class certification, defendants argued that joinder was not impracticable because the class members are sophisticated commercial entities capable of protecting their own interests. (D.I. 54 at 29)

"The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *see also* 7A Charles A. Wright, et al., *Federal Practice and Procedure*, § 1762, at 153 (1986) (hereinafter "Wright, et al.") Accordingly, there is no "magic number" that satisfies this requirement. *Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D.Pa.1989). Nonetheless, the impracticability of joining parties numbering in the hundreds or more are generally obvious and easily satisfy the numerosity requirement. See Herbert Newberg & Alba Conte, 1 *Newberg on Class Actions*, § 3.05, at 3-24 (3d ed.1992) (hereinafter "H. Newberg & A. Conte"). The focus of a court's inquiry is whether joinder of all class members is "impracticable," not whether joinder is impossible. H. Newberg & A. Conte, § 3.04, at 3-17; 7A Wright, et al., § 1762, at 159. A plaintiff need only make a showing of "strong litigational hardship or inconvenience...." *Id.; see* 7A Wright, et al., § 1762, at 159 (stating that class "representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class").

*15 Plaintiff has established that joinder of all potential class members would involve hundreds of members. (D.I.47, Ex. 16) Furthermore, these potential class members are located throughout the five states identified in the complaint. Although some potential class members may be capable of bringing their own independent actions, the court finds that the practical difficulties of joinder weigh in favor of plaintiff given the large size and geographic diversity of the proposed class.

**2. Commonality**

Subsection (a)(2) requires that there exist "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This prerequisite is usually satisfied "if the named plaintiff[ ] share[s] at least one question of fact or law with the grievances of the prospective class." *Neal*, 43 F.3d at 56 (citations omitted). Since this prerequisite can be satisfied by a "single common issue, it is easily met...." *Id.* (citing H. Newberg & A. Conte, § 3 . 10 at 3-50 (1992)); *see Georgine*, 83 F.3d at 627 (declining to establish a "high threshold for commonality"). Furthermore, the commonality prerequisite does not require that all class members share identical claims. *See Neal*, 43 F.3d at 56.

According to plaintiff, common questions of law and fact exist since its claims involve a common element: whether defendants engaged in certain practices in restraint of trade. (D.I. 46 at 20) As support, plaintiff cites several antitrust class action cases where commonality was satisfied. *See e.g., Weiss v. York Hosp.*, 745 F.2d 786, 805 (3d Cir.1984); *see also State of Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 556 (D.Minn.1968); *see also Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 795 (10th Cir.1970). Some common questions plaintiff has identified are as follows:
(1) Whether ATM network access and ATM network processing are two separate and distinct products;
(2) Whether defendants' contracts and MAC's rules required its customers to purchase ATM network processing from MAC;
(3) Whether the relevant markets are the market for regional ATM network access and ATM network processing;
(4) Whether defendants possess monopoly power in the relevant markets; and

1997 WL 811552  
(Cite as: 1997 WL 811552, *15 (D.Del.))

Page 16

(5) Whether defendants formed a combination or conspiracy in interstate commerce to monopolize or attempt to monopolize the relevant markets.

(D.I. 46 at 21). Defendants do not dispute that these questions are common to the proposed class. Given the low threshold for this prerequisite, see Georgine, 83 F.3d at 610, the court finds that plaintiff has established that its claims involve common questions of law and fact with the proposed class.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Similar to the commonality prerequisite, the typicality prerequisite does not require that the plaintiff's legal theories and factual circumstances be identical to those of the proposed class. See Neal, 43 F.3d at 56; see also Hassine, 846 F.2d at 177 (citing Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.1985). "The typicality requirement is generally met if the named plaintiff[ ]'[s] claims arise from the same events and are based on the same legal theories as those of the absent class members." Christians Mortgage Corp. v. Delaware Mortgage Bankers Assn., 136 F.R.D. 372, 379 (D.Del.1991).

