# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-CV-1324KAJ |
| v. | ) ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## EAMES PLAINTIFFS' REPLY BRIEF IN SUPPORT
## OF THEIR MOTION FOR CLASS CERTIFICATION

MURPHY SPADARO & LANDON
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

Attorneys for plaintiffs Thomas A. Eames,
Roberta L. Eames and Tammy Eames (on behalf of
themselves and all others similarly situated)

June 2, 2006

132172

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................................................6

I. THE EAMES PLAINTIFFS EASILY QUALIFY AS CLASS MEMBERS ...............................6

   A. The June 2003 Representation Was Made
      in Connection With the Purchase of New Coverage .............................................................6

   B. The February 2003 Representation Was Made Just Days Before
      (and in Connection With) the March 2003 Renewal .............................................................7

   C. The "In Connection With" Standard is Broad and Sweeping ...............................................9

   D. The Court Should Avoid a Hypertechnical Approach ........................................................ 10

   E. The Consumer Fraud Act Reaches Any Misrepresentations
      Made in Connection With a Sale ................................................................................... ......11

II. NATIONWIDE'S AGENTS ARE AGENTS FOR ALL PURPOSES .....................................12

   A. Agency Has Already Been Established for Particular Document Types ...........................13

   B. Nationwide Controls its Captive and Exclusive Agents ....................................................14

   C. At a Minimum, Nationwide's Agents are Vested With Apparent Authority ............ ........15

III. THE CLASS IS READILY ASCERTAINABLE ..................................................................16

IV. THE CLASS REPRESENTATIVES ARE MORE THAN ADEQUATE .............................17

CONCLUSION............................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) ...........................................................3, 11

Barnes v. Am. Tobacco Co., 161 F.3d 127 (3d Cir. 1998),
cert denied, 526 U.S. 1114 (1999) ............................................................................................5

In re Catanella and E.F. Hutton & Co., Inc. Sec. Litig.,
583 F. Supp. 1388 (E.D. Pa. 1984) ..........................................................................................20

Chiang v. Veneman, 385 F.3d 256 (3d Cir. 2004)......................................................................3

Coregis Ins. Co. v. Am. Health Foundation, Inc., 241 F.3d 123 (2d Cir. 2001).......................9

In re DaimlerChrysler A.G. Sec. Litig., 216 F.R.D. 291 (D. Del. 2003).................................5

Eisen v. Carlisle & Jacqueline, 417 U.S. 156 (1974) ...............................................................5

Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985),
cert. denied sub. nom., Weinstein v. Eisenberg, 474 U.S. 946 (1985) ...................................11

Fisher v. Townsends, Inc., 695 A.2d 53 (Del. 1997)......................................................4, 13, 14

Fort Howard Corp. and Subsidiaries v. Comm'r, 103 T.C. 345 (1994),
modified on other grounds, 107 T.C. 187 (1996) ....................................................................9

Impex Shrimp & Fish Co. v. Aetna Cas. & Sur. Co., 686 F. Supp. 183 (N.D. Ill. 1985)............ 20

Lewis v. Curtis, 671 F.2d 779 (3d Cir. 1982)...........................................................................5

Liberty Mut. Ins. Co. v. Enjay Chem. Co., 316 A.2d 219 (Del. Super. Ct. 1974)................. 15-16

In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527 (D. Del. 1994)...............................5

Montalvo v. Tower Life Building, 426 F.2d 1135 (5th Cir. 1970)............................................8

Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North Am., Inc.,
558 A.2d 1066 (Del. Super. Ct. 1989), aff'd, 596 A.2d 1358 (Del. 1991)..............................12

In re NASDAQ Market-Makers Anti-Trust Litig.,
169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................................19

Robidoux v. Celani, 987 F.2d 931 (2d Cir. 1993) ....................................................................11

Sanders v. Circle K Corp., 137 F.R.D. 292 (D. Ariz. 1991)................................................................13

Sears Mtge. Corp. v. Rose, 634 A.2d 74 (N.J. 1993) ....................................................................13

Tandy v. Marti, 213 F. Supp.2d 935 (S.D. Ill. 2002)....................................................................20

In re The Prudential Ins. Co. of America Sales Practices Litig.,
148 F.3d 283 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999)...................................................3

Thomas v. Harford Mut. Ins. Co., C.A. No. 01C-01-046HDR,
2003 WL 21742143 (Del. Super. Ct. July 25, 2003) ....................................................................12

In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231 (D. Del. 2002),
aff'd, 391 F.3d 516 (3d Cir. 2004) ....................................................................20

Weisfeld v. Sun Chem. Corp., No. 02-4478,
2004 WL 45152 (3d Cir. Jan. 9, 2004) ....................................................................11

**Other Authorities**

6 Del. C. §2512 ....................................................................10

6 Del. C. §2513 ....................................................................9

In their opening brief on the pending motion for class certification, plaintiffs Thomas A. Eames, Roberta L. Eames and Tammy Eames (the "Eames plaintiffs") showed that:

• In connection with the sale of the Eames's original policy in 1994, Nationwide's agent (the Culver agency) shared with Mr. Eames the rate quote reproduced at page A1 of the Eames plaintiffs' appendix.  Thomas Eames dep. at 35-36, 40 (A149-50).[1]

• On its face, that rate quote characterizes PIP as "full."

