IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 04-CV-1324KAJ |
| v. | ) ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

### EAMES PLAINTIFFS' REPLY ON MOTION FOR RECONSIDERATION OF THE COURT'S AUGUST 29, 2006 MEMORANDUM OPINION

In its August 29, 2006 Memorandum Opinion, the Court effectively held that with respect to the two offending representations in 2003 (and in connection with the Eames plaintiffs' "maximum limit" theory), the statute of limitations expired in 1997. The Eames plaintiffs' motion for reconsideration rests on the straightforward proposition that 1997 came six years before, not three years after, 2003; and since the lawsuit was filed in 2004, the three-year statute cannot possibly have expired.

Nowhere in its response does Nationwide contest (or even address) this point. The Court should thus grant reconsideration, and hold that the "maximum limit" theory remains viable in connection with the 2003 representations. Again, the statute of limitations with respect to those representations cannot possibly have run prior to 2006.

Yet notwithstanding its silence on the issue at hand, Nationwide's response remains an important document. This is because, in effectively seeking summary judgment on the 2003

representations, Nationwide manages to undercut the Memorandum Opinion's entire rationale. That is, Nationwide shows conclusively that the policy's reference to the $15,000/$30,000 PIP limit can *never* constitute "reason to know" of the actual dollar amount of PIP coverage. Thus (and as Nationwide effectively concedes in its response), the Eames's policy references the $15,000/$30,000 PIP limit *even today*, when the current existing limit is actually $100,000/$300,000.

## I. THE POLICY OFFERS NO "REASON TO KNOW"

The Eames plaintiffs have argued from the start that the actual amount of PIP limits provided under a Nationwide auto policy cannot be determined by reference to the policy text (or what Nationwide and the Court regard as the policy proper). Rather, the preprinted policy *always* sets forth the statutory minimum of $15,000 per person and $30,000 per accident. PIP limits over and above that minimum are reflected in extraneous documents, including memoranda of insurance, declarations pages, binders and the like. This point was thus made in the Eames plaintiffs' opening brief in support of their motion to remand (filed nearly two years ago); and again in their answering brief to Nationwide's original motion to dismiss (filed August 22, 2005). D.I. 7 at 3-4; D.I. 89 at 5-6. The Eames plaintiffs even offered affidavit testimony on the subject. D.I. 9.

The Court has never acknowledged this argument, and it may be that the Court is simply disinclined to credit it. But Nationwide has now shown that the argument is correct.

Specifically, Nationwide says that effective June 17, 2003, the PIP limits of the Eames's policy were increased to the maximum amount of $100,000 per person and $300,000 per

accident.[1] But as the Court long ago established, the *policy itself* references PIP limits of $15,000/$30,000. Indeed (and as the Court is aware), Nationwide has repeatedly argued that *even today* the policy "unambiguously" references the minimum PIP limit. On its original motion to dismiss, for example, Nationwide referenced page "N2" of the policy as the source for its "unambiguous" statement of PIP limits. D.I. 3 at 4. That page reads, in pertinent part, as follows:

> **BENEFITS**
>
> We will pay benefits up to a total of $15,000 for bodily injury per insured in one accident, and up to $30,000 in total if two or more insureds are injured in one accident.

D.I. 4 at A35 (page N2 of the policy) (emphasis omitted).

This, then, is the current (and indisputable) state of affairs: *First*, there is no dispute that the Eames plaintiffs purchased new coverage for their new car on June 17, 2003. *Second*, there is no dispute that on that same date Nationwide's agent provided Mr. and Mrs. Eames with the document attached as Exhibit A, reading (in part) "PERSONAL INJURY PROTECTION . . . FULL." *Third*, Nationwide says that at the time of this representation, the Eames's PIP limits were $100,000/$300,000. *Fourth*, Nationwide concedes that at that very same moment the policy "unambiguously" set forth limits of $15,000/$30,000 -- *as it still does today*.

Does any of this make sense? Can the policy "unambiguously" establish the existence of the minimum limits in 1994, when the same policy text *still* sets forth those minimum limits today, and Nationwide itself says that the policy currently provides *maximum* limits? If the

---

[1] The document reproduced at page B2 of Nationwide's appendix confirms that the Eames plaintiffs were forced to pay additional premium for this "full" coverage, despite having purchased "full" PIP from Nationwide in 1994.

policy is an unambiguous source of the actual PIP limits, how can it be that the current PIP limits are $100,000/$300,000, while the policy still reads $15,000/$30,000?

