**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMAS A. EAMES, ROBERTA L. EAMES and TAMMY EAMES, on behalf of themselves and all others similarly situated, | ) ) ) | **PUBLIC VERSION** |
| | ) | |
| Plaintiffs, | ) | C.A. No. 04-1324-JJF-LPS |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

**EAMES PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE**
**JUDGE'S MARCH 31, 2008 REPORT AND RECOMMENDATION**

JOHN SHEEHAN SPADARO, LLC
John S. Spadaro, No. 3155
724 Yorklyn Road, Suite 375
Hockessin, Delaware 19707
(302)235-7745

Attorneys for plaintiffs Thomas A. Eames,
Roberta L. Eames and Tammy Eames, on behalf of
themselves and all others similarly situated

April 21, 2008

1856

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................1

    A. The February 2, 2006 Memorandum Opinion ....................................................2

    i. The Consumer Fraud Claim.................................................................................2

    ii. The Civil Conspiracy Claim ...............................................................................3

    B. The Amended Complaint .....................................................................................4

    C. The August 29, 2006 Memorandum Opinion ......................................................4

    i. The Dismissal of the "Maximum Limit" Theory.................................................5

    ii. The Subject Matter Jurisdiction Question ..........................................................6

    D. The Procedural Posture Before the Magistrate Judge.........................................7

    E. The Magistrate Judge's Report and Recommendation ........................................8

SUMMARY OF ARGUMENT ........................................................................................10

STATEMENT OF FACTS ..............................................................................................12

    A. The Amended Complaint's Allegations ............................................................12

    B. How Nationwide Does It....................................................................................15

    1. The Rate Quotes, Rate Quote Letters, Binders, Etc..........................................15

    2. The Agency Office Automation System.............................................................18

    3. The Mechanics of Deception .............................................................................20

    4. Nationwide's Departure From the First Convention...........................................22

    5. Nationwide's Departure From the Second Convention.......................................23

    6. Nationwide's Motive .........................................................................................24

ARGUMENT ..................................................................................................................28

I. THE REPORT AND RECOMMENDATION IS CONTRARY TO
THE SETTLED LAW OF THE CASE ............................................................................28

II.  ADJUDICATION OF THE MERITS IS PREMATURE ........................................................29

III.  NATIONWIDE'S "FULL PIP" USAGE IS AMBIGUOUS,
CONFUSING AND MISLEADING .............................................................................30

IV.  THE MAGISTRATE JUDGE'S FORMULATION IS ITSELF CONFUSING ...................32

V.  UNDER ACCEPTED USAGE IN THE INSURANCE INDUSTRY, AND IN THE
CONTEXT OF INSURANCE LAW, "FULL COVERAGE" CONNOTES THE MAXIMUM
AVAILABLE COVERAGE ........................................................................................ 33

VI.  "FULL PIP" MEANS FULL PROTECTION, AND THE PIP LIMIT IS
THE THING THAT PROTECTS .................................................................................34

VII.  THE "REQUIRED STATEMENT" DOES NOT RESCUE THE
"FULL PIP" USAGE ...............................................................................................35

VIII.  THE COLLISION COVERAGE SECTION DOES NOT REMEDY
THE DECEPTION....................................................................................................37

IX.  THE ISSUE OF DECEPTION SHOULD BE LEFT TO THE JURY .................................39

X.  BECAUSE THE CONSUMER FRAUD CLAIM SHOULD SURVIVE,
THE CIVIL CONSPIRACY CLAIM SHOULD LIKEWISE SURVIVE .....................................39

CONCLUSION....................................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                          <u>Page</u>

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)........................10, 26, 29

*Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3d Cir. 1983) ........................... 15

*Eames v. Nationwide Mut. Ins. Co.*, C.A. No. 04-1324KAJ, 2006 WL 2506640
 (D. Del. Aug. 29, 2006) ..................................................................................................... *passim*

*Eames v. Nationwide Mut. Ins. Co.*, 412 F. Supp.2d 431 (D. Del. 2006)............................ *passim*

*Elliott v. Liberty Mut. Ins. Co.*, 983 F.2d 1055 (4th Cir. 1993) ....................................................33

*Hardy v. Nationwide Ins. Co.*, 356 S.E.2d 38 (Ga. Ct. App. 1987)....................................2, 31, 32

*Homsey v. Vigilant Ins. Co.*, 496 F. Supp.2d 433 (D. Del. 2007)..................................................15

*Johnson v. GEICO Cas. Co.*, 516 F.Supp.2d 351 (D. Del. 2007)...................................................15

*Ogbudimkpa v. Ashcroft*, 342 F.3d 207 (3d Cir.2003)...................................................................28

*Riccio v. Allstate Ins. Co.*, 357 So.2d 420 (Fla. Ct. App. 1978) ....................................................33

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ..............................................................................10, 26

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786
(3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985) ...................................................................... 15

*Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998)............................................................................28

<u>Other Authorities</u>

21 *Del. C.* §2118 ...............................................................................................................................1

Http://dictionary.reference.com/browse/full...............................................................................30

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 471 (10th ed. 1993)................................20

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs Thomas A. Eames, Roberta L. Eames and Tammy Eames (the "Eames plaintiffs") respectfully object to that part of the Magistrate Judge's March 31, 2008 Report and Recommendation that recommended dismissal of their claims for statutory consumer fraud and civil conspiracy.[1]  As shown below, the Magistrate Judge's recommendations were based on his conclusion that the amended complaint failed to allege any actual misrepresentation by Nationwide.  This conclusion is contrary to the law of the case (as established by the predecessor judge); inconsistent with standard English usage and the plain meaning of the term "full"; and belied by insurance industry jargon.

***

This proposed class action was commenced in the Superior Court of the State of Delaware in and for Sussex County on August 20, 2004.  On October 1, 2004, Nationwide removed the case from Superior Court to this Court.

Stated briefly, the Eames plaintiffs seek certification of a proposed class and subclass with respect to the defendant Nationwide's misrepresentation of policy limits for Personal Injury Protection (or "PIP") coverage under 21 *Del. C.* §2118.  They contend that Nationwide has represented to thousands of Delaware insureds that they enjoy "full" PIP (or "full coverage" for PIP), when in fact Nationwide contends or will contend that they are entitled to just the minimum PIP limits required by statute.  Significantly, the identical underwriting practice was condemned by a Georgia appellate court as "unbelievably deceptive" more than twenty years ago:

---

[1] The subject Report and Recommendation is attached as Exhibit A.  As to the other recommendations within that document, the Eames plaintiffs reserve their rights to appeal in due course.

> *** I cannot help but opine that this form [employing Nationwide's "full PIP" usage], while admittedly barely complying with the new statute, is ***unbelievably deceptive*** in that the block wherein one may indicate his selection of only basic personal injury protection is captioned by the words: "FULL COVERAGE."  Especially is this a less than adequate description in view of the fact that there is absolutely no coverage which may be purchased that is ***less*** than that which is designated as "FULL COVERAGE."

*Hardy v. Nationwide Ins. Co.*, 356 S.E.2d 38, 39 (Ga. Ct. App. 1987) (Carley, J., concurring) (emphasis added in part).

**A.  The February 2, 2006 Memorandum Opinion**

**i.  The Consumer Fraud Claim**

Following removal, Nationwide moved to dismiss the complaint for failure to state a claim.  On February 2, 2006, the predecessor judge, the Hon. Kent A. Jordan, decided the motion to dismiss -- and decided it in a manner that is crucial to these objections.  To begin, Judge Jordan dismissed the Eames plaintiffs' contractual claims (for declaratory judgment, breach of contract and bad faith breach of contract).  *Eames v. Nationwide Mut. Ins. Co.*, 412 F. Supp.2d 431, 435-37 (D. Del. 2006) ("*Eames I*").  But regarding the allegations of statutory consumer fraud, Judge Jordan's holding was twofold: first, that the Eames plaintiffs ***had indeed stated a cognizable consumer fraud claim***; and second, that though the consumer fraud claim was cognizable, it was not stated with sufficient particularity:

> When read in the light most favorable to Plaintiffs, the Complaint ***appears to allege false representations by Nationwide*** that were known to be false and that damaged Plaintiffs and other class members.  According to the Complaint, Nationwide "falsely described PIP limits as 'full'," and class members were harmed either because they believed that they had purchased coverage with limits higher than $15,000/30,000 or because they believed that they were the highest limits available to purchase.  ***  Thus, Nationwide has not shown, as it must under Rule 12(b)(6), that no relief could be granted for consumer fraud under any set of facts consistent with the allegations of the Complaint.