*16 The typicality prerequisite serves to "assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." Neal, 43 F.3d at 56 (citation omitted). Unlike commonality and numerosity, which evaluate the sufficiency of the class itself, " 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff." Hassine v. Jeffes, 846 F.2d 169, 177 n. 4 (3d Cir.1988). The Third Circuit has commented that "typicality is more akin to adequacy of representation" since "both look to the potential for conflicts in the class." Georgine, 83 F.3d at 632. The typicality inquiry, however, must nevertheless focus on whether the named plaintiff's "claims" or "defenses" are "typical," as provided for by Rule 23(a)(3). Accordingly, the typicality prerequisite "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." Georgine, 83 F.3d at 631 (citing Neal, 43 F.3d at 57)

Plaintiff's antitrust claims consist of (1) alleged conspiracies to restrain trade, impose a tie-in, and monopolize; (2) an alleged illegal tying arrangement; and (3) an alleged monopolization and attempted monopolization. Defendants argue that plaintiff's claims are atypical of the class because unique defenses exist. [FN16] According to defendants, plaintiff's claims are atypical of the class's claims because there exists the unique defenses of standing and lack of capacity as to Plaintiff. (D.I. 100 at 16-18) Defendants cite to their arguments relating to plaintiff's authority to assert post-April 17, 1992. Since unique defenses exist against plaintiff, defendants assert that class certification must be precluded.

> FN16. Defendants' arguments relating to conflicts and problems with classwide proof of certain required elements shall be addressed in discussing the adequacy of representation prerequisite and the predominance requirement.

Unique, dispositive defenses applicable to a named plaintiff may render its claims atypical. See Zenith Lab., Inc. v. Carter-Wallace, 530 F.2d 508, 512 (3d Cir.1976); see 5 James W. Moore, Moore's Federal Practice, ¶ 23.24[6], at 23-97 (3d ed.1997) (explaining that a unique defense that is central to the litigation precludes a finding of typicality). But see, In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Securities Litigation, 848 F.Supp. 527 (D.Del.1994) (holding that defendants' statute of limitations defenses are not unique to plaintiff and may be raised against all class members). As discussed above, the court has concluded that the Committee has not been given the authority to generate funds through the pursuit of third party claims and causes of action. Consistent with this conclusion, plaintiff has not and cannot satisfy the typicality prerequisite in Rule 23(a)(3).

### 4. Adequacy of Representation

Rule 23(a)(4) provides that a class action may be institute only if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4).

*17 The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees. [ ] This component includes an inquiry into potential conflicts among various members of the class [ ] because the named

1997 WL 811552                                                                                                    Page 17
(Cite as: 1997 WL 811552, *17 (D.Del.))

plaintiffs' interests cannot align with those of the absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class.

*Georgine,* 83 F.3d at 630. Defendants argue that plaintiff cannot adequately represent the class because (1) conflicts of interest are inherent in proving liability and (2) other conflicts exist based on plaintiff's unique status. The court shall address these arguments separately.

(a) **Conflicts in Proof of Liability**

An antitrust plaintiff, which seeks treble damages under § 4 of the Clayton Act, must prove (1) an antitrust violation; (2) fact of damage; and (3) amount of damage. *See Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 162 F.R.D. 471, 477 (E.D.Pa.1995) (citing, inter alia alia, *Weiss v. York Hosp.,* 745 F.2d 786, 805 (3d Cir.1984) and *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir.1977)); *See also Christiana Mortgage Corp.,* 136 F.R.D. at 380. The " 'fact of damage' " element is part of the proof of liability and must be distinguished from proving the amount of damages after liability has been established." *Christiana Mortgage Corp.,* 136 F.R.D. at 380 (citing Bogosian, 561 F.2d at 454-456). In the present case, the main allegation against defendants is the alleged illegal tying of ATM network processing with ATM network access. Plaintiff asserts that this tying arrangement allowed defendants to charge "supracompetitive" prices for services in the ATM network processing market. In order for a class member to establish "fact of damage" in relation to this alleged violation, it must prove that the MAC fees it paid involved an illegal overcharge.