• Also in connection with the original policy's purchase, Nationwide's agent shared with Mr. Eames a variety of other documents that likewise characterize PIP as full.  Id. at 25 (A147).

• Mr. Eames testified fourteen times that Linda Sanders of the Culver agency told him orally that the policy would include full PIP coverage.  Id. at 23-25, 29-30, 32 (A146-48).

• Mrs. Eames testified that she and her husband received the rate quote shown at page A1 of the Eames plaintiffs' appendix (with its characterization of PIP as "full") simultaneously with the policy itself.  Roberta Eames dep. at 36-37 (A166-67).

• Prior to the policy's sale, Nationwide's agent told Mrs. Eames by telephone that the policy would include full PIP coverage.  Id. at 38, 44-47 (A167-69).

• In February 2003 -- just days before the March 2003 policy renewal -- Nationwide's agent provided Mr. and Mrs. Eames with the "vehicle screen" printout shown at page A31 of the Eames plaintiffs' appendix.  Id. at 39-40 (A167).

• In June 2003, *while selling new insurance to the Eameses for a new vehicle*, the Culver agency provided Mr. and Mrs. Eames with the memorandum of insurance shown at page A32 of the Eames plaintiffs' appendix.  Id. at 40-41 (A168).

---

[1] As before, references to the alphanumeric sequence beginning with "A__" are to the appendix that accompanied the Eames's opening brief.

1

- All three documents -- the 1994 rate quote, the March 2003 vehicle screen, and the June 2003 memorandum of insurance -- contained the "full" usage. A1, A31, A32.

- All three document types are created by Nationwide's Agency Office Automation ("AOA") software. Szlosek dep. at 105-07, 111, 127-34 (A112-14, A118-20).

- The AOA system affirmatively requires the agent to employ the "full" usage on the PIP line entry for all the document types in question. Id. at 96, 98-99 (A110-11).

- According to Nationwide's Rule 30(b)(6) designee, the AOA software exists expressly "to enter new clients' information relative to the sale of insurance." Id. at 43 (A97).

- According to Nationwide's designee, its Delaware agents "have no other way of submitting a piece of business" than to use the AOA software. Id.

- According once more to Nationwide's designee, agents who quote rates to prospective purchasers of auto insurance do so on Nationwide's behalf. Id. at 116, 121-22 (A115-17).

- Nationwide's designee agreed that the Eames plaintiffs have successfully alleged deceptive practices "in connection with the sale of personal injury protection in the State of Delaware." Id. at 13 (A89).

- Nationwide's Delaware agents are captive, exclusive agents, prohibited under their contracts with Nationwide from selling any other insurer's auto products. Deaton dep. at 5-6 (A49-50); Szlosek dep. at 16-21 (A90-91).

- Nationwide's Delaware agents are contractually required by Nationwide to use only Nationwide's computer software. Deaton dep. at 9-10 (A50-51).

- Nationwide's agents must send and receive their e-mails on Nationwide's file server. Id. at 10 (A51).

132172                                  2

• Nationwide's Delaware agents are compensated strictly through commissions on the sale of Nationwide products. Szlosek dep. at 28 (A93).

• Nationwide's agents advertise by displaying the Nationwide logo and no other. Id. at 34-36 (A95).

• Nationwide's agents display Nationwide's signage to the public. Id. at 31 (A94).

In other words, the Eames plaintiffs have presented evidence confirming Nationwide's uniform employment of the "full PIP" usage in the sale of Delaware auto policies. We have established what the uniform representation is (the characterization of PIP as "full"); how it is imposed on Nationwide's insurance agents (through the mandatory use of the AOA software); the document types by which it is conveyed to consumers (including rate quotes, rate quote letters, memoranda of insurance, etc.); and the commercial motivation that drives the deception (Nationwide's unfavorable loss ratios for PIP coverage). This is an overwhelming case for class certification.

We have also shown that allegations of a common scheme of consumer fraud make the classic case for certification. See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997) (observing that the predominance standard under Rule 23 "is a test readily met" in cases alleging consumer fraud); In re The Prudential Ins. Co. of America Sales Practices Litig., 148 F.3d 283, 314-15 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999) (allegations of common scheme to defraud policyholders met predominance test). We have shown, too, that for purposes of class certification "the substantive allegations of the complaint must be taken as true." Chiang v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004).