The answer should be obvious. As we have argued from the first, the policy text *always* references the minimum $15,000/$30,000 limits. This is true regardless of whether Nationwide purports to sell minimum limits, maximum limits or something in between. The consumer cannot rely on the policy's "unambiguous" reference to minimum limits, because that reference is neither here nor there. Rather, the actual PIP limits are established by extraneous documents, including documents supplied by Nationwide's insurance agents. This is the incontrovertible truth of Nationwide's business practices, made plain by its own arguments.

In short, the text on page N2 of the policy (referencing the $15,000/$30,000 PIP limits) is not "reason to know" anything. The same page N2 is indisputably part of the policy today, and it *still* references the $15,000/$30,000 limit on a policy that (according to Nationwide) provides dramatically higher PIP limits. Nor should the Court favor Nationwide with any benefit of the doubt on this issue; since the contract is one of adhesion, Nationwide alone should bear the consequences of its confused memorialization of PIP limits:

> Insurance policies typically are not negotiated agreements. Consumers are presented with a complex form agreement on a take-it-or-leave-it basis. The industry has its own obscure terminology which, despite efforts toward plain language policies, is nevertheless difficult for the typical consumer to understand fully. In these respects, insurance agreements are classic examples of contracts of adhesion.

State Farm Mut. Auto. Ins. Co. v. Arms, 477 A.2d 1060, 1065 (Del. 1984).

The Court should thus recognize what Nationwide has now made clear: the policy's reference to the $15,000/$30,000 limit is not reason to know the actual PIP limit, because the policy is not intended to record the actual PIP limit. Rather, the policy ensures that Nationwide

meets the statutory "baseline", leaving other documents to establish whether PIP limits in excess of the minimum have been sold. Not incidentally, this approach is nowhere stated in any documents provided to the consumer, who is essentially left to fend for himself in divining what the actual PIP limits may be. But that being the case, the Court should revisit its Memorandum Opinion and uphold all the claims and theories pled in the Amended Complaint.

## II. A FRAUDULENT CONTRACT CANNOT SUPPLY "REASON TO KNOW"

Nationwide's focus on the policy's post-June 2003 PIP limits (of $100,000/$300,000) reveals the Memorandum Opinion's incompatibility with Delaware law. As we have previously shown, Delaware law holds that the parol evidence rule does not bar proof of prior or contemporaneous statements in cases alleging misrepresentation. Hynansky v. Vietri, No. 14645-NC, 2003 WL 21976031, at *4 (Del. Ch. Aug. 7, 2003) (citation omitted) (Ex. B). But for that rule, commercial sellers could trick consumers with impunity. For example, an auto dealership could record an artificially high price in its contract of sale, all the while assuring the consumer that the contract's figures are a mere formality. Once the consumer signed the contract, the dealer could then claim that the contract's four corners trumped all representations made outside the document. But Delaware law avoids this type of gross injustice; through the recognized exception to the parol evidence rule, Delaware law makes it impossible for sellers to hide behind the otherwise "unambiguous" terms of the contract's four corners.

How then can the four corners supply "reason to know" of the seller's deception? Can our hypothetical auto dealer defeat a claim on limitations grounds that he could not defeat on the merits, simply by invoking what the "unambiguous" (but fraudulent) contract says? Does not this approach reward the seller for his deception? Does it not frustrate the exception to the parol evidence rule? And is it not clear error?

135226                                       5

As shown above, the policy's reference to the $15,000/$30,000 PIP limit is not reason to know of Nationwide's deception, because that reference is not a guide to the actual amount of PIP limits. But it fails as "reason to know" for the additional reason that it is part of a contradictory (and fraudulent) regime under which the consumer is also told that his PIP is "full." This is not reason to know; it is reason to be confused.

### III. THE CONSUMER FRAUD ACT MUST BE READ BROADLY AND CONSTRUED LIBERALLY

There is no dispute that this case involves, at its very core, Nationwide's repeated characterizations of PIP coverage -- the very thing sold to Mr. and Mrs. Eames. If we accept the Eames's allegations as true (as we must on this motion), the offending representations relate directly to the amount of insurance that Nationwide sold. That being the case, it is logically impossible to treat those representations as somehow *not* connected to the sale.