> However, Nationwide does point out that the Complaint fails to plead the circumstances surrounding the alleged fraud with the necessary particularity . . . .
>
> ***
>
> Thus, the Complaint fails to allege fraud with the particularity necessary to satisfy Rule 9(b).  However, since the Complaint, when read in the light most favorable to Plaintiffs, does set forth a claim in skeletal form, I will dismiss Count IV without prejudice and grant Plaintiffs leave to amend as to that count.

*Eames I*, 412 F. Supp.2d at 437-38 (emphasis added).

In other words, the predecessor judge expressly found that when read in a light most favorable to the Eames plaintiffs (as the complaint must be read on a motion to dismiss), the original complaint did in fact allege false, harmful and actionable representations by Nationwide -- if only for purposes of pleading.  *Eames I*, 412 F. Supp.2d at 437-38.  The problem was ***not*** that no misrepresentations were alleged, but only that they were not alleged with sufficient particularity.  Further, the predecessor judge expressly granted the Eames plaintiffs leave to amend in order to meet the particularity requirement.

### ii.  <u>The Civil Conspiracy Claim</u>

The Eames plaintiffs also pled a count in civil conspiracy, the predicate wrong for which is consumer fraud.  Because *Eames I* dismissed that predicate claim without prejudice, the predecessor judge likewise dismissed the civil conspiracy claim without prejudice: "Since an amended complaint sufficient to support a consumer fraud claim may provide the necessary underlying wrong, Count V [alleging civil conspiracy], like Count IV, will be dismissed with prejudice."  *Eames I*, 412 F. Supp.2d at 439.

B. **The Amended Complaint**

On February 10, 2006 the Eames plaintiffs filed and served their amended complaint. As shown below, that pleading detailed the allegations of consumer fraud by alleging the date, place and time of the offending representations. *See* D.I. 158 ¶¶13, 13(a)-(g), 22-24. It included all the factual allegations that were made in the original complaint (which the predecessor judge recognized as pleading actual misrepresentations and actual harm); but it elaborated on those allegations at great length. *Compare* D.I. 1, and Exhibit A thereto (original complaint) *with* D.I. 158 (amended complaint).

C. **The August 29, 2006 Memorandum Opinion**

Nationwide responded to the amended complaint with a second motion to dismiss. This second motion was addressed by the predecessor judge's August 29, 2006 memorandum opinion. *See Eames v. Nationwide Mut. Ins. Co.*, C.A. No. 04-1324KAJ, 2006 WL 2506640 (D. Del. Aug. 29, 2006) ("*Eames II*") (Ex. B). Like the Court's decision on the original motion to dismiss, this latter opinion confirmed that the Eames plaintiffs ***had indeed alleged actual misrepresentations*** -- and alleged them in a way that the Court readily understood, and could just as readily summarize:

> According to the Plaintiffs, Nationwide misrepresented the liability limits for PIP coverage by using the term "full" to refer to PIP policies that only provided for the statutory minimum of $15,000 per person and $30,000 per accident. Plaintiffs contended that the use of "full" was a misrepresentation in two respects. First, Plaintiffs argued that "full" referred to the maximum amount of PIP coverage Nationwide offered, which was $100,000 per person and $300,000 per accident. "Thus, according to Plaintiffs, consumers are led to believe that they have purchased coverage with those maximum limits, and so the insurance policies must be interpreted to provide for those limits." Second, Plaintiffs argued that the use of the term "full" misleads consumers into believing "that they have purchased the fullest PIP limits or PIP coverage

> available; the purpose being to discourage them from seeking to
> purchase additional (and relatively inexpensive) PIP limits."

*Eames* II, slip op. at *1 (quoting *Eames* I, 412 F.Supp.2d at 433).

In short, the predecessor judge's rulings of February 2 and August 29, 2006 make it indisputably clear that when read in a light most favorable to the Eames plaintiffs, both the original and amended complaints allege actual misrepresentations.  Again, those precise same misrepresentations have previously been criticized, at the appellate level, as ***unbelievably deceptive.***  *Hardy*, 356 S.E.2d at 39.

### i.  The Dismissal of the "Maximum Limit" Theory

As the quoted matter from the August 29, 2006 Memorandum Opinion shows, the predecessor judge correctly read the amended complaint to state two alternative theories of recovery for consumer fraud.  Under the first theory -- what we may refer to as the "maximum limit" theory -- the Eames plaintiffs contend that Nationwide's "full PIP" usage is false because it tends to suggest to the consumer that he has purchased maximum limits of $100,000 per person and $300,000 per accident (these being the fullest PIP limits Nationwide sells in Delaware).  Under the second theory (the "fullest available limits" theory), the Eames plaintiffs contend that the "full PIP" scheme leads consumers to believe that the $15,000/$30,000 limits are "full" limits, when in fact they are minimum limits.

The August 2006 decision dismissed the "maximum limits" theory on statute of limitations grounds, but left the "fullest available limits" theory intact:

> However, Nationwide has not shown based on the Amended
> Complaint that Plaintiffs had reason to know prior to August 2001
> that coverage with higher PIP limits was available from
> Nationwide.  Thus, Plaintiffs' claim that Nationwide
> misrepresented the $15,000/$30,000 limits as the fullest PIP limits
> available may or may not be time-barred, depending on the record
> that may develop.  Thus, that consumer fraud claim, and the civil

> conspiracy claim to the extent that it relies on that claim, will not
> be dismissed at this stage of the litigation.

*Eames II*, slip op. at *4 (citing amended complaint) (Ex. B).

It should be clear that this ruling -- under which the predecessor judge expressly stated that the consumer fraud claim ***would not be dismissed*** -- cannot be reconciled with the Magistrate Judge's belief that the amended complaint alleges no misrepresentation at all.  If the predecessor judge felt that the amended complaint's articulation of the "fullest available limits" theory stated no claim of misrepresentation, he surely would not have declared that "the consumer fraud claim . . . will not be dismissed . . . ."  *Id.*  Nor would he have stated flatly that "[a]ccording to the Plaintiffs, Nationwide misrepresented the liability limits for PIP coverage by using the term "full" . . . ."  *Id.* at *1.

### ii.  <u>The Subject Matter Jurisdiction Question</u>

The predecessor judge felt that his dismissal of the "maximum limits" theory on limitations grounds might mean that the jurisdictional amount would no longer be breached, so that the case might have to be remanded to state court: "My conclusion that some of Plaintiffs' claims are time-barred raises a question as to whether this case should be remanded."  *Eames II*, slip op. at *5 (Ex. B).[2]  The predecessor judge thus reserved decision on the balance of Nationwide's motion to dismiss pending a resolution of the jurisdictional question; and he ordered the parties to address "whether the resulting damages would still be greater than $75,000 as required for diversity jurisdiction under §1332."  *Id.*

---

[2] Because this case was commenced prior to the passage of the Class Action Fairness Act of 2005, and because that Act has no retroactive effect, the Act's mechanism for aggregating the damages of absent class members does not apply to this case.

The parties filed their jurisdictional submissions in September 2006; and while they did not agree in all particulars, they did agree that the predecessor judge's prior analysis of subject matter jurisdiction -- under which this Court's jurisdiction was sustained, and the Eames plaintiffs' motion to remand was denied -- was unaffected by the dismissal of the "Maximum Limits" theory.  *See* D.I. 219, 222.

### D.  **The Procedural Posture Before the Magistrate Judge**

The posture of Nationwide's motion to dismiss the amended complaint, as it came before the Magistrate Judge, can be easily gleaned from the August 2006 Memorandum Opinion:

> In their pending Motion, Nationwide argues that the Amended Complaint should be dismissed pursuant to Rule 12(b)(6) because (1) Plaintiffs' claims are barred by the statute of limitations, (2) Plaintiffs have failed to plead fraud with the necessary particularity, (3) Plaintiffs have failed to plead harm, (4) Plaintiffs failed to state a claim for civil conspiracy, and (5) Tammy Eames has no standing to bring the asserted claims.  As discussed below, I conclude that Plaintiffs' claims are time-barred to the extent that they rely on the ["maximum limits" theory] . . . .  Because that conclusion raises a question as to whether the amount in controversy is still more than $75,000, I will reserve my decision on the remaining grounds for dismissal and require the parties to address the jurisdictional issue.