According to defendants, the MAC fees charged to each member institution are different depending on numerous factors. Since there are differences in fees charged, defendants assert that inherent conflicts exist relating to the proof of the alleged "overcharge" in MAC fees. The MAC fee schedule is explained in the declaration of Philip Valvardi, the Director of Client Relations for EPS. (D.I.55, Ex. 1)

The MAC fee schedule provides for three categories of MAC participants: (1) an "intercept processor," (2) an "authorization processor," and (3) a "full service participant." (D.I. 55, Ex. 1 at 5-6) An intercept processor provides itself several services related to the ATM network, including operating its own ATMs and monitoring its own customer accounts. (D.I. 112 at 117-118) Since an intercept processor provides itself these services, it does not pay for card management services (processor fees), transaction fees, or ATM operation fees. (D.I. 55, Ex. 1 at 5; 112 at 118) An authorization processor also provides itself some services related to the ATM network. An authorization processor does not operate its own ATMs, but does provide for its own card management services. Accordingly, authorization processors do not pay fees for card management services (processor fees). (D.I. 55, Ex. 1 at 6; 112 at 119) Full service participants, like Marian Bank, pay fees to the MAC ATM network, which provides card management, transaction, and ATM operation services. (D.I. 55, Ex. 1 at 3-6)

*18 The MAC fee schedule also involves different fees depending on such factors as "the number of transactions, [the] number of cards outstanding, and the number of ATM machines operated by the participant financial institution in any given month." (D.I. 55, Ex. 1 at 6). Participants with more transactions, ATMS, and cardholders are charged lower fees. (D.I. 55, Ex. 1 at 6) In contrast, participants with a relatively small number of ATMs, cardholders, and transactions (like Marian Bank) are charged "minimum fees." (D.I. 55, Ex. 1 at 3; 106 at 16) MAC participants with a larger number of monthly transactions were not charged "minimum fees." (D.I. 55. Ex. 1 at 7)

Other aspects of the MAC fee structure identified by defendants include the following factors: (1) participants that had been "grandfathered" because they had previously been participants of other networks are charged different fees; (2) after the formation of EPS, different fee schedules were created for "MAC west and "MAC west" portions of the ATM network; (3) participants pay "interchange" fees that are pass-through charges from one participant to another; and (4) fees were affected by participation in other regional and national ATM networks.

Defendants argue that the difference in fee schedules creates a conflict among the different class members because each class member would be interested in proving that the specific fees it paid reflects the alleged overcharge. As examples, defendants note that intercept processors do not pay processor fees or ATM operation fees, and pay only certain transaction fees. Defendants assert that intercept processors,

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

therefore, would only be interested in proving that the fees it did pay reflect the alleged overcharge. (D.I. 100 at 23) Likewise, authorization processors and full service participants, defendants argue, would only be interested in proving that the specific fees they paid reflects the alleged overcharge. (D.I. 100 at 24) Defendants also assert that small and large financial institutions would have conflicting interests. According to defendants:

> A small institution would seek to prove that the expenses to the network for ATM transactions did not fall as the volume increased, in order to attribute as much of the higher prices paid by the smaller institution as possible to anticompetitive profits. A larger institution that received volume discounts and paid lower prices, by contrast, would argue that expenses to the network for transactions did fall as volume increased due to economies of scale, in order to show that the entire fee schedule, including the relatively cheaper prices paid by the large institutions, reflected anticompetitive profits. Counsel for the class can only assert one of these theories, and some class members would therefore lose out.