Nationwide's response may be fairly distilled to three categories. First and foremost is the conclusory denial. Though all the allegations and the entire discovery record point to a single, uniform representation (the characterization of PIP as "full"), Nationwide insists that some wide variety of representations is at play. Curiously, Nationwide never says what these phantom representations are, or where they might be found in the discovery record. Nor does Nationwide address its designee's crucial testimony, confirming that whenever Nationwide purports to combine minimum PIP limits with zero deductible (as is almost always the case in the purchase of minimum PIP limits), the AOA system affirmatively demands that the "rate quotes", etc., read "PIP . . . FULL." See Szlosek dep. at 96, 98-99 (A110-11).

Nationwide's second line of attack is to simply disavow everything done by its insurance agents. The mainstay of this argument is the affidavit of one Mr. Holtkamp, who tells us that the agents are independent contractors. One problem with this argument is that (as shown below) independent contractors can also be agents under the law of agency. See Fisher v. Townsends, Inc., 695 A.2d 53, 58 (Del. 1997) (confirming that "there are agent-independent contractors and non-agent independent contractors.") A second, more fundamental problem is that the question of whether Nationwide's agents are or are not independent contractors turns on specific factors, all of which confirm that the agents are *not* independent contractors at all. See id., 696 A.2d at 59-60 (setting forth the legal framework to be applied to the agents' captive status, their mandatory use of Nationwide's software and file server, etc.).

Nationwide's third line of attack consists of trivial and out-of-context criticisms of the class representatives themselves. Here Nationwide insists that if a particular named plaintiff fails to define the term "interrogatory", or fails to recall verbatim every word from a twelve-year-old conversation, then that plaintiff cannot properly serve as a class representative. These criticisms

fail under the relevant case law -- all of which was cited prominently in our opening brief, and none of which is remotely addressed by Nationwide. See In re DaimlerChrysler A.G. Sec. Litig., 216 F.R.D. 291, 300 (D. Del. 2003) (quoting In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527, 559-60 (D. Del. 1994) for the proposition that the Third Circuit holds plaintiffs to a "very minimal requirement of knowledge about the litigation and the facts upon which it is based.") Accord, Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir. 1982) (class representative found to be adequate despite "a complete ignorance" of the case).

***

Ultimately the Court's task is a simple one. It does not involves a detailed inquiry into the merits, Nationwide's insistence to the contrary notwithstanding. Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 177-78 (1974) ("We find nothing in either the language or history of Rule 23 that gives the Court any authority to conduct a preliminary inquiry into the merits of the suit in order to determine whether it may be maintained as a class action"); Barnes v. Am. Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998), cert denied, 526 U.S. 1114 (1999) (same). Nor is there any question that the amended complaint alleges uniform misrepresentations and class-wide injury. See D.I. 150 at 10 (Court concludes that the original complaint alleged both uniform misrepresentations and class-wide injury). When these allegations are taken as true (as they must be), class certification logically follows.

Nationwide's rejoinder is that the Court need not blindly accept allegations that are wholly lacking in evidentiary support -- as though this were the state of the record. But what Nationwide really seeks is a sort of judicial nullification, under which the Court begins by assuming the jury's function and ends by rejecting outright any evidence unfavorable to Nationwide. For how else could the Court find that no offending representations were made to

Mr. and Mrs. Eames, when both have testified to the contrary? How else could the Court

conclude that individualized proofs are needed in the face of overwhelming evidence of a

uniform, computerized scheme?

But nullification is not properly an option. If (as the Third Circuit teaches us in Chiang)

the amended complaint's well pled allegations must be taken as true, then certainly Nationwide's

admissions must be taken as true. So when Nationwide's designee admits the practical

impossibility that any class member (including Mr. and Mrs. Eames) could escape the "full"

usage, there is nothing left to argue. See Szlosek dep. at 94-99 (A110-11) (confirming the AOA

software's immutable imposition of the "full" usage on every transaction).

## ARGUMENT

## I. THE EAMES PLAINTIFFS EASILY QUALIFY AS CLASS MEMBERS

### A. The June 2003 Representation Was Made in Connection With the Purchase of New Coverage

Nationwide argues that Mr. and Mrs. Eames are not members of the class because

they were not on the receiving end of the "full" usage at any time since August 20, 2001. But

this is wrong both factually and legally.

Mrs. Eames testified that in June 2003 she purchased a new vehicle to replace the one

that was damaged in the February 2003 collision. Roberta Eames dep. at 40-41 (A167-68). She

confirmed that while selling her insurance for that new vehicle, the Culver agency gave her the

memorandum of insurance reproduced at page A32 of the Eames plaintiffs' appendix:

> Q: Please look at Exhibit C. *** Have you seen this document before?
>
> A: Yes.
>
> Q: When did you first see this document?