Unless, of course, we turn the Consumer Fraud Act on its head -- which is precisely what Nationwide asks the Court to do. That is, Nationwide argues that "Delaware law . . . requires that courts restrict application of 6 Del. C. §2513 . . . ." Nationwide bf. at 5. But far from requiring any "restrictive" application, the Consumer Fraud Act compels precisely the opposite: "It is the intent of the General Assembly that such [deceptive] practices be swiftly stopped and that this subchapter shall be *liberally construed and applied* to promote its underlying purposes and policies." 6 Del. C. §2512 (emphasis added). The contrast between the liberal application required by the General Assembly and the restrictive one urged by Nationwide could hardly be clearer.

Equally clear is the breadth of the Act's reference to misrepresentations made "in connection with" the sale of insurance products. 6 Del. C. §2513(a). As the Second Circuit has observed, courts treat this phrase as equivalent to "relating to" and "associated with." Coregis

Ins. Co. v. Am. Health Foundation, Inc., 241 F.3d 123, 128-29 (2d Cir. 2001) (collecting cases). Courts have thus treated "in connection with" as broader than the phrase "arising out of." Id. at 129 (citations omitted). The U.S. Tax Court has likewise held that the "ordinary, everyday sense" of "in connection with" is "logically related." Fort Howard Corp. and Subsidiaries v. Comm'r, 103 T.C. 345, 351-52 (1994), modified on other grounds, 107 T.C. 187 (1996) (citations omitted).

The Act thus requires this Court to start with a phrase whose organic meaning is broad and sweeping, and then apply that phrase as broadly as necessary to reach deceptive conduct in consumer transactions. This (statutorily required) approach leads to the conclusion that *all* the critical representations to Mr. and Mrs. Eames -- the 1994 and 2003 representations alike -- were made in connection with the sale of insurance. That is, when Nationwide tells a purchaser that one of the principal coverages offered is "full" coverage, that representation has an obvious connection to the product's sale. It portrays the product as superior in quality and amount, and tends to encourage the purchaser to buy. To pretend otherwise -- to say that when the insurer trumpets its coverage as "full", that that characterization bears no relation to the product's sale -- is perverse and naïve.

### IV. THE CONSUMER FRAUD ACT TURNS ON THE NATURE, NOT THE TIMING, OF THE REPRESENTATION

Nationwide suggests that no post-sale representation can ever implicate the Consumer Fraud Act. That contention is neither here nor there, because (as Nationwide must itself concede) the Eames's policy consisted of regular six-month renewals. Under Delaware law, each such renewal constitutes *a separate and distinct insurance contract*:

> The rule is generally recognized that: "A renewal of a policy constitutes a separate and distinct contract for the period of time covered by such renewal."

Schwartz v. Centennial Ins. Co., C.A. No. 5350, 1981 WL 15074, slip op. at *2 (Del. Ch. Sept. 28, 1981) (quoting Long Bros. Grocery Co. v. United State Fidelity & Guar. Co., 110 S.W. 31 (Mo. Ct. App.1908)) (Ex. C). Accord, Montalvo v. Tower Life Building, 426 F.2d 1135, 1141-42 (5th Cir. 1970) (rejecting insurer's "single sale" analysis of renewal policies as "totally devoid of merit.") This means that Nationwide's February 8, 2003 characterization of PIP as "full" is not a *post*-sale representation, but a *pre*-sale one: it came just days before the March 2003 renewal, which (under Schwartz and Montalvo) was a separate and distinct sale.

But the "post-sale" analysis is inapposite in any event. The question is not whether a representation came before or after the sale, but only whether it was made *in connection with* the sale. Consider these points:

- The Act itself contains no exception for post-sale representations. Obviously, one cannot honor the statute's requirement of liberal construction by grafting onto it a limiting, temporal component not found in the statute itself.