*Eames II*, slip op. at *3 (Ex. B).

Nationwide's motion to dismiss the amended complaint thus presented the Court with five distinct arguments.  The predecessor judge decided the first point (the limitations argument) partly in Nationwide's favor, and partly in our favor.  The remaining four points were reserved for decision pending a resolution of the subject-matter-jurisdiction question, which has since been resolved.

As the predecessor judge's summary confirms, however, Nationwide ***did not argue*** that the Eames plaintiffs failed to allege any actual misrepresentation at all -- that point having been

decided when the predecessor judge held that the original complaint "appears to allege false representations by Nationwide . . . ." *Eames I*, 412 F. Supp.2d at 437.[3]

Following the predecessor judge's elevation to the Third Circuit, it was thus left to the Magistrate Judge to decide the remaining four issues on Nationwide's motion, beginning with the "particularity" issue.

### E.  <u>The Magistrate Judge's Report and Recommendation</u>

The Report and Recommendation addressed three pending motions: a motion for reconsideration filed by the Eames plaintiffs, a motion to strike filed by Nationwide, and Nationwide's motion to dismiss the amended complaint.  Again, these objections are directed only to the Magistrate Judge's recommendations on the motion to dismiss.

As demonstrated above, the four issues that the predecessor judge reserved in his August 2006 decision included Nationwide's claims that 1) the Eames plaintiffs had failed to plead fraud with particularity, 2) the Eames plaintiffs had failed to plead harm, 3) the Eames plaintiffs had failed to state a claim for civil conspiracy, and 4) Tammy Eames has no standing to assert the plaintiffs' claims.  *Eames II*, slip op. at *3.  Consequently, these were the only issues that were properly before the Magistrate Judge; and they were the only issues briefed by the parties.

This last point deserves special emphasis.  Nationwide's opening memorandum in support of its motion to dismiss the amended complaint is attached, for the Court's convenience, as Exhibit C.  The "particularity" argument -- which gave rise to the Magistrate Judge's conclusion that the amended complaint contained no "true" claim of misrepresentation -- appears at pages 6 through 13 of Nationwide's memorandum.  Throughout those pages Nationwide asserts a lack of

---

[3] The allegations that led to this holding were, of course, repeated in the amended complaint, which elaborated on (but did not delete or omit) the factual allegations of the original complaint.  *See generally* D.I. 158 (amended complaint showing deletions and additions).

detail in the pleading, just as one would expect from a "particularity" brief. But nowhere does Nationwide argue that no misrepresentation was alleged at all, or (to state it differently) that the merits of the "full PIP" usage could properly be decided at the pleadings stage.

Consider, then, the Eames plaintiffs' position in briefing Nationwide's motion to dismiss. On the one hand, the predecessor judge had twice declared that the pleadings did in fact allege actual misrepresentations (at least for purposes of pleading); and the Eames plaintiffs naturally relied on those decisions. On the other hand, Nationwide's motion to dismiss the amended complaint offered no argument whatever on the ultimate merits of the "full PIP" usage. There was thus no reason for the Eames plaintiffs to brief that ultimate issue, and no reason to expect it to be litigated before the Magistrate Judge.

Unfortunately, the Magistrate Judge determined, *sua sponte*, to do just that. Despite the predecessor judge's prior, repeated assertions that the pleadings had successfully alleged readily discernible theories of misrepresentation; despite the fact that the motion before the Magistrate Judge was a motion to dismiss, and not a motion for summary judgment; and despite the fact merits-related discovery had yet to even begin, the Magistrate Judge held that on the merits, the "full PIP" usage is not a misrepresentation at all:

> As already noted, the misrepresentation Plaintiffs allege is that Nationwide described the statutory minimum PIP coverage of $15,000/30,000 as "full" PIP coverage. However, review of the policy documents, and particularly the Statement demonstrates ***that this is not a misrepresentation***. In the context of the insurance policy purchased by Plaintiffs, "full" PIP coverage means coverage up to $15,000/30,000 with no deductible (*i.e.* zero deductible).

D.I. 247 at 16 (emphasis added) (Ex. A).

In the pages that follow we offer the briefing that we were effectively denied before the Magistrate Judge, on the merits of the "full PIP" usage -- or as much of that briefing as can be

offered in a case where only class-certification-related discovery, and no merits discovery, has been taken. We also offer our observations on the question of whether ordinary consumers might be confused or misled by the Magistrate Judge's own formulation, which (we should emphasize) translates directly to *Full PIP coverage means minimum coverage with no deductible*. Finally, we ask this Court to uphold the law of the case, established by the predecessor judge, under which "the Complaint appears to allege false representations by Nationwide that were known to be false and that damaged plaintiffs and other class members." *Eames I*, 412 F. Supp.2d at 437.

## <u>SUMMARY OF ARGUMENT</u>

1. By holding that the Eames plaintiffs failed to allege any actual misrepresentation, the Magistrate Judge improperly reversed the settled law of the case. The predecessor judge previously held that for purposes of pleading, both the original and amended complaints alleged misrepresentations. That decision is (or properly should be) binding on the Magistrate Judge.

2. The issue on a motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). By injecting *sua sponte* the issue of the ultimate merits of Nationwide's "full PIP" usage -- as opposed to the purely procedural issue of the particularity of the plaintiffs' pleading -- the Magistrate Judge thus turned Rule 12(b)(6) on its head. He also deprived the Eames plaintiffs of any fair opportunity to brief the ultimate merits of the "full PIP" scheme, which was not raised in Nationwide's opening brief on the motion to dismiss.

3. Because the dedicated phase for merits-related discovery has not even begun, the Magistrate Judge's approach deprived the Eames plaintiffs of the opportunity to take such

discovery with respect to the "full PIP" scheme.  But an informed decision on the scheme's ultimate merits requires a detailed examination of Nationwide's business practices, insurance industry usage and other factors.

4.  Nationwide's "full PIP" usage is ambiguous, confusing and misleading.  To ordinary speakers of standard English, "full" means "maximum"; and when used to describe an item for purchase, it suggests the best and most that money can buy.  That is why a Georgia appellate panel criticized the "full PIP" scheme as "unbelievably misleading."  It is why even the Magistrate Judge's own formulation -- in effect, that *full PIP means minimum PIP* -- would stymie most (if not all) ordinary consumers.

5.  Under accepted insurance industry usage, the term "full coverage" always connotes the maximum available coverage.

6.  Insurance industry jargon often employs the term "coverage" (as in "full coverage" or "additional coverage") to mean ***limits of liability***.  Even Nationwide uses the term this way, and has done so in this very case.  Thus, ordinary consumers may reasonably understand the phrase "full coverage" to mean "full limits."

7.  "PIP," of course, is an acronym for "Personal Injury Protection."  But where PIP coverage (and insurance generally) is concerned, the thing that protects is the policy's limit or benefit.  When an insurance company sells what it terms "full protection" -- the literal meaning of "full PIP" -- ordinary consumers may naturally conclude that they have purchased full limits.

8.  The "Required Statement to Policyholders," on which the Magistrate Judge relies, does not rescue the "full PIP" usage.  That statement merely refers to "Full Coverage with no deductible"; and since "full coverage" may be taken to mean "full limits," it does nothing to cure the ambiguity in Nationwide's other (extracontractual) statements.

9.  In addition, the "Required Statement" is itself hopelessly ambiguous and confusing.

10.  The policy language employed within the "Collision Coverage" section does nothing to remedy the deception.  First, it applies only to the Collision Coverage part, and not to PIP.  Second, it attaches to a coverage part that (unlike PIP) has no specified limit of liability whatever.  As Nationwide's own agent explained, it employs a different underwriting convention from that which underlies PIP coverage.

11.  Whether Nationwide's underwriting practices are deceptive is a jury question.  It should be left to the jury, and decided on a full (merits-related) discovery record.

12.  Because the Eames plaintiffs' consumer fraud claim should properly survive, their civil conspiracy claim should likewise survive.