(D.I. 100 at 22-23; 54 at 23-24) Finally, defendants note that the complaint identified five separate geographic markets based on state boundaries. (D.I. 100 at 25) Defendants argue that class members from one state may have conflicting interests with class members from another state. As an example, defendants explain that a Pennsylvania class member may be able to establish that it was charged supracompetitive prices by comparing Pennsylvania fees to New Jersey fees. This damage theory, defendants argue, would benefit Pennsylvania class members (like Marian Bank) at the expense of New Jersey class members. (D.I. 100 at 26)

*19 Plaintiff argues that the conflicts identified by defendants are speculative. Plaintiff asserts that MAC's fee schedule is not complex and can be easily compared on a classwide basis to facilitate the calculation of each class members' damages. Plaintiff has proposed three different methods to determine the amount of overcharge for the class:
(1) Comparing MAC's prices to competitor third party processors;
(2) Comparing MAC's prices to those of other ATM networks; and
(3) Comparing MAC's profits to those of competitors.

(D.I. 80 at 20) Plaintiff notes that damage calculations may be based on computer summaries of each class members' charges, which can be easily obtained since the entire network is computerized. (D.I. 80 at 20) Plaintiff argues that those MAC members that paid the monthly minimum actually have a greater incentive to protect the interests of the class since they were overcharged the most. (D.I. 107 at 6, n. 5) Plaintiff also notes that any potential conflicts between class members are minimal since full service participants constituted 74% of MAC members. (D.I. 80 at 20; D.I. 47, Ex. 10 at E1348) Finally, plaintiff argues that it has no intention of comparing prices on a state-by-state basis. (D.I. 107 at 7-9) Instead, plaintiff asserts that its damage theories involve comparing prices between different ATM networks or between different ATM network processors. (D.I. 107 at 8)

In considering the parties' arguments, the court finds that the potential conflicts based on the MAC fee structure do not preclude satisfaction of the adequacy of representation prerequisite. Defendants have not challenged plaintiff's proposed methods of calculating the alleged overcharge. Indeed, the court notes that defendants' method of calculating the alleged overcharge would prevent any class member from being an adequate representative. [FN17] The Third Circuit in *Bogosian* explained that

> FN17. The court is mindful of the Seventh Circuit's admonition:
> It is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified ... [This] is a bit like permitting a fox, although with pious countenance, to take charge of the chicken house.
> *Eggleston v. Chicago Journeyman Plumbers*, 657 F.2d 890, 895 (7th Cir.1981).

[w]hen an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of impact [damages] cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

561 F.2d at 454. Under the facts of the present case, the court finds that classwide proof that all MAC fees involved an overcharge may be demonstrated by plaintiff's proposed theories. [FN18] There is no indication in the record that these

1997 WL 811552                                                                                         Page 19
(Cite as: 1997 WL 811552, *19 (D.Del.))

methods would create conflicts or would not be feasible. [FN19] *See Bogosian*, 561 F.2d at 455 (commenting that common proof of impact may be established even if prices fluctuated within a range and were different in different regions, as long as they were higher in all regions than the range which would have existed in all regions under competitive conditions).

> FN18. With respect to the five different geographic markets identified in the complaint, plaintiff would be precluded from determining fact of damage based on a state-by-state comparison. *See Bogosian*, 561 F.2d at 452 n. 12.

> FN19. Of course, should evidence of conflicting interests arise during the course of litigation, the court would consider motions for decertification of the class pursuant to Fed.R.Civ.P. 23(c).

**(b) Conflicts Based on Marian Bank's Status**

*20 Defendants also identify conflicts relating to plaintiff's unique status. According to defendants, conflicts exist because plaintiff is a former MAC customer and has fiduciary duties to the class of excess depositors and creditors. Defendants assert that current customers might have an interest in negotiating a resolution that involved credits or the operation of the network. Former customers, defendants allege, would have no incentive to pursue such a resolution. This conflict is further magnified by the fact that plaintiff owes a fiduciary duty to the class of excess depositors and creditors and, in reality, is no longer a financial institution pursuing its corporate interests.