A: When I purchased my insurance.

Q: You saw this document when you purchased your insurance?

A: For my Ford Explorer.

***

This we purchased in June 2003 when I replaced the vehicle that
was in the accident. This is my Ford Explorer. Yes, I saw it the
day they printed it out in June of 2003.

Id. at 40-41 (A167-68). This testimony is corroborated by the document itself, which shows that
it was created on the same day (June 17, 2003) on which the new coverage for the Explorer
commenced. A32. It is likewise corroborated by the fact that the document was produced in
discovery by the Eames plaintiffs, who could only have received it from the Culver agency prior
to the lawsuit. It is corroborated, too, by Mr. Deaton, who testified that memoranda of insurance
are typically provided to consumers as proof of the sale, and immediately on receipt of the
premium for new coverage. Deaton dep. at 15-17 (A52).

Mr. and Mrs. Eames thus received a memorandum of insurance from the Culver agency
in June 2003 -- squarely within the time frame targeted by the class definition -- that clearly set
forth the "full PIP" usage. Consistent with Mr. Deaton's description of the process, they received
that document as proof of insurance, and as part of their purchase of new coverage for a new car.

### B. The February 2003 Representation Was Made Just Days Before (and in Connection With) the March 2003 Renewal

On February 8, 2003 -- one day after the Eames's auto collision -- Nationwide's agent
gave Mrs. Eames the "vehicle screen" printout shown at page A31 of the Eames plaintiffs'
appendix. Roberta Eames dep. at 39-40 (A167). Like every other such printout Nationwide

creates in Delaware, this one characterized PIP as full. A31. But what Nationwide fails to appreciate is that it was given to Mrs. Eames just days before the March 2003 renewal.

In fact, Nationwide acts as though the Eames's policy is a single transaction for all time -- a sort of "policy without end", issued in 1994 and still in effect today. But the original policy specified a definite term of just six months, from September 22, 2002 to March 22, 2003. Ex. A (policy declarations produced by Nationwide). In order to continue the policy, both sides had to affirmatively approve a renewal; and so successive renewal policies came into existence, from March to September, September to March, on a repeated six-month basis. See A32.

The Fifth Circuit rejected Nationwide's "single sale" approach to renewal policies in Montalvo v. Tower Life Building, 426 F.2d 1135 (5th Cir. 1970). There the plaintiffs brought claims under the Fair Labor Standards Act; and in order to determine the applicability of the statute, it was necessary to determine whether the defendants had annual gross sales of at least $1 million. Montalvo, 426 F.2d at 1139-41. The defendants claimed to have lesser annual sales, but that claim relied on their refusal to treat renewal premiums as sales. The Fifth Circuit rejected that approach as "totally devoid of merit":

> [D]efendants contend that "renewal" premiums should not be considered "sales" because "a life or health and accident insurance policy is a single contract subject to a single sale which takes place at the time the first premium is paid on the policy issued." ***
>
> This argument is totally devoid of merit. It involves a hypertechnical approach to the buying and selling of insurance protection which is totally unwarranted by economic reality. *** The insurer's receipt of a renewal premium evidences a sale of insurance protection for a specified period in exactly the same manner as the insurer's receipt of the initial premium.

Montalvo, 426 F.2d at 1141-42.

Nationwide's agent thus told Mrs. Eames in writing that the insurance product offered "full" PIP, just days before the March 2003 renewal sale. Like the 1994 rate quote and June 2003 memorandum of insurance, this representation went to the very heart of the thing sold -- the nature and amount of PIP coverage. It is simply unrealistic to pretend that such representations are somehow *disconnected from* the thing sold. Because they are not, the 2003 "vehicle screen" falls squarely within the Consumer Fraud Act's reach.

### C. The "In Connection With" Standard is Broad and Sweeping

Nationwide takes the narrowest view possible of the Consumer Fraud Act's reach. This is emphatically wrong.

By its plain terms, the Consumer Fraud Act reaches any misrepresentation or omission made "in connection with" the sale of insurance products. 6 Del. C. §2513(a). The phrase "in connection with" could hardly be broader. As the Second Circuit has observed, courts treat the phrase as equivalent to "relating to" and "associated with." Coregis Ins. Co. v. Am. Health Foundation, Inc., 241 F.3d 123, 128-29 (2d Cir. 2001) (collecting cases). Courts have thus treated "in connection with" as broader than the phrase "arising out of." Id. at 129 (citations omitted). The U.S. Tax Court has likewise held that the "ordinary, everyday sense" of "in connection with" is "logically related." Fort Howard Corp. and Subsidiaries v. Comm'r, 103 T.C. 345, 351-52 (1994), modified on other grounds, 107 T.C. 187 (1996) (citations omitted).