- The cases cited by Nationwide do not exempt post-sale representations. Rather, they weigh specific facts in each case to determine whether a sale occurred, and (if so) whether the offending representation was connected to that sale. Delaware's Superior Court has thus recognized that post-sale representations *can* be connected to a product's sale: "[I]t is clear that post-sale representations *which are not connected to the sale or advertisement of the vehicle* do not constitute consumer fraud under the Act." Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North Am., Inc., 558 A.2d 1066, 1074 (Del. Super. Ct. 1989), aff'd, 596 A.2d 1358 (Del. 1991) (emphasis added). If no post-sale representation could ever pass muster, there would be no occasion to speak critically of post-sale representations not connected to the sale. Cf. Thomas v. Harford Mut. Ins. Co., C.A. No. 01C-01-046HDR, 2003 WL 21742143, slip op. at

135226                                            8

*1 (Del. Super. Ct. July 25, 2003) (rejecting consumer fraud claim not because of post-sale representation, but because no cognizable sale had occurred) (Ex. D).

The issue, then, is not one of timing, but of connectedness to the sale of insurance. But an insurer's representation regarding the nature and amount of coverage is *always* connected to the product's sale -- particularly when that product is (like the Eames's policy) in an almost constant state of re-sale.

## V. THE 2003 REPRESENTATIONS CAUSED HARM

Nationwide insists that the Eames plaintiffs suffered no harm from its deception. But when sellers cheat consumers, harm invariably follows; and this case is no exception.

The 1994 deception caused harm in several respects: first, the Eameses were left with less insurance protection than they had a right to expect (based on Nationwide's "full" usage). Second, they were left with less insurance protection than they could have secured but for the deception. Third, they were left with less insurance protection than they ultimately needed (for the February 2003 collision). In each case they were deprived of the benefit of their bargain.

The February 8, 2003 representation, made just days before the March 2003 renewal, again left the Eameses with less insurance than they could reasonably expect (given the plain meaning of "full"). It again left them with less protection than they could have secured had they not been deceived.

Finally, if Nationwide is correct that the June 2003 transaction left the Eameses with (genuinely full) PIP limits of $100,000/$300,000, then it is clear that the Eameses were forced to pay additional premium for those limits -- despite the fact that Nationwide had been selling them

135226                                      9

"full PIP" every six months for the previous nine years.[2] Only an auto insurer could fail to see the harm in such a transaction.

## VI. PROCEDURAL FAIRNESS SHOULD BE RESTORED

The issue on this motion is whether the Court committed clear error in holding that the three-year statute of limitations on representations made in 2003 expired in 1997, six years before the representations were made. Unable to meet that issue, Nationwide has essentially filed a phantom summary judgment motion on other issues (those being the issues we were forced to address above). Nationwide has done this in a case in which the Eames plaintiffs have been barred throughout from taking discovery on the merits.[3]

A fair and orderly process should not allow this. Since Nationwide has ducked the issue, the Court should modify its Memorandum Opinion to make clear (at a minimum) that the 2003 representations cannot possibly be time-barred. Better yet, the Court should recognize that since the preprinted policy does not supply the actual PIP limits, nothing contained within the policy constitutes "reason to know" of Nationwide's deception.

                                Respectfully submitted,

                                MURPHY SPADARO & LANDON
                                /s/ John S. Spadaro
                                John S. Spadaro, No. 3155
                                1011 Centre Road, Suite 210
                                Wilmington, DE 19805
September 19, 2006                Attorneys for the Eames plaintiffs

---

[2] Page B2 of Nationwide's appendix confirms that Nationwide charged the Eameses additional premium for the purchase of the $100,000/$300,000 PIP limits in June 2003.

[3] We must, with respect, continue to lament this "phasing" of the case. See Fed. R. Civ. P. 23 advisory committee's note (warning against any "artificial and ultimately wasteful division between 'certification discovery' and 'merits discovery.'") The risk of unfairness is most pronounced here, where the defendant is essentially seeking summary judgment on issues that have not yet been the subject of merits-based discovery.

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, ) ) ) ) ) | |
| Plaintiffs, ) | C.A. No. 04-CV-1324KAJ |
| ) | |
| v. ) | |
| ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, ) ) ) | |
| Defendant. ) | |

## NOTICE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

Nicholas E. Skiles, Esq.
Swartz Campbell LLC
300 Delaware Avenue, Suite 1130
P.O. Box 330
Wilmington, DE 19899

MURPHY SPADARO & LANDON

/s/ John S. Spadaro
John S. Spadaro, No. 3155
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

Attorneys for plaintiffs
Thomas A. Eames, Roberta L. Eames and
Tammy Eames (on behalf of themselves and
all others similarly situated)

September 19, 2006

135112