## STATEMENT OF FACTS

### A.  The Amended Complaint's Allegations

The amended complaint alleges that as a matter of general business practice, and acting through its authorized insurance agents, Nationwide routinely represents to consumers that they are purchasing "full" PIP, when in fact Nationwide contends that the thing sold is just ***minimum*** PIP.  D.I. 158 ¶9.  It further alleges that Nationwide routinely makes these representations through "rate quotes" and other policy-related documents.  *Id*.  It also alleges that when Nationwide has occasion to pay PIP benefits to the affected claimants, "it treats their PIP limits as exhausted once the minimum statutory amount has been paid."  *Id*.

In addition, the Amended Complaint sets forth several allegations specific to (but not unique to) the Eames plaintiffs.  It alleges that they have been subjected by Nationwide to the offending practice.  *Id*. ¶13.  It alleges specific oral and written representations made to the Eames plaintiffs by Nationwide (through Nationwide's insurance agent), and promising them

"full" PIP.  *Id*.  It further alleges that the earliest of these representations (oral and written) were made to the Eames plaintiffs in or about March 1994, when the Nationwide auto policy was first sold to them.  *Id*.  It next alleges that, following the Eames plaintiffs' February 7, 2003 collision (in which all three plaintiffs sustained injuries, and thus became PIP claimants) Nationwide made additional written representations characterizing their PIP coverage as "full."  *Id*.  Finally, the amended complaint alleges that by letter to the Eames's attorney dated June 13, 2003, Nationwide took the position that Mr. Eames's PIP coverage had been exhausted, on an "each person" basis, by virtue of Nationwide's payment of the minimum limit -- meaning that Nationwide contends that PIP limits under the Eames's policy are subject to the statutory minimum of $15,000 per person, $30,000 per accident.  *Id*.

So that the Court may better appreciate the amended complaint's level of detail, we reproduce in full the allegations of paragraph 13:

> 13.  In connection with their claims for PIP benefits, the proposed class representatives have been subjected by Nationwide to the practices complained of above, including the practices alleged in paragraphs 9 and 10 above.  Specifically, Nationwide has represented to one or more of the proposed class representatives that the subject policy provides "full" limits of liability for PIP coverage; and it has thereafter taken the position that such limits have been exhausted by payment of the minimum statutory amount:
>
> a.  In approximately March 1994 Nationwide, acting through its agent Culver Insurance Agency of Seaford, Delaware (now known as Muncie Insurance & Financial Services, Inc.), sold the subject policy to Mr. and Mrs. Eames.  On or about March 14, 1994, and in connection with that sale, the Culver agency (acting for Nationwide) represented that the policy would provide "full" limits of liability for PIP coverage.
>
> b.  On information and belief, the document attached as Exhibit A (or one or more documents substantially identical to it) was shown to Mr. or Mrs. Eames, or both, by a representative of

the Culver agency, and at the time the policy was purchased in March 1994.

c. On information and belief, one or more representatives of the Culver agency represented orally to Mr. or Mrs. Eames (or both) that the subject policy would provide "full" limits of liability for PIP coverage. These representations were made on behalf of Nationwide, and at the time the policy was sold to Mr. and Mrs. Eames in or about March 1994.

d. On information and belief, the offending representations were made by Culver employees Keith Culver, Linda Sanders or both. They may also have been made by other representatives of the Culver agency.

e. The nature of insurance is such that representations may be deemed to have been made in connection with the insurance's sale even after (and long after) the payment of an initial premium or the initial issuance of policy-related documents. Representatives of the Culver agency have made such representations to Mr. and Mrs. Eames (on Nationwide's behalf) subsequent to March 1994. These representations are reflected, in whole or part, by the document attached as Exhibit B (dated February 8, 2003, and in which the Culver agency represented "PIP" as "FULL"); and by the separate document attached as Exhibit C (issued on or about June 17, 2003, and in which the Culver agency represented "PERSONAL INJURY PROTECTION" as "FULL.")

f. On or about June 13, 2003 (and in the aftermath of the February 7, 2003 collision) Nationwide advised Mr. Eames by letter that he had "exhausted his/her benefits under the PIP/NO FAULT portion of this insurance policy" (meaning the policy issued by Nationwide to Mr. and Mrs. Eames). A copy of this letter is attached as Exhibit D.

g. Despite its repeated representations to the contrary, Nationwide contends that Mr. and Mrs. Eames's policy provides only the minimum statutory PIP limits (of $15,000 per person and $30,000 per accident).

D.I. 158 ¶13 (citation omitted).[4]

_____

[4] Note that exhibit references in this passage are to the exhibits that accompanied the amended complaint.

The amended complaint thus alleges date, place and time, placing Nationwide on notice of the precise misconduct complained of. *See Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985) (citing *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir. 1983) in warning against a "too narrow" approach to Rule 9(b)). *See also Johnson v. GEICO Cas. Co.*, 516 F.Supp.2d 351, 358 (D. Del. 2007) (citing *Seville* to same effect); *Homsey v. Vigilant Ins. Co.*, 496 F. Supp.2d 433, 439 (D. Del. 2007) (same).

**B. How Nationwide Does It**

**1. The Rate Quotes, Rate Quote Letters, Binders, Etc.**

On August 9, 2005, the Eames plaintiffs took the Rule 30(b)(6) deposition of the Glenn Deaton agency, one of Nationwide's most prolific Delaware agents, through its designee, Glenn Deaton. Mr. Deaton testified that virtually his entire book of business (and all his auto business) involves the sale of Nationwide products. Ex. D at 5-6. Mr. Deaton gave detailed testimony regarding the process by which Nationwide agents sell auto insurance in Delaware:

> Q:  *** If I ask you to give me a step-by-step description of the process by which an ordinary Delaware consumer in your neighborhood comes in and purchases a Nationwide auto policy, could you do that for me?
>
> A:  Yes, I could.
>
> Q:  Okay.  Would you, please?
>
> A:  Sure.  Once a quote is given -- generally, the process starts by an individual requesting a quote for what the coverage would be. We would --
>
> Q:  I'm sorry.  I don't mean to interject.  Along the way I may ask you to clarify a term here or there.
>
> A:  Sure.

15

Q:  By "quote" your referring to the consumers asking how much will it cost me to buy auto insurance?

A:  They would like a price quotation for the cost of coverage.  We would gather the required information that is needed to prepare a quote, certain personal information about the type of vehicle, driving record, information about the driver and so forth.  Once the quote is prepared and given and accepted the application process would start where we would basically complete the Nationwide application on the computer, generate an application, going through the various information as needed about drivers and so forth, the vehicle and coverages.

**\*\*\***

Q:  When all of that was completed what would happen?

A:  The premium would be collected based on the applicant's choice of pay plan.  There are a variety of different pay plan options available.  We would collect the appropriate premium, provide a receipt.  And we would at that point provide a binder or memorandum of insurance, some proof that the application process had been completed. **\*\*\***

Deaton dep. at 13-15 (Ex. D).  Mr. Deaton elaborated on the practice of sharing written rate quotes with consumers, and the methods by which they are shared:

Q:  Thank you.  This process you've described very patiently for me, which I appreciate, this step-by-step process by which the consumer purchases the auto insurance from Nationwide, as part of that process are documents shared with the consumer at any stage?

A:  Documents, yes.

Q:  For example, is the price quote that you started your description with a written price quote?

A:  Yes.

Q:  And that's a document that's shared with the consumer and he can take home with him?

A:  We do have a formal quote letter when someone asks for a quote that we can provide[,] a user friendly quote letter.  Generally,

that's not sent out on a telephone quote or if someone comes into the office and I provide the quote on the computer and share with them the information on the monitor and they say yes, I would like to purchase that coverage, generally that quote letter is not printed out.  We would go directly into the application process.  Many times we would hot print or screen print, if you will, the quote to show them if they brought their policy with them and they would like to compare, we would print off a document like that.  Which would be just a screen print.  But there is a formal quote letter that can be generated if it's requested.

Q:  Whether the document is generated hard copy or not, is it often the case that the consumers are allowed to see the quote in writing while they're in your office?

A:  Yes.

*Id*. at 19-20.