Plaintiff argues that there is no indication in the record that the interests of former MAC participants are in conflict with those of current MAC participants. According to plaintiff, defendants' allegation that there may be conflicts relating to possible settlement issues is not particularly relevant since injunctive relief relating to the challenged conduct has already been obtained. *See United States v. Electronic Payment Services, Inc.*, Civ. No. 94-208, 1994 WL 730003 (D.Del. Oct.14, 1994). Nevertheless, assuming for purposes of this discussion that the Committee has the authority to pursue third party claims and causes of action in order to generate funds on behalf of the Class of excess depositors and creditors, it is not clear to the court that the individual interests of the present class would not conflict with the corporate interests of the financial institutions contemplated to be members of the proposed class. Certainly plaintiff's client is a completely different animal than the other proposed class members. And aside from the common interest present among plaintiffs in every case--that of maximizing the return on litigation--the court is unaware of any further commonality. Thus the court is unpersuaded that plaintiff could be an adequate representative of the proposed class of financial institutions.

**5. Predominance of Questions of Law and Fact**

Rule 23(b)(3) provides that a class may be certified if, *inter alia*, "the court finds that the questions of law or fact common to the class predominate over any questions affecting only individual members...." Fed.R.Civ.P. 23(b)(3). In determining whether the common questions of law and fact predominate, the court must focus on the issues required to establish liability. *Christiana*, 136 F.R.D. at 382. Predominance may be established if the resolution of certain common issues significantly advances the litigation "even if their resolution does not alone establish liability." *Id.* (citing *In re School Asbestos Litigation*, 789 F.2d 996, 1010 (3d Cir.1986)).

Plaintiff's five counts against the defendants are as follows: (1) conspiracy to restrain trade; (2) conspiracy to impose an illegal tying arrangement; (3) unlawful monopolization and attempted monopolization; (4) conspiracy to monopolize; and (5) illegal tying arrangement under the Bank Holding Act, 12 U.S.C. § 1971 *et seq*. As already noted, in order to establish liability for these counts, plaintiff must establish (1) a violation of the antitrust laws; (2) fact of damage; and (3) amount of damage. *See Bogosian*, 561 F.2d at 454-456.

*21 To establish an antitrust violation under § 1 of the Sherman Act, 15 U.S.C. § 1, plaintiff must prove (1) the existence of a conspiracy, combination, or contract; (2) a restraint on trade; and (3) an effect on interstate commerce. *See Christiana Mortgage Corp.*. 136 F.R.D. at 382 (citing *Weiss v. York Hosp.*, 745 F.2d 786, 812 (3d Cir.1984). To establish monopolization or attempted monopolization in violation of § 2 of the Sherman Act, plaintiff must prove (1) possession of monopoly power in a relevant market (or a dangerous probability of achieving monopoly power); (2) a specific intent to monopolize; and (3) that defendants engaged in predatory or anticompetitive conduct. *See Spectrum Sports, Inc. v. McQuillian*, 506 U.S. 447, 113 S.Ct.

1997 WL 811552                                                                                                              Page 20
(Cite as: 1997 WL 811552, *21 (D.Del.))

884, 122 L.Ed.2d 247 (1993); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). To establish an illegal tying arrangement, plaintiff must prove (1) that the tied and tying products are separate, distinct products/ services; [FN20] (2) the seller has "appreciable economic power" in the tying product; and (3) the tying arrangement affects a substantial amount of commerce in the tied market. *See Eastman Kodak Co.*, 504 U.S. at 462-646; *see also Jefferson Parish Hosp.*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). A tying arrangement is "an agreement by a party to sell one [tying] product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citation and internal quotes omitted).

> FN20. For two items to be considered separate and distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide the items separately. *See Jefferson Parish Hosp.*, 466 U.S. at 21-22; *see also Eastman Kodak Co.*, 504 U.S. at 462.

Plaintiff argues that common questions of law and fact predominate because defendants' actions are common to all class members and because most of the common elements of liability may be established without examining the effect on individual class members. According to plaintiff, the proof of a conspiracy to monopolize and impose a tying arrangement can be established on a classwide basis. As an example, plaintiff points to one of defendants' documents entitled, "Third Party Processing Study." (D.I.47, Ex. 16) Plaintiff contends that this document would be utilized at trial to prove that MAC's third-party tying rule was applied to all members of its ATM network, including Marian Bank; that the most "severe consideration for preserving the tie was to protect MAC's revenues and prevent the incursion of competition []; that the tying arrangement facilitated monopolization of ATM network access and that MAC knew that competitor third-party processors and ATM networks were anxious to enter the MAC market and could do so only if MAC lifted its anticompetitive restrictions.