When Nationwide tells a purchaser that one of the principal coverages offered is "full" coverage, that representation has an obvious connection to the product's sale. It portrays the product as superior in quality and amount, and tends to encourage the purchaser to buy. To pretend otherwise -- to say that when the insurer trumpets its coverage as "full", that that characterization bears no relation to the product's sale -- is perverse and naïve.

Add to this the General Assembly's clear statement of legislative intent: "It is the intent of the General Assembly that such [deceptive] practices be swiftly stopped and that this subchapter shall be *liberally construed and applied* to promote its underlying purposes and policies." 6 Del. C. §2512 (emphasis added). The Act thus requires this Court to start with a phrase whose organic meaning is broad and sweeping, and then apply that phrase as broadly as necessary to reach deceptive conduct in consumer transactions. This (statutorily required) approach leads to the conclusion that *all* the critical representations to Mr. and Mrs. Eames -- the 1994 and 2003 representations alike -- were made in connection with the sale of insurance.

### D. The Court Should Avoid a Hypertechnical Approach

Again, Nationwide's agent shared the June 2003 memorandum of insurance with Mrs. Eames as part of the sale of new coverage for the Eames's new vehicle. The agent likewise shared the February 2003 "vehicle screen" printout with Mrs. Eames on the eve of the March 2003 renewal. Nationwide admits, meanwhile, that such documents are the product of Nationwide's AOA software, which affirmatively requires the use of the "full" modifier. Szlosek dep. at 127-30 (A118-19). Nationwide is thus incorrect to say that Mr. and Mrs. Eames are not among those to whom the "full" usage has been directed since August 2001.

But that debate misses the point. The factors that unify the class are the fact and nature of the misrepresentations (on the one hand) and the injury they produce (on the other). The *timing* of the misrepresentation is incidental, so long as it is made in connection with the sale of insurance -- which, by their very nature, the offending representations were. The class definition might just as well refer to all persons *injured by* the offending representations at any time since August 2001. Indeed, it may be that such a formulation is both more artful and more accurate.

But as the Third Circuit has observed, the district court "'is not bound by the class definition proposed in the complaint.'" Weisfeld v. Sun Chem. Corp., No. 02-4478, 2004 WL 45152, slip op. at *1 (3d Cir. Jan. 9, 2004) (quoting Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993)) (Ex. B). If the Court feels the slightest unease concerning the temporal issue Nationwide has raised, the class should be certified to include those who (like Mr. and Mrs. Eames) suffered injury during the three-year limitations period beginning on August 20, 2001. This is what it means to say that class actions are looked upon favorably, and that all doubts are resolved in favor of certification. See Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985), cert. denied sub. nom., Weinstein v. Eisenberg, 474 U.S. 946 (1985) (class actions should be looked upon favorably, with all doubts resolved in favor of certification).

In short, class certification is not a game of "gotcha." The Court has before it a substantial record of uniform (deceptive) representations aimed at the named plaintiffs and the class alike. This is what unifies the class, and makes this case uniquely suited to representative treatment. See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . .")

### E. The Consumer Fraud Act Reaches Any Misrepresentation Made in Connection With a Sale

Nationwide suggests that no post-sale representation can ever implicate the Consumer Fraud Act. That contention is neither here nor there, because (as we have shown) the Eames's policy is continuously re-sold with every six-month renewal; and because the Eameses purchased new coverage for a new car in June 2003. But Nationwide is wrong in any event.

First, the Consumer Fraud Act contains no exception for post-sale representations. Its focus is not on the timing of the representation, but on whether the representation is connected to

the product's sale. Obviously, one cannot honor the statute's requirement of liberal construction by grafting onto it a limiting, temporal component not found in the statute itself.

Second, the cases cited by Nationwide do not exempt post-sale representations. Rather, they weigh specific facts in each case to determine whether a sale occurred, and (if so) whether the offending representation was connected to that sale. Delaware's Superior Court has thus recognized that post-sale representations *can* be connected to a product's sale: "[I]t is clear that post-sale representations *which are not connected to the sale or advertisement of the vehicle* do not constitute consumer fraud under the Act." Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North Am., Inc., 558 A.2d 1066, 1074 (Del. Super. Ct. 1989), aff'd, 596 A.2d 1358 (Del. 1991) (emphasis added). If no post-sale representation could ever pass muster, there would be no occasion to speak critically of post-sale representations not connected to the sale. Cf. Thomas v. Harford Mut. Ins. Co., C.A. No. 01C-01-046HDR, 2003 WL 21742143, slip op. at *1 (Del. Super. Ct. July 25, 2003) (rejecting consumer fraud claim not because of post-sale representation, but because no cognizable sale had occurred) (Ex. C).