Rate quotes are thus shared with consumers as a regular part of the insurance agent's business -- and small wonder, since it is generally difficult to sell a product without telling the purchaser its price.  As Mr. Deaton testified, these rate quotes are communicated to consumers in any of four ways: by "formal" rate quote letter; by telephone; by displaying the quote on a computer screen in the consumer's presence; and by a "hot print" or "screen print" of the screen in hard copy.  But however the quote is communicated, it always characterizes PIP as "full."

Representative samples of these various document types were obtained by the Eames plaintiffs through nonparty subpoenas of four Nationwide agents in Delaware.  The document reproduced as Exhibit E is an auto rate quote (titled, appropriately enough, "Auto Rate Quote #1").  In the line entry for PIP -- within the same column that shows limits of liability or deductibles (as the case may be) in dollars for all coverages other than PIP -- the unadorned modifier "FULL" appears.[5]

---

[5] Redactions within the documents produced by the nonparty insurance agents were made by the agents' attorney, ostensibly to protect the privacy of the insureds.

The document reproduced as Exhibit F is a rate quote letter, formatted in a manner closely similar to the rate quote shown at Exhibit E.  In a column otherwise reserved for dollar amounts -- one that reads, for example, "100/300 Per Person/Occurrence" for third-party bodily injury coverage -- PIP is described only by the words "Full Coverage."

Reproduced as Exhibit G is a binder receipt of the type Mr. Deaton described.  Exhibit H is a memorandum of insurance.  Both documents employ the same uniform format, under which the PIP entry for the "dollar amount" column -- the column that shows limits of liability (in dollars) for third-party bodily injury coverage, third-party property damage coverage, etc. -- reads "FULL."  And so it is with the additional document types collected at Exhibit I.

### 2.  <u>The Agency Office Automation System</u>

It is no accident that Nationwide agents throughout Delaware all characterize PIP as "full" in such a broad variety of policy-related documents.  The practice is a routine one because Nationwide's software imposes it on the agent.  This software -- essentially the holy grail of the disputed practice -- is the Agency Office Automation ("AOA") system.

Ironically, The Eames plaintiffs stumbled upon this information while questioning Nationwide's 30(b)(6) designee on the application process generally (as opposed to the "full" usage specifically):

> Q:  Is an application process a requirement of Nationwide?
>
> A:  The application process, I mean it's the only way to actually process whereby the agent is inputting the information into his it's called AOA.  It's an agency office automation system where he's inputting this information.  That process -- you would have no other way of submitting a piece of business that were to be sold to actually Nationwide for that without having to go through that application process.  So it's not that Nationwide requires something like that.  It's just the way, the process of placing the business into Nationwide's portfolio.

Deposition of P. Szlosek, Nationwide's designee, at 43 (Ex. J).  Asked to elaborate on the nature

of the AOA system, Ms. Szlosek described a "front-end input system that the agencies use to

enter new clients' information relative to the sale of insurance."  *Id*.

      Ms. Szlosek explained that the AOA system provides the framework for the entire auto

insurance transaction.  It displays all the relevant data fields, and requires the agent to tab from

field to field as he enters or selects appropriate information -- for example, the insured's name

and address, the make and model of the vehicle to be insured, the types of coverages to be

placed, and the limits of liability for each.  *Id*. at 44.  She further explained that the AOA system

"doesn't skip anything," requiring the agent to hit the tab key as he proceeds from one data field

to the next.  *Id*. at 94-95.

      In other words, Nationwide's Delaware agents do not spend their work days typing in the

word "full" on the PIP line entry.  If the assigned deductible is zero (as is overwhelmingly the

case where Nationwide purports to sell the minimum PIP limits), the AOA system generates the

"full" usage automatically:

> Q:  The word full appears in the next column, does it not?
>
> A:  Yes.
>
>                       \*\*\*
>
> Q:  Mechanically how does that word appear on the document of
> this type?  Do you know?
>
> A:  Yes, I do know.  This is one of the deductible selections that
> ***the agent has to enter*** with respect to the coverage personal injury
> protection.

*Id*. at 96 (emphasis added).  *See also id*. at 98-99 (confirming that the AOA system affirmatively

requires the agent to convey the deductible value zero with the word "full").

3.  **The Mechanics of Deception**

Nationwide's deceptive practice works by exploiting expectations.  It takes a word of ordinary usage ("full") and plain meaning ("maximum").[6]  It places that word where, by convention, it would naturally describe the amount or extent of insurance provided.  It then interprets the word to mean essentially the opposite -- not maximum, but minimum.

We turn, then, to the conventions that feed the natural impression that the modifier "full", placed within the "limits" column, suggests full limits.  They were explained in detail by Mr. Deaton, beginning with comprehensive coverage.

Mr. Deaton confirmed that the dollar amount shown in the "limits/deductibles" column for comprehensive coverage is a deductible (in the example used at Mr. Deaton's deposition, $250) and not a limit of liability.  Deaton dep. at 35 (Ex. D).  The reason, he explained, is that no readily identifiable limit of liability exists for such coverage: the loss's value will depend on the ever-depreciating value of the car, and the extent of the damage -- factors that either change over time or simply cannot be predicted.  *Id*. at 35-36.  The first and most important convention, then, is that where definite limits of liability are identifiable, they are set forth as a dollar amount in the appropriate column; and where they are not, a deductible appears in that space:

> Q:  So the limit of liability is not expressed in that column for comprehensive coverage because it's not a readily identifiable number at the time the policy is purchased?
>
> A:  Correct.
>
> Q:  Rather, it's a number to be determined later based on the depreciating value of the property?
>
> A:  And the amount of damages incurred, correct.

***

---

[6] See MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 471 (10th ed. 1993).

Q:  And the reason that entry [for collision coverage] is expressed as a deductible rather than showing the limit of liability for collision damage is the same reason you explained with respect to comprehensive coverage, right?

A:  Yes.

Q:  It is an unknowable factor at the time the policy is purchased?

A:  Correct.

***

Q:  And the 10,000 indicates, the 10,000 figure in that middle column of the last page of Deaton Exhibit 2 for [third-party] property damage indicates the dollar amount of the limit of liability for property damage coverage?

A:  That's correct.

Q:  And that's expressed as a dollar amount because it is a dollar amount known at the time the policy is purchased?

A:  That's correct.

Q:  When the policy is purchased it's readily ascertainable what the limit of liability is for property damage coverage or bodily injury coverage, right?

A:  Correct.

Q:  And for the bodily injury entry we see 15/30 in the middle column.  Do you see that?

A:  Yes.

***

Q:  So that's the limit of liability for bodily injury coverage?

A:  Correct.

*Id*. at 36-38.  The first convention may thus be expressed as *For that which has an identifiable limit of liability, the limit if liability is shown.*

The second convention -- which can be readily confirmed by reference to any of the sample documents found at Exhibits E through I -- may be expressed as *That which is measured in dollars is expressed in dollars*.  For comprehensive and collision coverage (where deductibles apply), the deductibles are always shown as a numerical dollar amount.  For third-party bodily injury, third-party property damage and uninsured motorist coverage (where identifiable limits are known), the limits are likewise shown as dollar amounts.

With a single exception, these two conventions are uniformly employed; and the Court will find them at work in the columnar coverage descriptions of Nationwide's rate quotes, rate quote letters, binders, memoranda of insurance, vehicle screens and other document types.  But as the reader will have guessed, the exception is PIP.

## 4.  <u>Nationwide's Departure From the First Convention</u>

PIP has, of course, a readily identifiable limit if liability.  The minimum PIP limit is prescribed by statute; and absent some deception, PIP limits (whether minimum, maximum or in between) are readily ascertainable from the moment an auto policy is formed until the day it expires.  Yet according to Nationwide, the documents that set forth limits for all other "limits-based" coverages make no reference to PIP limits.  Instead, says Nationwide, that entry is reserved for the insured's "deductible option" -- indicating whether a deductible was chosen and, if so, in what amount.  D.I. 95 at 6 (Nationwide argues that "full PIP" entries "reflect that the Eames (sic) had elected PIP coverage with no deductible.")  Thus, among the "limits-based" coverages, only the PIP entry fails to inform the consumer of the applicable limits.

**5.  Nationwide's Departure From the Second Convention**

Since PIP is a coverage that can have both a limit of liability and a deductible, one might ask whether Nationwide's decision to express one but not the other is so terribly deceptive after all.  But Nationwide's failure to show the PIP limit is only half the deception.