(D.I. 107 at 10-11)

Defendants do not challenge plaintiff's assertion that many common elements of liability may be established on a classwide basis. Indeed, the proof of a conspiracy to restrain trade is generally considered a common question that predominates over other issues. *See* 7B Wright, et al., § 1781, at 4; *see e.g., Eisen v. Carlisle & Jacquelin*, 391 F.2d 555 (1968). Despite these common issues, defendants argue that common issues do not predominate because the required elements of fact of damage and coercion cannot be proved on a classwide basis. According to defendants, these elements will predominate over the other common questions of law or fact.

*22 For the reasons stated above, the court is not persuaded by defendants' assertion that fact of damage can only be proven on an individual basis. The court is also unpersuaded by defendants' assertion that "coercion" can only be evidenced on an individualized basis. [FN21]

> FN21. *Compare Bogosian*, 561 F.2d 434, and *Bogus v. American Speech & Hearing Assn.*, 582 F.2d 277 (3d Cir.1978), and *Little Caesar Enterprises v. Little Caesar Enterprises*, 172 F.R.D. 236 (E.D.Mich.1997) *with Kellam Energy, Inc. v. Duncan*, 668 F.Supp. 861 (D.Del.1987) (citing *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)).

(6) Superiority of the Class Action

The second requirement under Rule 23(b)(3) is that the court find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Generally, if common questions are found to predominate in a proposed antitrust class action, courts have found that the class action is a superior method of settling the controversy. *See* 7B Wright, et al., § 1781, at 23. Four factors, however, should be considered in making this determination: (1) whether other members wish to control the action or bring separate actions; (2) whether other suits have already been commenced; (3) whether it is desirable to concentrate litigation in a particular forum; and (4) whether difficulties are likely to be encountered in managing the class action. *See Christiana Mortgage Corp.*, 136 F.R.D. at 385.

Defendants argue that the class action is not superior because the individual members of the proposed class are capable of bringing their own claims. Defendants note the proposed class is not a class of individuals,

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1997 WL 811552                                                                                          Page 21
(Cite as: 1997 WL 811552, *22 (D.Del.))

but rather a class of financial institutions. According to defendants, such class members certainly have the resources and incentive to litigate the proposed claims assuming they were valid. In response, plaintiff asserts that many class members are actually small institutions with one or two branches. Plaintiff argues that the class action is the superior method of adjudication because, *inter alia,* many institutions fear bringing individualized claims against "the most powerful banking interests in the Mid-Atlantic." (D.I. 107 at 17)

The record indicates, and the parties have noted, that no other class members (apart from possibly Royal Bank) have filed their own actions or otherwise indicated an interest in this action. Thus, the first two factors do not preclude certification. The third factor favors certification since there is a potential for inconsistent judgments if similar suits were initiated in other forums. The fourth factor does not disfavor certification since the court has no reason to believe that the proposed class could not be managed properly. Finally, the court is unpersuaded by defendants' argument that the class action device is not appropriate because the class members are sophisticated commercial entities. Defendants have not challenged the assertion that the class includes many small financial institutions. Accordingly, the court finds that the class action would be an appropriate method for adjudicating this controversy.

### III. CONCLUSION

For the reasons stated above, the court holds the Assignment of the post-April 17, 1992 claims is invalid and unenforceable because plaintiff lacks the authority to pursue third party claims. For the same reasons, the court also concludes that plaintiff has not satisfied the prerequisites of class certification under Fed.R.Civ.P. 23. Consequently, the court shall grant defendants' motion for partial summary judgment and deny plaintiff's motion for class certification. An appropriate order shall issue.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works