The issue, then, is not one of timing, but of connectedness to the sale of insurance. But an insurer's representation regarding the nature and amount of coverage is *always* connected to the product's sale -- particularly when that product is (like the Eames's policy) in an almost constant state of re-sale. Any other view of the matter is commercially naïve.

## II. NATIONWIDE'S AGENTS ARE AGENTS FOR ALL PURPOSES

Nationwide apparently believes that the issue of its insurance agents' agency turns on whether an affiant is willing to make the conclusory assertion that those agents are really independent contractors. Not so.

First, settled Delaware law confirms that when a principal vests an independent

contractor with actual or apparent authority, that independent contractor becomes an agent within

the meaning of the law of agency:

> There are some agents, however, who are not servants. All agents
> who are not servants are regarded as independent contractors. In
> addition, all non-agents who contract to do work for another are
> also termed "independent contractors." Consequently, there are
> agent-independent contractors and non-agent independent
> contractors.

Fisher v. Townsends, Inc., 695 A.2d 53, 57 (Del. 1997) (quoting Sears Mtge. Corp. v. Rose, 634

A.2d 74, 79 (N.J. 1993); other citations omitted). Nationwide's agents may thus be servants or

independent contractors; and if the latter, they may be agents or non-agents. These are fact-

specific questions, and precisely the sort of merits-based inquiry that is inappropriate on a Rule

23 motion. However, because Nationwide has raised these issues, we address them below.

### A. Agency Has Already Been Established
### For Particular Document Types

Nationwide's 30(b)(6) designee has testified plainly that 1) rate quotes are prepared by

Nationwide's Delaware agents for the contemplated purpose of quoting policy terms and

premiums to consumers; 2) such rate quotes are presented to the consumers as part of the sale

transaction; and 3) when the agent presents rate quotes to the consumer, he does so on

Nationwide's behalf. Szlosek dep. at 116, 121-22 (A115-17). This testimony is binding on

Nationwide. Sanders v. Circle K Corp., 137 F.R.D. 292, 294 (D. Ariz. 1991) (the purpose of

Rule 30(b)(6) "is to create testimony that would bind the corporation.") There is thus no genuine

issue as to rate quotes: they are always made on Nationwide's behalf, and always in connection

with the policy's sale.

An equally compelling record exists as to memoranda of insurance. Asked to describe the process by which Nationwide's auto products are sold in his locality, Mr. Deaton testified that the transaction involves (among other things) an exchange of premium payment for proof of insurance. Deaton dep. at 13-17 (A51-52). According to Mr. Deaton, that proof of insurance takes the form of "a binder or memorandum of insurance." Id. at 15 (A52). On its face, the agent's part in this exchange must logically be on Nationwide's behalf; that is, we cannot conclude that the proof of insurance is presented on the agent's behalf alone unless we are prepared to conclude that the premium is collected on the agent's behalf alone. But not even Nationwide would argue that it has no right to the premium.

Nationwide is thus reduced to arguing that Mr. Deaton's testimony sheds light only on his own personal, idiosyncratic practices. In fact, Mr. Deaton offered his description in response to a question that targeted the step-by-step sales process in his "neighborhood" (or locality). Id. at 13 (A51). Nothing in that question, and nothing in his response, remotely limits his testimony to his own unique practices. Nor has Nationwide offered any evidence to contradict Mr. Deaton's account of the process -- though if such evidence existed, it would clearly be available to Nationwide.

In short, the "full" usage is routinely employed in rate quotes and memoranda of insurance, two of the very document types shared with Mr. and Mrs. Eames. When that happens -- *every time* it happens -- it is done on Nationwide's behalf.

## B. Nationwide Controls its Captive and Exclusive Agents

In determining a party's status as servant or independent contractor, Delaware law looks to the Restatement (Second) of Agency §220 (1958). Fisher, 695 A.2d at 59. The section 220 analysis is highly fact-specific; and for this reason, the determination of whether a party is a

servant or independent contractor "is ordinarily made by the factfinder." Id. (citations omitted).
Some of the most important factors are the extent of control that the master exercises over details
of the servant's work; whether or not the putative servant is engaged in a distinct occupation or
business; whether the employer supplies the instrumentalities and tools for the work; the method
by which the workman is paid; and whether or not the work is a part of the employer's regular
business. Id. at 59 (citing section 220).

These factors make an overwhelming case for treating Nationwide's Delaware agents as
servants in a master-servant relationship. As noted in our opening brief, Mr. Deaton described
himself as a captive and exclusive agent of Nationwide, and Nationwide's designee was forced to
admit as much. Deaton dep. at 5-6 (A49-50); Szlosek dep. at 16-21 (A90-91). Through the
AOA software (which Nationwide's insurance agents *must* use), Nationwide controls the day-to-
day details of policy sales. Nationwide supplies all the essential tools of the trade, providing the
agent with all its software (which, again, the agent must use), and requiring the agent to send and
receive his e-mails on Nationwide's file server. The agent is likewise compelled to participate in
Nationwide's company intranet. Further, the agent is compensated strictly through commissions
on the sale of Nationwide products. All these facts were presented in our opening brief, and
none are disputed.