For the other auto coverages that are sometimes subject to deductibles, Nationwide always expresses the deductible in dollars -- $100, $250 and so forth.  Where the coverage is eligible for a deductible but no deductible is assigned, Nationwide simply leaves the applicable entry blank.  *See* Exs. E through I.  But here again, the only exception is PIP.  For PIP the range of possible deductibles starts at zero, then increases to $250, $500 and so forth.  All those values are expressed numerically (in dollars) but the first: if the PIP deductible is zero, Nationwide conveys that information with the single word "Full."

***

Nationwide thus says that when the limits/deductibles column reads $10,000 in the property damage entry, consumers should conclude that they have $10,000 in property damage coverage; but when the same column reads "full" in the PIP entry, they should ***not*** conclude that they have full PIP.  Instead, they should understand, with no risk of confusion, that the word "full" conveys the numerical value "zero":

> Q:  Going from lowest [deductible] to highest, it would be full, then $100, then $250 and then $500, right?
>
> A:  Mm-hmm.
>
> Q:  You have to answer yes or no.
>
> A:  Yes.
>
> Q:  So in that progression full has a dollar value of zero, right?
>
> A:  Correct.

> Q:  The other values are expressed in dollar values within the agency office automation system, right?
>
> A:  Correct.

Szlosek dep. at 99 (Ex. J).

### 6.  <u>Nationwide's Motive</u>

Sellers of goods and services usually seek to sell ***more*** goods and services, not less.  So why would Nationwide use deception to discourage the sale of more PIP?  Why would it promote a consumer's mistaken belief that he had purchased more than the minimum limits?  Or that the minimum limits were all he could possibly purchase?

The Amended Complaint answers this directly: "Nationwide pursues this [deception] because its loss ratio on PIP claims has historically been unfavorable."  D.I. 158 ¶ 10.  Though Nationwide will deny this allegation, there is substantial evidence to support it.

The Eames plaintiffs took Nationwide's Rule 30(b)(6) deposition on April 11.  REDACTED.  Ex. K.  REDACTED.[7]

As Nationwide's designee acknowledged, REDACTED (Ex. J).  REDACTED.  Ex. K.  REDACTED.

***

---

[7]  "Loss ratio" is, in simplest terms, the ratio of money going out to money coming in -- that is, the ratio of net sums spent on claims handling and claims payment to net earned premium.

It must be remembered, meanwhile, that the facts outlined above are the product of class-certification-related discovery only. Under the Court's March 28, 2005 Scheduling Order, and pursuant to a subsequent "So Ordered" entry with respect to the parties' scheduling stipulation, no merits-related discovery is permitted until Nationwide's motion to dismiss and the Eames plaintiffs' motion for class certification are decided. D. I. 43, 204. But even the limited discovery permitted to date confirms that this is a complex case involving a complicated and widespread corporate practice. That practice cannot properly be understood by reference to a few scraps of paper on a *sua sponte* basis. What is required, rather, is a full discovery record of the type that plaintiffs are routinely afforded in all but the rarest cases. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) for the proposition that on a motion to dismiss the issue "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'")

***

Finally, one point of clarification is in order. In his Report and Recommendation, the Magistrate Judge says that at oral argument, "Plaintiffs' counsel acknowledged that . . . 'full coverage' means 'full coverage with no deductible.'" D.I. 247 at 17 n.5 (citing hearing transcript, D.I. 244 at 11-13). We were astounded to read that assertion, since we would never say what the Magistrate Judge attributed to us in a million years.

The cited passages from the hearing transcript actually show that counsel merely accepted a proposition that he opposes for the sake of argument only, and in order to demonstrate its fallacy:

> THE COURT: Okay. But we are in agreement that [page] A50 says full coverage with no deductible.

MR. SPADARO: In part, sure.

THE COURT: And that means zero deductible.

MR. SPADARO: Well, that means full coverage.

THE COURT: That means zero, right?

MR. SPADARO: Full coverage with zero deductible, but what does full coverage with zero deductible mean?  Full coverage is not some sort of isolated term.  You find it throughout the world of insurance.  And wherever you find it, except in this lawsuit, when someone says full coverage, they're talking about the breadth of coverage.

***

When Nationwide says full, what they mean is no deductible.  Let's first, ***for the sake of argument***, embrace that proposition.  Now, how does that fit into Delaware's contract construction regime? *** [C]ase after case all say that the insurers['] unilateral intent means nothing.  *** Nationwide is not allowed to adopt some sort of linguistic regime that means something to Nationwide and its insurance agents but may mean something else to reasonable consumers.

D.I. 244 at 11-13 (emphasis added).

No objective reader should fail to appreciate that counsel's remarks squarely rejected Nationwide's construction of "full coverage" as 1) contrary to the plain meaning of the term, as understood by reasonable consumers, and 2) untenable under settled rules of construction.  With all respect, the fact that the Magistrate Judge construed these remarks as the Eames plaintiffs' Waterloo -- a sort of global surrender of their entire theory of the case -- demonstrates his misapprehension of the arguments and issues.

## ARGUMENT

### I. THE REPORT AND RECOMMENDATION IS CONTRARY TO THE SETTLED LAW OF THE CASE

The predecessor judge held over two years ago that "[w]hen read in the light most favorable to Plaintiffs, the Complaint appears to allege false representations by Nationwide that were known to be false and that damaged Plaintiffs and other class members." *Eames I*, 412 F. Supp.2d at 437. A comparison of the original pleading to the amended complaint confirms that all of the factual allegations that informed this holding were reiterated in the amended pleading. It is thus not surprising that in reviewing the amended complaint, the predecessor judge was able to discern both the nature of the alleged misrepresentations and the way in which they tend to deceive. *Eames II*, slip op. at *1 (explaining that under the Eames plaintiffs' theory of the case, "the use of 'full' [is] a misrepresentation in two respects") (Ex. B).

Under the doctrine of the law of the case, "once an issue has been decided, parties may not relitigate that issue in the same case." *Waldorf v. Shuta*, 142 F.3d 601, 616 n.4 (3d Cir. 1998). *And see Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 210 n.7 (3d Cir.2003) (citing *Waldorf*). Because the predecessor judge has already held, after careful consideration, that the pleadings do in fact allege actual misrepresentations, the law of the case should not be disturbed by the Magistrate Judge. Yet the Magistrate Judge has flat-out *reversed* the predecessor judge on this point. Where the predecessor judge says that the pleadings "appear[] to allege false representations by Nationwide," the Magistrate Judge holds that the alleged conduct "is not a misrepresentation." D.I. 247 at 16 (Ex. A).

There is simply no reconciling these two perspectives. The predecessor judge held that, as a matter of pleading, actual misrepresentations had in fact been alleged. The Magistrate Judge holds under Rule 12(b)(6) that the same pleading alleges no true misrepresentations.

To restore the law of the case, and to avoid the odd procedural prospect of a Magistrate Judge's reversing a district court judge, the Magistrate Judge's conclusion -- that the amended complaint fails, as a matter of pleading, to allege any actual misrepresentation -- should be reversed.  The Magistrate Judge can then proceed to address the four issues (including the "particularity" issue) that the predecessor judge reserved for decision in *Eames II*.

## II.  <u>ADJUDICATION OF THE MERITS IS PREMATURE</u>

The Magistrate Judge was asked to decide a motion to dismiss under Rule 12(b)(6).  The issue on such a motion is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997).

As demonstrated above, the practices complained of are complex in origin; and they can best be understood only in the context of a full record.  But here, where merits-related discovery has yet to even begin, no such record is possible.

In short, the Magistrate Judge wrongly converted Nationwide's motion to dismiss into a motion for summary judgment.  By doing so, he unwittingly deprived the Eames plaintiffs of the discovery record that might one day inform such a motion.  This Court should thus uphold the Eames plaintiffs' objections, and remand the matter to the Magistrate Judge for resolution of the predecessor judge's "reserved" bundle of issues.  Finally, if and when the merits of the "full PIP" usage come before this Court under Rule 56, they should be decided on a full discovery record, and with the benefit of relevant case law and prevailing insurance industry usage on the meaning of "full coverage" (which the Magistrate Judge never considered).