The section 220 factors thus reveal that Nationwide's Delaware agents are employees,
and not independent contractors at all. But however they are labeled, there can be no serious
question that they act for Nationwide.

### C. At a Minimum, Nationwide's Agents
### Are Vested With Apparent Authority

Apparent authority "is such power as a principal holds his Agent out as possessing or
permits him to exercise under circumstances as to preclude a denial of its existence." Liberty

Mut. Ins. Co. v. Enjay Chem. Co., 316 A.2d 219, 222 (Del. Super. Ct. 1974). It is "such authority as a reasonably prudent business man using due care and discretion would naturally suppose the employee to have." Id. On the record here, there can be no question that Nationwide's Delaware agents have *at least* apparent authority.

As shown in our answering brief, Nationwide's designee conceded that its Delaware agents displayed Nationwide's signage. She further acknowledged that when those agents advertise, they display the Nationwide logo alone. They go about collecting underwriting information for Nationwide; quoting policy terms and premium rates for Nationwide; collecting premiums for Nationwide; and issuing proof of insurance to those who purchase Nationwide policies. Not only would reasonable consumers believe them to be acting for Nationwide, but such consumers could not sensibly reach any other conclusion.

### III. THE CLASS IS READILY ASCERTAINABLE

There can be no great difficulty in either identifying class members or proving that they were subjected to the "full" usage. Though we have not even begun merits-based discovery, we have already shown that the offending usage, imposed automatically through Nationwide's AOA software, is universal. We have also shown that it appears in rate quotes, rate quote letters, binders and memoranda of insurance -- documents that (according to Mr. Deaton, Ms. Szlosek or both) are shared with consumers as a matter of practice.

At a minimum, this evidence makes a *prima facie* case that every eligible policyholder -- those who Nationwide contends purchased minimum PIP limits with no deductible -- was targeted by the "full" usage. All such policyholders, and all PIP claimants under the affected policies, are properly class members.

Alternatively, documents in the possession of Nationwide and its agents will reveal the
existence of these specific document types (which, again, are created with the express intent of
sharing them with consumers). If Nationwide's designee and agent are to be believed, then every
such document signals a disclosure of the "full" usage to the policyholder. Once again, all
affected policyholders and PIP claimants would be class members.

## IV.  THE CLASS REPRESENTATIVES ARE MORE THAN ADEQUATE

Nationwide's criticisms of the named plaintiffs are misleading and exaggerated. Some
examples:

*"The plaintiffs have had little involvement in the case, and few communications with
proposed Class Counsel."* As we have already established, the Third Circuit grants certification
in cases where the class representative knows nothing of the litigation or the litigation process.
But one could do far worse than the plaintiffs in explaining how class actions work. See Roberta
Eames dep. at 19 (A162) (describing a class action as "[w]here someone represents for everyone
that's involved in a similar situation and you got the plaintiff that's going to represent everybody
that's been treated the way we were"); Thomas Eames dep. at 15 (A144) (describing the role of
class representative as "representing an individual with the same situation that you are in.")

As for contacts with the Murphy Spadaro firm, Mrs. Eames confirmed that she has
communicated with attorney Spadaro both in person and by phone. Roberta Eames dep. at 14-16
(A161). But Mr. Eames explained that the Murphy Spadaro firm was retained through the
Eames's personal attorney, Clayton Bunting. Thomas Eames dep. at 15 (A144). Had
Nationwide's examiner followed up on that testimony, he would have learned that attorney
Bunting (who has a closer personal relationship with the plaintiffs than attorney Spadaro) often

acts as a conduit of information between the Murphy Spadaro firm and the plaintiffs; and that attorney Spadaro reports on the case's progress to Mr. Bunting regularly.

*"Only oral representations were made to Mrs. Eames."* As we have shown, Mr. and Mrs. Eames received the rate quote reproduced at page A1of the Eames plaintiffs' appendix in connection with the policy's original sale in 1994. In February 2003, on the eve of the March 2003 renewal, Mrs. Eames was also given the "vehicle screen" shown at page A31 of the appendix. While purchasing new coverage in June 2003, Mrs. Eames was given the memorandum of insurance shown at page A32 of the appendix. Each set forth the "full PIP" usage in writing.

*"Mrs. Eames cannot recall who she spoke with in 1994."* Mrs. Eames testified that she "had spoken with Linda and Keith [at the Culver agency] at different times" in 1994. Roberta Eames dep. at 22 (A163). She stated unequivocally that she spoke with Keith Culver regarding the purchase of her policy in February or March 1994. Id.