### III.  NATIONWIDE'S "FULL PIP" USAGE IS AMBIGUOUS, CONFUSING AND MISLEADING

"Full" means "maximum."  Thus the first three listed entries in Dictionary.com all convey, expressly or by implication, the concept "maximum":

> 1.  completely filled; containing all that can be held; filled to utmost capacity: *a full cup.*
>
> 2.  complete; entire; maximum: *a full supply of food for a three-day hike.*
>
> 3.  of the maximum size, amount, extent, volume, etc.: *a full load of five tons; to receive full pay.*

Http://dictionary.reference.com/browse/full (last visited on April 16, 2008).

Given the (adhesive) nature of automobile insurance contracts and the nature of consumer-insurer relations, it is suspect on its face for an auto insurer to employ the usage "full PIP" in any transaction that purports to sell minimum PIP limits.  Minimum, after all, is the direct opposite of maximum.

Nationwide's usage is thus inherently ambiguous.  Where minimum PIP is sold, no modifier whose primary meaning is "maximum" should come within a hundred miles of the transaction.  Yet the organic ambiguity is only part of the story.

As shown above, the offending document types all employ the same columnar format. When Nationwide completes the limits entry for coverages that involve policy limits, it always sets forth an actual policy limit in dollars.  When that entry involves a deductible but no policy limit, it conveys the deductible in dollars.  But for PIP, which can involve both a policy limit ***and*** a deductible, it conveys neither: it neither displays the PIP limits in dollars (as, for example, $15,000 per person and $30,000 per accident); nor does it convey the absence of a deductible with the dollar value $0, the word zero, or the words "no deductible."  Instead, it avoids any

mention of policy limits altogether, while purporting to convey the dollar value zero with the single word "full."  And ordinary consumers are supposed to grasp this?

Small wonder that the practice has attracted judicial criticism.  In *Hardy v. Nationwide Ins. Co.*, 356 S.E.2d 38 (Ga. Ct. App. 1987), the Georgia Court of Appeals addressed Nationwide's simultaneous characterization of PIP as both "basic" and "full" -- a different and less problematic practice than the one challenged here, but a closely similar one nonetheless. Specifically, *Hardy* was a case in which the PIP claimant signed a Nationwide insurance application in the following format:

> [T]he second page of the application for insurance in this case provided the applicant . . . with a seriatim selection of a number of available coverages, including "BASIC PERS INJURY PROT" and, immediately below, "ADD PERS INJURY PROT".  To the right of the basic PIP selection was a box labeled "FULL COVERAGE"; this box was marked with an "X."  To the right of the additional (or optional) PIP selection was a series of boxes labeled "$5,000," "$20,000" and "$45,000," respectively; none of these boxes was marked.

*Hardy*, 356 S.E.2d at 39.  Because the form expressly denominated **basic** PIP, the Court of Appeals found that it was not confusing:

> The application here plainly separates the selection of **basic** PIP coverage from the selection of additional PIP coverage.  [The Georgia statute] mandates $5,000 minimum PIP coverage on motor vehicles registered in this state.  The term "FULL COVERAGE" when used in conjunction with the selection of **basic** PIP coverage on the application obviously means full PIP coverage in the amount of $5,000.

Id. (emphasis added).

But the features that rescued Nationwide in the *Hardy* case are absent here.  The documents targeted by the Eames plaintiffs -- the rate quotes, memoranda of insurance, etc. --

make no reference to *basic* PIP.  Nor do they contrast basic PIP from additional PIP, or offer a

menu of specified dollar limits.

The Court should also consider Judge Carley's special concurrence in *Hardy*.  In that

special concurrence, Judge Carley criticized Nationwide's use of the "full" modifier as

*unbelievably deceptive*:

> I am constrained to concur in the result reached by the majority
> that the application form complies with the current statutory
> language . . . .
>
>                                               ***
>
> With that preface, I cannot help but opine that this form, while
> admittedly barely complying with the new statute, is ***unbelievably
> deceptive*** in that the block wherein one may indicate his selection
> of only basic personal injury protection is captioned by the words:
> "FULL COVERAGE."  Especially is this a less than adequate
> description in view of the fact that there is absolutely no coverage
> which may be purchased that is ***less*** than that which is designated
> as "FULL COVERAGE."

*Hardy*, 356 S.E.2d at 40 (emphasis added in part).

Again, the Magistrate Judge reached his conclusion -- that the "full PIP" usage is no

misrepresentation at all, even for purposes of pleading -- in derogation of the law of the case, and

without the necessary discovery record.  But it should be clear from *Hardy* that his interpretation

is not the only one possible: reasonable, experienced and thoughtful jurists have found the "full

PIP" usage "unbelievably" deceptive.

### IV.  THE MAGISTRATE JUDGE'S FORMULATION IS ITSELF CONFUSING

The Report and Recommendation states flatly that the "full PIP" usage is not a

misrepresentation because "[i]n the context of the insurance policy purchased by Plaintiffs, 'full'

PIP coverage means coverage up to $15,000/30,000 with no deductible . . . ."  D.I. 247 at 16 (Ex.

A).  But what does this formulation mean?

The reference to "coverage up to $15,000/30,000" is, of course, to the statutorily-required *minimum* PIP limits.  The Magistrate Judge's formulation thus translates directly to *Full PIP means minimum PIP with no deductible* -- a phrase that is inherently confusing and not a little Orwellian.  It also contains, as a primary clause, the notion that *Full PIP means minimum PIP*.  That formulation has all the crystal clarity of *free for five dollars*.

### V.  UNDER ACCEPTED USAGE IN THE INSURANCE INDUSTRY, AND IN THE CONTEXT OF INSURANCE LAW, "FULL COVERAGE" CONNOTES THE MAXIMUM AVAILABLE COVERAGE

References to "full coverage" abound in insurance policies, insurance-related documents and case law.  The term often, if not always, connotes a "maximum" in terms of the dollar amount of coverage; in other words, the maximum available limit.

This can be seen in *Elliott v. Liberty Mut. Ins. Co.*, 983 F.2d 1055 (4th Cir. 1993), in which the Fourth Circuit repeatedly uses the term "full UM [or uninsured motorist] coverage" to mean the highest UM limits of liability available.  *Elliott*, slip op. at * 1-4 (Ex. L)[8].  The same usage appears in *Riccio v. Allstate Ins. Co.*, 357 So.2d 420 (Fla. Ct. App. 1978), in which a Florida appellate court repeatedly invokes the term "full coverage" to mean *highest limit*.  *Riccio*, 357 So.2d at 421-22.

Even Nationwide uses the term "coverage" (as in "full coverage" or "additional coverage") to mean *limits of liability*.  In a brief filed in late 2006, Nationwide repeatedly referred to the purchase of higher PIP *limits* as a purchase of higher PIP *coverage*:

> On June 17, 2003 (when they added the new family car to their policy), Plaintiffs elected to purchase *additional PIP coverage*.  In fact, they elected to purchase the *maximum additional PIP coverage* available.

---

[8] Though listed in the Federal Reporter, *Elliot* is an unpublished entry in a table of opinions.

> The [policy's] Declarations and Endorsement . . . confirm that Plaintiffs purchased the additional Personal Injury **Protection**.  As the Court can see, they purchased additional PIP (or "APIP") with limits of $85,000/$270,000.  When added to their $15,000/$30,000 coverage required by law, this gave Plaintiffs the maximum combined PIP available -- $100,000/$300,000.

D.I. 220 at 4 (emphasis added).  In this passage, Nationwide equates the terms "limits," "coverage," and "protection," so that the purchase of more limits is a purchase of more coverage (in the form of Personal Injury Protection).  By the same accepted usage, a sale of full PIP *coverage* may reasonably be construed, by consumers and insurers alike, as a sale of full PIP *limits*.

### VI.  "FULL PIP" MEANS FULL PROTECTION, AND THE PIP LIMIT IS THE THING THAT PROTECTS

Though the Magistrate Judge employed the terms "full coverage" and "full PIP coverage," the usage that matters most (because it is far more prolific) is somewhat different.  As shown in the documents collected at Exhibits E through I, Nationwide's most frequent usage is to insert (through the AOA system) the unadorned adjective "FULL" in the entries marked "PIP" or "Personal Injury Protection."