*"The plaintiffs were not shown the critical document types."* Again, Mr. and Mrs. Eames both testified that the rate quote shown at page A1 of the Eames plaintiffs' appendix was disclosed to them by the Culver agency, contemporaneously with the original policy's sale. Thomas Eames dep. at 35-36, 40 (A149-50); Roberta Eames dep. at 36-37 (A166-67). Nor is there any dispute that the 2003 vehicle screen and memorandum of insurance -- both of which were produced in discovery by the Eames plaintiffs themselves -- were shared with the plaintiffs. Nationwide's designee confirmed that all three document types (rate quotes, vehicle screens and memoranda of insurance) are created, and imprinted with the "full PIP" usage, through the AOA software. Szlosek dep. at 105-07, 111-16, 119-20, 127-34 (A112-20).

*"Mr. Eames, and not the agent, was the source for the 'full PIP' usage."* Mr. Eames did not create the rate quote, vehicle screen and memorandum of insurance on which the Eames plaintiffs' allegations rest; Nationwide's agent did. But Mr. Eames also testified that the agent told him orally that the policy provided full PIP coverage. Referring to Culver employee Linda Sanders, he stated that "[s]he told me I had full coverage." Thomas Eames dep. at 24 (A146). A moment later he repeated this testimony. Id. He explained his understanding that "I'm getting 100/300 on PIP because she's telling me I got full coverage." Id. at 25 (A147). He stated that "full coverage" was "what I was told I was getting for my PIP." Id. at 30 (A148). The question is not whether Mr. Eames gave this testimony, but how Nationwide came to argue otherwise.

*"Mr. Eames could not recall details."* When Nationwide's examiner asked Mr. Eames whether he could remember the agent's "specific words" (from a conversation in 1994, no less), Mr. Eames candidly expressed doubt that anyone could honestly claim such a verbatim recollection. Thomas Eames dep. at 23 (A146). Mr. Eames also admitted that after twelve years, he could not offer a detailed physical description of the agent except to describe her dirty blond hair. Id. at 26 (A147). These points are not a basis for denying class certification.

*"The plaintiffs have not even offered a trial plan."* Nothing in Rule 23 requires plaintiffs to propose a "trial plan" (whatever Nationwide means by this term) on this motion. Certainly Nationwide offers no authority for such a requirement. But uniform representations lend themselves to summary proofs at trial. Further, trial courts enjoy a broad range of tools for trial management; and for this reason, "[c]ourts are generally loath to deny class certification based on speculative problems with case management . . . ." In re NASDAQ Market-Makers Anti-Trust Litig., 169 F.R.D. 493, 529 (S.D.N.Y. 1996).

*"Tammy Eames was never subjected to the 'full' usage."* A large body of case law confirms that the private right of action under the Consumer Fraud Act does not require privity. Rather, Nationwide can be liable to any consumer in the stream of commerce who suffers injury from its misrepresentations. Tandy v. Marti, 213 F. Supp.2d 935, 937-38 (S.D. Ill. 2002) (no privity with consumer required under substantially identical Illinois statute); Impex Shrimp & Fish Co. v. Aetna Cas. & Sur. Co., 686 F. Supp. 183, 187 (N.D. Ill. 1985) (same); In re Catanella and E.F. Hutton & Co., Inc. Sec. Litig., 583 F. Supp. 1388, 1441-42 (E.D. Pa. 1984) (no privity required under New Jersey statute). Because Tammy Eames has been injured by Nationwide's misrepresentations (in that her claim is subject to minimum, not full, PIP limits) she is properly a member of the class. See In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 249 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004) (class members need only establish a causal link between the deceptive conduct and the claim of injury).

The Eames plaintiffs are more than adequate class representatives, and their claims make the classic case for certification.

## CONCLUSION

For the reasons set forth above, and for the reasons set forth in the Eames plaintiffs' opening brief, the Eames plaintiffs respectfully request that class certification be granted.

Respectfully submitted,

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302)472-8100

June 2, 2006                    Attorneys for the Eames plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

THOMAS A. EAMES, ROBERTA L. EAMES     )
and TAMMY EAMES, on behalf of          )
themselves and all others              )
similarly situated,                    )
                                       )
                          Plaintiffs,  )          C.A. No. 04-CV-1324KAJ
                                       )
v.                                     )
                                       )
NATIONWIDE MUTUAL INSURANCE            )
COMPANY,                               )
                                       )
                          Defendant.   )

**NOTICE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk

of the Court using CM/ECF which will send notification of such filing(s) to the following:

Nicholas E. Skiles, Esq.
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, DE 19899

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

Attorneys for plaintiffs
Thomas A. Eames, Roberta L. Eames and
Tammy Eames (on behalf of themselves and
all others similarly situated)

June 2, 2006

131731