In other words, the "full PIP" usage is by far the most common device for discouraging the purchase of additional PIP limits.  The final *P* in "PIP," meanwhile, means *protection* (as in "Personal Injury Protection").  To employ the modifier "full" in an entry marked "PIP" is thus to tell the consumer directly that he has *full protection.*

The thing that "protects" in Personal Injury Protection is, of course, the policy limit.  The absence of a deductible does not "protect," since a person with no insurance at all also has no deductible.  But only those with the benefit of a PIP limit -- in this case, financial protection (which always comes in the form of money) -- have protection.

Whatever else "full PIP" may mean, and whatever Nationwide claims it means, its plainest, most direct and inescapable meaning is "full Personal Injury Protection."  Because the PIP limits (*i.e.*, money) are the thing that protects, ordinary consumers may reasonably understand "full protection" to mean "full limits."

## VII.  THE "REQUIRED STATEMENT" DOES NOT RESCUE THE "FULL PIP" USAGE

The Magistrate Judge placed heavy reliance on the document titled "Delaware Motorists' Protection Act, Required Statement to Policyholders" (the "Required Statement").  But that reliance is misplaced.

For the Court's convenience, a copy of the Required Statement is attached as Exhibit M. Under column B, and alongside the entry for PIP, it refers to "Full Coverage with no Deductible."  This, the Magistrate Judge said, must explain the references to "full PIP" in Nationwide's extracontractual documents.  D.I. 247 at 16-17.  This led the Magistrate Judge to conclude that "'full' PIP coverage means coverage up to $15,000/30,000 with no deductible . . . ." *Id*. at 16.

But this makes no sense.  If the terms "full PIP" and "full PIP coverage" mean "minimum coverage with no deductible," then the formulation employed by the Required Statement ("Full Coverage with no Deductible") would necessarily mean "minimum coverage ***with no deductible with no deductible***."  That is, if the "no deductible" component is (as the Magistrate Judge insists) embedded within the term "full coverage", it would not need to be tacked on as a suffix to that term.  Rather, it would be enough to simply say "full coverage," and (according to the Magistrate Judge) thereby convey the simultaneous concepts of minimum limits and zero deductible.

But in truth, when "full" is inserted beside an entry marked "PIP," it conveys nothing about the deductible. To ordinary consumers, "full PIP" and "full coverage" mean maximum (not minimum) limits. The Required Statement's reference to "Full Coverage with no Deductible" thus translates, without torture or strain, to ***maximum limits with no deductible***.

But the Magistrate Judge's misreading of the Required Statement is perhaps understandable in light of the document's internal contradictions. As any ordinary reader can tell, the document was completed not by Mr. Eames but by Linda Sanders, Nationwide's insurance agent. (A comparison of Ms. Sanders's signature on the document to the various entries in column C confirm this.) In column B, the agent was to select either "Minimum Limits" or "Additional limits as shown in Column C." Ex. M. Instead, she proceeded to tick off "Minimum Limits," and then manually write ***additional*** limits in the column C entry. *Id.* She then ticked off the "Full Coverage with no Deductible" entry, leaving the document an incomprehensible mess. For a case of this size, complexity and importance to be scuttled on such flimsy evidence as this, and without the benefit of discovery, should be unthinkable.

In short, the Required Statement is hopelessly ambiguous and confusing -- so confusing that Nationwide's professional insurance agent failed to understand it, and was unable to complete it in any sensible way. Its reference to "Full Coverage with no Deductible" cannot possibly mean what the Magistrate Judge says it means, without rendering that phrase an awkward and silly redundancy. The Magistrate Judge's recommendation should thus be reversed.

## VIII.  THE COLLISION COVERAGE SECTION
## <u>DOES NOT REMEDY THE DECEPTION</u>

The policy text on which Nationwide has relied throughout this case is attached as Exhibit N.  From that document the Magistrate Judge plucked a single passage from the "Collision Coverage" section, as evidence of the supposed clarity of the "full PIP" usage.

Specifically, the "Collision Coverage" section promises that Nationwide "will not subtract the deductible amount for broken glass if you have full (no deductible) Comprehensive coverage in force."  Ex. N at P1.  The Magistrate Judge treats this passage as an all-purpose definition of the term "full coverage", to be applied to every coverage section in the policy.

But that is not the policy that Nationwide drafted.  Rather, Nationwide's policy sets forth both a general definitional section, and a dedicated definitional section for PIP coverage.  *Id*. at D1, N1.  Neither definitional section supplies any special definition of the term "full coverage."

Of course, if "full coverage" *did* mean "no deductible" (as suggested by the Collision Coverage passage), then the Required Statement's reference to "Full Coverage with no Deductible" would mean *no deductible with no deductible* -- another in a string of absurdities that surround Nationwide's litigation posture.  Further, the selected passage from the Collision section does nothing to illuminate the many references to "full PIP" that appear in Nationwide's binders, rate quotes, memoranda of insurance, etc.: whatever "full coverage" may mean, *full PIP* (that is, "full protection") must mean *maximum limits*.

But the Magistrate Judge was comparing apples to oranges in any event.  As Nationwide's insurance agent, Mr. Deaton, explained, Collision Coverage is measured not by any policy limit, but by the presence, absence and amount of the deductible.  This is because the future value of a broken windshield cannot be determined with any reasonable certainty at the

time the policy is sold; rather, it is a function of the vehicle's depreciation over time, and the ever-changing (usually inflating) market prices:

> Q:  So the limit of liability is not expressed in that column for comprehensive coverage because it's not a readily identifiable number at the time the policy is purchased?
>
> A:  Correct.
>
> Q:  Rather, it's a number to be determined later based on the depreciating value of the property?
>
> A:  And the amount of damages incurred, correct.
>
> \*\*\*
> Q:  And the reason that entry [for Collision Coverage] is expressed as a deductible rather than showing the limit of liability for collision damage is the same reason you explained with respect to comprehensive coverage, right?
>
> A:  Yes.
>
> Q:  It is an unknowable factor at the time the policy is purchased?
>
> A:  Correct.

Deaton dep. at 36-37 (Ex. D).

In other words, the term "full coverage" in the context of collision insurance *must* refer to the presence or absence of a deductible, and *cannot* refer to the value of the policy limit, because collision damage is subject only to deductibles (and not policy limits).  The same term, when used in connection with PIP coverage, involves the *opposite* context: the protection offered by Personal Injury Protection is measured solely in terms of the PIP limit.

These complexities eluded the Magistrate Judge because, again, he chose to resolve complex and fact-intensive issues *sua sponte* with no merits-related discovery record.  Suffice it to say that nothing in the Collision Coverage section rehabilitates Nationwide's "full PIP" usage.

## IX.  <u>THE ISSUE OF DECEPTION SHOULD BE LEFT TO THE JURY</u>

Ultimately, it should not be for the Magistrate Judge, or even the trial judge, to decide whether Nationwide's alleged deception offends ordinary sensibilities.  That issue is intensely fact-driven, and should be left to the jury.  It should also be informed by a full discovery record on the merits -- a record which does not yet exist.

## X.  BECAUSE THE CONSUMER FRAUD CLAIM SHOULD SURVIVE, <u>THE CIVIL CONSPIRACY CLAIM SHOULD LIKEWISE SURVIVE</u>

As the law of the case has already established, the procedural fate of the Eames plaintiffs' civil conspiracy claim is tied to the procedural fate of their predicate consumer fraud claim.  *See Eames I*, 412 F. Supp.2d at 438-39.  Because, as we have shown, the Eames plaintiffs' consumer fraud claim should properly survive the pleading stage, their civil conspiracy claim should likewise survive.

## <u>CONCLUSION</u>

For the reasons stated above, the Eames plaintiffs respectfully request that this Court

uphold their objections to that part of the Magistrate Judge's March 31, 2008 Report and

Recommendation that recommends the dismissal of their statutory consumer fraud claim. With

that accomplished, the remaining issues that the predecessor judge reserved in his August 29,

2006 Memorandum Opinion can then be remanded to the Magistrate Judge for decision.

Respectfully submitted,

<u>/s/ John Sheehan Spadaro</u>
John S. Spadaro, No. 3155
JOHN SHEEHAN SPADARO, LLC
724 Yorklyn Road, Suite 375
Hockessin, Delaware 19707
(302)235-7745

Attorneys for plaintiffs Thomas A. Eames,
Roberta L. Eames and Tammy Eames, on behalf of
themselves and all others similarly situated

April 21, 2008